**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**KATHLEEN SCHAFER, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                      **NO: 06-8262**

**STATE FARM FIRE AND CASUALTY CO., ET AL.**    **SECTION: "K"(2)**

**<u>ORDER AND REASONS</u>**

Before the Court are Motions to Dismiss Case, Strike Amended Complaint Class

Allegations (Rec.Doc.No. 23) filed by Defendant State Farm Fire & Casualty Company ("State

Farm") and to Dismiss Party, Strike Amended Complaint Class Action Allegations (Rec.Doc.No.

29) filed by Defendant Xactware, Inc. ("Xactware"). After reviewing the pleadings, memoranda,

relevant law, and hearing oral argument of the parties on June 13, 2007, the Court grants the

motions in part and denies the motions in part.

**<u>I. BACKGROUND</u>**

1

This lawsuit arises out of a property adjustment dispute between a homeowner's insurer and policyholders relating to damages sustained when Hurricane Katrina struck the city of New Orleans on August 29, 2005. Specifically, Plaintiffs' claims relate to the methodology employed by State Farm and/or its agents in adjusting Plaintiffs' property damage claims.

Prior to the storm, Plaintiffs Kathleen and Gordon Schafer ("Schafers") obtained an insurance policy from Defendant State Farm for their property located at 3128 State Street Drive, New Orleans, Louisiana. Like many others, Plaintiffs sustained substantial damage to their home because of Hurricane Katrina. Pursuant to the terms of their homeowner's policy, they presented their claim for damages and/or loss to State Farm. Subsequently, State Farm sent independent adjusters to the Plaintiffs' property to determine the extent of the loss.

It is alleged that State Farm and/or its agents used a computer software program called Xactimate in determining the value of the loss. Xactimate is a computer software program created and distributed by Defendant Xactware. It is designed to calculate the replacement value of damaged property at issue. Plaintiffs describe Xactimate as follows:

> Xactimate is used by the insurance claims adjuster entering in the damaged immovable property component parts (e.g. drywall or siding) and the size of the damaged property (e.g. square feet or linear feet) and the program applies a pre-determined price for that damaged item and calculates that "line item's" replacement cost.
>
> The "line item" prices purportedly include labor, materials and other necessary items for each repair (e.g. nails, caulk, etc.).[1]

---

[1] *See* Am. Compl. ¶ 14, 15 (Rec.Doc.No. 4).

Plaintiffs take issue with the use of the Xactimate program by State Farm claims adjusters for three reasons.  First, Plaintiffs allege that State Farm pressures or requires claims adjusters to accept the pricing database prices in their adjustment calculations.[2] If the adjuster does not use the software,[3] Plaintiffs offer that the adjuster "risk[s] [his] submission being flagged by the insurance carrier's claim examiner and 'kicked back' or rejected, thus, delaying the adjuster's payment."[4] Second, Plaintiffs contend that State Farm receives their own unique pricing database prices that are below the market value,[5] yet "Xactware purportedly determines the line item prices by surveying area contractors, surveying material costs from the area's major suppliers, and/or receiving settled claim amounts."[6] Third, Plaintiffs submit that Defendant

---

[2]     *Id.* ¶ 16.

[3]     Although the allegations suggest an insidious motive on the part of State Farm, the Louisiana Department of Insurance promulgated an emergency rule after Hurricane Katrina requiring that parties use the Xactware software "or similar reputable sources" as a starting point in mediating adjustment disputes. La. Admin. Code tit. 37:XI, Chapter 41, Rule 22, § 4117(B) (2007). Still, the Department of Insurance in promulgating this rule acknowledges that many adjustment disputes remain unresolved since Hurricane Katrina and insureds continue to face the "risk of receiving sub-quality work, or [face] a substantial disparity between repair estimates and customary costs [of repair]." Alternative Procedures for the Resolution of Disputed Residential Insurance Claims arising from Hurricane Damage, 33:5 La. Reg. 795 (May 20, 2007).

[4]     Am. Compl. ¶ 17.

[5]     "State Farm has a special 'profile' designed into the Xactimate program which can be loaded by claims adjusters when working with that particular insurance company. State Farm receives its own pricing database prices which are slightly different from the Xactimate standard prices, although all are below market value." *Id.* ¶ 23, 24.

[6]     *Id.* ¶ 19.

Xactware "closely works with many insurance companies"[7] who also receive similar below market pricing database prices and have special "profiles"[8] in the Xactimate program. It is this alleged scheme that Plaintiffs suggest ultimately causes Plaintiffs to pay out-of-pocket for repairs or substantial delay in obtaining repairs.

In connection with these allegations, Plaintiffs seek to bring a class action against State Farm and Xactware on the belief that "thousands of other insureds across the state of Louisiana on or about August 29, 2005, had in full force and effect homeowner's insurance contracts with State Farm" and were affected by the arrangement between Xactware and State Farm and between Xactware and other homeowner's insurance companies.[9]

In addition to these class allegations, Plaintiffs bring claims against both Defendants for horizontal price fixing, negligence, and intentional misrepresentation and/or fraud, and breach of contract.[10]

Defendant State Farm here seeks dismissal of the claims for horizontal price fixing, negligence, violations of Louisiana insurance law, and fraud. Moreover, State Farm seeks dismissal of the class action allegations arguing that individualized issues predominate over

---

[7] *Id.* ¶ 20.

[8] *Id.* ¶ 23.

[9] *Id.* ¶ 31.

[10] Although the breach of contract allegation in Count II of the Amended Complaint only implicates State Farm, the breach of contract allegation in Count V refers to "defendants" and could be interpreted as referencing Xactware.

class-wide issues.[11] Defendant Xactware brings their motion to dismiss also seeking dismissal of the substantive claims as well as the class action allegations.[12]

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rule of Civil Procedure provides that in response "to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim" the pleader may raise by motion the defense of "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004)(quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). "[T]he plaintiff must plead enough facts to state a claim to relief that is plausible on its face" in order to survive a Rule 12(b)(6) motion to dismiss. *Bell Atl. Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).[13] "Factual allegations must be enough to raise a right

---

[11]     *See* Mot. Dismiss ("State Farm's Motion") at 25 (Rec.Doc.No. 23).

[12]     *See* Mot. Dismiss ("Xactware's Motion") at 14 (Rec.Doc.No. 29).

[13]     This Court has previously stated that a district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Blackburn v. Marshall,* 42 F.3d 925, 931 (5th Cir.1995). The Supreme Court has recently abrogated the often cited "no set of facts" language in *Conley* commenting that the case has been frequently mischaracterized as setting forth a minimum pleading standard when it was simply "describ[ing] the breadth of opportunity to prove what an adequate complaint claims." *Twombly*,

5

to relief above the speculative level, on the assumption that all the allegations in the complaint

are true (even if doubtful in fact)." *Id.* at 1965 (quotation marks, citations, and footnote omitted).

## III. ANALYSIS

**A.      Class Action Allegations**

Defendant State Farm argues that the class action allegations should be dismissed

because the individualized issues predominate over class-wide issues. Specifically, Defendant

State Farm submits that such individualized issues include the following:

       i.       the damage to each putative class member's home;

      ii.      the home repairs needed;

     iii.      whether payments made by State Farm were sufficient to repair the home;

     iv.     whether any repair estimates provided by State Farm included "below market" line items;

      v.     whether payment to the homeowner was based in whole or in part on such "below market" line items, rather than payment

---

127 S.Ct. at 1968. In other words, the *Twombly* court reads *Conley* as standing for the
proposition that "once a claim has been stated adequately, it may be supported by showing any
set of facts consistent with the allegations in the complaint." *Id.* (citing *Sanjuan v. American Bd.
of Psychiatry and Neurology*, 40 F.3d 247, 251 (7th Cir. 1994)(once a claim for relief has been
stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent
with the complaint"). Thus, rejecting the *Conley* "no set of facts" test, the *Twombly* court
employs a plausibility standard for scrutinizing the sufficiency of pleadings in the context of
Rule 12(b)(6) motion to dismiss.

of costs actually incurred;

vi.     the communication between State Farm and the proposed class member regarding their homeowner's insurance claim;

vii.    reliance by the claimant;

viii.   the timeliness of State Farm's payments; and

ix.     whether delays or errors were arbitrary, capricious, or without reasonable cause.[14]

Defendant Xactware joins in State Farm's argument and also adds that the Amended Complaint contains no allegations that "the preconditions for replacement cost coverage under the State Farm policy have been met and, therefore, lack standing as individuals and prospective class (sic) representative to seek damages based on the alleged failure of State Farm to reimburse them on a replacement cost basis."[15]

Plaintiff opposes the Defendants' Motions to Strike arguing that a class certification hearing is set for December 26, 2007, and the Court's consideration of issues pertaining to the certification would be premature at this time. Notwithstanding the prematurity of examining class issues, Plaintiffs further maintain that they "adequately allege a basis for maintaining class allegations."[16]

The Court finds that consideration of these issues are premature at this time considering that

---

[14]    State Farm's Motion at  3.

[15]    Xactware's Motion at 13.

[16]    *See* Opp. Mot. Strike (Rec.Doc.No. 34).

7

there are pending motions to dismiss to determine which parties and claims will remain in the litigation, and ultimately "because a hearing and proper record will be necessary to decide certification issues." *In re Enron Corp. Securities, Derivative & Erisa Litigation*, 2004 WL 405886, at *24 (S.D. Tex. Feb. 25, 2004).

**B.      Horizontal Price Fixing**

**i.      Applicable Law**

Plaintiffs state their horizontal price fixing claim as follows:

> An agreement, combination or conspiracy between defendants, and other competing companies, existed, at all material times herein, to fix the prices utilized in calculating the amount(s) to be paid under the terms of Plaintiffs/Insureds' insurance contracts with State Farm for covered damage to immovable property.
>
> The Defendant State Farm acted conscious of other competing insurance companies' actions in using the Xactimate program, and its attendant below market prices, and intentionally acted in parallel, and in combination, to fix the prices utilized in calculating the amount to be paid under the terms of Plaintiffs/Insured' and class members' insurance contracts with Defendant State Farm for covered damage to immovable property.
>
> The reduction in the amount paid out thereby reduced the payout and increased the profits of the Defendant State Farm, despite the losses caused by Hurricane Katrina and Rita.
>
> Setting the payout amount lower than it would be if market prices were paid out would be detrimental to an insurance company's competitiveness if it were not for the combined use of the same prices. Additionally, insurance companies have actively coordinated their actions through various organizations and associations.
>
> The purpose of the conspiracy was to depress the amount paid

out under the terms of the insurance contract to below market prices. Plaintiffs/Insureds' damages were caused by the failure of Defendant State Farm to pay market cost for damaged items State Farm acknowledged was due under their policies.[17]

In the Amended Complaint, Plaintiffs do not invoke a particular federal or state statute that supports an action for horizontal price fixing;[18] however, they acknowledge in their consolidated opposition to Defendants' respective motions to dismiss that their claim is governed by Louisiana antitrust law.[19,20]

La. R.S. 51:122 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal." LA. REV. STAT. ANN. § 51:122. This statute is the state counterpart of Section 1 of the Sherman Antitrust Act, which requires a finding that "contract, combination..., or conspiracy [is] in restraint of

---

[17]     *See* Am. Comp. ¶ 32 - 37.

[18]     "Horizontal combinations are those between competitors that restrain enterprises at the same level of distribution. Vertical combinations, on the other hand, are imposed by persons at different levels of distribution." *Plaquemine Marine, Inc. v. Mercury Marine*, No. 03-1036 (La. App. 1 Cir. 7/25/03); 869 So.2d 110, 117 (citations omitted). It is clear that Xactware and State Farm are not competitors and that Plaintiff is alleging the existence of horizontal conspiracy among State Farm and other insurers.

[19]     *See* Opp. Mot. Dismiss at 9 (Rec.Doc.No. 35).

[20]     Under the McCarran-Ferguson Act, the "business of insurance" is subject to state regulation and federal antitrust laws will not apply. 15 U.S.C. § 1012 (a) & (b). Here, it is clear that Plaintiffs' antitrust claims relate to the business of insurance as they involve an insurer's obligations under a contract of insurance and the adjustment of Plaintiffs' property damage claims. *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1331 (11th Cir. 2004) ("performance of an insurance contract - including the adjustment of claims - constitute business of insurance"). The Court finds that Plaintiffs are precluded from bringing a federal antitrust suit by virtue of the McCarran-Ferguson Act and, therefore, Plaintiffs must rely on state antitrust law.

trade or commerce" in order to find liability. 15 U.S.C. § 1 ("Sherman Act"). Given that the

Louisiana antitrust statutes seeks to proscribe the same kind of anti-competitive conduct as the

Sherman Act, "[f]ederal antitrust precedent is persuasive authority for interpreting parallel

provisions of Louisiana law in the absence of contrary state precedent." *Wilson v. Mobil Oil

Corp.*, 984 F.Supp. 450, 461 (E.D. La. Oct. 28, 1997) (Vance, J.).


   ii.     **Antitrust Standing**


       As a threshold matter, there is a question as to whether Plaintiffs have standing to

maintain an antitrust action against State Farm or Xactimate. Defendants contend that the alleged

conspiracy affects the price for repair services and materials and because Plaintiffs do not

provide such services, they have "nothing more than an indirect interest in the effects, if any, of

an alleged conspiracy to suppress the prices charged by sellers in that market."[21]

       "As a prerequisite to bringing an action under the Sherman Act, [p]laintiffs must

demonstrate an antitrust injury and antitrust standing." *Blanchard & Co., Inc. v. Barrick Gold

Corp.*, 2003 WL 22071173, at *4 (E.D. La. Sep. 3, 2003) (Berrigan, J.) (citing *Cargill, Inc. v.

Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986)); *see also Bell v. Dow Chemical Co.*, 847

F.2d 1179, 1182 (5th Cir. 1988) ("Proving antitrust injury is a necessary requirement for proving

standing; the former cannot stand alone from the latter."). "Standing to pursue an antitrust suit

---

[21]     Xactware's Reply in Support Mot. Dismiss and Strike Class Allegations at 7
(Rec.Doc.No. 41) ("Xactware's Reply").

exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (citing *McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988)).

As to the first and third elements, Plaintiffs' injuries include the cost Plaintiffs would have to pay out-of-pocket to meet the price for repair services and/or the cost associated with delaying disbursement of the adequate amount of insurance proceeds.[22] These alleged injuries were directly caused by State Farm's alleged antitrust behavior. Thus, the Court finds that Plaintiffs ostensible injury was proximately caused by Defendants' alleged conduct and is distinct from any antitrust injury sustained by repair service providers, making Plaintiffs the proper party to bring this suit.

As to the second element, the Supreme Court has described an antitrust injury as

> ....[an] injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short be, "the type of loss that the claimed violations...would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969)). The Fifth Circuit further elaborated that the antitrust injury "must be viewed from the perspective of the plaintiff's

---

[22]     *See* Am. Comp. ¶ 37.

11

position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp.*, 123 F.3d at 305.

Plaintiffs allege that State Farm conspired with other insurers to payout less than the market price for repair services through use of the Xactimate program though the insurers were required to pay for the market price for the loss under the terms of their respective insurance contracts. State Farm's supposed anti-competitive scheme may have caused a depression of market prices for repair services; however, such would only be to the benefit of Plaintiffs as ultimate consumers of the repair services. The injuries Plaintiffs suffered, i.e. the out-of-pocket expense and/or delay caused by State Farm's "low-balling" of the repair costs, flow directly from the alleged anti-competitive behavior of the Defendants and, therefore, the Court finds that Plaintiffs' injuries are "within the conceptual bounds of [an] antitrust injury." *Doctor's Hosp.*, 123 F.3d at 305.

### iii.    Alleging Anti-Competitive Conspiracy or Agreement

Generally, a plaintiff must prove the existence of a "contract, combination...or conspiracy" that unreasonably restrains trade to recover under section 1 of the Sherman Act. However, "[s]ection 1 does not proscribe independent action by a single entity, regardless of its purpose or effect on competition." ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (5th ed. 2002) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761

(1984)).[23] "Price-fixing agreements between two or more competitors otherwise known as

horizontal price-fixing agreements, fall into the category of arrangements that are *per se*

unlawful." *Texaco Inc v. Dagher*, 57 U.S. 1 (2006) (citing *Catalano, Inc. v. Target Sales, Inc.*,

4465 U.S. 643 (1980)).

The U.S. Supreme Court has recently examined a section 1 action for horizontal price-

fixing in the context of a motion to dismiss in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct 1955

(2007).[24] Emphasizing that the pleading standard for bringing a claim under § 1 of the Sherman

Antitrust Act is governed by the notice requirements of Rule 8(a)(2) of the Federal Rules of Civil

Procedure, the *Twombly* court articulated the following standard:

> [W]e hold that stating such a [conspiracy] claim requires a complaint
> with enough factual matter (taken as true) to suggest that an
> agreement was made. Asking for plausible grounds to infer an
> agreement does not impose a probability requirement at the pleading
> stage; it simply calls for enough fact to raise a reasonable expectation
> that discovery will reveal evidence of illegal agreement...
> ....
>
> It makes sense to say, therefore, that an allegation of parallel conduct
> and a bare assertion of conspiracy will not suffice. Without more,
> parallel conduct does not suggest conspiracy, and a conclusory

---

[23]      Plaintiffs need not identify all conspirators in the complaint in order to survive dismissal. *Walker Distributing Co. v. Lucky Layer Brewing Co.*, 323 F.2d 1, 8 (9th Cir. 1963).

[24]      The Court acknowledges that the *Twombly* decision was issued subsequent to the filing of the Amended Complaint. Although this would be grounds in some circumstances to allow Plaintiffs to amend their Complaint, the Court finds that Plaintiffs cannot under these factual circumstances allege the necessary predicates that would cure the inadequacies in their horizontal price-fixing claim. *See Shane Matherne Enterprises, Inc. v. Sokolic*, 2007 WL 1438736 (E.D. La. May 15, 2007) ("[T]he Court is mindful that motions to dismiss should be rarely granted, and that it should grant leave to amend when the defects in the pleadings are not insurmountable.").

> allegation of agreement at some unidentified point does not supply
> facts adequate to show illegality. Hence, when allegations of parallel
> conduct are set out in order to make a § 1 claim, they must be placed
> in a context that raises a suggestion of a preceding agreement, not
> merely parallel conduct that could just as well be independent action.

*Twombly*, 127 S.Ct. at 1965-66.

The *Twombly* court required that plaintiffs assert facts in the pleadings that plausibly demonstrate the existence of an illegal agreement. *Id.* at 1966.[25,26] Consequently, a bare allegation that a conspiracy or agreement exists is not sufficient to preclude granting of a Rule 12(b)(6) motion to dismiss despite there being factual allegations of even consciously parallel anti-competitive conduct. *Id.* at 1966. Without more, the allegations, though "consistent with conspiracy," are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 1964.

The *Twombly* court also focused on the likelihood that the alleged parallel conduct was "anything more than the natural, unilateral reaction of each [competitor]" as opposed to being a result of a conspiracy or agreement. *Id* at 1971. That is, absent factual allegations which set forth that the parallel conduct is a result of a conspiracy, there is "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.*

---

[25]     Such parallel behavior includes that which "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 127 S.Ct. at 1966 (quoting 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425, at 167 -185 (2d ed. 2003)).

[26]     The Court notes the significance of *Twombly* and agrees with the characterization of the decision as "a clear and visible departure from the liberal federal pleading standards..." that ultimately will render it difficult to withstand dismissal without direct evidence of an illegal agreement. Janet. L. McDavid & Eric Stock, *Bell Atlantic v. Twombly*, 29 Nat'l. L. J. 47 (2007).

The plaintiffs in *Twombly* alleged that incumbent local exchange carriers ("ILECs")[27] conspired to prevent competitive local exchange carriers ("CLECs") from obtaining any of the ILECs' market share. The plaintiffs argued that a conspiracy was necessary because allowing even one CLEC into the market "would have revealed the degree to which competitive entry by the CLECs would have been successful in other territories." *Id.* The court ultimately determined that this contention did not adequately suggest a conspiracy because each ILEC had a strong independent incentive to keep CLECs out of the market. The court characterized defendants' actions as "so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing." *Id.*

Prior to *Twombly*, a plaintiff could base "a claim of collusion on inferences from consciously parallel behavior [by] show[ing] that certain 'plus factors' also exist[ed]." *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 360 (3rd Cir. 2004). Although there was no finite set of what constituted plus factors, the Court of Appeals for the Third Circuit identified three such elements: 1) evidence that the defendant had a motive to enter into a price-fixing conspiracy; 2) evidence that the defendant acted contrary to its interests;[28] and (3) evidence implying traditional

---

[27]     ILECs are regional service monopolies that existed after the 1984 divestiture of local telephone business by American Telephone & Telegraph Company. The Telecommuncations act of 1996 withdrew approval of the ILEC's monopolies, and required the ILECs to now share its network with CLECs.

[28]     As an example, the court suggests that it would be contrary to a business's interest
to keep prices high if it wanted to increase its market share vis-a-vis competitors. *Flat Glass*, 385 F.3d at 361.

conspiracy. However, it seems that the *Twombly* ruling supersedes any articulation of the "plus factor" test given that *Twombly* court sought "to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct." *Twombly*, 127 S.Ct. at 1963.

In their claim against Defendants for engaging in horizontal price-fixing, Plaintiffs maintain that there existed an "agreement, combination or conspiracy between the [D]efendants, and other competing companies...to fix the prices utilized in calculating the amount(s) to be paid under the terms of Plaintiffs/Insureds' insurance contracts with State Farm for covered damage to immovable property."[29] This intentional reduction below market prices is alleged to have "reduced the payout and increased the profits of the Defendant State Farm," and thereby, "caused the failure of Defendant State Farm to pay market cost for damaged items State Farm acknowledged was due under their policies."[30]

Plaintiffs further assert that:

> State Farm acted conscious of other competing insurance companies' actions in using the Xactimate program, and its attendant below market prices, and intentionally acted in parallel, and in combination, to fix the prices utilized in calculating the amount to be paid under the terms of Plaintiffs/Insureds' and class members' insurance contract with Defendant State Farm for covered damage to immovable property...
> ....
> Setting the payment amount lower than it would be if market prices were paid out would be detrimental to an insurance company's competitiveness if it were not for the combined use of the same prices. Additionally, insurance companies have actively coordinated

---

[29]     Am. Compl. ¶ 32

[30]     *Id.* ¶ 34, 37.

their actions through various organizations and associations.[31]

Finally, Plaintiffs allege that the injury caused by this artificial depression of prices as State Farm failed to "pay market cost for damaged items State Farm acknowledged was due under their policies."[32]

It is clear that the primary economic advantage to the insurer of using the Xactimate software, which allegedly prices repair costs below market value, is to increase the premiums received to proceeds paid ratio. The Court finds that Plaintiffs do not present the necessary factual predicates that plausibly suggest the existence of a conspiracy.[33]

Even with respect to the plus factors, Defendants activities were not economically irrational in a competitive market. That is, they had a strong economic incentive to keep payouts for damages low. This is clearly the primary motive of the insurer to use the Xactimate program which allegedly prices materials below market value. Moreover, collusion was not necessary to engage in the alleged anti-competitive conduct, as any insurer could benefit from the Xactimate software regardless of what other insurers did.

The Court finds that State Farm's behavior was natural considering the strong economic incentive to keep payouts low, and moreover, there is no allegation in Plaintiff's Complaint that

---

[31]     *Id.* ¶ 33, 35.

[32]     *Id.* ¶ 37.

[33]     The Plaintiffs offer "insurance companies have actively coordinated their actions through various organizations and associations." A similar allegation was made in *Twombly* and was not sufficient to imply a conspiracy.

would plausibly suggest the conduct was anything other than unilateral. Therefore, the Court grants Defendants' motions to dismiss with respect to the horizontal price-fixing claims against State Farm and Xactware.

## C.   Breach of Contract

Under Louisiana law, "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation." LA. CIV. CODE. ANN. art. 1914 (2007); *Imperial Chemicals Ltd v. PKB Scania (USA), Inc.*, No. 04-2742 (La. App. 1 Cir. 2/22/06); 929 So.2d 84. With respect the breach of contract claim and/or intentional breach of contract claim,[34] Plaintiffs allege that State Farm failed to "fully compensate the Plaintiffs/Insureds and class members for the damage and loss to their immovable property, in breach of the terms and conditions of their policies and Louisiana law."[35] Moreover, Plaintiffs maintain that State Farm breached duties imposed by La. R.S. §§ 22:658 and 22:1220.[36] Also, Plaintiffs submit that "State Farm misrepresented the fairness, accuracy and amount due under the policy for the damage acknowledged to be covered under the terms of the policy."[37]

---

[34]    Count V does not provide additional allegations distinct from those in the other counts of the Amended Complaint despite the fact that it is entitled "Breach of Contract/Intentional Breach of Contract."

[35]    Am. Compl. ¶ 39.

[36]    *Id.* ¶ 41, 42.

[37]    *Id.* ¶ 43.

In light of the legal standard governing motions to dismiss under Rule 12, the Court finds that these factual assertions against State Farm are not merely conclusory, but rather, support recovery for a breach of contract claim so long as the allegations are proven to be true.

As for the breach of contract claim against Xactware, Plaintiffs do not address Defendant's contention that the breach of contract claim must fail because there is no contract between Xactware and Plaintiffs. Therefore, the Court finds that Xactware's argument has merit and dismisses the breach of contract claim against Xactware.

**D.      Negligence**

**i.      State Farm's Negligence**

Louisiana courts employ a duty/risk formula for analyzing claims of negligence.[38] The elements of the duty/risk formula are set forth as follows:

1.      Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?

2.      Did the defendants owe a duty to the plaintiffs?

3.      Was the duty breached?

4.      Was the risk, and harm caused, within the scope of protection

---

[38]      Louisiana Civil Code article 2315 establishes that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LA. CIV. CODE ANN. art 2315 (2007).

afforded by the duty breached?

*Roberts v. Benoit*, No. 91-394 (La. 9/9/91); 605 So.2d 1032, *on rehearing,* 605 So. 2d 1050, 1051 (La. 1991) (citations omitted).

Under the duty/risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. As such, in order for liability to attach under a duty/risk analysis, plaintiffs must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). *Bacon v. Travelers Ins. Co.*, 1995 WL 716772 (E.D. La. Dec. 5, 1995).

The question of whether a duty exists in a particular set of circumstances is a question of law. *Harris v. Pizza Hut of Louisiana, Inc.,* 455 So. 2d 1364, 1371 (La. 1984). Simply put, the inquiry is whether the plaintiff has any law – statutory, jurisprudential, or arising from general principles of fault – to support his claim.

Plaintiffs allege that Defendants State Farm was negligent in paying  "an amount below the fair market repair/restoration cost of the damaged immovable property acknowledged under the subject policy."[39] Plaintiffs maintain that the practice of calculating replacement cost below market value violates statutory duties imposed by Louisiana law. Moreover, Plaintiffs allege the

---

[39]     Am. Compl ¶ 46.

following acts of negligence:

    A.    Negligently calculating and compiling price lists for the Louisiana regions which were below the fair market repair/restoration cost for damaged immovable property;

    B.    Failing to timely update the price databases to keep up with the increase in the fair market repair/restoration cost for damaged immovable property after Hurricane Katrina and Rita;

    C.    Failing to exercise the requisite degree of care in ensuring that its employees, who were charged with the responsibility of administering the price databases, were properly trained and supervised to do so; and/or

    D.    Failing to ensure improper input from biased sources did not invalidate the accuracy of the price databases;

    E.    Plaintiffs/Insureds reserve the right to amend this list should more information become available during the pendency of this litigation.[40]

Louisiana's insurance "bad faith" statutes with respect to insurer's wrongful practices are found at La.Rev.Stat. § § 22:658 and 22:1220.The first statute found in the Louisiana Insurance Code at La.Rev.Stat. 22:658 provides that all insurers shall pay the amount of any claim due any insured within 30 days after receipt of satisfactory proofs of loss from the insured or any party in interest. La.Rev.Stat. 22:658(A)(1). Subsection (3) of this statute requires the insurer to initiate loss adjustment of property damage claim or reasonable medical expenses claim within fourteen days after notification of loss by the claimant, where there is no catastrophic loss. Where there is catastrophic loss, the insurer has thirty days to initiate loss adjustment. Failure to comply with

---

[40]    *Id.* ¶ 47.

this provision subjects the insurer to the penalties provided in La.Rev.Stat. 22:1220. La.Rev.Stat. 22:658(A)(3).

It is thus clear that State Farm has a duty of good faith and fair dealing to its insured, that this duty is sufficiently alleged to have been breached, and the breach proximately caused Plaintiffs' alleged damaged. Therefore, the Court finds that Plaintiffs have adequately stated a negligence claim against State Farm.

**ii.     Xactware's Negligence**

Plaintiffs allege in the Amended Complaint that Xactware engaged in the following negligent acts:

> A.     Negligently calculating and compiling price lists for the Louisiana regions which were below the fair market repair/restoration cost for damaged immovable property;

> B.     Failing to timely update the price databases to keep up with the increase in the fair market repair/restoration cost for damaged immovable property after Hurricane Katrina and Rita;

> C.     Failing to exercise the requisite degree of care in ensuring that its employees, who were charged with the responsibility of administering the price databases, were properly trained and supervised to do so; and/or

> D.     Failing to ensure improper input from biased sources did not

invalidate the accuracy of the price databases;

E.    Plaintiffs/Insureds reserve the right to amend this list should more information become available during the pendency of this litigation.[41]

Furthermore, Plaintiffs allege that "Xactware knew or should have known that State Farm was using its price lists to issue damage estimates to its insureds with a representation that Xactware was impartial, third party company," and should be held negligent in this regard.[42] Finally, Plaintiffs aver that Xactware acted as State Farm's agent and should be held solidarily liable with State Farm.[43]

As stated above, in order to determine if Plaintiffs have sufficiently alleged a negligence claim against Xactware, the Court must determine whether Xactware owes a legal duty to Plaintiffs. In their Opposition to Xactware's Motion to Dismiss, Plaintiffs suggest for the first time that Xactware is liable under Louisiana Products Liability Act ("LPLA") and/or that Xactware's legal duty arises out of LPLA.[44] The Court finds the latter argument wholly without merit. The LPLA is the exclusive remedy against manufacturers for damages caused by their

---

[41]    *Id.* ¶ 47.

[42]    *Id.* ¶ 50.

[43]    *Id.* ¶ 52. The Court finds this argument without merit as it is not alleged that Xactware was specifically employed by State Farm to estimate the repair costs of Plaintiffs' home. Rather, Xactware developed a software program that was subsequently purchased or licensed by State Farm and used in its adjustment process. The Court finds that State Farm did not confer authority onto Xactware such that a relationship of mandate existed. *See* LA. CIV. CODE ANN. art. 2989.

[44]    *See* LA. REV. STAT. ANN § 9:2800.51, *et seq.*

products,[45] and thus, the statute does not create a legal duty for the purposes of Civil Code article 2315.[46]

As for liability under the LPLA itself,[47] the statute provides that "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." LA. REV. STAT. ANN. § 9:2800.54(A).

A product is defined as "a corporeal movable that is manufactured for placement into trade or commerce, including a product that forms a component part of or that is substantially incorporated into another product or immovable." LA. REV. STAT. ANN. § 9:2800.53. The Louisiana Supreme Court has held that computer software is a corporeal movable. *South Cent. Bell Telephone Co. v. Barthelemy*, No. 94-499 (La. 10/17/94); 643 So.2d 1240, 1244 ("[W]e hold that computer software at issue in this case constitutes corporeal property under our civilian concept of that term..."). Moreover, other courts and legal scholars have suggested that defective computer software may give rise to strict products liability in tort. *See* Restatement (Third) of

---

[45]    LA. REV. STAT. ANN. § 9:2800.52.

[46]    This argument was offered by Plaintiffs during Oral Argument held before the Court on June 13, 2007.

[47]    Although the LPLA claim was not adequately alleged in the Complaint, the Court may allow Plaintiffs leave to amend within its discretion if it finds that such would be in the interest of justice. *Shane Matherne Enterprises, Inc. v. Sokolic*, 2007 WL 1438736 (E.D. La. May 15, 2007) ("[T]he Court is mindful that motions to dismiss should be rarely granted, and that it should grant leave to amend when the defects in the pleadings are not insurmountable.").

Torts: Prod. Liab. § 19 (1998); *see also Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035 (9th Cir. 1991).

Based on the foregoing, the Court finds that the Xactimate program may be a product for the purposes of the LPLA.[48] However, the Court notes that a claim under the LPLA has not been adequately alleged in the Complaint. Therefore, it would be inappropriate at this time for the Court to rule on the applicability of the LPLA to the instant case without being tethered to discrete factual allegations in the Complaint. Thus, the Court finds that it would be in the interest of justice to defer ruling on the applicability of the LPLA until such time as Plaintiffs, if they so choose, amend their Complaint stating an LPLA claim and Defendants, upon proper motion, challenge the viability of an LPLA claim.

The Court also notes that because the LPLA is an exclusive remedy for products and Plaintiffs have not otherwise shown the existence of a legal duty on the part of Xactware, the Court dismisses Plaintiffs other negligence claims against Xactware.

---

[48] Defendant Xactware suggests that the LPLA does not provide for the kind of recovery sought here arguing that "damages based on sufficiency of performance under a contract is very different than claiming that a product caused damage to your person or property." *See* Xactware's Reply at 3 (Rec.Doc.No. 41). However, the LPLA defines damage broadly stating that damage "includes damage to the product itself *and economic loss arising from a deficiency in...the product*" only to the extent redhibition does not apply. LA. REV. STAT. ANN. § 9:5800.53(5) (emphasis added). It is clear that redhibition does not apply at the threshold because Plaintiffs are not the buyers of this product. *See* La. Civ. Code Ann. art 2520. The same seller-buyer relationship need not exist in the LPLA context because a claimant need only incur damages from an unreasonably dangerous product in order to recover under the LPLA. LA. REV. STAT. ANN. § 9:5800.53(4).

E.      **Intentional Misrepresentation and/or Fraud**

With respect to allegation of fraud, Federal Rule of Civil Procedure 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy the pleading requirements of Rule 9(b) a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Tech., Inc.,* 112 F .3d 175, 177 (5th Cir.1997). To put it another way, Rule 9(b) requires that a plaintiff alleging fraud specify the "who, what, when, where, and how" of the alleged fraud." *U.S. Ex Rel Williams v. Bell Heliocopter Textron,* 417 F.3d 450, 453 (5th Cir.2005) (internal quotation and citation omitted).

Plaintiffs bring intentional misrepresentation and/or fraud claims against State Farm and Xactware for "intentionally colluding to keep down the prices of its price lists in the Xactimate system," and "basing its price lists, in whole or in part, on settled claim amounts submitted by State Farm and/or its agents," despite knowing many policy holders would not exercise their right to seek additional supplemental payment for full market value of the replacement costs.[49]

The Court finds that these contentions are alleged with sufficient specificity as to satisfy Rule 9(b) and preclude dismissal under Rule 12(b)(6). Accordingly,

**IT IS ORDERED** that Defendants' Motions to Strike (Rec.Doc.Nos. 23,29) are

---

[49]      *Id.* ¶ 53-55.

**DENIED**.

      **IT IS FURTHER ORDERED** that Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part. Specifically, with respect to the horizontal price-fixing claim, the motion to dismiss is granted as to both State Farm and Xactware. With respect to the breach of contract claim the motion to dismiss is denied as to State Farm and granted as to Xactware. As for the intentional misrepresentation and/or fraud claim, the motion to dismiss is denied. With respect to the negligence claim, the motion to dismiss is denied as to State Farm and Xactware. However,

      **IT IS FURTHER ORDERED** that Plaintiffs be granted until September 7, 2007, to **AMEND** their Complaint to state a claim for relief under the Louisiana Products Liability Act.

      New Orleans, Louisiana, on this  22nd day of August, 2007.

                                      **STANWOOD R. DUVAL, JR.**
                         **UNITED STATES DISTRICT COURT JUDGE**