Transcript of the Testimony of
# 1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

**Date taken: December 18, 2009**

**Vincent Brown, et al v. State Farm Fire & Casualty Company, et al**

***\*\*Note\*\****
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

```
                CIVIL DISTRICT COURT
                  PARISH OF ORLEANS
                 STATE OF LOUISIANA

VINCENT BROWN AND          *  NO. 06-7269
JEANNE BROWN               *
                           *
VERSUS                     *  DIVISION "M"
                           *
STATE FARM FIRE AND CASUALTY*
COMPANY AND BOB NOWLIN     *
 *  *  *  *  *  *  *  *  *  *


        1442 Deposition of STATE FARM FIRE AND
CASUALTY COMPANY, through its designated
representative, CHRISTOPHER JOHN LAPINSKIE,
212 Berry Farm Lane, St. John, Florida
32260, taken in the offices of Zaunbrecher,
Treadaway, LLC, 3850 N. Causeway Boulevard,
Lake II, Suite 1045, Metairie, Louisiana
70002, reported on Friday, the 18th day of
December, 2009.
        The deposition was videotaped and
stenographically reported.
```

Page 1

```
1   APPEARANCES:
2
3
4       HERMAN, HERMAN, KATZ & COTLAR
        (BY:  SOREN E. GISLESON, ESQUIRE)
5       820 O'KEEFE AVENUE
6       NEW ORLEANS, LOUISIANA 70113
7           ATTORNEYS FOR THE PLAINTIFFS
8
9       ZAUNBRECHER TREADAWAY, LLC
        (BY:  ALAN A. ZAUNBRECHER, ESQUIRE)
        3850 N. CAUSEWAY BOULEVARD
10      LAKEWAY II
        METAIRIE, LOUISIANA 70002
11
        ATTORNEYS FOR STATE FARM FIRE AND
12      CASUALTY COMPANY
13
14
15      BLUE WILLIAMS, LLP
        (BY:  JOHN C. HENRY, ESQUIRE)
        3421 NORTH CAUSEWAY BOULEVARD
16      SUITE 900
        METAIRIE, LOUISIANA 70002-3760
17
        ATTORNEYS FOR STATE FARM FIRE AND
18      CASUALTY COMPANY
19
20  ALSO PRESENT:
21      BRIAN SOILEAU, LEGAL VIDEO SPECIALIST
        PROFESSIONAL SHORTHAND REPORTERS, INC.
22
23  REPORTED BY:
24      DIANE TEWIS CLARK, RPR, RMR, CRR
        Certified Court Reporter
25
```

Page 2

```
1               *   *   *
2          EXAMINATION INDEX
3                              Page
4   EXAMINATION BY MR. GISLESON ..........9
5
6               *   *   *
7
8          INDEX OF EXHIBITS
9                              Page
10
11  Exhibit No. 1 .......................13
12     1442 Deposition Notice and Subpoena
13  Exhibit No. 2 .......................13
14     1442 Deposition Notice and Subpoena
15  Exhibit No. 3 .......................14
16     Judgment
17  Exhibit No. 4 .....................115
18     OG 7501 Claim Procedures First
       Party, BROWNV00000235PROD through
19     BROWNV00000255PROD
20  Exhibit No. 5 .....................139
21     OG 75-01, Claim Procedures - First
       Party, BROWNV00000215PROD through
22     BROWNV00000234PROD
23
24
25
```

Page 3

```
1   Exhibit No. 6 .....................149
2      Memorandum to State Farm Claim
       Associates Handling CAT PL in the
3      Central and Southern Zones from
       Property and Casualty Claim
4      Consulting Services, dated
       September 13, 2005,
5      BROWNV00000576PROD through
       BROWNV00000578PROD
6
7   Exhibit No. 7 .....................186
8      Car Index:  22 RQ-20352 B 98
9   Exhibit No. 8 .....................187
10     Car Index:  22 RQ-20352 B 98
11  Exhibit No. 9 .....................188
12     26-page document with the title,
       "View Contact Details - Brown,
13     Vincent"
14  Exhibit No. 10 ....................201
15     Documents titled CCF Print,
       Coverage Lines, Activity Log,
16     Activity Log, System Generated Log,
       Facts and Policy Notes, BROWN0211
17     through BROWN0214
18  Exhibit No. 11 ....................204
19     Copy of the draft that was issued
       to Vincent D. and Jeannie W. Brown
20     in the amount of $2,500 on 9/6/05.
21  Exhibit No. 12 ....................207
22     Flood Coding Strip, BROWN0217
23  Exhibit No. 13 ....................210
24     Payment authorization request for
       payment of this flood claim,
25     BROWN0218
```

Page 4

1 (Pages 1 to 4)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1   Exhibit No. 14 .....................215
2     Statement of loss for the Vincent
      Brown flood claim, BROWN0219
3
4   Exhibit No. 15 .....................221
5     Flood Claim Worksheet, BROWN0220
6   Exhibit No. 16 .....................225
7     Flood Loss Questionnaire, BROWN0221
      through BROWN0223
8
9   Exhibit No. 17 .....................230
10    Contents List, BROWN0224
11  Exhibit No. 18 .....................234
12    XacTotal estimate that was created
      by Dan Sullivan. BROWN0225 through
13    BROWN0228
14  Exhibit No. 19 .....................242
15    Document entitled "Louisiana
      Exposures," BROWN0229
16
17  Exhibit No. 20 .....................246
18    CCF print of the homeowners policy,
      BROWN0008 through BROWN0011
19
20  Exhibit No. 21 .....................254
21    Luling Catastrophe Office estimate,
      BROWN0017 through BROWN0020
22
23  Exhibit No. 22 .....................256
24    Personal property inventory form
      for a food loss, BROWN0021
25

Page 5

1   Exhibit No. 23 .....................257
2     Prohibited Use Worksheet
3   Exhibit No. 24 .....................258
4     Handwritten notes, BROWN0027
5   Exhibit No. 25 .....................264
6     Screen shot of the CSR, BROWN0055
      and BROWN0056
7
8   Exhibit No. 26 .....................268
9     Image List Details Report for
      Claim, BROWN0054
10
11  Exhibit No. 27 .....................269
12    Declarations Page
13  Exhibit No. 28 .....................275
14    Document titled "View Contact
      Details - Vincent O. Brown"
15
16  Exhibit No. 29 .....................289
17    Insurance Policy
18
19
20
21
22
23
24
25

Page 6

1                  S T I P U L A T I O N
2          It is stipulated and agreed by and
3    between counsel for the parties hereto that
4    the deposition of the aforementioned witness
5    is hereby being taken under the Louisiana
6    Code of Civil Procedure, Article 1421, et
7    seq., for all purposes, in accordance with
8    law;
9          All formalities, with the
10   exception of the reading and signing of the
11   transcript by the witness, are hereby
12   waived;
13         All objections, except those as to
14   the form of the question and the
15   responsiveness of the answer, are hereby
16   reserved until such time as this deposition,
17   or any part thereof, may be used or sought
18   to be used in evidence.
19
20                       * * *
21
22         DIANE TEWIS CLARK, RPR, RMR, CRR,
23   Certified Court Reporter, State of
24   Louisiana, officiated in administering the
25   oath to the witness.

Page 7

1    THE VIDEOGRAPHER:
2          Today is the 18th day of December,
3    2009.  The time is approximately 9:14.  This
4    is the 1442 videotaped deposition of State
5    Farm Fire & Casualty Company through Chris
6    Lapinskie, taken at the office of
7    Zaunbrecher and Treadaway, LLC, located at
8    3850 North Causeway Boulevard, Metairie,
9    Louisiana, for the case entitled Vincent
10   Brown versus State Farm Fire & Casualty
11   Company, et al.
12         Will counsel please identify
13   themselves and which party they represent.
14   MR. GISLESON:
15         Soren Gisleson on behalf of the
16   plaintiffs.
17   MR. ZAUNBRECHER:
18         Alan Zaunbrecher on behalf of
19   State Farm.
20   MR. HENRY:
21         John Henry, co-counsel for State
22   Farm.
23                       * * *
24         CHRISTOPHER JOHN LAPINSKIE,
25   after having been first duly sworn by the

Page 8

2 (Pages 5 to 8)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1 above-mentioned court reporter, did testify
2 as follows:
3 EXAMINATION BY MR. GISLESON:
4     Q.   Mr. Lapinskie, I believe I've
5 deposed you once before and questioned you
6 in open court.
7          Do you remember those two times?
8     A.   Yes, I do.
9     Q.   And it's my understanding that
10 you're being proffered today as a corporate
11 representative of State Farm; is that
12 correct?
13    A.   That is correct.
14    Q.   What is your understanding of
15 being designated as a corporate
16 representative of State Farm?
17    A.   My understanding, I'm here as
18 1442.  The answers I give are answers on
19 behalf of State Farm.
20    Q.   Have you seen the 1442 corporate
21 representative deposition notice?
22    A.   In preparation for my appearance
23 here today, I have reviewed this deposition
24 notice.
25    Q.   And as the corporate

Page 9

1          In what way is it different?
2    MR. ZAUNBRECHER:
3          The one I received stops, and this
4 is the subpoena that was served, stops at
5 No. 17.  There is a third page to yours, to
6 the one that you just gave us that goes from
7 No. 18 to No. 23.
8    MR. GISLESON:
9          Let me see?  Could I see the one
10 you have, too?
11    MR. ZAUNBRECHER:
12          Sure.  This is the one we were
13 working off of.  This is the one that was
14 sent to us and served on me.
15          You want to go off the record
16 while we look at it?
17    MR. GISLESON:
18          Let's do some preliminary stuff
19 before I come back to this and not try to
20 multitask.
21 EXAMINATION BY MR. GISLESON:
22    Q.   What is your personal address,
23 Mr. Lapinskie?
24    A.   I reside at 212 Berry Farm Lane,
25 St. John, Florida 32260.

Page 11

1 representative of State Farm --
2    A.   One second.
3    Q.   Sure.
4    MR. ZAUNBRECHER:
5          Let me say the date.
6    THE WITNESS:
7          That goes further than the one I
8 was looking at.
9    MR. ZAUNBRECHER:
10          It goes further than the one that
11 I have, too.
12    MR. GISLESON:
13          Which one are you looking at?
14    MR. ZAUNBRECHER:
15          The notice.
16    MR. GISLESON:
17          What's it dated?
18    MR. ZAUNBRECHER:
19          November 17th, 2009.
20    MR. GISLESON:
21          That one is dated --
22    MR. ZAUNBRECHER:
23          November 17th, 2009, but it's
24 different from the one that I received.
25    MR. GISLESON:

Page 10

1    Q.   And how long have you resided at
2 that address?
3    A.   I just built the house.  I moved
4 in on October 22nd of this year.
5    Q.   And where did you live before
6 then?
7    A.   I was in a temporary residence.
8 The address which I can't remember, it was
9 only about three months.  So we'll go with
10 my prior residence which was in Lincoln,
11 Nebraska, 6501 Winding Ridge Court, Lincoln,
12 Nebraska.  I can't remember the zip.  Sorry.
13    Q.   Sure.  That's all right.  In
14 looking at these two notices, it just
15 appears as though the one you have is
16 missing Page 3, that's all.  That it's not
17 anything other than you missing Page 3.  I
18 don't know why that would be -- I'm going to
19 go ahead and attach this deposition notice
20 along with the subpoena before -- I'm not
21 going to get to all those areas of inquiry
22 on the third page until later on in the
23 deposition.  So in the meantime, why don't
24 you go ahead and look at them.
25    MR. ZAUNBRECHER:

Page 12

3 (Pages 9 to 12)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    Are you marking that?
2    MR. GISLESON:
3    Yes, that's going to be designated
4  as Exhibit 1.
5    (Exhibit No. 1 marked for
6  identification.)
7    MR. ZAUNBRECHER:
8    Just for completeness of the
9  record, I think we need to attach the one
10 that was sent to me and I was working off
11 of. I admit I did not note the pages going
12 from 2 to 4.
13   MR. GISLESON:
14   Let's designate the 1442
15 deposition notice you have as Exhibit 2.
16   MR. ZAUNBRECHER:
17   Thank you.
18   (Exhibit No. 2 marked for
19 identification.)
20   MR. ZAUNBRECHER:
21   And, again, just for completeness
22 of the record, we spoke about this before,
23 I'm going to attach a copy of the judgment
24 of the court, dated June 4, 2009, pertaining
25 to this 1442 deposition as Exhibit No. 3.

Page 13

1    (Exhibit No. 3 marked for
2  identification.)
3  EXAMINATION BY MR. GISLESON:
4    Q.  Is it your understanding then, we
5  will start -- I will direct your attention
6  to Exhibit 2. Is it your understanding that
7  you are the person knowledgeable to testify
8  as to all of those areas of inquiry on
9  Exhibit No. 2?
10   A.  I'm prepared to answer the
11 questions as outlined in Exhibit 2, yes,
12 sir.
13   Q.  And that by answering questions
14 relative to Exhibit No. 2, you are going to
15 bind State Farm to those answers?
16   A.  I understand my responses are
17 binding on State Farm, yes, sir.
18   Q.  We talked a minute ago about my
19 having taken your deposition before in
20 another case and your providing testimony in
21 court in a class certification hearing.
22   Have you provided any other
23 depositions on behalf of State Farm as a
24 corporate representative?
25   A.  Yes, I have provided other

Page 14

1  depositions on behalf of State Farm.
2    Q.  In the capacity of a corporate
3  representative?
4    A.  Yes.  My depositions have been in
5  the capacity of -- some of my depositions
6  have been in the capacity as -- of a
7  corporate representative.
8    Q.  Do you maintain copies of these
9  depositions?
10   A.  No, sir.
11   Q.  Do you know somebody who does
12 maintain copies of those depositions?
13   A.  State Farm maintains copies of
14 those depositions.
15   Q.  Do you know who within State Farm
16 would maintain copies of those depositions?
17   A.  No, sir.
18   Q.  Can you give, to the best estimate
19 you can, the number of corporate
20 representative depositions you've given for
21 State Farm?
22   A.  I haven't kept a count, but it
23 would be 12, 12 plus.
24   Q.  Since the time you provided
25 testimony in open court earlier this year in

Page 15

1  Judge Duval's courtroom in the Eastern
2  District, have you provided any testimony in
3  the capacity of a corporate representative?
4    A.  Since the class action hearing, I
5  believe I participated in another 1442
6  deposition, yes, sir.
7    Q.  Do you know the name of the
8  insured in that case?
9    A.  The name alludes me at this time.
10   Q.  Do you remember who defense
11 counsel was in that case?
12   A.  Redman was the defense.
13   MR. ZAUNBRECHER:
14   Fitz?
15   THE WITNESS:
16   I'm sorry, he was plaintiffs'
17 counsel.
18 EXAMINATION BY MR. GISLESON:
19   Q.  All right.  Other than that one
20 deposition since the class certification
21 hearing, have you given any other
22 depositions?
23   A.  I don't recall at this time that I
24 have, no, sir.
25   Q.  Who was defense counsel for -- or

Page 16

4  (Pages 13 to 16)

1  counsel on behalf of State Farm during that
2  last deposition?
3      A.   David Persons was counsel on
4  behalf of State Farm.
5      Q.   Do you know what firm he's with?
6      A.   No, sir.  That name alludes me at
7  this time.
8      Q.   Who did you speak with to prepare
9  for today's deposition?
10     A.   Part of my preparation for this
11 deposition was discussion with counsel.  I
12 also spoke with our pricing specialist that
13 was working in that capacity during
14 Hurricane Katrina.
15     Q.   What were the names of the counsel
16 that you spoke with to prepare for today's
17 deposition?
18     A.   Counsel that I worked with was
19 Alan and Jay -- I can't remember his last
20 name, I'm sorry.
21     MR. ZAUNBRECHER:
22         I can provide it if you want,
23 counsel.
24     MR. GISLESON:
25         Sure.

Page 17

1      MR. ZAUNBRECHER:
2          McInery, I think it's
3  M-C-I-N-E-R-Y.
4  EXAMINATION BY MR. GISLESON:
5      Q.   Do you know what firm Mr. McInery
6  works for?
7      A.   No, I'm sorry, I don't.
8      Q.   Do you know whether he was
9  in-house counsel for State Farm?
10     A.   No, he's not in-house counsel for
11 State Farm.
12     Q.   Do you know what city he's located
13 in?
14     A.   He's out of Burlington, Alabama.
15     MR. ZAUNBRECHER:
16         Can I correct that?  It's
17 Birmingham.
18     THE WITNESS:
19         Birmingham, sorry.
20 EXAMINATION BY MR. GISLESON:
21     Q.   In addition to Jay and Alan, did
22 you speak with any other attorney to prepare
23 for today's deposition?
24     A.   I also spoke with in-house counsel
25 and that would be Bennett Lillie.

Page 18

1      Q.   Where is Bennett Lillie located?
2      A.   Bennett is out of Bloomington,
3  Illinois.
4      Q.   Did you speak with any other
5  attorneys to prepare for today's deposition
6  in addition to Bennett, Alan and Jay?
7      A.   During one of my conference calls,
8  I spoke with Joe Consila.
9      Q.   Joe Consila is out of Chicago with
10 Schiff Hardin; is that right?
11     A.   I believe that's the name of the
12 firm, and, yes, he is out of Chicago.
13     Q.   In addition to Jay, Alan, Bennett
14 and Joe, did you speak with any additional
15 counsel to prepare for today's deposition?
16     A.   I believe that's all the counsel I
17 spoke with.
18     Q.   You mentioned a minute ago about
19 speaking with a pricing specialist who is
20 employed by State Farm in that capacity at
21 the time.  I assume that the Brown estimate
22 was written; is that correct?
23     A.   That's correct.
24     Q.   What was the name of that pricing
25 specialist?

Page 19

1      A.   I'm having a little trouble with
2  names today, Soren, I'm sorry.
3      Q.   Was his name Mark Richter?
4      A.   Thank you.  Mark Richter.
5      Q.   When did you speak with Mark
6  Richter?
7      A.   My discussion with Mark Richter
8  was last Friday.
9      Q.   Who was present during that
10 conversation with Mark Richter?
11     A.   My discussion with Mark Richter
12 was over the phone and during a conference
13 call, Bennett Lillie, Joe Consila and Alan
14 were also on that phone, on that conference
15 call.
16     Q.   Was that the first time you had
17 ever spoken with Mark Richter?
18     A.   I've had conversations with Mark
19 Richter before.  That was the time -- the
20 conference call was specific to this case on
21 Friday.
22     Q.   It seems from your earlier answers
23 that perhaps Mark Richter is no longer the
24 pricing specialist?
25     A.   I didn't ask what capacity he's

Page 20

5  (Pages 17 to 20)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1 working in at this time. My focus was his
2 capacity at the time of the Brown estimate.
3     Q.   You said pricing specialist.
4 Isn't it true that Mark Richter was the
5 pricing specialist for the State of
6 Louisiana?
7     A.   Mark Richter is a pricing
8 specialist -- during the time of Hurricane
9 Katrina, Mark Richter was one of the pricing
10 specialists for the State of Louisiana.
11 There were other pricing specialists. Mark
12 Richter was the one we spoke with while
13 working claims in the Greater New Orleans
14 area.
15     Q.   Do you know what Mark Richter's
16 actual title was during the time of Katrina,
17 when he was the pricing specialist for State
18 Farm?
19     A.   His title is pricing specialist.
20     Q.   Was he in any supervisory capacity
21 at the time?
22     A.   Mark Richter did not have any
23 supervisory capacity at that time. He was
24 the pricing specialist.
25     Q.   When you say the pricing

Page 21

1 specialist, it kind of implies that he's the
2 only one?
3     A.   He was the pricing specialist that
4 we worked with during Hurricane Katrina in
5 the Greater New Orleans area.
6     Q.   Do you know whether he worked with
7 Garrett Gaubert?
8     A.   I'm familiar with the name Garrett
9 Gaubert, but I have no recollection as to if
10 he reported to or worked with Garrett.
11     Q.   Have ever spoken with Garrett
12 Gaubert?
13     A.   I do not believe I spoke with
14 Garrett, no.
15     Q.   Have you received any e-mail or
16 correspondence from Garrett Gaubert?
17     A.   I do not recall that -- receiving
18 any e-mail from Garrett, no, sir.
19     Q.   Was your understanding of what
20 Mark Richter's duties and responsibilities
21 were around the time after Hurricane Katrina
22 when the Brown estimate was prepared?
23     A.   I did not do an all inclusive list
24 of what his duties and responsibilities were
25 at the time of the creation of the Brown

Page 22

1 estimate, but his one duty was he was our
2 contact for pricing issues and was our
3 pricing specialist.
4     Q.   Isn't it true that State Farm no
5 longer uses pricing specialists in the State
6 of Louisiana?
7     MR. ZAUNBRECHER:
8         Let me just enter an objection as
9 being beyond the scope of the discovery
10 order issued by the court.
11         And I direct the witness not to
12 answer.
13 EXAMINATION BY MR. GISLESON:
14     Q.   As you sit here today, do you know
15 whether State Farm still uses pricing
16 specialists in the State of Louisiana?
17     MR. ZAUNBRECHER:
18         Same objection. I'm going to go
19 ahead and allow the witness to answer it.
20 For ease of future handling of this
21 deposition and so as not to disrupt your
22 flow, I'm going to note same objection and
23 instruct the witness either answer or okay
24 to answer or not. I don't want to belabor
25 this and ruin your flow.

Page 23

1 So here in the future in this
2 deposition, the I will just note same
3 objection as being beyond the scope of the
4 court's discovery order for this deposition
5 and tell the witness whether to answer or
6 not.
7         Thank you. Please answer if you
8 can.
9 EXAMINATION BY MR. GISLESON:
10     Q.   Do you recall the question?
11     A.   If I recall, the question was
12 whether the State of Louisiana uses pricing
13 specialists at this time.
14         In preparation for this, it was
15 not a question or an area of inquiry that I
16 dealt into, so I do not know.
17     Q.   Just to be clear, the question was
18 whether State Farm still uses a pricing
19 specialist for the State of Louisiana.
20 That's all. The way you made it sound, it
21 sounded like Louisiana uses a pricing
22 specialist.
23         In addition -- well, tell me some
24 more about Mark Richter. Was he responsible
25 for changing any of the unit prices -- well,

Page 24

6 (Pages 21 to 24)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al      1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1   let me ask it this way. What is your
2 understanding of what Mark Richter's duties
3 were after Hurricane Katrina as it related
4 to the Xactimate program?
5     MR. ZAUNBRECHER:
6      Same objection. Are your talking
7 about limited to this claim? Or just any
8 claim, any price?
9     MR. GISLESON:
10      I'm talking about what his
11 understanding of Mark Richter's role was
12 after Hurricane Katrina.
13     MR. ZAUNBRECHER:
14      Same objection.
15      Don't answer.
16 EXAMINATION BY MR. GISLESON:
17    Q. In your conversation with Mark
18 Richter, did you discuss whether he had any
19 role or contributed in any way to the unit
20 prices identified in the Brown estimate?
21     MR. ZAUNBRECHER:
22      Go ahead.
23     THE WITNESS:
24      In my conversation with Mark
25 Richter, I asked him about the unit prices

Page 25

1 EXAMINATION BY MR. GISLESON:
2    Q. It's your understanding that the
3 way the process works is State Farm receives
4 unit prices from Xactware; correct?
5    A. Of the pricing list that becomes
6 State Farm's price list is based off of a
7 price list that we receive from Xactware,
8 yes.
9    Q. Just for background, what is
10 Xactware?
11    A. Xactware is a company that
12 provides State Farm with estimating program
13 that we use to estimate some of our property
14 damage claims.
15    Q. What is the name of that program?
16    A. The name of the program that we
17 use for estimating is Xactimate.
18    Q. It's actually Xactware's program,
19 they have the ownership rights to the
20 computer programs, Xactimate?
21     MR. ZAUNBRECHER:
22      Same objection. It's beyond the
23 scope of the discovery order and beyond the
24 notice of deposition.
25      If you know, you can answer.

Page 27

1 contained within the Brown estimate and
2 confirmed that the unit prices within the
3 Brown estimate were from the State Farm
4 price list.
5 EXAMINATION BY MR. GISLESON:
6    Q. Does that mean that State Farm
7 changed the unit prices that was provided to
8 State Farm from Xactware?
9     MR. ZAUNBRECHER:
10      Again limited to this claim?
11     MR. GISLESON:
12      Yes.
13     MR. ZAUNBRECHER:
14      Please answer.
15     THE WITNESS:
16      In review of the estimate, I noted
17 that there were -- I confirmed with Mark
18 Richter that the unit prices contained
19 within the Brown estimate were State Farm
20 unit prices.
21      Two of the unit prices in there,
22 one for removal of roofing, one for
23 replacement of roofing, were adaptations
24 that Mr. Richter had made based on
25 information that he had received.

Page 26

1     THE WITNESS:
2      Can I get the question again,
3 please?
4 EXAMINATION BY MR. GISLESON:
5    Q. I forgot what it was.
6     MR. GISLESON:
7      Madam Court Reporter?
8     MR. ZAUNBRECHER:
9      The question was did Xactware own
10 the software?
11     MR. GISLESON:
12      Okay.
13     MR. ZAUNBRECHER:
14      If you know, please answer.
15     THE WITNESS:
16      Xactware is the creator of the
17 program. As far as ownership of the program
18 that was used in this claim, State Farm had
19 bought that program to use, so.
20 EXAMINATION BY MR. GISLESON:
21    Q. Did they buy the program or did
22 they license the program from Xactware?
23     MR. ZAUNBRECHER:
24      Same objection.
25      Answer if you know.

Page 28

7 (Pages 25 to 28)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    THE WITNESS:
2        I believe it's licensed from
3    Xactware.
4    EXAMINATION BY MR. GISLESON:
5        Q.   So they licensed the software from
6    Xactware.  The software doesn't really
7    include the price list though; does it?
8        MR. ZAUNBRECHER:
9        Are you talking about that was
10   used in this claim?
11       MR. GISLESON:
12       I'm trying to lay some foundation
13   so that when he answers the questions, it
14   makes sense.  Because we're working off some
15   assumptions I think that Chris and I are
16   aware of, but if you're reading a cold
17   record, it's just not going to make that
18   much sense.  So I have to lay a little bit
19   of a predicate.
20       MR. ZAUNBRECHER:
21       Again, I think it's beyond, but if
22   he knows those foundational questions, I
23   will allow him to answer it.
24   EXAMINATION BY MR. GISLESON:
25       Q.   I will ask it this way:  Isn't it

Page 29

1    true that there's Xactimate, the computer
2    program, and then it uses price lists which
3    are sort of separate from the program, but
4    are used in the course of using the program
5    that need to be updated periodically?
6        A.   The price lists that are used in
7    the Xactimate program are updated, yes.
8        Q.   And the price lists originate from
9    Xactware and then are sent to State Farm;
10   correct?
11       A.   The price list that State Farm
12   uses as their price list is based on a price
13   list that we receive from Xactware, yes.
14       Q.   And then State Farm pursuant to
15   its agreement with Xactware has the option
16   of increasing the unit price, lowering the
17   unit price or keeping the unit price the
18   same; correct is?
19       A.   Once we receive the price list
20   from Xactware, we have the ability to make
21   changes to that price list, yes, sir.
22       Q.   And you can make the changes --
23   you can increase the unit price or decrease
24   the unit price or keep it the same, right?
25       A.   Once we have the price list, yes,

Page 30

1    we can increase, decrease or keep it the
2    same.
3        Q.   And in relation to the Brown --
4        A.   If I can just clarify it, the list
5    was unit prices, so it was not just a broad
6    sweep.  We have the ability to change the
7    unit price up, down or the same.
8        Q.   And in terms of the Brown claim,
9    and the unit items identified in the Brown
10   claim, did State Farm keep those unit prices
11   the same from Xactware, did they increase
12   the unit prices or decrease the unit prices?
13       A.   There were two unit prices that
14   were revised by State Farm.  That would be
15   the removal of roofing and replacement of
16   roofing.  In my preparation for this
17   deposition, I asked whether that was an
18   increase or a decrease and it was a decrease
19   in price.
20       Q.   Did you ask -- and this is Mark
21   Richter who told you this?
22       A.   The information that I just
23   relayed was information I received from
24   pricing specialist Mark Richter.
25       Q.   Did you ask Mark Richter why he

Page 31

1    decreased the unit price that came from
2    Xactware?
3        A.   In preparation for today's
4    deposition, I did ask that question.  The
5    unit price for roofing was revised based on
6    information that Mark Richter was receiving
7    from the field reps as to what the going
8    rate was in the area and what roofers were
9    accepting as a reasonable price for work
10   that was being performed.
11       Q.   Okay.  What information did he
12   rely upon to decide to lower the unit prices
13   they received from Xactware on the roofing
14   items?
15       A.   I think your use of roofing items
16   is a very broad statement.  The two roofing
17   items that I'm referring to is 20- to
18   25-year shingles, remove and replace.  It
19   was not a change to all roofing items.  The
20   information that he used to revise that was
21   information he was receiving from the
22   offices in and around the New Orleans area
23   from the claim reps who were in the field.
24       Q.   Did he tell you whether the
25   information was based on any documents?

Page 32

8  (Pages 29 to 32)

1    A.   Any documents, we were generating
2  estimates every day.  We were receiving
3  quotes back from contractors every day so
4  those documents -- I mean, he surveyed the
5  claim reps receiving those documents, so
6  that change was based on documents and
7  information from the people on the ground
8  doing the work.
9    Q.   And you keep using the word
10 "information."  I'm trying to figure out
11 what that information was and the form that
12 information came in.
13      When he said, "I relied upon
14 information coming to me," did he say I
15 looked at 50 State Farm estimates that came
16 from the Greater New Orleans area within
17 this time frame to make that decision and I
18 have a copy of those 50 estimates in my
19 office?
20    MR. ZAUNBRECHER:
21      Same objection.
22      Again, you can answer the question
23 as to what Mr. Richter told you, if
24 anything.
25    THE WITNESS:

1    I've relayed what Mr. Richter has
2  told me with regards to the pricing.  I did
3  not delve into whether he did or didn't have
4  documents on those.  I can verify that I
5  indeed was here during that time and I was
6  one of the people that was relaying that
7  information to Mr. Richter as to what
8  pricing was working in the area that I was
9  working, which was the greater Hammond area.
10   Q.   Did Mr. Richter tell you or did
11 you ask Mr. Richter whether he relied upon
12 any local contractors or roofers to come up
13 with that decision to lower the unit price?
14   A.   I did not ask Mark Richter whether
15 he did an independent survey himself of
16 contractors, no.
17   Q.   Would you agree that the best
18 person to ask why that unit price was
19 lowered in the New Orleans Metropolitan area
20 for this time frame for the Brown estimate
21 would be Mark Richter?
22   A.   I believe I've relayed to you the
23 information I received from Mark Richter.
24 I've also relayed the fact that I was here
25 during that time and can confirm that the

1  prices that we were using at that time were
2  was being accepted by contractors in the
3  area.
4    Q.   Would you agree, though, that
5  whether Mr. Richter conducted an independent
6  survey of contractors is a question best
7  posed to Mr. Richter?
8    MR. ZAUNBRECHER:
9      Let me object, one, to the form of
10 the question, and, two, as being beyond the
11 scope of the notice of deposition and beyond
12 the scope of the court's discovery order and
13 instruct the witness not to answer.
14 EXAMINATION BY MR. GISLESON:
15   Q.   Why did you talk to Mark Richter
16 in the first place?
17   A.   In preparation for today's
18 deposition, I talked to Mark Richter about
19 the prices contained within the estimate for
20 the Browns.
21   Q.   Is it fair to say as you sit here
22 right now, you don't know the specific
23 information Mr. Richter relied upon to make
24 the decision to lower the unit prices for
25 the unit prices in the Brown estimate?

1    MR. ZAUNBRECHER:
2      I object to the form of the
3  question.
4      If you understand it, please
5  answer.
6    THE WITNESS:
7      The unit prices contained within
8  the Brown estimate contains both Xactimate
9  unit prices and a change to proofing prices,
10 that was done by Mark Richter.
11   MR. GISLESON:
12     Madam Court Reporter, can you read
13 my question again?
14     (Whereupon, the requested
15 testimony was read by the Court Reporter)
16     "Q   Is it fair to say as you sit
17 here right now, you don't know the
18 specific information Mr. Richter relied
19 upon to make the decision to lower the
20 unit prices for the unit prices in the
21 Brown estimate?"
22   MR. ZAUNBRECHER:
23     Same objection.  I think he
24 answered.
25     If you have anything to add,

9  (Pages 33 to 36)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1   please do so.
2       THE WITNESS:
3           The information Mr. Richter used
4   to establish the pricing that is in the
5   State Farm price list for the roofing
6   materials, 20- to 25-year shingles remove
7   and replace was information that he was
8   receiving through the various offices as to
9   what the going rate was in those areas based
10  on estimates that we were being generated at
11  that time.
12  EXAMINATION BY MR. GISLESON:
13      Q.  So you don't know if Mr. Richter
14  relied upon any contractors's estimates to
15  come to that decision; do you?
16      MR. ZAUNBRECHER:
17          I object to the form.  He told you
18  what Mr. Richter told him.
19  EXAMINATION BY MR. GISLESON:
20      Q.  Do you know whether Mr. Richter
21  relied upon any contractors' estimates to
22  come to the decision to lower the unit price
23  in the Brown estimate?
24      MR. ZAUNBRECHER:
25          Same objections, and I want to add
                                        Page 37

1   asked and answered several times.
2           If you have anything else to add,
3   please do so.
4       MR. GISLESON:
5           I don't -- I don't -- I'm not
6   getting an answer out of him.
7   EXAMINATION BY MR. GISLESON:
8       Q.  Do you know whether he used any
9   contractors' estimates to come to the
10  decision to lower the unit price for the
11  unit prices in the Brown estimate?
12      MR. ZAUNBRECHER:
13          Same objection, and he has
14  answered that.  He has told you what Richter
15  told him he relied upon.  He's told you
16  several times.
17      MR. GISLESON:
18          He keeps saying information.  I'm
19  trying to find out a very specific question.
20  EXAMINATION BY MR. GISLESON:
21      Q.  Did he rely upon a single
22  contractor's estimate to make the decision
23  to lower the unit prices for the unit price
24  in the Brown estimate?
25      MR. ZAUNBRECHER:
                                        Page 38

1       Same objection.
2       If you can explain your answer
3   anyway further, please do so.
4       THE WITNESS:
5           The information that Mr. Richter
6   relied upon was information that he received
7   from the claim representatives who were on
8   the ground.  That information includes
9   interaction with contractors.
10          Did Mark Richter have a specific
11  estimate in front of him from a contractor
12  to make that unit price decision?  I don't
13  know.  But did Mark Richter have information
14  from claim reps who did have specific
15  estimates in front of them as to roofing?
16  Absolutely.
17  EXAMINATION BY MR. GISLESON:
18      Q.  Now, was Mark Richter the one who
19  made the decision to lower the unit price
20  for these unit prices or was his job --
21  excuse me, to make the recommendation to
22  lower the price and somebody else made the
23  decision?
24      MR. ZAUNBRECHER:
25          Are you limiting it to this claim?
                                        Page 39

1       MR. GISLESON:
2           To this claim.
3       MR. ZAUNBRECHER:
4           Please go ahead.
5       THE WITNESS:
6           The use of the price that was used
7   in this price list -- in this claim was the
8   price that was established in the State Farm
9   price list.
10  EXAMINATION BY MR. GISLESON:
11      Q.  The question is:  Who made the
12  decision?  Did Mark Richter make the
13  decision to lower it or did Mark Richter
14  just make the suggestion to lower it and
15  someone else within State Farm said lower
16  it?
17      A.  Mark Richter did not do this
18  estimate.  The claim rep did this estimate.
19  The estimate that this claim rep did was
20  based on a State Farm price list.  There
21  wasn't a specific this is the Browns, I'm
22  going to lower this unit price.
23  EXAMINATION BY MR. GISLESON:
24      Q.  We spoke earlier about Mark
25  Richter, what you understood Mark Richter's
                                        Page 40

10  (Pages 37 to 40)

1  duties to be.  Do you remember that?
2      A.  I recall us talking about what
3  Mark Richter's duties would be, yes, sir.
4      Q.  You spoke about Mark Richter being
5  the pricing specialist for the New Orleans
6  Metropolitan area during the time frame of
7  the Brown estimate.  Do you remember that?
8      A.  I recall that conversation, yes,
9  sir.
10      Q.  Was part of his duties and
11  responsibilities to make the decision of
12  what the State Farm unit prices would be for
13  that area or was it to simply make the
14  recommendation?
15      A.  As the pricing specialist, Mark
16  Richter would gather information and would
17  make a recommendation as to what the price
18  could be and once receiving approval, would
19  make that change.
20      Q.  Okay.  Who would Mark Richter make
21  that recommendation to and who had the
22  authority to say go ahead and do it?
23      MR. ZAUNBRECHER:
24          Objection as being beyond the
25  scope of not only the deposition, but the

Page 41

1  discovery order.
2          If you know, please answer.
3      THE WITNESS:
4          I do not recall who Mark Richter
5  reported to.
6  EXAMINATION BY MR. GISLESON:
7      Q.  Would you agree that Mark Richter
8  would know who he reported to?
9      MR. ZAUNBRECHER:
10          I object to the form.  I'm not
11  sure any person can testify under oath as to
12  what another person might know.
13          Please don't answer that.
14  EXAMINATION BY MR. GISLESON:
15      Q.  Doesn't commonsense dictate that
16  Mark Richter would know who his supervisor
17  was during the time frame of the Brown
18  estimate?
19      MR. ZAUNBRECHER:
20          Objection.  That's a different
21  form.
22          If you know that, please answer.
23      THE WITNESS:
24          I would believe Mark Richter would
25  know who he reported to, yes.

Page 42

1  EXAMINATION BY MR. GISLESON:
2      Q.  What documents did you review to
3  prepare for today's deposition?
4      A.  In preparation for today's
5  deposition, I looked at the deposition order
6  Nos. 1 through 17.  I also reviewed the
7  Brown homeowners and flood file.
8      Q.  Before I forget, did Mr. Richter
9  ever tell you what Xactware unit prices were
10  for the items in the Brown estimate?
11      A.  I did not ask what the Xactware
12  prices were for the two unit prices that
13  were changed by Mark Richter.
14      Q.  Did you ask just in general terms,
15  you know, how much lower State Farm made
16  those unit prices?
17      MR. ZAUNBRECHER:
18          I object to the form, but you can
19  answer if you have any information that's
20  responsive.
21      THE WITNESS:
22          In preparation for today's
23  deposition, I asked what the difference, if
24  it was -- let me try and reword that.  The
25  Brown estimate was for one square removal of

Page 43

1  roofing and one square replacement of
2  roofing.  I asked what that difference was
3  comparing State Farm's to what we thought
4  Xactware's was and the total difference was
5  less than $20.
6  EXAMINATION BY MR. GISLESON:
7      Q.  $20 per unit price or $20 total?
8      A.  $20 in total including the
9  material tax associated with those unit
10  prices.
11      Q.  If you wanted to find out what
12  Xactware -- I'm sorry, who gave you that
13  information?
14      A.  The information that I received
15  that I just recounted was information I
16  received from Mark Richter.
17      Q.  Okay.  Did Mark Richter tell you
18  what he was looking at when he gave you this
19  conclusion?
20      A.  No, I did not ask what he was
21  looking at when he gave me that information,
22  no, sir.
23      Q.  Did Mark Richter say he had the
24  Xactware program open in front of him and he
25  was checking it out?

Page 44

11 (Pages 41 to 44)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1     A.   When I was speaking with Mark
2   Richter, he was looking at the Xactimate
3   price list.  I did not ask whether he was
4   looking in the Xactware program or not.
5     Q.   So is it fair to say that you
6   haven't confirmed whether the information
7   Mark Richter gave you was factually correct?
8     A.   I don't know that I understand
9   that question.
10     Q.   Sure.  Did you go about to do
11   anything to confirm that $20 number that
12   Mark Richter gave you?
13   MR. ZAUNBRECHER:
14     I believe he said less than $20.
15   EXAMINATION BY MR. GISLESON:
16     Q.   Less than $20.
17     A.   Did I do my own independent
18   research?  No.
19     Q.   So it's fair to say Mark Richter
20   knew the Xactware unit price he was basing
21   that comparison on; right?
22   MR. ZAUNBRECHER:
23     I object to the form.
24     But if you understand, please
25   answer.

Page 45

1     A.   The conversation was a conference
2   call, yes, sir.
3     Q.   The conference call you had with
4   Mr. Richter, do you know where Mr. Richter
5   was physically located?
6     A.   I believe at the time I spoke with
7   Mr. Richter last Friday, he was in
8   Shreveport.
9     Q.   Does he live in Shreveport?
10     A.   I didn't ask where he lived, no,
11   sir.
12     Q.   Is it your understanding that he
13   lives in Shreveport?
14     A.   Any answer I gave you to that
15   would be purely speculative.  I don't know
16   where he resides.
17     Q.   Were there any attorneys present
18   with him on his end in Shreveport during the
19   course of the conference call?
20     A.   The conference call was a
21   conference call.  I was not in the room with
22   attorneys, I do not believe he was in the
23   room with attorneys.  The attorneys that I
24   referenced prior were on the same conference
25   call.

Page 47

1   THE WITNESS:
2     If the question is did Mark
3   Richter know what the Xactware price was?  I
4   don't know that he knew that.  He knew what
5   his changes were.
6   EXAMINATION BY MR. GISLESON:
7     Q.   Did you know what he was looking
8   at or do you know what he based the decision
9   for -- do you know what he was looking at or
10   what he based that comment on when he made
11   it to you?
12   MR. ZAUNBRECHER:
13     I assume you mean with regard to
14   the less than $20 difference?
15   MR. GISLESON:
16     Yes.
17   MR. ZAUNBRECHER:
18     Please answer.
19   THE WITNESS:
20     I believe he was looking at the
21   State Farm price list, but I wasn't looking
22   at what he was looking at, no, sir.
23   EXAMINATION BY MR. GISLESON:
24     Q.   And this conversation took place
25   over the phone?

Page 46

1     Q.   So is it fair to say you don't
2   know?
3     A.   I didn't hear anyone else announce
4   themselves when Mark Richter got on the
5   conference call.
6     Q.   And that leads you to believe
7   what?
8     A.   That Mark Richter was on the phone
9   with himself.
10     Q.   Do you know whether Mark Richter
11   had any conversations with anyone else
12   before he got on the conference call about
13   the subject matter you all discussed on the
14   conference call?
15     A.   I don't know that I understand the
16   question.  Sorry.
17     Q.   Do you know if Mr. Richter talked
18   to any of the attorneys that you discussed
19   earlier before he got on the conference call
20   with you?
21     A.   The conference call that I was on
22   on Friday invited Mr. Richter in.  I do not
23   know that there were conversations that
24   occurred prior to that conference call with
25   Mr. Richter and other counsel, no, sir.

Page 48

12  (Pages 45 to 48)

1      Q.   Do you know what documents
2  Mr. Richter looked at before he got on that
3  conference call?
4      A.   In preparation for today's
5  deposition, I did not ask what documents he
6  looked at prior to getting onto the
7  conference call.
8      Q.   Have you ever used the Xactimate
9  program in the course of doing an estimate,
10  I'm sorry?
11      A.   Can I get the question again,
12  please?
13      Q.   Sure.  Have you ever used the
14  Xactimate program in the course of writing
15  up an estimate?
16      A.   I've used the Xactimate program
17  since '96 in the course of my employment
18  with State Farm.
19      Q.   We spoke earlier about the
20  documents you reviewed in preparation for
21  today's deposition.  You spoke of -- I think
22  you said the insurance policy; right?
23      A.   No, but thank you.  I did look at
24  the insurance policy.
25      Q.   Maybe you said the homeowners
Page 49

1  claims file?
2      A.   I did look at the homeowners
3  claims file.
4      Q.   You looked at the flood claims
5  file?
6      A.   I did look at the flood claims
7  file, yes.
8      Q.   There were some documents also
9  produced in the course of discovery in this
10  case, some OGs.  Did you look at any of
11  those OGs?
12      A.   I did not review the OGs, no, sir.
13      Q.   When I say OG, what does an OG
14  mean?
15      A.   OG would be an acronym for
16  operation guide.
17      Q.   And State Farm has a lot of
18  operation guidelines for just about
19  everything; right?
20      MR. ZAUNBRECHER:
21          I object to the form.
22          You can answer it if you
23  understand it.
24      THE WITNESS:
25          State Farm does have operation
Page 50

1  guides for us to consult, yes.
2  EXAMINATION BY MR. GISLESON:
3      Q.   Okay.  Since you reviewed the
4  homeowners file, why don't you tell me what
5  is supposed to be in a claims file?  Let me
6  ask it this way:  What is State Farm's
7  policy, practice and procedure for what is
8  supposed to comprise a claims file for a
9  homeowners's claim?
10      MR. ZAUNBRECHER:
11          I object to the form -- same
12  objection.  I will allow some leeway, but
13  it's clearly beyond the scope.
14          I will allow some leeway and
15  please answer his question if you understand
16  it.
17      THE WITNESS:
18          The documents contained within a
19  claim file are the documents required to
20  proceed with that claim file.
21  EXAMINATION BY MR. GISLESON:
22      Q.   What are those documents?
23      A.   That's an impossible question to
24  answer, Counsel.  A claim file could contain
25  one piece of information, it could contain a
Page 51

1  lot of information, depending on the
2  complexity of that claim file.
3      Q.   Isn't there an operating guideline
4  that talks about the document that is
5  supposed to comprise the claims file?
6      A.   There is a document, an operation
7  guide, that references the creation of a
8  claim file, but it's a guide and maybe I can
9  help this along.
10          If I have a claim for a lost ring,
11  I certainly wouldn't want a building
12  estimate in there.  If I have a claim that
13  was opened in error, I certainly wouldn't
14  expect to see anything other than a log note
15  saying opened in error.
16      Q.   Wouldn't you agree that in terms
17  of category of documents, there's a
18  procedure that a certain category of
19  documents need to be placed in the claims
20  file; right?
21      MR. ZAUNBRECHER:
22          Let me note my continuing
23  objection to this entire line of questioning
24  as being beyond both the scope of the notice
25  of deposition and the court's discovery
Page 52

13  (Pages 49 to 52)

1  order.
2  EXAMINATION BY MR. GISLESON:
3      Q.  Let me narrow it then somewhat.
4  Did State Farm have a policy, practice and
5  procedure for what documents were supposed
6  to compromise a Hurricane Katrina claim file
7  for a claim arising out of the New Orleans
8  Metropolitan area?
9      MR. ZAUNBRECHER:
10      Same objection.
11      If you understand it, I will again
12  allow you to answer it even though it's
13  clearly in my view beyond the scope.
14      THE WITNESS:
15      The documents contained within the
16  Brown file are the documents that I would
17  expect to see based on the Brown loss.
18  EXAMINATION BY MR. GISLESON:
19      Q.  As you sit here right now, you
20  don't -- you don't have any understanding of
21  what those documents should have been that
22  compromise a typical claims file for a
23  Katrina claim?
24      MR. ZAUNBRECHER:
25      I object to the form.  I think

Page 53

1  you've gone far enough with that beyond the
2  scope and I'm going to direct him not to
3  answer further questions.  He will answer
4  any questions you have about this claim
5  file, which is what the court ordered.
6  EXAMINATION BY MR. GISLESON:
7      Q.  Would you agree that what the
8  insurance policy would compromise should be
9  in the claims file?
10      A.  Contained within our claims file
11  is not a copy of the insurance policy, no,
12  sir.
13      Q.  So then the policy, it shouldn't
14  be in the claims file?
15      MR. ZAUNBRECHER:
16      Same objection.
17      THE WITNESS:
18      I don't believe I understand what
19  your question is.
20  EXAMINATION BY MR. GISLESON:
21      Q.  The Browns have a claims file;
22  right?
23      A.  There is a claim file for the
24  Browns, yes.
25      Q.  And as part of the claims file for

Page 54

1  Browns, does it include the Browns'
2  insurance policy?
3      A.  A physical copy of their insurance
4  policy would be contained within the claims
5  file.  Is that what the question is?
6      Q.  Yes.
7      A.  No.
8      Q.  Why not?
9      A.  Because the claims file references
10  what that policy is and we can reference
11  that policy.
12      Q.  How does it reference the policy?
13      A.  I'm assuming you have a copy of
14  the claims file?
15      Q.  Yes, sir.
16      A.  On Brown 0008, in the middle
17  right-hand side, it says FP7955, homeowners
18  policy.  That is the policy that the Browns
19  had.  It also lists the options and any
20  endorsements that the Browns had.  I believe
21  on your copy, it would be where you have
22  your orange.
23      Q.  So what other information -- well,
24  you've reviewed -- let's do it this way --
25  so you've reviewed the Browns' claims file;

Page 55

1  right?
2      A.  In preparation for today's
3  deposition, I have reviewed the Browns'
4  file.
5      Q.  Was there anything missing from
6  the claims file that you noticed that should
7  have been in the Browns' claims file?
8      A.  I felt the information contained
9  within the Brown file was the information
10  needed to support the decision that was made
11  on the Brown file.
12      Q.  Is that what comprises a claim
13  file, whether or not there's enough
14  information in the file that supports State
15  Farm's decision?
16      MR. ZAUNBRECHER:
17      Same objection as before.  We've
18  been through this.  He told you what he
19  expected -- he saw what he expected to see.
20  I mean -- I object to the form of the
21  question.  Beyond the scope.
22      MR. GISLESON:
23      Are you directing him not to
24  answer?
25      MR. ZAUNBRECHER:

Page 56

14  (Pages 53 to 56)

1    I would ask that you repeat the
2  question.
3    MR. GISLESON:
4      Madam Court Reporter, can you
5  repeat the question please?
6      (Whereupon, the requested
7  testimony was read by the Court Reporter)
8      "Q    Is that what comprises a
9  claim file, whether or not there's
10 enough information in the file that
11 supports State Farm's decision?"
12    MR. ZAUNBRECHER:
13      Just note my objection.
14      If you can answer that, go ahead.
15    THE WITNESS:
16      The Brown file itself does not
17 dictate what would be required within a
18 claims file.  The information contained
19 within the Brown file is the information
20 that supports the outcome of the Brown file.
21 EXAMINATION BY MR. GISLESON:
22    Q.  What dictates what should be in
23 the Brown file then?
24    MR. ZAUNBRECHER:
25      I objection to the form.

Page 57

1      Go ahead and answer it if you
2  think you can.
3    THE WITNESS:
4      The items contained within the
5  Brown file would be the items that the
6  handling adjusters felt were needed to
7  support the decision that they made.
8    MR. ZAUNBRECHER:
9      Soren, when you reach a good
10 breaking point in the next 10 or 15 minutes,
11 just for two or three minutes.
12    MR. GISLESON:
13      And, Chris, if you ever need a
14 break, just let us know and we will take a
15 break.
16    THE WITNESS:
17      Thank you.
18 EXAMINATION BY MR. GISLESON:
19    Q.  The question then -- well, is
20 there any information that you reviewed
21 on -- let me ask it this way:  Is there any
22 information related to the Browns' claim
23 file that wasn't in the claims file that you
24 saw that State Farm would somehow maintain
25 in a computer database somewhere?

Page 58

1    A.  I'm going to ask you to reword the
2  question because I don't understand it the
3  way it's been asked.
4    Q.  Sure.  Is the claims file you
5  reviewed for the Browns the entire Browns'
6  claims file?
7    A.  The claims file that I reviewed
8  for the Browns is the pre-litigation claims
9  file.
10    Q.  Okay.  That's fair enough.
11      So there was -- was there any
12 documents missing out of the pre-litigation
13 claims file that you figured out should have
14 been in the claims file, but weren't?
15    A.  My review of the claims file, I
16 did not believe I saw anything or felt that
17 there was something missing.
18    Q.  How is the claims file, the
19 Browns' claim file maintained by State Farm,
20 electronically, hard copy or both?
21    A.  At the time of Hurricane Katrina,
22 State Farm catastrophe services was working
23 with both an electronic and paper hybrid
24 version of the claims file.  So in answer to
25 your question, there would be an electronic

Page 59

1  claim file as well as paper copies.
2    Q.  Where was the Browns' electronic
3  portions of the claims file maintained?
4    A.  The electronic claim file is
5  maintained on the State Farm server.
6    Q.  What is the name of the State Farm
7  server; do you know?
8    A.  I don't know the name of the State
9  Farm server, no, sir.
10    Q.  What is the name of the State Farm
11 claims software that the Browns' claim would
12 have been stored on?
13    A.  We refer to it as the claims
14 service record or CSR.
15    Q.  How -- is there a State Farm
16 server that you log onto, an access code, to
17 gain admittance onto the system?
18    A.  During Hurricane Katrina, there
19 was a server that we logged onto, yes, sir.
20    Q.  And at some point, there had to be
21 a field or a screen where you would type in
22 information relevant to a particular
23 insured; right?  In order to get at his
24 electronic portion of the claims file?
25    A.  If you're asking about a search

Page 60

15 (Pages 57 to 60)

1 function, we could search by either claim
2 number, policy number, or insured's name.
3      Q.   So you log on, you want to find
4 out and you want to see everything on the
5 server related to the Browns' claim; all
6 right?  You get to the screen, what items --
7 well, first off, can you print up what's on
8 that screen that you type in the search
9 functions for?
10     A.   I'm certain you can do a screen
11 print of that screen, yes, sir.
12     Q.   What information is located or
13 identified on that screen that would assist
14 you in eventually pulling up the Browns'
15 claim file?  What options are available to
16 you?
17     A.   I don't know that I can give you
18 an all inclusive list, but it would include
19 a claim number, an area to put in a claim
20 number, an area to put in a last name, an
21 area to put in a first name, an area to put
22 in a policy number, not the 7955, but the
23 actual policy number associated with the
24 Browns.
25     Q.   What about address?

Page 61

1      Q.   Okay.  Another computer screen?
2      A.   That's correct.
3      Q.   And if you wanted to, you could
4 make a printout of the Browns' claims file
5 computer screen; right?
6      A.   We could probably do a screen
7 print, yes, sir.
8      Q.   And there are areas and fields on
9 the Browns' claims screen, right, that allow
10 you to do certain things?
11     A.   The initial screen that comes up,
12 I do not believe I can edit, no, sir.
13     Q.   What is on that screen?
14     A.   On that screen would be their
15 name, their address, policy type, policy
16 number, data loss, catastrophe code.  It's
17 not all inclusive, but that's the major
18 parts.
19     Q.   Okay.  So I've got this
20 information in front of me on the screen,
21 but if you wanted to see all the major
22 parts, you would just do a screen shot;
23 right?
24     MR. ZAUNBRECHER:
25         A screen what?

Page 63

1      A.   I believe you can search by
2 address, but it's not very successful.
3      Q.   Would that also be on the same
4 screen?
5      A.   The search screen is a single
6 screen, yes.
7      Q.   What if I wanted to pull up any
8 information from the Browns concerning who
9 worked on the Browns' claims file before
10 suit was filed?  Could I pull up that
11 information from that screen?  Which
12 adjusters?
13     A.   You can pull up the claims file
14 from that screen.  Contained within the
15 claim file is the names of the people that
16 worked on that claims file.
17     Q.   Okay.  Is there any other
18 information on the initial screen that would
19 assist you in getting to the Browns' claim?
20     A.   I do not believe so, no.
21     Q.   So you type in the Browns' policy
22 number, boom, it takes you to the Browns --
23 what does it take you to?
24     A.   It takes me to the Browns' claim
25 file.

Page 62

1 EXAMINATION BY MR. GISLESON:
2      Q.   Or you would print up the screen?
3      A.   No, sir.  I would just navigate
4 within the screen.
5      Q.   Okay.  But I'm talking about in
6 terms of this deposition.  If I had that
7 printout of that screen shot in front of me,
8 I could ask you questions about every single
9 one of those various items on the screen
10 that you can't remember?
11     A.   Everything that's contained within
12 that screen is contained within the paper
13 file that you have received, Counsel.
14     Q.   Okay.  So I've got this
15 information in front of me and let's say I
16 want to go check out the claims log.  How do
17 I get to the claims log from the screen in
18 front of me, the Browns' claim log?
19     MR. ZAUNBRECHER:
20         You mean the activity log; don't
21 you?
22 EXAMINATION BY MR. GISLESON:
23     Q.   Is that what you call it, the
24 activity log?
25     A.   I would refer to it as an activity

Page 64

16  (Pages 61 to 64)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1   log, yes, sir.
2       Q.   What is the activity log?
3       A.   The activity log is where the
4   adjuster will make notes as to their
5   workings on the file.
6       Q.   So I've got the Browns' claims
7   file in front of me, I've got the screen,
8   we've pulled it up, and now I want to check
9   out the activity log.  How do I do that from
10  that screen?
11      A.   Down at the bottom of the screen,
12  there's a function key that you can press.
13  I believe it's F5 that gets you to the
14  activity log.
15      Q.   What other function keys are there
16  for the Browns' claim?
17      A.   There would be a function key for
18  generating a draft, there be another one for
19  getting to the images, there would be
20  another one for review of the policy, policy
21  type, another one wore confirming what the
22  deductible is, another one that would get
23  you to a loss history, facts of the loss.
24      Q.   I'm sorry, what was that?
25      A.   Facts of the loss.

Page 65

1       Q.   Facts of the loss?
2       A.   Which would be the initial
3   reporting.
4       Q.   Is that everything that you can
5   remember?
6       A.   You would be able to get to what's
7   contained within this copy that you had
8   received, sir.
9       Q.   Okay.
10      A.   Other than, I apologize, other
11  than any file -- any documents that may have
12  been paper only.
13      MR. GISLESON:
14          Let me know if you want to take a
15  break.
16      MR. ZAUNBRECHER:
17          Thank you.
18      MR. GISLESON:
19          We will take a break and come
20  back.
21      THE VIDEOGRAPHER:
22          We're off the record.  It's 10:13.
23          (Whereupon, a brief recess was
24  taken.)
25      THE VIDEOGRAPHER:

Page 66

1          We're back on the record.  It's
2   10:22.
3   EXAMINATION BY MR. GISLESON:
4       Q.   Mr. Lapinskie, before we went off
5   the record, we were discussing the various
6   function keys on the Browns' screen shot on
7   the State Farm database system.  What was
8   the claim -- or the State Farm claim system?
9   Is that the right way to say it?
10      A.   CSR is what we refer to it as.
11      Q.   Is that just an internal name for
12  it or is that the name of the actual
13  software that's used?
14      A.   I wouldn't -- I don't know whether
15  that's an official name or an internal name.
16  It's the name that I've used forever.
17      Q.   Before we went off the record, we
18  were talking about the function keys.  I
19  think you mentioned that they would be
20  identified on the bottom of the screen; is
21  that right?
22      A.   That's correct.  The function keys
23  are identified on the bottom.
24      Q.   The first one you mentioned was a
25  function key for draft.  What is that?

Page 67

1       A.   Drafts are what we issue to our
2   insureds when we make payment for a claim.
3       Q.   And what information would be
4   contained in the drafts?
5       A.   The information that would be
6   generated on the draft.
7       Q.   The next one you mentioned was
8   images.  What kind of information would be
9   found in the images?
10      A.   Images would be where we would
11  scan in the paper copies of information
12  received, be it outgoing correspondence,
13  incoming correspondence.
14      Q.   Just returning to the drafts part
15  right quick.  Let's say you wanted to check
16  out the drafts of the Brown file, you click
17  the function for drafts and up pops the
18  screen concerning the drafts.  What does
19  that look like?
20      A.   It's a list of draft numbers and
21  payments.
22      Q.   Did you see that document in the
23  claims file when you were reviewing it?
24      A.   I saw copies of the drafts, yes.
25      Q.   Were they copies of the drafts

Page 68

17  (Pages 65 to 68)

1 itself or were they a copy of the printout
2 of the screen for the drafts?
3    A.  Both, actually.
4    Q.  The next one is images.  Have you
5 actually looked on the computer screen for
6 the Browns' file, Browns' claim?
7    A.  In preparation for today's
8 testimony, I took a look at the same claims
9 file as it was delivered to you.  So, no, I
10 did not look at the electronic claims file.
11    Q.  You haven't done a comparison to
12 see if there's anything on the electronic
13 Browns' claims file that wasn't produced in
14 the paper claims file?
15    A.  I did not do a comparison between
16 the two, no, sir.
17    Q.  So if I asked you what images were
18 scanned in to the Browns' electronic claims
19 file, you could tell me generally what those
20 images are, but specifically as to Brown,
21 you wouldn't be able to comment because you
22 haven't seen the Brown electronic claims
23 file; right?
24    A.  I would be able to generally tell
25 you.  Yeah, I wouldn't be able to tell you

Page 69

1 Browns' claims file, unless it was blocked
2 from me, yes, I could.
3    Q.  What does that mean, blocked from
4 you?
5    A.  We have the ability to limit
6 access to files based on a business need.
7    Q.  Do you know if the Browns'
8 electronic claims file has been blocked from
9 you?
10    A.  I have no reason to believe that
11 it is, but, no, I couldn't answer that
12 question.
13    Q.  After images, you testified -- I
14 think you said, if my handwriting serves me
15 correctly, review policy type.  Is that what
16 you said after images; do you remember?
17    A.  I don't know that I used the word
18 "review," but it would tell me what the
19 policy type was, yes.
20    Q.  So when you pull up that screen,
21 what does it look like?
22    A.  It lists their homeowners policy,
23 options and endorsements.
24    Q.  In your review of the Browns'
25 claims file, have you seen what would have

Page 71

1 in the Brown file.  I don't know that I
2 would give you a full response as to whether
3 or not an item was imaged or not.  If you
4 have a question with regard to a specific
5 item, based on that item, I may be able to
6 tell you, yes, sir.
7    Q.  Can you access the State Farm
8 claims network remotely just with a computer
9 anywhere you happen to be?
10    A.  I have the ability to get into CSR
11 without being hard wired, yes, sir.
12    Q.  And State Farm provided you with a
13 laptop?
14    A.  I have a State Farm-issued laptop,
15 yes, sir.
16    Q.  And did you bring that laptop with
17 you on your trip to New Orleans for this
18 deposition?
19    A.  I have that laptop with me at my
20 hotel room, yes, sir.  Was it for this
21 deposition?  No, sir.
22    Q.  But you could use that laptop with
23 you to access the Browns' claim files if you
24 wanted to; correct?
25    A.  If I had a need to access the

Page 70

1 been the review policy function?
2    A.  In my review of the Brown file --
3 maybe I can help you.  The screen would look
4 very similar to Brown 42, right here
5 (indicating).
6    Q.  Okay.  Is that, in fact, the
7 screen printout for the review policy or are
8 you just showing me a document that would
9 reflect the same policy that would be in
10 your review policy?
11    A.  It's not a screen printout, no,
12 sir.
13    Q.  The next one function you
14 identified was confirmed deductibles?
15    A.  That's correct.
16    Q.  What information would pop up if I
17 typed in the function key for confirm
18 deductibles on the Brown claim?
19    A.  What you would see would be the
20 same as in Brown 42 on the right-hand side.
21    Q.  What is the Brown deductible as
22 identified in the document in front of you?
23    A.  I'm sorry, the deductible wouldn't
24 show in that area that I pointed to in this
25 document.  It would be -- it would be $500.

Page 72

18  (Pages 69 to 72)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1     Q.   Could you identify the Bates
2  number, too, please?
3     A.   I'm sorry, that's Brown 008.
4     Q.   Okay.  Is that the document that
5  would show up on the confirmed deductible
6  part on the computer screen?
7     A.   This document?
8     Q.   Yes.
9     A.   No, it doesn't look the same.
10  It's the same information.
11     Q.   Next we have loss history.
12  Function on the claims database.  What is
13  loss history?
14     A.   Whether they had prior claims.
15     Q.   Did you -- what does it look like
16  when you pull it up?
17     A.   For the Browns, it would be empty.
18     Q.   Did you see a computer printout
19  anywhere of the empty screen shot for the
20  loss history for the Browns?
21     A.   Brown 008, top right-hand corner
22  where it says "claim history."
23     Q.   And that would just be for past
24  claim history with State Farm, right, not
25  with other insurance companies?

Page 73

1  the Brown claim that you could think of.
2  You gave me those six, and I'm asking if
3  there are any other function keys?
4     A.   There's print functions.
5     Q.   Okay.  Now, actually I think we
6  started this conversation with the activity
7  log.  How do I get to the activity log from
8  there?
9     A.   From where?
10     Q.   From this screen that shows me the
11  various functions on the bottom and the
12  Brown claim information up top?
13     A.   I believe the activity log is F6.
14     Q.   Okay.
15     A.   It might be F5.  I don't know what
16  the actual function is, but it's a function
17  key.
18     Q.   Okay.  So now we talked about
19  seven of these types of functions.  Are
20  there any other functions on the Brown
21  electronic claim file that would provide me
22  with additional information concerning the
23  claim?
24     A.   There is a key to enter parties to
25  the loss.

Page 75

1     A.   That would be just the claim
2  history under this policy with State Farm.
3     Q.   The next function you identified
4  was facts of the loss.
5     A.   That is correct.
6     Q.   What is that?
7     A.   That is the same information as
8  you would see on Brown 008 down in the lower
9  right-hand corner.
10     Q.   Is this, in fact, what would pull
11  up, though, if you want the facts of the
12  loss of the Brown claim or would it look
13  different?
14     A.   Would it be the same page?
15     Q.   Yes.
16     A.   The entire page?  No, sir.  It
17  would be the lower right-hand corner, facts
18  of loss.
19     Q.   Okay.  Are there any other
20  function keys concerning the Brown file
21  other than the ones we just spoke of?
22     A.   I don't know that I understand the
23  question.
24     Q.   Sure.  I asked you earlier to
25  identify other function keys that related to

Page 74

1     Q.   Anything else?
2     A.   There's a key to see the system
3  log.
4     Q.   What's the system log?
5     A.   The system log is -- you will see
6  the system log starting on Brown 0040 and
7  ending on Brown 0041.
8     Q.   How is the system log different
9  from the activity log?
10     A.   Well, the sequence associated with
11  the system log follows within the sequence
12  of the activity log and it just outlines
13  when there was electronic activity.  For
14  example, system log No. 16 indicates that we
15  printed it manually on printer L199.  That
16  would be on Brown 0041.
17     Q.   Any other functions that you can
18  think of?
19     A.   I would also be able to see policy
20  notes as contained on Brown 0043.
21     Q.   Is policy notes an actual
22  function, additional function?
23     A.   Yes.
24     Q.   Any other functions you can think
25  of?

Page 76

19 (Pages 73 to 76)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1     A.   And you would also be able to see
2   documented changes as contained within Brown
3   0047.
4     Q.   What are documented changes?
5     A.   That is when there is a
6   reassignment from an office to another
7   office, a change from -- change in status
8   from either open to closed, documents on
9   contact dates, inspection dates,
10  reassignments to other individuals, other
11  claim handlers.
12    Q.   And the documented changes is its
13  own separate function key?
14    A.   In order to see it, there is a
15  separate function key that you would hit,
16  yes, sir.
17    Q.   The any other function keys for
18  the Browns' claim?
19    A.   I believe that covers it.
20    Q.   What about e-mails from the
21  adjuster to sort of the internal claims
22  person?  Let's assume that -- let me ask you
23  this way:  Was the wind estimate for the
24  Brown claim e-mailed to State Farm as an
25  attachment?

Page 77

1     A.   The estimate for the Brown file is
2   a printed estimate.  That was the question
3   and that was the answer.
4     Q.   How do you know it was printed and
5   then submitted?
6     A.   Because when it's printed, there's
7   a date indicating when it was printed.  That
8   was 11/21/2005.
9     Q.   Is that the only indication to you
10  that it was a printed estimate as opposed to
11  being e-mailed or uploaded to the claims
12  file?
13    A.   The adjuster does not have the
14  ability to upload the Xactimate estimate to
15  the claims file.  During Hurricane Katrina,
16  the adjuster printed off that estimate.  The
17  estimate may be imaged into the claims file,
18  but the estimate was generated in paper form
19  for the claim file.
20    Q.   Why?
21    A.   Because that's relative to the
22  claim file.
23    Q.   But why wouldn't Brown adjuster --
24  well, the Brown adjuster had access to the
25  activity log; right?  He could go into the

Page 79

1     MR. ZAUNBRECHER:
2         E-mailed from the claims rep?
3     MR. GISLESON:
4         Yes.
5   EXAMINATION BY MR. GISLESON:
6     Q.   Yeah, was it e-mailed?  Was it
7   uploaded?  How does that work?
8     A.   During the time of Hurricane
9   Katrina, the estimate was printed for the
10  claim file.
11    Q.   So the adjuster would go out and
12  do his Xactimate estimate and he would go to
13  the nearest Kinko's and he would print it up
14  and e-mail it to State Farm?
15    MR. ZAUNBRECHER:
16        I object to the form.
17        But can answer the question.
18    THE WITNESS:
19        The adjusters were provided with a
20  printer that would allow them to print out
21  that estimate and that estimate would be
22  delivered to a State Farm office.
23  EXAMINATION BY MR. GISLESON:
24    Q.   They wouldn't upload it to the
25  system, to the claims file?

Page 78

1   system on his laptop and he could make notes
2   on the activity log; right?
3     A.   The Brown adjuster, the adjuster
4   that worked on the Brown claim did have
5   access to the electronic activity log, yes.
6     Q.   Then why does he have access to
7   the electronic activity log and can't just
8   simply upload or e-mail his Xactimate
9   estimate on to the same electronic claims
10  file for the Browns?
11    MR. ZAUNBRECHER:
12        I object to the form.
13        You can answer it if you --
14    THE WITNESS:
15        Because that is scanning, it's
16  scanned into the file and that's not a
17  function that we give to the adjuster.
18  That's done through our COS.
19  EXAMINATION BY MR. GISLESON:
20    Q.   Who did the adjuster send his
21  Brown estimate to?
22    A.   Who did he send it to?  Are you
23  asking if it was e-mailed?  Is that what
24  you're asking?
25    Q.   No.  I mean, somebody else put it

Page 80

20  (Pages 77 to 80)

1  in the claims file, the Brown estimate in
2  the claims file; right?
3      MR. ZAUNBRECHER:
4          Soren, just for clarification, are
5  you talking about the scanning in or the
6  paper copy?
7  EXAMINATION BY MR. GISLESON:
8      Q.  Do me a favor, take the Brown
9  estimate, the adjuster finishes the Brown
10  estimate.  You testified he printed it up.
11  Who did he hand it in to?
12      A.  When -- when Dekievit completed
13  his estimate, he noted on 11/27/05, he gave
14  it to Carrie Demane, that would be the claim
15  file in total.  Not -- okay, the estimate is
16  part of the claim file.  When Dekievit was
17  finished with his part of the claim
18  handling, he gave the claim file, which also
19  contained the estimate to Demane.
20      Q.  Could he spell that?
21      A.  D-E-M-A-N-E.
22      Q.  What is the Bates number of the
23  document?
24      A.  Brown 0038.
25      Q.  And when did the adjuster give it

Page 81

1  estimate to the State Farm server.  That
2  State Farm server can be accessed by
3  Xactimate.
4      Q.  Can you tell at all from the
5  documents you looked at when the Brown
6  estimate was uploaded to the State Farm
7  server?
8      A.  From the documents contained
9  within the claim file, I do not know when
10  that was loaded to the server.
11      Q.  Can you tell -- well, do you know
12  at all based on the documents that you've
13  seen or just from whatever source, when the
14  Brown estimate was uploaded to the State
15  Farm server?
16      A.  I do not know when the Brown
17  estimate was uploaded to the server, no,
18  sir.
19      Q.  If you wanted to find out when the
20  Brown estimate was loaded to the State Farm
21  server, how would you do that?
22      A.  I would have to access that server
23  and look.
24      Q.  What server is it?
25      A.  That would be -- the way I would

Page 83

1  to Demane?
2      A.  He noted on 11/27/05, the scope of
3  the loss and an estimate from the scope,
4  there was not a lot of wind damage to this
5  loss.  What I found was damage to the roof
6  and the front door that was kicked in after
7  the flood.  I've covered A, B, and C.
8  Please mail checks to policyholder and close
9  the claim.  That's what he noted on 11/27.
10  On 11/28 he noted a mailing address, and on
11  12/9, Carrie reviewed that claim.
12      Q.  Pursuant to the document you're
13  looking at, can you tell whether the Brown
14  Xactimate estimate ever made it into the
15  electronic claim system of State Farm?
16      A.  The electronic paper copy of the
17  estimate is contained within the paper file
18  that I'm looking at.  Whether that estimate
19  was scanned into images, I would only
20  speculate.
21      Q.  Do you know whether the Brown
22  estimate was sent to the State Farm server
23  and then fed back to Xactware?
24      A.  Part of the approach once
25  generating an estimate is to upload that

Page 82

1  find that out is through the XactAnalysis
2  program.
3      Q.  How does the XactAnalysis
4  program -- well, how does the Brown estimate
5  find its way into the -- how can I use the
6  XactAnalysis program to find out information
7  about the Brown claim?
8      A.  The information that you would
9  gain from the XactAnalysis program is
10  information about the estimate.  It would
11  not have any other information about the
12  claim.  The information that you would have
13  is about the estimate.
14      Q.  What information about the Brown
15  estimate can I get from the XactAnalysis
16  program?
17      A.  You would be able to get the
18  estimate.  You would see a stamp as to when
19  that estimate was loaded down, loaded up,
20  and created.
21      Q.  But would I be able to find out
22  whether any changes were made to the Brown
23  estimate?
24      MR. ZAUNBRECHER:
25          You mean within the XactAnalysis

Page 84

21 (Pages 81 to 84)

1  program?
2      MR. GISLESON:
3          Uh-huh (indicating affirmatively).
4      MR. ZAUNBRECHER:
5          Go ahead and answer.
6      THE WITNESS:
7          Within the XactAnalysis program, I
8  can not make changes to an estimate.
9  EXAMINATION BY MR. GISLESON:
10     Q.   But the question is:  Can you use
11 the XactAnalysis program to see if any
12 changes were made to the Brown estimate?
13     MR. ZAUNBRECHER:
14         I just object to the form of the
15 question.  I'm confused.  Changes -- I'm not
16 sure what you mean by that.
17         But if you understand, please
18 answer.
19     THE WITNESS:
20         If any changes -- with the
21 XactAnalysis program, I can see how -- I can
22 see the generation of that estimate, when it
23 was started, when it was loaded.  So the
24 answer to your question would be -- I
25 believe it would be, yes, but I don't know

Page 85

1  that that's the question you're really
2  asking.
3  EXAMINATION BY MR. GISLESON:
4      Q.   In seeing the generation of a
5  particular estimate, could you also see
6  whether a particular estimate was added or
7  something was added to the estimate or taken
8  away from the estimate at certain points?
9      MR. ZAUNBRECHER:
10         Note my objection to that.  The
11 same objection I've made several times.  If
12 you're limiting it to this estimate, of
13 course.
14     MR. GISLESON:
15         I'm limiting it to Brown.
16     MR. ZAUNBRECHER:
17         Thank you.
18     THE WITNESS:
19         Would I be able to see if there
20 was changes to the estimate?  Yes, I would
21 be able to see when that estimate was
22 generated, what was added to it, and I would
23 also be able to see if there was something
24 removed.
25 EXAMINATION BY MR. GISLESON:

Page 86

1      Q.   How long would it take you to run
2  an XactAnalysis report for the Brown
3  estimate?
4      A.   I don't understand your definition
5  of report.
6      Q.   Can't you run a report from an
7  XactAnalysis that shows you how an estimate
8  has changed over time?
9      A.   It would take me, depending on
10 connectivity, about a minute to pull the
11 estimate down from XactAnalysis.
12     Q.   Which would include all the
13 information about whether there was any
14 changes to Brown estimate; right?
15     A.   Once I brought it -- once I
16 brought it down, I would be able to choose
17 from a series of reports that would tell me
18 document changes.
19     Q.   Okay.  Is there any other -- in
20 addition to the XactAnalysis, in addition to
21 the claim system, electronic claim system,
22 we discussed a minute ago, is there any
23 other information related to the Brown
24 claim, stored or saved electronically by
25 State Farm?

Page 87

1      A.   I don't know that I understand
2  your question.
3      Q.   Okay.  Is there any other
4  electronic information relative to the Brown
5  claim stored by State Farm that we haven't
6  discussed today?
7      A.   Information relative to the Brown
8  claim, I'm struggling with your question,
9  counsel.
10     Q.   Okay.  You testified earlier that
11 there is -- because this is a Hurricane
12 Katrina claim, there is sort of a Brown
13 electronic claim file, electronic claim
14 information, and there is Brown paper claim
15 information; right?
16     A.   At the time that the claim was
17 being handled, it was both an electronic and
18 paper copy, yes, sir.
19     Q.   And you testified so far about the
20 electronic portion of the Browns' claims
21 file; right?
22     A.   Our discussion discussed both the
23 electronic and the paper.
24     Q.   Okay.  I'm focusing just on the
25 electronic right now.  Is there any other

Page 88

22  (Pages 85 to 88)

1  electronic information relative to the
2  Browns' claim that saved, stored or
3  maintained by State Farm?
4      MR. ZAUNBRECHER:
5          I will object to the form of the
6  question.
7          But go ahead.
8      THE WITNESS:
9          The electronic information
10  relative to the Brown claim is stored within
11  the Brown file.
12  EXAMINATION BY MR. GISLESON:
13      Q.   Okay.  And it's only stored as
14  to -- did you say CSR?
15      A.   The Brown claim is stored within
16  the a claim service records CSR, yes, sir.
17      Q.   Is there anything within CSR
18  related to the Browns that we haven't
19  discussed?
20      A.   Is there anything within CSR
21  related to the Browns that we haven't
22  discussed?  Absolutely.
23      Q.   Okay.  What else is in the CSR
24  related to the Browns that we haven't
25  discussed?

Page 89

1      A.   There's the underwriting
2  information as you see in the premiere copy.
3      Q.   How do you get to the underwriting
4  information for the Browns in CSR?
5      A.   As a claims representative or
6  management person, the access to the
7  underwriting information is gained only by
8  using a print function.
9      Q.   What does that mean?
10      A.   Generating the same copy as you've
11  received.
12      Q.   But when you say -- you can only
13  get it from a print function, I don't
14  understand.
15      A.   You do not get to see it
16  electronically.  I have to request the print
17  and when I request that print, which is
18  called a full CCF, as you received, I see
19  additional underwriting information.
20      Q.   I'm sorry, you said full CCF?
21      A.   Yes, sir.
22      Q.   What is full CCF?
23      A.   In the Brown file, the full CCF is
24  -- Brown 0028 to Brown 0053.
25      Q.   Is full CCF a term of art within

Page 90

1  State Farm?
2      A.   Full claims service record or fire
3  claims service record full, Brown 0028.
4      Q.   What does CCF stand for?
5      A.   Might be -- I used different
6  terminology.  The acronym would be FCSR,
7  fire claim service record full.
8      Q.   I'm sorry, FCSR?
9      A.   FCSR.
10      Q.   Fire --
11      A.   Claim.
12      Q.   Claim.
13      A.   Service record.
14      Q.   Okay.  Why is the word "fire" used
15  if we're talking about a homeowners policy?
16      A.   State Farm Fire Company is the
17  company that handles homeowners claims.
18      Q.   Does State Farm refer to its
19  homeowners policies as fire policies?
20      MR. ZAUNBRECHER:
21          I object to the form and beyond
22  the scope.
23      MR. GISLESON:
24          You're directing him not to
25  answer?

Page 91

1      MR. ZAUNBRECHER:
2          I am.
3      MR. GISLESON:
4          All right.
5  EXAMINATION BY MR. GISLESON:
6      Q.   Does State Farm refer to the
7  Browns' homeowners policy as a fire policy?
8      MR. ZAUNBRECHER:
9          I object to the form.
10          You can answer it if you can.
11      THE WITNESS:
12          I refer to the Browns' policy as a
13  homeowners policy form FP7955.
14  EXAMINATION BY MR. GISLESON:
15      Q.   Is FCSR a term of art within State
16  Farm?
17      A.   FCSR stands for fire claims
18  service record.
19      Q.   Is there a document somewhere
20  within State Farm that says the fire claims
21  service record shall be compromised of the
22  following documents?
23      A.   If there is, I'm not aware of that
24  document.
25      Q.   In addition to CSR and Xact --

Page 92

23 (Pages 89 to 92)

1  well, staying with CSR, is there anything
2  else -- any other electronic information
3  within CSR related to the Brown claim that
4  we haven't discussed?
5      A.  I don't believe so, no, sir.
6      Q.  Can the XactAnalysis program be
7  run to determine any other information
8  concerning the Brown claim that is neither
9  in the claims file, the electronic claims
10 file or the paper claims file?
11     A.  The XactAnalysis program is an
12 evaluation of the estimate itself.  The
13 estimate is pertinent to the claim file.
14 The XactAnalysis program is not.
15     Q.  Return to the paper portion of the
16 Browns' claims file.  Why don't you tell me
17 what part of the Browns' claims file that
18 you reviewed in preparation for today that
19 by its nature was maintained by State Farm
20 in a paper format?
21     A.  The use of the terminology
22 "paper," the paper that was contained within
23 the Brown file would be, for example, the
24 letter that we received from the SBA which
25 would be Brown 0057, 0058, 0059, 0060, 0061;

Page 93

1  would also be the copies of letters as in
2  Brown 0077; the return envelope, 0078; back
3  of that envelope 0079; the other letter,
4  Brown 0080; paper would also include the
5  faxed cover sheet, 0015, 0012; paper would
6  also include 0087, which is the estimate,
7  0088, 0089, 0090; the paper would also
8  include 0091, 0092; 0086, statement of loss;
9  0082 is another copy of the estimate, 0083,
10 0084, 0085; the fire claim message, 0013 is
11 a paper form; 0023, fire claim message;
12 another fax copy sheet, 0026, 0025; another
13 statement of loss, 0093, 0094, 0110, 0109,
14 and a copy of the estimate, 0017, 0018,
15 0019, 0020; the estimate received from the
16 contractors, 0095, 0096, 0098, 0100, 0102,
17 0104, 0106; contents inventory list, 0021;
18 the additional living expense calculation,
19 0022; the scope notes as taken by our
20 adjuster, 0027.  That would be -- it would
21 have originated as paper.  Some may have
22 been scanned in to images.
23     Q.  Where is the Browns' paper claim
24 file maintained?
25     A.  At this time, I believe the paper

Page 94

1  file is with counsel.
2      Q.  Pre-litigation, where was it
3  maintained?
4      A.  Pre-litigation, the paper file was
5  with our service unit and I believe that was
6  stored in Dallas.
7      Q.  At the time of -- from the time
8  the Brown claim was made until litigation,
9  was it the policy, practice and procedure
10 for all the correspondence, or anything
11 originated in writing sent to State Farm to
12 be uploaded into the system?
13     A.  From the time of the creation of
14 the claim file to the time of litigation,
15 there was a -- we were transitioning from
16 paper file to electronic file.  So the
17 answer to that is both yes and no.
18     Q.  Could you explain a little bit
19 more what you mean by yes and no?
20     A.  At the onset, paper was maintained
21 as paper.
22     Q.  Do you know or have any knowledge
23 as to whether anyone related to this case,
24 ever went to look at the paper portion of
25 the Brown file to make copies and produce

Page 95

1  this litigation?
2      A.  I don't know that I understand the
3  question.
4      MR. ZAUNBRECHER:
5          I object to the form.
6  EXAMINATION BY MR. GISLESON:
7      Q.  Somewhere out there there is a
8  Browns' paper file; right?
9      MR. ZAUNBRECHER:
10         It's right here.
11 EXAMINATION BY MR. GISLESON:
12     Q.  Let me ask you this way:  What was
13 the procedure for a claim where a suit had
14 been filed and part of the claim file was
15 paper claim?
16     MR. ZAUNBRECHER:
17         I object.  It's beyond the scope.
18 You can ask about this claim and just for
19 the record, I have the original claims file.
20 I've had the original claims file.  I have
21 it here today since litigation.
22 EXAMINATION BY MR. GISLESON:
23     Q.  Do you know if anyone with State
24 Farm requested the paper file from Houston
25 to --

Page 96

24  (Pages 93 to 96)

1      MR. ZAUNBRECHER:
2          It's Dallas.
3   EXAMINATION BY MR. GISLESON:
4      Q.   It's Dallas, from Dallas?
5      MR. ZAUNBRECHER:
6          I object to the form of the
7   question.
8          If you understand it, please
9   answer.
10     THE WITNESS:
11         Can I get the question again?
12  EXAMINATION BY MR. GISLESON:
13     Q.   Sure.  Do you know, do you have
14  any firsthand knowledge whether anybody on
15  behalf of State Farm requested the Brown
16  paper file from Dallas?
17     A.   The paper file is in possession of
18  counsel.  Counsel is here in Louisiana.  It
19  was previously stored in Dallas.  By that
20  fact, we got it here some how.
21     Q.   Have you ever seen the paper file
22  that came from Dallas?
23     A.   I have not looked at the original
24  paper file, no, sir.
25     Q.   Has anyone told you that the paper
                                        Page 97

1   that what you're asking?
2      MR. GISLESON:
3          No.
4      MR. ZAUNBRECHER:
5          I'm sorry, please clarify the
6   question.
7      MR. GISLESON:
8          Could you ask my question again,
9   Madam Court Reporter.
10         (Whereupon, the requested
11  testimony was read by the Court Reporter)
12      "Q    If you wanted to find out
13  whether the Brown paper file was sent
14  from Dallas to anyone else in this
15  case, who would you go ask?"
16     MR. ZAUNBRECHER:
17         I object to the form.
18         Answer it if you can.
19     THE WITNESS:
20         If I wanted to find out how my
21  counsel received the paper file, I would ask
22  my counsel.
23  EXAMINATION BY MR. GISLESON:
24     Q.   I mean, but as you sit here today,
25  you've never seen the original paper file
                                        Page 99

1   file was sent from Dallas to counsel in this
2   case?
3      A.   I did not.  In preparation for
4   today's testimony, I did not ask how the
5   paper file got to counsel.
6      Q.   But did you ask that the paper
7   file that counsel has is, in fact, the paper
8   file that was stored in Dallas?
9      A.   I did not ask where the paper file
10  originated from, no, sir.
11     Q.   Did anyone tell you, well, we just
12  printed up everything from the computer
13  system and we're going to maintain that
14  that's the Brown claim file?
15     A.   I did not -- in preparation for
16  today's testimony, I did not ask about the
17  origins of the claim file.
18     Q.   If you wanted to find out whether
19  the Brown paper file was sent from Dallas to
20  anyone else in this case, who would you go
21  ask?
22     MR. ZAUNBRECHER:
23         Just for a clarification, you mean
24  besides counsel?  Was the Brown file sent to
25  anyone from State Farm besides counsel?  Is
                                        Page 98

1   from Dallas; right?
2      A.   As I've said previously, I've not
3   looked at the original paper file, no, sir.
4      Q.   So since you haven't, you can't
5   tell that the file that was presented to you
6   was, in fact -- contained the original paper
7   file from Dallas; can you?
8      A.   I've not done a comparison of what
9   I received, as well as you received, with
10  the original paper file, no, sir.
11     Q.   What is FileZilla?
12     A.   I have absolutely no idea.
13     Q.   Does State Farm use a computer
14  program known as FileZilla in maintaining
15  the Brown claim?
16     A.   FileZilla is a terminology that
17  I'm not familiar with.
18     Q.   Before I forget, if we could go
19  through your background.  You have a college
20  education?
21     A.   I have an university education,
22  yes, sir.
23     Q.   From where?
24     A.   University of Calgary, Canada.
25     Q.   What year?
                                        Page 100

                          25 (Pages 97 to 100)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    A.   I graduated in 1998 -- I'm sorry,
2  1988.
3    Q.   And what is -- what was your
4  degree in?
5    A.   I have a BA in economics as well
6  as a BA in history.
7    Q.   And at what point after you
8  graduated from Calgary, did you start work
9  for State Farm?
10   A.   I started my employ with State
11  Farm in 1993, July.
12   Q.   What did you do in between July
13  of '93 and graduation from Calgary?
14   A.   Prior to joining State Farm, I
15  worked as a -- the term was a replacement
16  broker.  I bought and sold commodities for
17  insurance companies.  I serviced insurance
18  companies on stolen items, items damaged in
19  fires, water damaged items, in Calgary.
20   Q.   Maybe I don't know what a
21  replacement broker is.  Is it like what we
22  would consider an insurance agent in the
23  States?
24   A.   No, sir.  No, sir.  What it would
25  be is if you had a fire and you lost your

Page 101

1  stereo equipment, you filed your claim with
2  your insurance company.  Your insurance
3  company would contact us and tell me what
4  stereo equipment you had and I would
5  determine what replaced it now and I would
6  sell it to you at a reduced price.
7    Q.   Excuse me, when you began work
8  with State Farm in July of '93, where did
9  you work?
10   A.   I started my employ with State
11  Farm in Calgary.
12   Q.   And what was your job title at the
13  time?
14   A.   My job title was claim
15  representative.
16   Q.   And what were your duties and
17  responsibilities as a claims representative
18  on behalf of State Farm?
19   A.   As a claims representative, I
20  handled claims for State Farm on the
21  homeowners side.
22   Q.   Were you a field adjuster; in
23  other words, would you be the one going out
24  and scoping and pricing the loss?
25   A.   Part of my duties included

Page 102

1  inspections on site, yes, sir.
2    Q.   And how long were you a claims rep
3  for State Farm?
4    A.   My employ as a claims rep was
5  between 1993 and -- July '93 until March
6  of '96.
7    Q.   And what happened in March of '96?
8    A.   In March of 1996, I was promoted
9  in to catastrophe services as a reinspector
10  trainer.
11   Q.   What is a reinspector trainer?
12   A.   My job functions as a reinspector
13  trainer were to go out and reevaluate a loss
14  that was adjusted by an adjuster for quality
15  control and devise training plans based on
16  deficiencies I may have found.
17   Q.   And you said you worked for
18  catastrophe services; is that right?
19   A.   That's correct.
20   Q.   That is a division within State
21  Farm?
22   A.   That is a part of State Farm, yes,
23  sir.
24   Q.   What is catastrophe services
25  within State Farm?

Page 103

1    A.   As a member of catastrophe
2  services, I traveled throughout the country,
3  including Canada, handling a catastrophic
4  event such as hail, tornado, flooding,
5  hurricane, weight of ice and snow.  When we
6  receive a large amount of claims in a short
7  period of time, the offices aren't staffed
8  for that kind of event.  We come in, we pick
9  that up.  We handle it for them.
10   Q.   How long were you a reinspector in
11  the catastrophe services department of State
12  Farm?
13   A.   My position was a reinspector
14  trainer.
15   Q.   Sorry.
16   A.   And I was in that position until
17  December of 1996.
18   Q.   What happened in December of '96?
19   A.   In December of 1996, I was
20  promoted to team manager position.
21   Q.   Was it a team manager within
22  catastrophe services?
23   A.   That is correct.
24   Q.   What were the duties and
25  responsibilities of a team manager?

Page 104

26  (Pages 101 to 104)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    A.   As a team manager, I had a group
2  of claim representatives who reported to me
3  that I had administrative and operational
4  responsibility for.
5    Q.   Did you oversee or have settlement
6  authority as team manager?
7    A.   I did have settlement authority as
8  a team manager, yes, sir, and I do.
9    Q.   What is settlement authority?
10   A.   Settlement authority is the dollar
11 amount at which -- up to which I can issue
12 settlement without further approval.
13   Q.   What was your settlement authority
14 as team manager in '96?
15   A.   In 1996, my settlement authority,
16 I believe, was a hundred and fifty thousand.
17   Q.   And how long were you a team
18 manager for State Farm?
19   A.   My position as team manager still
20 continues.  The job title may have changed.
21 My position is team manager.
22   Q.   Okay.  And currently how many
23 claim representatives do you supervise?
24   A.   My team is comprised of ten claim
25 representatives currently.

Page 105

1    Q.   And what part of the country are
2  these claim representatives situated?
3    A.   Claim representatives that I
4  supervise currently are housed in the
5  Jacksonville operations center with me.
6    Q.   That's Jacksonville, Florida?
7    A.   Jacksonville, Florida, yes.
8    Q.   And State Farm has carved up the
9  United States in different geographical
10 areas; right?
11   MR. ZAUNBRECHER:
12     I object to the form, but answer
13 it if you can.  I think divided would be
14 better than curved up.
15   THE WITNESS:
16     We have divided the country into
17 13 different zones -- not the country,
18 because we also have Canada.
19 EXAMINATION BY MR. GISLESON:
20   Q.   So North America?
21   A.   No, because we don't have Mexico.
22   Q.   So just the U.S. and Canada is
23 divided into 13 zones?
24   A.   Thirteen zones, that's correct.
25   Q.   What zone is Jacksonville, Florida

Page 106

1  in?
2    A.   Jacksonville, Florida is in the
3  Florida zone.
4    Q.   Florida has its own zone?
5    A.   That's correct.
6    Q.   What zone is Louisiana in?
7    A.   Louisiana, I believe, is in the
8  central zone.
9    Q.   From your role as team manager
10 from 1996 to the present, have you ever been
11 assigned to the central zone?
12   A.   I have worked claims within the
13 central zone, but I am a corporate
14 representative.
15   Q.   Have you ever been -- you're
16 assigned to the Jacksonville, Florida;
17 right?  You're assigned to the Florida zone?
18   A.   Absolutely not.
19   Q.   No?
20   A.   No.
21   Q.   Is it -- why isn't it you're not
22 assigned to a particular zone?
23   A.   Because I'm catastrophe services
24 which is a corporate entity.  We worked out
25 of the Florida zone.

Page 107

1    Q.   You just happen to be located in
2  Florida, but you don't -- you're not
3  restricted to adjusting claims within a
4  particular zone of State Farm?
5    A.   No.  I am still catastrophe
6  services.  I handle claims throughout the
7  United States as well as Canada.
8    Q.   Did you personally adjust
9  Hurricane Katrina claims?
10   A.   My position during Hurricane
11 Katrina was as a team manager.  I
12 co-adjusted -- I co-adjusted and did not
13 have file assignments myself.
14   Q.   Have you ever spoken with
15 anyone -- well, have you ever spoken with
16 the Browns, the plaintiffs in this case?
17   A.   I do not believe I've spoken with
18 the Browns, no, sir.
19   Q.   Have you ever seen or inspected
20 that house in person?
21   A.   I have not seen or inspected their
22 house, no, sir.
23   Q.   Have you ever spoken with anyone
24 who adjusted the Brown claim?
25   A.   I did not speak with anyone who

Page 108

27  (Pages 105 to 108)

1 adjusted the Brown claim, no, sir.
2    Q.   So you didn't speak with anyone
3 who went out and prepared the Xactimate
4 estimate?
5    A.   I did not speak with the preparer
6 of the Xactimate estimate, no, sir.
7    MR. GISLESON:
8       I've got a pretty decent stopping
9 point right now because I'm about to go into
10 the documents itself, which should take
11 about two hours.  So I don't know if you
12 want to take a break and then early lunch or
13 something or you want to push on for 15
14 minutes and then do a lunch?
15    MR. ZAUNBRECHER:
16       Let's go off the record for a
17 second and talk about it.
18    THE VIDEOGRAPHER:
19       We're off the record.  It's 11:14.
20       (Whereupon, a brief recess was
21 taken.)
22    THE VIDEOGRAPHER:
23       Back on the record.  It's 11:23,
24 the beginning of Tape 2.
25 EXAMINATION BY MR. GISLESON:

Page 109

1    Q.   Mr. Lapinskie, when we went off
2 the record, I sort of indicated I wanted to
3 start moving on to the documents in this
4 case.  But before I get to the claims file,
5 I wanted to get to some of the operational
6 guidelines that were produced in this case.
7       I would like you to take a look at
8 this document and identify it if you can.
9 For the sake of the record, I would like to
10 identify it by Bates stamp number which is
11 235 to 255.
12       Can you identify that document,
13 Mr. Lapinskie.
14    A.   This document is OG, operation
15 guide 7501, claim procedures first party.
16    Q.   And there's a date in the
17 left-hand corner in the box.  Do you see
18 that?
19    A.   The date of 11/17/04.
20    Q.   What does that date represent to
21 you?
22    A.   That date would be the creation
23 date of this document.
24    Q.   Would this --
25    A.   I would like to clarify.  The

Page 110

1 creation date of this iteration of this
2 document.
3    Q.   And is this the -- is the subject
4 of this OG claims procedure first party?
5    A.   The subject is claims procedures
6 first party, yes, sir.
7    Q.   And is this the claims procedure
8 that would have been in effect after
9 Hurricane Katrina?
10    MR. ZAUNBRECHER:
11       I object to the form.  The only
12 claims --
13 EXAMINATION BY MR. GISLESON:
14    Q.   Is this the claims procedure first
15 party OG that would have applied to the
16 Browns' adjustment?
17    A.   I do not believe there is another
18 iteration of this pre-Hurricane Katrina.
19 It's based on that information, I believe
20 so, yes.
21    Q.   It's your testimony that whatever
22 adjusters were assigned to the Browns' claim
23 should have abided by the procedures set
24 forth in this document in front of you?
25    MR. ZAUNBRECHER:

Page 111

1       I object to the form, but go
2 ahead.
3    THE WITNESS:
4       The operation guides are operation
5 guides.  What the adjusters abide by are the
6 policies.  The guides are there to assist
7 them, but the guides aren't to change the
8 policy.
9 EXAMINATION BY MR. GISLESON:
10    Q.   Are you aware of any document
11 after Katrina that would have changed the
12 procedures in this OG guide to deal with
13 Hurricane Katrina issues that would have
14 applied to the Brown case?
15    MR. ZAUNBRECHER:
16       I object to the form.
17       Please answer.
18    THE WITNESS:
19       I'm not aware of a document that
20 usurped or took this away, no, sir.
21 EXAMINATION BY MR. GISLESON:
22    Q.   What about any document that would
23 have changed or altered any of the
24 requirements procedure in this document?
25    MR. ZAUNBRECHER:

Page 112

28  (Pages 109 to 112)

1    Limited to the Brown claim, I'm
2  sure?
3       MR. GISLESON:
4       Uh-huh (indicating affirmatively).
5       THE WITNESS:
6       Any documents that would change
7  these procedures?  There's some procedures
8  that are in this document that don't pertain
9  to the policy in force on the Brown case, so
10 the policy itself is the one that's going to
11 establish the approach that should be taken.
12 EXAMINATION BY MR. GISLESON:
13      Q.  So are you aware of any of -- any
14 changes to the policies in this operating
15 guidelines?
16      A.  I don't know that I understand the
17 question, Counsel.
18      Q.  I was just pausing.  Let me
19 restart it.
20      Are you aware of any changes to
21 this operating guideline after Katrina would
22 have affected in any way the adjustment
23 practices or policies for the Brown claim?
24      A.  I'm not aware of any changes
25 that -- I really don't understand the

Page 113

1       question.  Sorry.
2       Q.  Okay.  You testified earlier that
3  this OG7501 was the claim procedures first
4  party guidelines that would have been in
5  place at the time the Browns' claim was
6  adjusted; correct?
7       A.  The operation guide 7501 is
8  entitled claims procedures first party, and
9  the document that we have in front of us is
10 the document that was available at the time
11 of Hurricane Katrina, yes, sir.
12      Q.  And this establishes the
13 guidelines that should have applied or that
14 the adjuster should have applied in
15 adjusting the Brown claim; right?
16      MR. ZAUNBRECHER:
17      He's already answered that.
18      MR. GISLESON:
19      He kind of did and he kind of
20 didn't.  That's what I'm trying to get at.
21      THE WITNESS:
22      This operation guide establishes
23 guidelines and procedures for handling
24 first-party structural and personal property
25 losses, for specific types of losses such as

Page 114

1       crime, water, et cetera, refer also to the
2  OG under that title.
3       So if your question is is this an
4  all inclusive document that bound us as to
5  how we should handle the Brown claim, the
6  answer is, no.  Is this a document that we
7  could reference in the review of the Brown
8  claim?  Absolutely.
9       MR. GISLESON:
10      Before I forget, I'm going to mark
11 this version of OG7501 as Exhibit 4.
12      (Exhibit No. 4 marked for
13 identification.).
14 EXAMINATION BY MR. GISLESON:
15      Q.  Is there any other OGs -- I
16 thought you testified -- I thought you said
17 a minute ago, there might be other OGs that
18 would apply to the adjustment of the Browns'
19 claim?
20      MR. ZAUNBRECHER:
21      I thought he said a policy.
22      Correct us if we're wrong.
23      THE WITNESS:
24      I'm sorry.
25      MR. ZAUNBRECHER:

Page 115

1       Go ahead.
2       THE WITNESS:
3       For specific types of losses such
4  as crime, water, et cetera, refer also to
5  the OG under that title.  We had water
6  associated with this.  You may want to
7  reference that water OG.
8  EXAMINATION BY MR. GISLESON:
9       Q.  What was that water OG?  Is that
10 identified there?
11      A.  That water OG is not identified
12 here, no, sir.
13      Q.  Other than the water OG, can you
14 think of any other OGs that would apply as
15 any type of guideline for the adjustment of
16 the Browns' claim?
17      A.  In my review of the Browns' claim,
18 I don't know that I would refer to an OG for
19 the handling of it.  I would stick with the
20 policy itself.
21      Q.  Why is that?
22      A.  The OGs are there when I have a
23 question as to policy.  It can provide me
24 additional guidance.  I don't know that
25 there was additional guidance required in

Page 116

29  (Pages 113 to 116)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  the handling of this claim.
2      Q.  Is it fair to say you drew that
3  conclusion from your review of the claims
4  file?
5      A.  That is the conclusion I drew from
6  the review of the claims file.
7      Q.  Because you didn't speak with any
8  of the adjusters; correct?
9      A.  I did not speak with any of the
10  adjusters, no.
11      Q.  You never spoke with Mr. and
12  Mrs. Brown; correct?
13      A.  I did not speak with Mr. and
14  Mrs. Brown.
15      Q.  I want to direct your attention to
16  what appears to be a subsequent version of
17  OG7501.  It has a later date in the top left
18  corner of March 28th, 2007.  Do you see
19  that?
20      A.  I do.
21      MR. GISLESON:
22          And, again, for the record, I
23  would like to identify this document as
24  being Bates stamped 215 to 234.
25      EXAMINATION BY MR. GISLESON:

Page 117

1  in general pursuant to your request, it's
2  clearly post litigation and I will object to
3  the relevance.
4          I'm assuming we're reserving all
5  objections and I'm happy to let him look at
6  it and see if there is anything.
7          With that, we can go off the
8  record.
9      THE VIDEOGRAPHER:
10          We're off the record.  It's 11:33.
11          (Whereupon, an off-the-record
12  discussion was held.).
13      THE VIDEOGRAPHER:
14          We're back on the record.  It's
15  11:37.
16      EXAMINATION BY MR. GISLESON:
17      Q.  Mr. Lapinskie, just before we went
18  off the record, you were going to do a
19  comparison between the two versions of
20  OG7501 to determine whether or not there
21  were any differences.  Did you, in fact,
22  find any differences?
23      MR. ZAUNBRECHER:
24          Let me enter an objection to any
25  line of questioning regarding the 2007

Page 119

1      Q.  Have you seen this document
2  before?
3      A.  I believe I have, yes, sir.
4      Q.  Do you know what the difference is
5  between this version of the document and the
6  preceding one that was identified as
7  Exhibit 4?
8      A.  I've not done a side-by-side
9  comparison recently that I recall seeing
10  what the differences are.  If you would like
11  me to do that, I could.
12      Q.  Well, is there -- as you sit here
13  right now, do you remember there being any
14  differences between the two OGs?
15      A.  There must be a difference;
16  otherwise, we wouldn't release another one.
17      Q.  Okay.
18      MR. GISLESON:
19          Maybe we can go off the record for
20  a couple of minutes and you can take a look
21  at them, if that's okay.
22      MR. ZAUNBRECHER:
23          I'm willing to let him do that,
24  but I will enter a continuing objection.
25  This document, even though it was produced

Page 118

1  revisions to 75 -- OG7501 as being beyond
2  the scope of the deposition.  It can't
3  possibly relate to the handling of the Brown
4  claim because it was generated after this
5  litigation had started and if you would
6  like, I will give you an opportunity to lay
7  a foundation, but, otherwise, if there is no
8  foundation, I'm going to have to direct the
9  witness not to answer.
10      MR. GISLESON:
11          You're directing the State Farm
12  corporate representative not to testify
13  about a document that State Farm produced in
14  this case?
15      MR. ZAUNBRECHER:
16          Correct, because it's clearly
17  beyond the scope of the court's discovery
18  order which we attached as Exhibit No. 3.
19  Just because it's been produced, does not
20  mean it's the subject -- an appropriate
21  subject for this deposition.  If it were an
22  open 1442 deposition, yes, but this is not.
23  And, again, if you can lay a foundation as
24  to its possible relation to the handling of
25  the Browns' claim, I invite you to do so and

Page 120

30 (Pages 117 to 120)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al
1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  I will withdraw my objection and
2  instruction.
3  EXAMINATION BY MR. GISLESON:
4      Q.   Did you object to interrogatory
5  No. 14 -- I'm sorry, area of inquiry No. 14,
6  which stated a deponent to testify to any
7  and all documents produced through
8  discovery?
9      MR. ZAUNBRECHER:
10         Yes, we did object to it.
11  EXAMINATION BY MR. GISLESON:
12     Q.   Isn't it true that State Farm has
13  the duty -- owes a duty to its insured to
14  fairly and timely adjust the claim?
15     MR. ZAUNBRECHER:
16         I object to the form of the
17  question.  If you're talking about the
18  Browns, please answer the question.
19  EXAMINATION BY MR. GISLESON:
20     Q.   Do you understand the question?
21     A.   Can I get the question again,
22  please?
23     Q.   Isn't it true that State Farm owes
24  the Browns the duty to fairly and timely
25  adjust their claim?

Page 121

1  circumstances surrounding Hurricane Katrina,
2  yes, sir.
3  EXAMINATION BY MR. GISLESON:
4      Q.   No.  The question is:  State Farm
5  has a duty that it owes to the Browns to
6  timely and fairly adjust the Hurricane
7  Katrina claim; right?
8      MR. ZAUNBRECHER:
9          I object as calling for a legal
10  conclusion, but you can answer it if you
11  understand it.
12     THE WITNESS:
13         It complies with my agreement with
14  the insureds, I try to handle those claims
15  as quickly and expeditiously as I could,
16  yes, sir.
17  EXAMINATION BY MR. GISLESON:
18     Q.   But you agree that State Farm owes
19  the Browns a duty, not the fact that you did
20  or did not, in fact, do it, but that State
21  Farm owes the Browns that duty to timely and
22  fairly adjust their claim?
23     MR. ZAUNBRECHER:
24         Same objection.  It is calling for
25  a legal conclusion from a lay witness.  What

Page 123

1      A.   When we receive a claim, we try to
2  handle it as quickly and expeditiously as we
3  can, yes, sir.
4      Q.   And isn't it true that the duty to
5  fairly and timely adjust the claim persists
6  past the filing of a lawsuit against State
7  Farm?
8      MR. ZAUNBRECHER:
9          I object to the form.  Beyond the
10  scope.
11         Answer it if you can.
12     THE WITNESS:
13         I don't know that I understand the
14  question.
15  EXAMINATION BY MR. GISLESON:
16     Q.   Well, do you agree with me that
17  State Farm does, in fact, have the duty to
18  timely and fairly adjust the Browns' claim?
19     MR. ZAUNBRECHER:
20         Asked and answered, but go ahead
21  again.
22     THE WITNESS:
23         When we receive the Browns' claim,
24  we handled it as quickly and as
25  expeditiously as we could under the

Page 122

1  duty State Farm will be determined in this
2  case.
3          If you can answer it based on your
4  understanding of the question, please do so.
5      THE WITNESS:
6          We want to handle the Browns'
7  claim, yes, sir.
8  EXAMINATION BY MR. GISLESON:
9      Q.   So you have no understanding as to
10  whether or not State Farm owes a duty to the
11  Browns to timely and fairly adjust their
12  claim?
13     MR. ZAUNBRECHER:
14         Just note a general continuing
15  objection.  Keep going.
16     THE WITNESS:
17         I don't understand your use of the
18  terminology "duty."  Did we inspect the
19  Browns' claim?  Yes, we did.  Did we
20  evaluate the Browns' claim?  Yes, we did.
21  Did we make payment based on that
22  evaluation?  Yes, we did.
23  EXAMINATION BY MR. GISLESON:
24     Q.   So as you sit here today, you
25  don't have an understanding of what it means

Page 124

31 (Pages 121 to 124)

1  to owe a duty to the insured?
2      A.  I believe that my -- my struggle
3  with regards to that question is you're
4  eliminating the conditions that we're
5  working in during Hurricane Katrina and are
6  going to bind me to some other definition of
7  duty that doesn't really meet the definition
8  of a Hurricane Katrina claim.
9      Q.  So whether you have a duty depends
10  on the situation of the claim that's being
11  adjusted?
12      MR. ZAUNBRECHER:
13          I object to the form.
14          Go ahead.
15      THE WITNESS:
16          Post Hurricane Katrina, there was
17  no access to the Browns' claim.  Could you
18  get there as quickly as I wanted to?  No.
19  EXAMINATION BY MR. GISLESON:
20      Q.  What is State Farm's position as
21  to how quickly it needs to go about
22  adjusting an insured's claim like the
23  Browns?
24      MR. ZAUNBRECHER:
25          I object to the form of the
                                        Page 125

1  question.
2          You can answer it if you
3  understand it.
4      THE WITNESS:
5          State Farm's position is to handle
6  the claim as quickly and expeditiously as we
7  can under the circumstances surrounding the
8  particular claim.
9  EXAMINATION BY MR. GISLESON:
10      Q.  Does State Farm have any sort of
11  policy, practice or procedure -- let's do
12  this:  Do you have an understanding of what
13  a proof of loss is?
14      A.  Contained within the Brown
15  claim -- I'm sorry, contained within the
16  Brown policy is a reference to proof of
17  loss, yes, I do.
18      Q.  Other than the reference to the
19  proof of loss in the Brown claim, do you
20  have any other independent understanding of
21  what proof of loss means?
22      MR. ZAUNBRECHER:
23          He said the Brown policy.
24      MR. GISLESON:
25          Policy.
                                        Page 126

1      THE WITNESS:
2          If you're asking for a legal
3  definition of proof of loss, I don't feel
4  qualified to comment on what the legal
5  definition of proof of loss is.
6  EXAMINATION BY MR. GISLESON:
7      Q.  Have you ever given any testimony
8  of what you understood a proof of loss to
9  mean outside of what the insurance policy
10  says?
11      MR. ZAUNBRECHER:
12          I object as beyond the scope of
13  discovery.
14          Don't answer that.
15      MR. GISLESON:
16          It goes straight towards his
17  credibility.  If there's another deposition
18  out there that he testified and gave this
19  exact testimony on, that's relevant to this
20  case, and now he's saying I can't do it,
21  then it definitely goes toward his
22  credibility.
23      MR. ZAUNBRECHER:
24          You make a good point.
25          Go ahead and answer if you can
                                        Page 127

1  answer the question.
2      THE WITNESS:
3          Have I been questioned on proof of
4  losses in prior depositions?  Yes.
5  EXAMINATION BY MR. GISLESON:
6      Q.  Have you provided testimony as to
7  what your understanding was of proof of loss
8  in prior depositions?
9      A.  My understanding of proof of
10  losses as defined within the policy, I've
11  also referenced proof of loss as a document
12  that I received in compliance with
13  requirements associated with flood policies.
14      Q.  Have you ever testified as proof
15  of loss being State Farm's understanding of
16  what the claim is and the value of the
17  claim?
18      A.  I don't recall using those words
19  to establish a definition of proof of loss,
20  no, sir.
21      Q.  Have you ever used or defined the
22  term "proof of loss" outside of the context
23  of what's written in the homeowners policy
24  and referenced in the flood policy?
25      MR. ZAUNBRECHER:
                                        Page 128

                              32 (Pages 125 to 128)

1 Has he ever used the term or has
2 he ever defined it?
3 MR. GISLESON:
4 Both.
5 MR. ZAUNBRECHER:
6 Well, then I object to the
7 multiple-part question.
8 EXAMINATION BY MR. GISLESON:
9 Q. You can answer the question.
10 A. May I receive the question again?
11 (Whereupon, the requested
12 testimony was read by the Court Reporter)
13 "Q Have you ever used or defined
14 the term 'proof of loss' outside of the
15 context of what's written in the
16 homeowners policy and referenced in the
17 flood policy?"
18 MR. ZAUNBRECHER:
19 Please read my comment and
20 counsel's response about both.
21 (Whereupon, the requested
22 testimony was read by the Court Reporter)
23 "MR. ZAUNBRECHER:
24 Has he ever used the
25 term or has he ever defined it?
Page 129

1 "MR. GISLESON:
2 Both.
3 "MR. ZAUNBRECHER:
4 Well, then I object to
5 the multiple-part question."
6 MR. ZAUNBRECHER:
7 If you can answer, then please do
8 so.
9 THE WITNESS:
10 I do not recall providing any
11 other definition of proof of loss.
12 EXAMINATION BY MR. GISLESON:
13 Q. Could inspection by an adjuster be
14 considered proof of loss under the Browns'
15 policy?
16 MR. ZAUNBRECHER:
17 I object to the form.
18 Answer. Just inspection.
19 THE WITNESS:
20 Could be inspection -- inspection
21 on itself provide or be termed a proof of
22 loss under the definition under the policy?
23 I do not believe so, no.
24 EXAMINATION BY MR. GISLESON:
25 Q. Have you ever testified that the
Page 130

1 inspection by an adjuster could be
2 considered proof of loss?
3 MR. ZAUNBRECHER:
4 Again, I object to the form. If
5 you have some testimony you want to show him
6 in a certain context, reference a case? Is
7 that a direct quote?
8 Without further foundation, I
9 object to the form and direct the witness
10 not to answer that question.
11 If you lay a foundation and define
12 in quotations has he ever testified a quote,
13 he can certainly answer that.
14 EXAMINATION BY MR. GISLESON:
15 Q. When the adjuster in this case
16 inspected the Browns' property, was that
17 proof of loss?
18 A. When Dekievit inspected the
19 property, he was continuing with claim
20 handling.
21 Q. When the adjuster completed his
22 estimate and sent that estimate in to State
23 Farm and requested payment, was that proof
24 of loss?
25 MR. ZAUNBRECHER:
Page 131

1 I object to the form.
2 Answer, if you can.
3 THE WITNESS:
4 If I am looking at the definition
5 of proof of loss within the policy, no.
6 EXAMINATION BY MR. GISLESON:
7 Q. Is that the only place State Farm
8 looks to to determine proof of loss of a
9 claim is what's written in the policy?
10 A. If the policy is in conflict with
11 legal terms, then the legal terms will
12 prevail. That's outlined within the policy.
13 Q. Are there any legal terms in the
14 State of Louisiana that define or concern
15 proof of loss that preempt any term of proof
16 of loss in the policy that you're aware of?
17 MR. ZAUNBRECHER:
18 I object to the form. Beyond the
19 scope. Calls for a legal conclusion.
20 Direct not to answer.
21 EXAMINATION BY MR. GISLESON:
22 Q. Does State Farm have a position
23 that the Browns ever provided State Farm
24 with satisfactory proof of loss?
25 A. I do not believe I received
Page 132

33 (Pages 129 to 132)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  satisfactory proof of loss from the Browns.
2      Q.   Did State Farm, pursuant to its
3  even adjustment at some point come across
4  anything that could be considered
5  satisfactory proof of loss?
6      MR. ZAUNBRECHER:
7          Same objection.
8          Please answer.
9      THE WITNESS:
10         We proceeded with claim handling
11 and made a payment.  I believe we received
12 the information that we felt we needed to
13 establish our payment and our decision.
14 Whether that meets the definition of proof
15 of loss under legal definition, that's for
16 you all to decide.
17 EXAMINATION BY MR. GISLESON:
18     Q.   Has State Farm ever looked to
19 Louisiana law to assist it in providing
20 instruction to its adjusters concerning the
21 timeliness of an adjustment?
22     MR. ZAUNBRECHER:
23         I object.  Beyond the scope of
24 this deposition.  Beyond the course of the
25 discovery order and instruct the witness not

Page 133

1  to answer.
2  EXAMINATION BY MR. GISLESON:
3      Q.   Isn't it true that State Farm
4  routinely provides instructions to its
5  adjusters based upon its understanding of
6  Louisiana law.
7      MR. ZAUNBRECHER:
8          Same objection.  Same instruction.
9  EXAMINATION BY MR. GISLESON:
10     Q.   Isn't it true under the policy and
11 duty State Farm owes its insureds, it's
12 required to provide that instruction to its
13 adjusters when they adjust a claim in
14 Louisiana?
15     MR. ZAUNBRECHER:
16         Same objection.  Same instruction.
17 EXAMINATION BY MR. GISLESON:
18     Q.   Isn't it true that Louisiana has a
19 30-day requirement that a claim must be paid
20 within 30 days of the insurance company
21 receiving satisfactory proof of loss?
22     MR. ZAUNBRECHER:
23         Same objection.  Same instruction.
24 EXAMINATION BY MR. GISLESON:
25     Q.   Isn't it true that the Browns

Page 134

1  provided or that State Farm received
2  satisfactory proof of loss of the Brown
3  claim the date the adjuster inspected the
4  property?
5      A.   On the date that the -- that
6  Dekievit inspected the property, he was
7  continuing with claim handling.  I do not
8  believe that that meets -- I do not believe
9  that that is satisfactory proof of loss.  He
10 was evaluating his claim.
11     Q.   Isn't it true that State Farm
12 received satisfactory proof of loss when the
13 adjuster completed his report and submitted
14 it for payment to State Farm?
15     MR. ZAUNBRECHER:
16         I object to the form.
17         You can answer.
18     THE WITNESS:
19         Satisfactory proof of loss is a
20 legal term of which I'm not qualified to
21 respond to.  During the handling of the
22 claim, the adjuster performed their
23 adjustment, and when he was able to get
24 access to the house, he put his estimate
25 together and recommended payment based on

Page 135

1  that estimate.
2  EXAMINATION BY MR. GISLESON:
3      Q.   Is it State Farm's position that
4  satisfactory proof of loss is always a legal
5  of term?
6      MR. ZAUNBRECHER:
7          Same objection as before and
8  direct not to answer.
9  EXAMINATION BY MR. GISLESON:
10     Q.   Is it State Farm's position that
11 you can't figure out what satisfactory proof
12 of loss is without hiring an attorney?
13     MR. ZAUNBRECHER:
14         Same objection.  Add an objection
15 to the form of the question.
16         Instruct not to answer.
17 EXAMINATION BY MR. GISLESON:
18     Q.   At some point, State Farm paid the
19 Browns some amount of money; right?
20     A.   There was a payment to the Browns,
21 yes, sir.
22     Q.   Is it State Farm's position that
23 they made the payment even though there was
24 never a satisfactory proof of loss made by
25 the insureds or discovered on behalf of

Page 136

34  (Pages 133 to 136)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

| | |
|---|---|
| 1   State Farm? | 1   proof of loss is defined as in that policy. |
| 2      MR. ZAUNBRECHER: | 2      MR. GISLESON: |
| 3          I object to the form. | 3          Before I forget, let me identify |
| 4          Answer if you can. | 4   the March 2000 OG as Exhibit 5.  I can get |
| 5      THE WITNESS: | 5   that exhibit from you so that I can put the |
| 6          The use of the terminology "proof | 6   sticker on it. |
| 7   of loss" in your question sounds to me like | 7      THE WITNESS: |
| 8   a legal term.  We continued with claim | 8          Did you say 2005? |
| 9   handling.  We estimated, we evaluated, we | 9      MR. GISLESON: |
| 10  made payment based on that evaluation in | 10         I don't think so.  March of 2007 |
| 11  compliance with our policy. | 11  as Exhibit 5. |
| 12  EXAMINATION BY MR. GISLESON: | 12         (Exhibit No. 5 marked for |
| 13      Q.   Was State Farm aware that it had a | 13  identification.). |
| 14  duty to timely adjust and pay the Browns' | 14      THE WITNESS: |
| 15  claim within 60 days of receiving | 15         On page 13 of FP79552E, it |
| 16  satisfactory proof of loss? | 16  outlines:  "Submit to us within 60 days |
| 17      MR. ZAUNBRECHER: | 17  after the loss your signed sworn proof of |
| 18         I object to the form. | 18  loss which sets forth to the best of your |
| 19         Answer it if you can. | 19  knowledge and belief, the time and cause of |
| 20      THE WITNESS: | 20  loss, interests of the insured and all |
| 21         I do not believe that we received | 21  others on the property involved and all |
| 22  any document that would meet the definition | 22  encumbrances on the property, other |
| 23  of proof of loss as contained within the | 23  insurance which may cover the loss, change |
| 24  policy; however, we did make payment. | 24  in title or occupancy of the property during |
| 25  EXAMINATION BY MR. GISLESON: | 25  the term of this policy, specifications of |
| Page 137 | Page 139 |

| | |
|---|---|
| 1      Q.   What type of document, in your | 1   any damage, building and detailed estimates |
| 2   opinion, would satisfy or would qualify as | 2   for repair of the damage and inventory of |
| 3   satisfactory proof of loss? | 3   damaged or stolen personal property |
| 4      A.   I referenced proof of loss as | 4   described in 2C." |
| 5   outlined within the policy and it's outlined | 5          2C states:  "Prepare an inventory |
| 6   within that policy.  That's what would meet | 6   of damaged or stolen personal property |
| 7   my definition. | 7   showing detailed quantity, description, age, |
| 8      Q.   As you sit here today, you don't | 8   replacement cost and amount of loss. |
| 9   have an understanding of what of proof of loss | 9   Attached to the inventory, all bills, |
| 10  means under Louisiana law? | 10  receipts and related documents that |
| 11      MR. ZAUNBRECHER: | 11  substantiate the figures in the inventory. |
| 12         I object to the form.  Same | 12  Receipts for additional living expenses |
| 13  objection as before. | 13  incurred and records supporting the fair |
| 14         Instruct him not to answer. | 14  rental value loss and evidence or affidavits |
| 15  EXAMINATION BY MR. GISLESON: | 15  supporting a claim under the credit card |
| 16      Q.   And as you sit here today, you | 16  bank fund transfer card, forgery and |
| 17  don't have an understanding of what | 17  counterfeit money coverage stating the |
| 18  satisfactory proof of loss means in the | 18  amount and cause of loss." |
| 19  context of the Browns' policy? | 19  EXAMINATION BY MR. GISLESON: |
| 20      MR. ZAUNBRECHER: | 20      Q.   Is that the only proof of loss |
| 21         I object to the form. | 21  that State Farm considers applicable under |
| 22         You can answer if you can. | 22  the Browns' insurance policy? |
| 23      THE WITNESS: | 23      A.   As previously stated, if the |
| 24         If I could be provided with a copy | 24  policy is in conflict with Louisiana law, on |
| 25  of the Browns' policy, I could outline what | 25  the Brown, then the Louisiana law policy |
| Page 138 | Page 140 |

35  (Pages 137 to 140)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al        1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

```
 1   will prevail.
 2       Q.   Is the Browns' policy in conflict
 3   with Louisiana law?
 4       MR. ZAUNBRECHER:
 5           Same objection as before.  He's
 6   not a lawyer.  You're asking for a legal
 7   opinion.  He's not going to answer that.
 8   EXAMINATION BY MR. GISLESON:
 9       Q.   Isn't it true that the Browns'
10   policy is in conflict with Louisiana law?
11       MR. ZAUNBRECHER:
12           Same objections.
13           Instruction not to answer.
14   EXAMINATION BY MR. GISLESON:
15       Q.   Isn't it true that State Farm was
16   supposed to adjust the Browns' claims
17   pursuant to the requirements of Louisiana
18   law?
19       MR. ZAUNBRECHER:
20           Same objection.  You're calling
21   for a legal opinion of a lay witness.
22   EXAMINATION BY MR. GISLESON:
23       Q.   Isn't it true that State Farm was
24   supposed to adjust this claim in good faith
25   as set forth in Louisiana statutes?
                                    Page 141
```

```
 1   EXAMINATION BY MR. GISLESON:
 2       Q.   Did State Farm provide any
 3   guidance to the Browns' adjuster by e-mail
 4   as to how to adjust the Browns' claim?
 5       A.   I'm not aware of any e-mail
 6   between the adjuster and anyone from State
 7   Farm specific to the Browns' claim.
 8       Q.   Did you look?
 9       A.   Did I physically do a search?  No,
10   sir.
11       Q.   Is it possible to do a search?
12       A.   Not by me, no, sir.
13       Q.   Who can do the search?
14       A.   We have the ability of reviewing
15   the e-mail.  As for a name, I don't know.
16       Q.   If you wanted to find something
17   that said I need to do a search to see if
18   this adjuster for the Brown property ever
19   sent or received e-mails relative to the
20   Brown claim, who would you go ask how that
21   gets done?
22       A.   With regard to the Browns' claim,
23   I would put that request through my counsel.
24       MR. ZAUNBRECHER:
25           And, again --
                                    Page 143
```

```
 1       MR. ZAUNBRECHER:
 2           Same objection.
 3           If you can understand as a
 4   layperson, please answer, not giving a legal
 5   opinion.
 6       THE WITNESS:
 7           We received notice of the claim
 8   from the Browns.  Once we were able to gain
 9   access to the area that the Brown residence
10   was at, we gained that access, we evaluated
11   that claim, we made payment on that claim
12   and we provided the Browns with any policy
13   interpretations that may be applicable and
14   we settled accordingly.
15   EXAMINATION BY MR. GISLESON:
16       Q.   Are you aware of any time limit
17   requirements that would apply to the Browns
18   as set forth in Louisiana law?
19       MR. ZAUNBRECHER:
20           I object to the form.
21           You can answer, if you can, as a
22   layperson.
23       THE WITNESS:
24           My answer would be nothing but
25   speculation.
                                    Page 142
```

```
 1   EXAMINATION BY MR. GISLESON:
 2       Q.   Before suit got filed --
 3       MR. ZAUNBRECHER:
 4           I'm voicing an objection.  I
 5   object to the line of questioning.  All
 6   e-mails, as requested, have been produced.
 7   There was a privilege log that has not been
 8   contested for counsel communications, but
 9   e-mails have been produced in this case.
10   EXAMINATION BY MR. GISLESON:
11       Q.   Has anyone told you that they did
12   an e-mail search to find out if any of these
13   e-mails exist?
14       A.   In my preparation for this
15   deposition, I did not request information on
16   e-mail searches, no, sir.
17       Q.   And, in fact, if there were
18   e-mails going back and forth, they're not
19   required to be placed in the claims file;
20   are they?
21       A.   If there is an e-mail that is
22   specific to the claims file that cannot be
23   summarized elsewhere, then I think that
24   e-mail would be in the claims file.
25       Q.   The e-mail should be in the claims
                                    Page 144
```

36 (Pages 141 to 144)

1    file; right?
2        A.   During Hurricane Katrina, it was
3    very, very difficult for that to happen, so
4    it may be in that claims file.
5        Q.   As a matter of policy, practice
6    and procedure, any e-mail related to the
7    Browns' claim should be in the Browns'
8    electronic claims file; right?
9        A.   I don't think I can use that
10   terminology, no, sir.
11       Q.   So it's not a violation of State
12   Farm policy if there's an e-mail related to
13   the Brown claim that's not in the Browns'
14   claim file?
15       MR. ZAUNBRECHER:
16           I object to the form.
17           Answer if you can.
18       THE WITNESS:
19           Your use of the terminology
20   related is very, very broad.  If there is an
21   e-mail from the agent to his underwriters
22   with regards to the Brown policy, that could
23   be deemed as related to the claim file.  But
24   I don't believe that that would be something
25   that would be required to be in the claim

Page 145

1    file.
2        Q.   I'm talking about the adjuster or
3    anyone with authority to pay on this claim.
4        MR. ZAUNBRECHER:
5            Is there a question?
6    EXAMINATION BY MR. GISLESON:
7        Q.   Would it violate State Farm
8    policy, practice and procedure, if there was
9    an e-mail sent or received by the adjuster
10   on that claim or anyone else that never made
11   its way to the electronic claims file or the
12   paper claims file of State Farm?
13       MR. ZAUNBRECHER:
14           I object to the form.  It calls
15   for speculation.
16           Answer it if you can.
17       THE WITNESS:
18           I can't think of a situation
19   contained within the Brown claim file where
20   an e-mail would be used.
21   EXAMINATION BY MR. GISLESON:
22       Q.   Before I forget, Mark Richter
23   still is employed by State Farm; right?
24       A.   Mark Richter is still an employee
25   of State Farm, yes, sir.

Page 146

1        Q.   How does the Outlook program --
2    well, for every single person who has
3    touched the Brown claims file, before a suit
4    was filed, you can actually type their name
5    into the Outlook system and it gives you
6    where they're located; right?
7        A.   Not necessarily, no.
8        Q.   What does it give you?  What
9    information does it provide to you?
10       A.   For every single person, it
11   depends on if that's an external or external
12   employee.  The information that it will give
13   me is their name, their sign-on ID, any
14   other information is particular to that
15   individual and the scope of their employ.
16       Q.   Including their supervisor?
17       A.   Including their supervisor.
18       Q.   Including the area of the country
19   with which they work?
20       A.   I think you need to clarify what
21   your question is.  Because if they're a
22   State Farm employee, then I can see the
23   hierarchy as to who they report to.  If they
24   are an external employee, I would not see
25   the hierarchy.  So your use of the word

Page 147

1    "included" I think would show on the record
2    could be interpreted either way.
3        Q.   I was talking about internal
4    employees.
5        A.   I need your question again,
6    Counsel.
7        Q.   If you type in the name of an
8    internal employee who worked on the Browns'
9    claim, the Outlook system will reflect their
10   supervisor; correct?
11       A.   If I was to do that today, it
12   would reflect -- their supervisor today.
13       Q.   Would it also reflect where
14   they're located?
15       A.   It may reference where they're
16   located, depending on whether they work out
17   of their house or not.
18       Q.   And would it reflect their title
19   within the firm, their job title?
20       A.   For an internal employee, it would
21   reference their job title, yes, sir.
22       Q.   How would State Farm go about
23   conducting a search for any e-mail related
24   to the Brown claim sent before suit was
25   filed?

Page 148

37 (Pages 145 to 148)

1    MR. ZAUNBRECHER:
2        I object to the form and as beyond
3    the scope of the court's discovery order.
4        But if you know, feel free to tell
5    counsel.
6    THE WITNESS:
7        I do not know.
8    EXAMINATION BY MR. GISLESON:
9        Q.   Do you know who within State Farm
10   would know?
11       A.   I do not know.
12       Q.   And is it fair to say you don't
13   know if that was ever done in this case?
14       A.   In preparation for this testimony,
15   I did not ask if there was a review of
16   e-mail traffic.
17       Q.   I would like to direct your
18   attention to this document.  Can you
19   identify that?
20       A.   Do you want to number this
21   document now?
22       (Exhibit No. 6 marked for
23   identification.)
24   EXAMINATION BY MR. GISLESON:
25       Q.   I'm going to identify it as
                                        Page 149

1    Exhibit 6, but what I handed you is Bates
2    stamped 576 through 578.
3        A.   The document that you placed
4    before me is entitled wind and water
5    claim-handling protocol.
6        Q.   Have you ever seen it before?
7        A.   Yes, I have seen this document
8    before.
9        Q.   Okay.  When was the first time you
10   saw this document?
11       A.   The first time I saw this document
12   was on or around September 13th, 2005.
13       Q.   And who -- well, would this
14   document apply at all to the Browns' claim?
15       A.   There are portions contained
16   within this document that could be given a
17   casual relationship between this document,
18   yes.
19       Q.   Which part would, in your opinion,
20   would apply to the Brown claim?
21       A.   The damage caused by windstorm on
22   Page 577, damage to separate portions with
23   distinguishable wind or excluded water, the
24   inclusion of policy wording, losses not
25   insured to, which is midway down that page.
                                        Page 150

1    Damage caused by floodwaters with available
2    flood policy may also apply.
3        Q.   Is that everything?
4        A.   I believe so, yes, sir.
5        Q.   Okay.  So who wrote this document?
6        A.   This document came to us from
7    property and casualty claim consulting
8    services.
9        Q.   What is that?
10       A.   P and C claims which is the
11   acronym that I would use for property and
12   casualty claim consulting services is a
13   department within State Farm that consults
14   with claims on the handling of claims.
15       Q.   Where are they located?
16       A.   P and C claims is located within
17   Bloomington -- within the offices located in
18   Bloomington, Illinois.
19       Q.   Do you have a name of an actual
20   person who wrote this or contributed to
21   writing this?
22       A.   This document is the result of
23   committee work.  There is no one author to
24   this document.
25       Q.   Who was on the committee?
                                        Page 151

1        A.   I do not know the names of all the
2    people involved in the committee so I could
3    not answer that question.
4        Q.   Do you know the name of anybody
5    involved on the committee?
6    MR. ZAUNBRECHER:
7        I'm just going to enter a
8    continuing objection as beyond the scope of
9    the handling of the Browns' claim.  Again,
10   I'm allowing some leeway and some foundation
11   and will continue to do so.
12       So if you know, go ahead and
13   answer, but just note my objection for the
14   record.  Thank you.
15   THE WITNESS:
16       I believe one of the people
17   involved in the creation of this document
18   was a consultant, claims consultant, Mike
19   Tucker.
20   EXAMINATION BY MR. GISLESON:
21       Q.   Who is Mike Tucker?
22       A.   A claims consultant.
23       Q.   Is that his title?
24       A.   I believe that is his title, yes,
25   sir.
                                        Page 152

38  (Pages 149 to 152)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  Q. Do you know where he's located?
2  A. Mike Tucker resides in
3  Bloomington, Illinois.
4  Q. What makes you think that Mike
5  Tucker was to committee that drafted this
6  memo?
7  A. Mike Tucker is the consultant for
8  Louisiana during the time of Hurricane
9  Katrina.
10  Q. Who else was on the committee who
11  helped draft this memo?
12  A. As previously stated, I do not
13  know who was on the committee associated
14  with the generation of this draft. It came
15  to us from property and casualty claims
16  consulting. It is my understanding that
17  Mike Tucker was a contributor to the
18  creation of this document.
19  Q. Okay. As you sit here today, do
20  you remember the names of anyone else who
21  helped contribute to create this document?
22  A. No, I do not.
23  Q. How was this document circulated?
24  A. We initially received this
25  document from our section manager in paper

Page 153

1  EXAMINATION BY MR. GISLESON:
2  Q. Doesn't it make sense to you that
3  if I want to find out what e-mails the
4  adjuster received concerning how to adjust
5  Katrina claims, I should ask that particular
6  adjuster?
7  MR. ZAUNBRECHER:
8  I object to the form of the
9  question.
10  Answer it if you can.
11  I'm not sure what you mean by
12  makes sense, but answer it if you can.
13  THE WITNESS:
14  We're four years from this event.
15  I don't know if that would be a good source
16  or not.
17  EXAMINATION BY MR. GISLESON:
18  Q. What's the name of the State Farm
19  adjuster who inspected the Browns' premises
20  again? I don't have it on me. Do you know?
21  A. The adjuster who performed the
22  work, the initial inspection was independent
23  and his last name is Dekievit.
24  Q. I will never be able to pronounce
25  that or spell it.

Page 155

1  format as well as in an e-mail format.
2  Q. Would it have been sent by e-mail
3  to the adjuster working on the Browns'
4  claim?
5  A. It's possible it could have. I do
6  not know.
7  Q. Were any other written materials
8  concerning the adjustment of Katrina claims
9  in Louisiana sent to the adjuster who
10  adjusted the Browns' claim?
11  A. I do not know if there was any
12  other written material outlining practices
13  or procedures that was sent to the adjuster
14  that handled the Brown claim.
15  Q. If I wanted to know that
16  information, who would I ask?
17  A. As previously discussed, I do not
18  know who I would reference to determine the
19  e-mail traffic received by that adjuster.
20  Q. It makes sense to you though to
21  ask the adjuster himself; right?
22  MR. ZAUNBRECHER:
23  I object to the form. If there is
24  a request for documents, it should go
25  through counsel.

Page 154

1  MR. GISLESON:
2  Can we get --
3  MR. ZAUNBRECHER:
4  As long as we get it consistent.
5  As long as we call it -- I think Dekievit is
6  the -- D-E-K-I-E-W-I-T.
7  MR. GISLESON:
8  According to our activity log,
9  it's D-E-K-I-E-V-I-T.
10  MR. ZAUNBRECHER:
11  It's in as W some places, too. I
12  can tell you that.
13  EXAMINATION BY MR. GISLESON:
14  Q. Dekievit was not a State Farm
15  adjuster?
16  A. There was a question by the court
17  reporter which one we're going to agree
18  with.
19  MR. GISLESON:
20  I'm sorry, I can do Dekievit, now
21  that I've written it down and it's in front
22  of me.
23  (Whereupon, an off-the-record
24  discussion was held.)
25  EXAMINATION BY MR. GISLESON:

Page 156

39 (Pages 153 to 156)

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255
New Orleans * Baton Rouge * Shreveport                              (504) 529-5255

1    Q.   At the time, Mr. Dekievit adjusted
2  the Browns' claim, was he a State Farm
3  employee?
4    A.   At the time he adjusted the claim
5  he was not a State Farm employee, no, sir.
6    Q.   Is he currently a State Farm
7  employee?
8    A.   He is not a State Farm employee,
9  no.
10   Q.   Who did Mr. Dekievit work for at
11 the time he adjusted the Browns' claim?
12   A.   The company that he worked for was
13 David Morse & Associates, Inc.
14   Q.   Do you know where David Morse &
15 Associates, Inc. is located?
16   A.   I have a mailing address of P.O.
17 Box 26004, Glendale, California 91222-6004.
18   Q.   Have you made an attempt to
19 contact Mr. Dekievit?
20   A.   I personally have made no attempt
21 to contact Mr. Dekievit.
22   Q.   Are you aware of whether any other
23 State Farm employee has made any effort to
24 contact Mr. Dekievit?
25   A.   I do not know the answer to that

Page 157

1  cases?
2    A.   The adjustment of the -- I will
3  just double-check -- the adjustment of the
4  flood claim was done over the phone.
5    Q.   What do you mean the adjustment of
6  the flood was done over the phone?
7    A.   Review of the facts of loss was
8  done over the phone and based on those facts
9  of loss plus information from -- a review of
10 those facts with the policyholder resulted
11 in an issuance of $8,200 for building and
12 $2,800 for contents.
13   Q.   So how was State Farm able to
14 adjust the Browns' flood claim over the
15 phone?
16   A.   During Hurricane Katrina, the NFIP
17 had received a number of claims and the
18 handling of those claims, we received
19 authority from the NFIP to streamline the
20 handling of those claims in an effort to get
21 money into the policyholders's hands
22 quickly.
23   Q.   What were the procedures that the
24 NFIP said you don't need to worry about
25 because of Katrina?

Page 159

1  question.
2        MR. GISLESON:
3        I'm going to attach the
4  wind/water-handling protocol dated
5  September 13th, 2005 as Exhibit 6.
6  EXAMINATION BY MR. GISLESON:
7    Q.   Do you have a copy in front of
8  you?
9    A.   (Handing).
10   Q.   All right.
11       MR. ZAUNBRECHER:
12       Can we go off the record just a
13 second?
14       THE VIDEOGRAPHER:
15       Off the record. It's 12:21.
16       (Whereupon, a recess was taken for
17 lunch.)
18       THE VIDEOGRAPHER:
19       Back on the record. It's 1:13.
20 EXAMINATION BY MR. GISLESON:
21   Q.   Mr. Lapinskie, I want to sort of
22 start talking about the flood adjustment in
23 the Brown case.
24       What is your understanding of how
25 the flood adjustment proceeded in the Brown

Page 158

1        MR. ZAUNBRECHER:
2        I object on the form.
3        You can answer it.
4  THE WITNESS:
5        It's not that they said we didn't
6  need to worry about something, they said
7  what we could do was adjust certain areas
8  based on satellite imagery and with
9  verification of certain policy information
10 over the phone.
11 EXAMINATION BY MR. GISLESON:
12   Q.   So State Farm then was able to
13 perform the entire flood adjustment process
14 for the Brown property without sending
15 anyone out there to actually inspect it; is
16 that correct?
17   A.   The payment for the flood policy
18 of the Browns, the flood claim of the Browns
19 was done over the phone without a site
20 inspection, yes, sir.
21   Q.   Not only the payment, but just
22 about everything else that had to do with
23 the flood claim was done over the phone;
24 right?
25       MR. ZAUNBRECHER:

Page 160

40  (Pages 157 to 160)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1     I object to the form.
2          Answer it if you can.
3     THE WITNESS:
4          The settlement of the flood claim
5     was done without a site inspection.
6     EXAMINATION BY MR. GISLESON:
7     Q.   But the homeowners claim did have
8     a site inspection?
9     A.   The homeowners claim was settled
10    based on the site inspection, yes, sir.
11    Q.   Why did you do a site inspection
12    of the homeowners claim, but adjust the
13    flood claim over the phone?
14    A.   10/10/05, log note 8, Brown 0039,
15    CR attempted to complete an estimate for the
16    wind damages over the phone -- that's
17    implied, not listed in the actual activity
18    log -- but insured insisted on a field
19    inspection. Insured believes the entire
20    roof needs replacement, gutters, exteriors,
21    doors, so the file was moved to the field
22    war handling.
23         So it was handled with a field
24    inspection at the insured's request on
25    10/10/05.

Page 161

1     do a homeowners claim over the phone and in
2     what situation did they say, no, we need to
3     send somebody out there?
4     A.   In situations such as the Browns,
5     we will attempt -- we were attempting to try
6     and settle this one over the phone.
7     Q.   Where can you tell that you were
8     trying to settle it over the phone
9     initially?
10    A.   Log note 8 on Brown 0039.
11    Q.   Could you read what part of log
12    note No. 8?
13    MR. ZAUNBRECHER:
14         He already has. He just read it.
15         Read it again.
16    THE WITNESS:
17         Received call from Vincent Brown.
18    See companion flood claim, 18-R 355-619.
19    Discussed damages resulting from wind. CR
20    attempted to complete estimate for wind
21    damages, but insured insisted on field
22    inspection. Insured believes the entire
23    roof needs replacement, gutters, exterior
24    doors. Moved claim to field for handling.
25    EXAMINATION BY MR. GISLESON:

Page 163

1     Q.   So if the insured wouldn't have
2     requested a field inspection, State Farm
3     wouldn't have done them?
4     A.   There's a possibility that this
5     could have been handled over the phone, yes,
6     sir.
7     Q.   Under what situations does State
8     Farm do a homeowners adjustment over the
9     phone without sending anyone out to inspect
10    the property?
11    MR. ZAUNBRECHER:
12         I object to the form. Beyond the
13    scope of the discovery order.
14         If you can answer, please do so.
15    THE WITNESS:
16         In a situation such as the Browns
17    in this claim, we attempted to handle over
18    the phone. They asked for a field
19    inspection. Might this have been settled
20    over the phone? I don't know. They
21    requested a field inspection.
22    EXAMINATION BY MR. GISLESON:
23    Q.   The question was a little bit more
24    than that. The question was: Under what
25    situations does State Farm say, oh, we can

Page 162

1     Q.   So is it fair to say then that
2     before October 10th, 2005, State Farm had
3     not assigned a field inspector to inspect or
4     field adjuster to inspect the Browns'
5     property?
6     A.   I don't believe that there was a
7     field adjuster assigned prior to 10/10/05.
8     Q.   You said there was or was not?
9     A.   I said I do not believe that there
10    was, no, sir.
11    Q.   What was the date that the claim
12    was made or received by State Farm?
13    A.   On the 31st of August, there is an
14    entry from our claims response center or
15    call response center: Insured is currently
16    staying at her sister's home -- I'm sorry,
17    at her sister's home in Tyler. So on or
18    around August 31st of 2005.
19    Q.   So on August 31st, 2005, State
20    Farm was noticed of the Browns' claim;
21    correct?
22    A.   I'm sorry, I didn't hear the
23    question.
24    Q.   Sure. On or about August 31st,
25    2005, State Farm was put on notice of the

Page 164

41  (Pages 161 to 164)

1  Browns' claim; correct?
2      A.   So August 31, 2005, we received --
3  there was a claim filed by the Browns, yes.
4      Q.   And on October 10th, 2005, State
5  Farm for the first time assigned a field
6  adjuster to inspect the Browns' premises;
7  right?
8      A.   On October 10th, 2005, State Farm
9  at the insured's request moved the file to
10 the field for a field inspection.
11     Q.   For the first time?
12     A.   That was the first time that the
13 insured insisted on a field inspection, yes,
14 sir.
15     Q.   When was -- when did the
16 inspection actually take place?
17     A.   Photos of the Brown loss are dated
18 11/15/2005 at 2:00 p.m.
19     Q.   And do we know -- how do you
20 know -- how do you know the date on the
21 photographs is the date of the inspection?
22     A.   That's the date that's on the
23 photos.
24     Q.   Is there anywhere else, any other
25 document other than the time-stamped
                                    Page 165

1  top right-hand corner which states, John, I
2  do not see anything that states his full
3  name.
4  EXAMINATION BY MR. GISLESON:
5      Q.   Was this document scanned into the
6  electronic claims file or is this part of
7  the paper file?
8      A.   This would be part of the paper
9  file.  As to whether it was scanned into the
10 images, I do not know.
11     Q.   Can you read Mr. Dekievit's
12 handwriting as to the one, two, three, four,
13 five numbering?
14     A.   I believe so, yes.
15     Q.   Could you please read 1 through 5
16 for me?
17     A.   One:  17 shingles missing/damaged;
18 two, 82 feet five-inch aluminum seamless
19 gutter; three, reset one soffit vent; four,
20 six panel exterior front door and frame
21 damaged for access.
22     Q.   Is there anything written next to
23 No. 5?
24     A.   No. 5 is a notation of an area, 10
25 foot 2 by 20 foot 2.
                                    Page 167

1  photographs that would show you when the
2  inspection took place?
3      A.   Brown 0027 up at the top
4  right-hand corner, inspected 11/15/05.
5      Q.   So what is Brown 0027?
6      A.   Brown 0027 is Dekievit's scope
7  notes, rough notes, based on his inspection
8  performed on 11/15/05.
9      Q.   How do you know those are
10 Dekievit's notes?
11     A.   The file was assigned to Dekievit
12 at this time.  He has log notes outlining
13 that he inspected it.  There is no reason
14 not to believe that those are Dekievit's
15 notes.
16     Q.   What's Dekievit's first name?
17     A.   Johnathan.
18     Q.   Does his name appear anywhere on
19 this document?
20     MR. ZAUNBRECHER:
21        You're talking about 0026?
22     MR. GISLESON:
23        Yes.
24     THE WITNESS:
25        Other than the reference of the
                                    Page 166

1      Q.   What does that reference?
2      A.   I do not know.
3      Q.   There appear to be some notations
4  on the right-hand of the side -- right-hand
5  side of the page.  Do you see that?
6      A.   Yes, I do.
7      Q.   Can you read those?
8      A.   Three hundred to $400 -- $300 for
9  trip, looks like $400 for trip, Hotel
10 Renaissance in Dallas, $150 per day, five
11 days total.  $750.  Food for our family of
12 four, $60 a day equals three hundred.
13 Jennifer Brown, Vincent Brown, Eldridge
14 Simms, Ashante Simms.  Gas expense looks
15 like three hundred, then a one added to it,
16 so thirteen hundred.  Food in freezer, six
17 hundred.  Total nineteen hundred.  Hotel
18 fee, seven fifty.  Hotel food -- actually
19 that twenty-six fifty is the addition of the
20 nineteen and the seven fifty.  $300, that
21 would be the trip cost, twenty-nine fifty.
22     Q.   What trip cost for that $300
23 amount?
24     A.   That trip cost would be the
25 expenses associated with traveling from
                                    Page 168

42 (Pages 165 to 168)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  here, Louisiana to the hotel that they were
2  residing at in Dallas.
3      Q.  What is the date of the Xactimate
4  report that was generated?
5      A.  The Xactimate report was printed
6  on November 21st, 2005.
7      Q.  Could you direct me to a Bates
8  stamp number, please?
9      A.  Brown 0017.
10      Q.  And what's the date you're
11  referring to, where is it located on that
12  piece of paper?
13      A.  It would be at the top center of
14  the page, 11/21/2005.
15      Q.  Okay.  Can I direct your attention
16  to the price list on the right-hand corner.
17          (Whereupon, an off-the-record
18  discussion was held.)
19  EXAMINATION BY MR. GISLESON:
20      Q.  As to the price list, can you read
21  that for me?
22      A.  LANO5F5D3.
23      Q.  And what does that stand for?
24      A.  Louisiana New Orleans, the version
25  of Xactimate, it's the third quarter -- I'm

Page 169

1  version.
2      Q.  Do you know what the D or the
3  three means?
4      A.  D is the fourth quarter, three is
5  the third version.
6      Q.  Do you have any reason to believe
7  that Mr. Richter would know the full meaning
8  of the interpretation of this price list?
9      A.  I believe Mr. Richter could give
10  me that information, yes.  I believe I knew
11  it at one time as well.  I just don't recall
12  it at this time.
13      Q.  Could you read to me what is
14  listed underneath the price list?
15      A.  Restoration/service/remodel with
16  service charges broken out.
17      Q.  What are service charges?
18      A.  The base service charges are
19  additional allowances contained within the
20  estimate for trip time set up.
21      Q.  Why were they factored out for the
22  Brown estimate?
23      A.  In the Brown estimate, you will
24  note that Page 2 has the unit cost based on
25  the quantities being estimated for.  On

Page 171

1  sorry, fourth quarter, third version.
2      Q.  What does the five stand for?
3  MR. ZAUNBRECHER:
4          There are two fives.
5  EXAMINATION BY MR. GISLESON:
6      Q.  The first five stand for?
7      A.  I believe that's the date, 2005.
8      Q.  And what does the F stand for?
9      A.  Going by memory, I believe the 5F
10  or F5 references the version of Xactimate
11  used.
12      Q.  What do you mean the version used?
13      A.  Xactimate issues new versions as
14  they do new updates.  This is the new
15  version.
16      Q.  Meaning this is the update,
17  updated version within what?
18      A.  It's like Windows '95; Windows
19  '97.
20      Q.  So then explain to me what the 5F
21  or the F5 means then?  You said it's a
22  version, but which version?  Does the F5
23  tell you which version it is?
24      A.  As we sit here today, I do not
25  recall how those letters relate to a

Page 170

1  Page 3, you will see an adjustment for base
2  service charges.  So they're just broken out
3  to show how that price is arrived at.
4      Q.  But they are, in fact, included in
5  the final number?
6      A.  The base service charges are
7  included in the settlement process, yes,
8  sir.
9      Q.  So whether it's broken in or
10  factored -- whether it's broken out or
11  factored in doesn't matter because the end
12  number is going to be the same regardless.
13  It's just a different format for the
14  Xactimate?
15      A.  I don't know where you got that
16  definition from, but that's not anything
17  near to what my response was.
18      Q.  So you testified on the Brown
19  estimate the base service charges are broken
20  out; right?
21      A.  Yes, the base service charges are
22  broken out on the Brown estimate.
23      Q.  And so what that means is that
24  there's simply an additional line item that
25  identifies what the base service charges

Page 172

43  (Pages 169 to 172)

1  are, but that they're still factored in and
2  applied to the ultimate amount that was paid
3  to the Browns; right?
4      A.  The base service charges are shown
5  as an additional line item and those
6  additional line items are added together
7  with the other line items to come to the
8  line item total as seen on Brown
9  00017226578.
10      Q.  So the Browns were paid for the
11  base service charges?
12      A.  Included in the estimate is the
13  base service charges.  Those base service
14  charges were included in the settlement,
15  yes.
16      Q.  If I can direct your attention two
17  lines down on Brown 17 where it says date
18  inspected.  What date is right there?
19      A.  The date inspected shows
20  10/10/2005.
21      Q.  But that can't be right; right?
22      A.  I can't see how that date
23  inspected would be the right date, no.
24      Q.  Any idea why somebody -- why the
25  adjuster put the wrong date down as the date
Page 173

1  inspected on his report?
2      A.  10/10/2005 is the same date of
3  which this claim was assigned to
4  Mr. Dekievit.  I'm assuming that -- anything
5  else would be an assumption.
6      Q.  So it would just be best to ask
7  Mr. Dekievit?
8      A.  That's correct.
9      Q.  I note that there wasn't any
10  depreciation taken out of this estimate; is
11  that correct?
12      A.  In the Brown estimate, there is no
13  deduction for depreciation, that's correct.
14      Q.  Why is there no deduction for
15  depreciation?
16      A.  The Browns' policy is endorsed
17  with a -- has an endorsement attached to it
18  that allowed for replacement cost benefits
19  to be paid up front.
20      Q.  What's the name of that
21  endorsement?  I think you have the policy to
22  your left.
23      A.  Are we going to mark the policy?
24      Q.  Yeah.  I just hadn't gotten to the
25  line of questioning, so I was going to wait
Page 174

1  until I got to that before I marked it.
2      A.  Loss settlement endorsement
3  FE5273.
4      Q.  And what was the date that the
5  Browns were paid pursuant to the 11/15/05
6  inspection?
7      A.  A draft was generated on
8  December 12th, 2005, two drafts.
9      Q.  In what amounts?
10      A.  One draft was in the amount of
11  $1,868.16; the second draft was in the
12  amount of $2,370.12.
13      Q.  And who approved that payment?
14      MR. ZAUNBRECHER:
15          I'm sorry, I didn't hear the tail
16  end of that question.
17      MR. GISLESON:
18          Who approved the payments?
19      MR. ZAUNBRECHER:
20          Okay.
21      THE WITNESS:
22          On 12/9/05, Carrie Demane stated
23  it was -- this is on Brown 0038, log note
24  14, stated it was okay to pay based on the
25  adjustments statement of loss.  In the
Page 175

1  activities log, it says SOL.
2  EXAMINATION BY MR. GISLESON:
3      Q.  Can you spell that person's name?
4      A.  D-E-M-A-N-E, first name, Carrie,
5  C-A-R-R-I-E.
6      Q.  Did the adjuster have any
7  authority to pay this claim?
8      MR. ZAUNBRECHER:
9          I just object to the form of the
10  question.  I'm not sure what you mean.
11          You mean write a check on the
12  spot?  I'm not sure what you mean.
13          If you understand the question, go
14  ahead and answer it, sir.
15      THE WITNESS:
16          Mr. Dekievit chose to submit the
17  estimate to Carrie Demane for approval.
18  Carrie approved that.  I don't know whether
19  it was within or not within his authority
20  levels.
21  EXAMINATION BY MR. GISLESON:
22      Q.  Isn't it true that since
23  Mr. Dekievit was not a State Farm adjuster,
24  he actually had no settlement authority;
25  right?
Page 176

44  (Pages 173 to 176)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    A.   That would be a false statement.
2    Q.   Okay.  Why is that?
3    A.   Independent adjusters were given
4  file authority to handle claims out in the
5  field, but they were not forced to handle
6  claims out in field.  If they chose to
7  discuss a claim further, they had that
8  ability.
9    Q.   So as you sit here today, you
10 don't know Mr. Dekievit had settlement
11 authority or not have settlement authority?
12 MR. ZAUNBRECHER:
13      You mean within this amount?
14 MR. GISLESON:
15      For this claim.
16 MR. ZAUNBRECHER:
17      Okay.
18 THE WITNESS:
19      As I sit here today, I know that
20 Mr. Dekievit sent the claim in to Carrie for
21 approval to pay.
22 EXAMINATION BY MR. GISLESON:
23    Q.   Does that tell you he didn't have
24 authority?  Does that tell you he did have
25 authority, but chose not to use it?

Page 177

1    A.   It tells me neither.
2    Q.   So you don't know if Mr. Dekievit
3  had any settlement authority whatsoever?
4    A.   I do not know what his authority
5  levels were.
6    Q.   Or if he had any at all?
7    A.   I do not know what his authority
8  levels were.
9    Q.   Which would include the fact that
10 he might not have had any settlement
11 authority?
12    A.   I would find that rather unusual,
13 but I would have to entertain your response,
14 yes.
15    Q.   Do you know anything about
16 Mr. Dekievit?
17 MR. ZAUNBRECHER:
18      I object to the form.
19      Go ahead.
20 EXAMINATION BY MR. GISLESON:
21    Q.   Do you know whether Mr. Dekievit
22 is a state certified contractor in
23 Louisiana?
24    A.   I do not know.
25    Q.   Do you know whether Mr. Dekievit

Page 178

1  has any contracting experience whatsoever?
2    A.   I do not know.
3    Q.   Do you know whether Mr. Dekievit
4  has any roofing experience whatsoever?
5    A.   I do not know.
6    Q.   Do you know whether Mr. Dekievit
7  had any adjusting experience before he went
8  out and adjusted the Browns' claim?
9  MR. ZAUNBRECHER:
10      I object to the form.  I'm not
11 sure what you mean by adjusting experience.
12      Go ahead and answer if you know.
13 THE WITNESS:
14      I don't know what adjusting he did
15 prior to seeing the Brown claim, no, sir.
16 EXAMINATION BY MR. GISLESON:
17    Q.   If you wanted to find out if he
18 had any experience or find out about his
19 background, what would you do?
20    A.   One of the places I may go to find
21 out further information about Mr. Dekievit's
22 background is with his employer.
23    Q.   His employer was David Morse &
24 Associates; right?
25    A.   David Morse & Associates was his

Page 179

1  employer at that time, yes, sir.
2    Q.   You?
3  MR. ZAUNBRECHER:
4      Soren, you want to take two
5  minutes?
6  MR. GISLESON:
7      Sure.
8  THE VIDEOGRAPHER:
9      We're off the record at 1:43.
10      (Whereupon, a brief recess was
11 taken.)
12 THE VIDEOGRAPHER:
13      We're back on the record.  It's
14 1:49.
15 EXAMINATION BY MR. GISLESON:
16    Q.   Mr. Lapinskie, I want to go
17 through some documents with you.  The
18 question is going to be pretty standard, but
19 I just need you to identify them, where
20 they're found on your system.
21      But I guess before I do that, I
22 need to ask are the Browns' flood documents
23 and flood claim file maintained separately
24 from the homeowners claim file?
25    A.   The flood claim is a separate

Page 180

45  (Pages 177 to 180)

1  claim with a separate claim number and the
2  documents for the flood claim are separate
3  from the homeowners claim.
4      Q.  Are they in the same system that
5  we discussed earlier?
6      A.  The claim itself is both
7  electronic and paper.  CSR is where the
8  electronic copy would be found.
9      Q.  Is the format, is the Browns'
10 flood claim formatted the same in the
11 electronic format within the CSR database as
12 the homeowners claims file?
13     A.  Taking a broad -- broad
14 interpretation of formatting, yes.  The
15 flood claim itself has additional items that
16 we're required to report on for the NFIP, so
17 would it look different within CSR?  Yes,
18 because it's a flood policy versus a
19 homeowners policy.
20     Q.  At some point you extracted
21 through -- the flood claim information from
22 the Browns and you submitted it pursuant to
23 reporting requirements to the NFIP; correct?
24     A.  There is -- the entire flood claim
25 is available to the NFIP for review.

1  properly?
2      A.  Yes, you did.
3      Q.  Do you have any idea what that
4  refers to?
5      A.  No, I do not.
6      Q.  What about in the bottom left-hand
7  corner, do you see where it reads source:
8  Echo agent.
9      A.  Yes, I do.
10     Q.  What does Echo mean; do you know?
11     A.  Echo would be the system that the
12 agent has.
13     Q.  Are you able to make any kind of
14 conclusion that these documents came from
15 State Farm concerning Bob Nowlin's file or
16 whether they came from Bob Nowlin?
17     A.  As I'm not familiar with this
18 document, I'm not familiar with the Echo
19 system that the agents use, I can make no
20 conclusion.
21     Q.  Does State Farm use the Echo
22 system?
23     A.  The Echo system is used by State
24 Farm agents.
25     Q.  Obviously State Farm has got to

1      Q.  But you're still required to
2  report, at least in summary fashion, the
3  Browns' claim to the NFIP?
4      A.  The Browns' claim is reported to
5  the NFIP, yes.
6      Q.  I'm going to use what I have in
7  front of me because it's probably in a
8  different order, but I would also like to
9  note that when the flood claim was provided
10 to me, it wasn't Bates stamped, although the
11 homeowners claim file was, so that's another
12 reason I do it this way.
13         If you can, identify that
14 document.
15     A.  I do not recall seeing this
16 document.  So, no, I can't.
17     Q.  Does this document look like
18 something that came from State Farm's
19 system?
20     A.  As this is a document I'm not
21 familiar with, I cannot provide you with
22 that information.
23     Q.  I direct your attention to the top
24 left-hand corner of the document.  It says
25 car index:  22RQ-20352V98.  Did I read that

1  use a system that's compatible with Echo in
2  order to communicate with the State Farm
3  agent's systems; right?
4      A.  I believe the two systems talk to
5  each other, yes, sir.
6      Q.  Have you ever used the Echo
7  system?
8      A.  No, I have not.  I'm taking a look
9  at this document that was put before me and
10 I notice an effective date of 5/23/07 and
11 5/23/07 as a receive date, a written date of
12 5/22/07 and a time of 1:11P.  I'm struggling
13 with what this has to do with the flood
14 claim.
15         Is this truly a document that was
16 submitted to us?  I'm struggling with a lot
17 about this, Counsel.  This is not Bates
18 stamped.  You're asking me to identify a
19 document that I do not believe was submitted
20 to us through counsel in compliance with
21 any -- anything.  I would like to know the
22 source of this document.
23     Q.  Sure.  The source of this document
24 is defense counsel.
25     MR. ZAUNBRECHER:

46  (Pages 181 to 184)

1      I would think the entire
2  underwriting file, flood and homeowners came
3  to you and it was not our practice to Bates
4  stamp underwriting files and that's where
5  this is from.
6      MR. GISLESON:
7          Okay.
8      MR. ZAUNBRECHER:
9          It didn't come from the flood
10  claims file.
11      MR. GISLESON:
12          It came from your attorney.
13      MR. ZAUNBRECHER:
14          It came from the underwriting file
15  produced in response to your discovery
16  request.
17      MR. GISLESON:
18          Okay.
19  EXAMINATION BY MR. GISLESON:
20      Q.   So does that assist you at all in
21  identifying that record anymore?  That
22  document anymore?
23      MR. ZAUNBRECHER:
24          I have to say, that is an
25  assumption on my part.

Page 185

1      MR. GISLESON:
2          That's fine.
3          I will identify it as Exhibit 7,
4  so that at least we know what we're talking
5  about.  Could you hand that to me?
6      THE WITNESS:
7          (Handing)
8          (Exhibit No. 7 marked for
9  identification.).
10      MR. GISLESON:
11          I think you're right, this is
12  probably all underwriting.
13      MR. ZAUNBRECHER:
14          It is all underwriting.
15  EXAMINATION BY MR. GISLESON:
16      Q.   Is it fair to assume that your
17  answers to your ability to identify this
18  document would be the same as your answer to
19  Exhibit 7?
20      A.   This is not part of a flood claim
21  file.
22      Q.   Okay.  Are you able to identify
23  that document?
24      A.   No, sir, I am not.
25      Q.   Is the underwriting information

Page 186

1  maintained by State Farm in the Echo
2  database of the Echo system?
3      A.   I'm not familiar with the
4  underwriting information.
5      MR. GISLESON:
6          I'm going to identify that
7  document as Exhibit 8.
8          (Exhibit No. 8 marked for
9  identification.)
10  EXAMINATION BY MR. GISLESON:
11      Q.   Okay, do you know what these
12  documents are, these 26 pages?
13      A.   I'm not familiar with these
14  documents.
15      Q.   Do you know what format they're
16  in?
17      A.   No, sir.  I'm not familiar with
18  these documents.
19      Q.   Do you know what Necho entry
20  means?
21      A.   I'm not familiar with the Necho
22  system.
23      Q.   Necho is another system?
24      A.   Necho and Echo, I believe, are
25  part of the same system.  I do not -- I'm

Page 187

1  not familiar with this system at all.  This
2  is on the agency side.
3      Q.   But it's your understanding that
4  the Browns -- you agree that these
5  documents -- well.  But it's your
6  understanding that the Necho system is a
7  system maintained by State Farm pertaining
8  to agent documents?
9      A.   My familiarity with the Necho
10  system is limited to the point where I do
11  not feel qualified to make or agree with
12  that statement.
13      Q.   Okay.
14      MR. GISLESON:
15          I will attach all 26 pages as
16  Exhibit 9.
17          (Exhibit No. 9 marked for
18  identification.).
19  EXAMINATION BY MR. GISLESON:
20      Q.   Is it fair to say that you can not
21  authenticate any of these documents?
22      A.   I cannot authenticate any of these
23  documents, no, sir.
24      Q.   I guess I better make that clear.
25  Is the same true for Exhibit 7 and 8, you

Page 188

47  (Pages 185 to 188)

1  are not able to authenticate these
2  documents?
3      A.  I cannot authenticate those
4  documents, no, sir.
5      Q.  I hand you a four-page document.
6  Can you identify that document?
7      A.  The document that you gave to me
8  Bates stamped Brown 211, 212, 213, and 214
9  are part of the flood file.
10     Q.  What part of the flood file is it?
11     A.  Coverage information associated
12  with the flood file as well as activity
13  logs, system-generated logs, initial facts,
14  policy notes.
15     Q.  And what State Farm system --
16     A.  I'm sorry, I wasn't finished.
17     Q.  I'm sorry.
18     A.  And the flood underwriting
19  information.
20     Q.  What State Farm system, computer
21  system is this saved under?
22     A.  This would be a printout from CSR.
23     Q.  There is a handwritten name on the
24  top of Brown 211.  Do you see that?  It
25  appears to be Dan Sullivan?

Page 189

1      A.  Brown 211, there is a handwritten
2  Dan Sullivan, yes, sir.
3      Q.  Do you know who Dan Sullivan is?
4      A.  Dan Sullivan is an independent
5  adjuster that worked for State Farm during
6  Hurricane Katrina.
7      Q.  Why would his name appear on this
8  document?
9      A.  On 10/6/05, Dan Sullivan -- I'm
10  sorry, Dan Sullivan, S-U-L-L-I-V-A-N, was
11  attempting to progress the file as per the
12  log note in the homeowners claim, 10/6/05,
13  Brown 0039, and the flood claim Brown 212,
14  log note 10.
15     Q.  Why would someone print out this
16  page on 211 and handwrite their name at the
17  top; do you know?
18     MR. ZAUNBRECHER:
19          Printed the front -- oh, you
20  weren't giving a date, you were giving the
21  Bates stamp number.
22     THE WITNESS:
23          I'm sorry, I was hearing that
24  date, too.  This is a print that was
25  generated for the creation of the paper file

Page 190

1  and then Dan Sullivan was the person that
2  was working on it.
3  EXAMINATION BY MR. GISLESON:
4      Q.  Is Document 211 a completely
5  different document from 212 or are they a
6  continuation of the same document?
7      A.  That would be a continuation of
8  the same document.
9      Q.  So in the top right-hand corner of
10  212 where it says Page 2, and there's no
11  similar page identifying Page 1, would Bates
12  stamp 211 be considered Page 1 of that
13  document?
14     A.  I would agree with that statement,
15  yes, sir.
16     Q.  The upper right-hand corner, a
17  couple of lines underneath Dan Sullivan,
18  there is a rep: QK50.  What does that stand
19  for?
20     A.  As an individual who works for
21  State Farm, we're given a four-digit
22  identifier.  That four-digit identifier,
23  QK50, I believe, refers to Tiffany Simmons.
24     Q.  What is your identifying number?
25     A.  My four digit is H as in Harry, P

Page 191

1  as in Paul, V as in Victor, E as in Edward.
2      Q.  Does the name in the top left-hand
3  corner after the word route, Rachel, I
4  guess, Crochet, C-R-O-C-H-E-T, do you know
5  what that is?
6      A.  I do not know who that is, no.
7      Q.  Do you know what that means,
8  Route:  Her name?
9      MR. ZAUNBRECHER:
10         Counsel, it's no mystery.  I will
11  be happy to stipulate on the record that the
12  person that's usually up there is the person
13  that prints out the request for a claims
14  file on a certain date and the date this was
15  requested.  A lot of the claims files have a
16  different person, route, colon, and that's
17  who prints out the claims file, but please
18  correct me if I'm wrong.
19     THE WITNESS:
20         I was looking to see if there was
21  anything that would be able to confirm that
22  for me, but I can't confirm that, but, yes,
23  I believe that's the person who printed the
24  initial claims --
25     MR. GISLESON:

Page 192

48  (Pages 189 to 192)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    Is there a date that they would
2  have printed this out?
3    THE WITNESS:
4    Yes. There's the log I was
5  looking for, system-generated logs No. 15,
6  Brown 0147, Rachel Crochet, C-R-O-C-H-E-T,
7  or Rachel.
8  EXAMINATION BY MR. GISLESON:
9    Q.  Where are you looking?
10    A.  Brown 0147.
11    MR. ZAUNBRECHER:
12    That's the total log or the
13  complete?
14    THE WITNESS:
15    System-generated logs.
16  EXAMINATION BY MR. GISLESON:
17    Q.  Okay.
18    A.  And 10/10/05 at 8:53, requested a
19  print on printer L825.  And that mirrors the
20  current date that you would see on Brown
21  0211 of 10/10/05.
22    Q.  Is there any indication why they
23  would want to print that up on October 10,
24  2005?
25    A.  On 10/6/05, the payment was issued

Page 193

1    Q.  Just underneath that to the left,
2  it says S-T-A-T, R-P-T Unit.  Do you know
3  what that means?
4    A.  State reporting unit, no, sir.
5    Q.  Do you know what the No. 40
6  underneath there refers to?
7    A.  No, sir.
8    Q.  Next to it is S-C-C.  Do you know
9  what that means?
10    A.  That's section.
11    Q.  Underneath that A, do you know
12  what that means?
13    A.  The Section A.
14    Q.  Section A of what?
15    A.  In CSR, we have a hierarchy and
16  that hierarchy for this claim was Section A,
17  Unit NN, Team D.
18    Q.  What does it tell you?  Does it
19  tell what team or person is ultimately
20  responsible for the Brown flood claim?
21    A.  I would struggle with the name
22  ultimately.  What this tells me, what this
23  tells me is at the time of this printing,
24  this file belonged to Section A, Unit NN
25  Team D.

Page 195

1  and that I'm taking that from Brown 146 or
2  the payment was requested to be issued.
3    On a flood file, once we issue a
4  payment, flood files are maintained paper.
5  Paper is the master file, per se.  So once
6  we have finished our claim handling, that
7  claim is printed.
8    Q.  The top right-hand corner of 211,
9  there is some other -- it looks like some
10  abbreviations with some indicators
11  underneath it.  One is T-R-A-N and
12  underneath it is BBBB.  Do you know what
13  that means?
14    A.  No, sir.
15    MR. ZAUNBRECHER:
16    Help me just a second, where you
17  are.
18    MR. GISLESON:
19    211.
20    MR. ZAUNBRECHER:
21    Oh, now.  Thank you.
22  EXAMINATION BY MR. GISLESON:
23    Q.  Next to that is C-N-T-Y.  Do you
24  know that what is?
25    A.  That is a county code.

Page 194

1    Q.  I guess somewhere State Farm
2  maintains a key or a table that tells me in
3  plain English who they were in this
4  particular team, unit and section; is that
5  right?
6    A.  I don't know that I understand the
7  question.
8    Q.  I mean, they're just letters;
9  right?  And so at some point, there's got to
10  be -- the letters have to match up to
11  somebody or somebody or someplace; wouldn't
12  they?
13    A.  In all likelihood, it matches up
14  to a place.
15    Q.  Okay.
16    A.  And that would be -- I would just
17  have to speculate.  I don't know.
18    Q.  As you sit here today, you don't
19  who -- well, let's do this:  Who authorized
20  the payment on the Browns' flood claim?
21    A.  Ultimately the NFIP is the author
22  of that payment.
23    Q.  Who at State Farm authorized the
24  payment of the Browns' flood claim?
25    A.  Dan Sullivan authorized the

Page 196

49  (Pages 193 to 196)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                              1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

```
 1    payment.
 2        Q.   Is Dan Sullivan a State Farm
 3    employee at this time?
 4        A.   I believe Dan Sullivan was an
 5    independent.
 6        Q.   Who did Dan Sullivan work for?
 7        A.   In the claim file, I do not know
 8    who he reported to or who he -- which firm
 9    he worked for.
10        Q.   Would those letters we discussed a
11    minute ago, the Section A, Unit NN, Team D,
12    inform us as to who Dan Sullivan worked for
13    at the time?
14        A.   I do not believe so, no.
15        Q.   If you wanted to find out who Dan
16    Sullivan worked for at the time, who would
17    you ask?
18        A.   I believe I could look that up on
19    the system and find out who he worked for.
20        Q.   How would you go about doing that?
21        A.   I would go back to the record that
22    I had for that office that Dan was in and I
23    could find out who he worked for at that
24    time.
25        Q.   And that sort of outlook method of
                                        Page 197
```

```
 1    finding out where someone is wouldn't work
 2    because he was an outside employee?
 3        A.   If he was an outside employee, it
 4    would show that he was an independent
 5    adjuster.  It may not signify what firm he
 6    was reporting to at that time.
 7        MR. ZAUNBRECHER:
 8           Counsel, I will agree to get that
 9    information and forward it to you to.
10        MR. GISLESON:
11           I think the judge ordered that I
12    take the deposition of the flood adjuster.
13        MR. ZAUNBRECHER:
14           He said claims adjuster and I
15    don't know whether that included flood or
16    not.
17        MR. GISLESON:
18           The document, this isn't the
19    judgment.
20        MR. ZAUNBRECHER:
21           "Following the completion of the
22    State Farm adjuster assigned to the claim."
23           That's what the wording says.
24        MR. GISLESON:
25           This is the June 4th Order.  No,
                                        Page 198
```

```
 1    I'm talking about the one we got the month
 2    or the month before that.  That specifically
 3    said flood adjuster, claims adjuster.
 4        MR. ZAUNBRECHER:
 5           Oh, oh, oh, that one.
 6        MR. GISLESON:
 7           And the corporate rep.
 8        MR. ZAUNBRECHER:
 9           All I can assure you is I will
10    give you whatever contact information we
11    have.
12        MR. GISLESON:
13           It's my understanding that this is
14    your last involvement in the case.  From
15    here on out --
16        MR. ZAUNBRECHER:
17           That may not be.  My involvement
18    in the case will be to comply with the
19    things that I agree to here today, at least,
20    and I can assure you I will give you -- I
21    will get you that information.  I will get
22    you whatever contact information State Farm
23    has with regard to him individually and his
24    employer and provide it to you as promptly
25    as possible.
                                        Page 199
```

```
 1    EXAMINATION BY MR. GISLESON:
 2        Q.   What makes you think Dan Sullivan
 3    was the one who authorized the payment?
 4        A.   On Brown 0209, it says,
 5    "Authorized by Dan Sullivan."  That is the
 6    payment, as well as on Brown 0210, it says,
 7    "Authorized by Dan Sullivan."  That is the
 8    other payment.
 9        Q.   So we can tell from these
10    documents that Dan Sullivan, although he was
11    he an outside adjuster or independent
12    adjuster, however you want to say it, had
13    authority to settle the flood claim, at
14    least in this amount?
15        A.   In reference to these documents,
16    which documents would you be referring to?
17    The documents that you had or the ones that
18    I referenced?
19        Q.   The one you just referenced.
20        A.   That would tell me that Dan
21    Sullivan authorized and paid these claims.
22    It does not tell me whether he is an
23    independent or a staff adjuster.
24        Q.   I'm sorry.  He's not an
25    independent adjuster?
                                        Page 200
```

50 (Pages 197 to 200)

1    A.   I would be going strictly by
2  memory.  I do not know whether he's
3  independent or staff.
4    Q.   Oh.  So as you sit here right now,
5  you don't know whether Dan Sullivan is
6  currently a State Farm employee?
7    A.   I do not know Dan Sullivan.  I do
8  not know whether he works for State Farm or
9  if he's an independent adjuster working for
10  State Farm.
11    Q.   And that's true of the time that
12  he was dealing with the Browns' flood claim,
13  too?
14    A.   That is correct.  I do not know
15  Dan Sullivan.
16    MR. GISLESON:
17      I want to attach the four pages I
18  handed you, Brown 211 through Brown 214 of
19  as Exhibit 10.
20      (Exhibit No.  10 marked for
21  identification.).
22    MR. ZAUNBRECHER:
23      No. 10?
24    MR. GISLESON:
25      Yes.

Page 201

1    MR. ZAUNBRECHER:
2      Okay.
3  EXAMINATION BY MR. GISLESON:
4    Q.   I ask that you take a look at
5  that.
6    A.   (Complying).
7    Q.   Can you identify that?
8    A.   The document marked Brown 0216 is
9  a copy of the draft that was issued to
10  Vincent D. and Jeannie W. Brown in the
11  amount of two thousand five hundred on
12  9/6/05.
13    Q.   Was this an advance of some sort?
14    A.   This was an advance that was
15  issued, yes, sir.
16    Q.   Was it -- this was an advance on
17  the flood claim; right?
18    A.   This advance was applied to the
19  personal property claim under the flood
20  claim, yes.
21    Q.   Why was it applied to the personal
22  property and not the business -- not the
23  coverage A?
24    A.   At the time of Hurricane Katrina to
25  State Farm made the business decision to

Page 202

1  provide advances to our insureds.  Insureds
2  were displaced throughout the country.
3  Those advances would be applied to the
4  contents portion of the claim, if there was
5  contents available.
6    Q.   Why did you apply it to the
7  contents portion of it, but not the building
8  portion of it?
9    A.   Under the building portion, we may
10  have to protect a lienholder which would
11  make it kind of pointless in the receiving
12  an advance.
13    Q.   So you're saying, if you issued it
14  under property coverage, then you might have
15  to put the mortgage company's name on the
16  check which would delay, if not completely
17  thwart, the insured's ability to get a quick
18  payment?
19    A.   Your use of the term "property"
20  implies building or contents, so I wouldn't
21  say that.
22    Q.   Could you fix my statement then
23  to --
24    A.   We applied it to the contents
25  because the lienholder did not have an

Page 203

1  interest in the contents.
2    MR. GISLESON:
3      I mark this as Exhibit 11, Brown
4  216.
5      (Exhibit No. 11 marked for
6  identification.).
7  EXAMINATION BY MR. GISLESON:
8    Q.   Can you identify this document?
9    A.   The document marked Brown 0217 is
10  what's classified as the flood coding strip.
11    Q.   What is a flood coding strip?
12    A.   It's a piece of paper that would
13  be completed by the adjuster based on
14  information gathered during claim handling.
15    Q.   Would it have been filled out --
16  well, do you know who filled out this
17  document?
18    A.   I do not know who filled out this
19  document.
20    Q.   Could I direct your attention
21  underneath where it says, R-replacement
22  cost, A-actual cast value.  Why is the A
23  circled; do you know?
24    A.   Because the flood policy was at an
25  actual cash value based on insurance to

Page 204

51 (Pages 201 to 204)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    value.
2        Q.   Do you see the water depth?  Right
3    above that there is FICO-654.  Do you see
4    that?
5        A.   Yes.
6        Q.   What does that mean?
7        A.   That is a code that we receive
8    from the NFIP.  I don't know what it
9    references to, but it is a code that we code
10   specifically to this event.
11       Q.   Underneath it it says water depth.
12   What is the water depth there?
13       A.   The NFIP has a rating system, two
14   digits for the depth of the water.  This is
15   rated at plus 04, which means it's above the
16   foundation and as for the depth, I would
17   need to see the coding reference to see what
18   height that was.
19       Q.   Well, it looks like somebody wrote
20   in there four feet, three inches.
21       MR. GISLESON:
22           Let's switch tapes real quick.
23       THE VIDEOGRAPHER:
24           We're off the record.  It's 2:24.
25           (Whereupon, an off-the-record
                                        Page 205

1    discussion was held.)
2        THE VIDEOGRAPHER:
3            We're back on the record.  It's
4    2:28, the beginning of Tape 3.
5    EXAMINATION BY MR. GISLESON:
6        Q.   Mr. Lapinskie, returning to Brown
7    217, it appears as though there are a number
8    of items in which numbers are written in and
9    scratched out.  Do you see that?
10       A.   Yes, do I.
11       Q.   Do you know have knowledge as to
12   who scratched out those numbers?
13       A.   No, I do not.
14       Q.   Do you know why those numbers are
15   scratched out?
16       A.   No, I do not.
17       Q.   In order to find out who wrote
18   these numbers in and who scratched it out,
19   how would you find that out?
20       A.   Dan Sullivan is the person who
21   handled this claim.  My assumption is Dan
22   Sullivan would have filled out this form.
23   The reason for scratching out the water
24   depth is because the NFIP does not recognize
25   four foot three inches.  They have this
                                        Page 206

1    coding system 01, 02, 00, 99.  So that would
2    be scratched out to correct it to the right
3    coding system.  The reason why the other
4    numbers were scratched out, I do not know.
5        Q.   At the bottom of the page, it
6    reads Rob Bruce, BNYN?
7        A.   No.
8        Q.   Do you know BNYN?
9        A.   I'm assuming that is Robert
10   Bruce's four-digit sign on.
11       MR. GISLESON:
12           I would like to attach Brown 217
13   as Exhibit 12.
14           (Exhibit No. 12 marked for
15   identification.).
16   EXAMINATION BY MR. GISLESON:
17       Q.   Can I get the copy that I handed
18   you?
19       A.   (Handing).
20       Q.   I direct your attention to this
21   document.  Can you identify this?
22       A.   Document received March -- marked
23   Brown 0218 is a payment authorization
24   request for payment of this flood claim.
25       Q.   And if I can direct your attention
                                        Page 207

1    to payee, INS, what does that stand for?
2        A.   INS is an abbreviation for
3    insured.
4        Q.   And what does MTG mean?
5        A.   That an abbreviation for
6    mortgagee.
7        Q.   Do you see the X right above that?
8        A.   Yes, sir.
9        Q.   Is that a handwritten X with a
10   circle?
11       A.   I believe so, yes, sir.
12       Q.   Do you know why that's done?
13       A.   Those are specific areas that
14   needed to be filled out for this payment
15   authorization to not be routed back with
16   questions asking what needed to be
17   completed.
18       Q.   So I direct your attention
19   underneath where it says, cause/line?
20       A.   Yes, sir.
21       Q.   What does underneath that 17-001
22   mean?
23       A.   On 17 is the cause of loss, flood.
24   001 is the line that that coverage is
25   available under CSR, so the payment would go
                                        Page 208

52 (Pages 205 to 208)

1  through.
2      Q.   Two lines underneath that is
3  18/000.  What does that mean?
4      A.   Eighteen is cause of loss, flood,
5  for contents.  If I can clarify, 17 is cause
6  of loss, flood, for building.
7      Q.   What does the IM mean with a
8  circle around it?
9      A.   That's the insured and mortgagee.
10     Q.   What does the I underneath that
11 mean?
12     A.   Insured.
13     Q.   To the regular box, it says
14 transaction.  He's got the D circled.  What
15 does that mean?
16     A.   D is a payment code.
17     Q.   D circled means you're going to
18 make payment?
19     A.   That is correct.  Oh, it means
20 make the payment, yes, sir.
21     Q.   It means make the payment.  And --
22     A.   Let me just clarify before we --
23     Q.   Yes.
24     A.   This entire payment authorization
25 says make the payment.  In order to make the

Page 209

1  payment, the person issuing the draft, the
2  person authorizing the draft needs to tell
3  the person issuing the draft what type of
4  transaction code it is?  It's a D.  What the
5  amount is?  It's eighty-two hundred.  Who
6  that's being issued to?  Insured and
7  mortgagee.  Under which line?  001.  For
8  what cause?  17.
9          I'm assuming your next question is
10 payment Code 1.  Payment code 1 means this
11 is a final payment.
12     MR. GISLESON:
13         I would like to attach that as
14 Exhibit 13.
15     (Exhibit No. 13 marked for
16 identification.)
17 EXAMINATION BY MR. GISLESON:
18     Q.   I would like to direct your
19 attention to this document.  Can you
20 identify that document?
21     A.   That document put before me marked
22 Brown 20 -- sorry, 219 is a statement of
23 loss for the Vincent Brown flood claim.
24     Q.   And who filled out this document?
25     A.   The document was completed by Dan

Page 210

1  Sullivan.
2      Q.   And the date it was completed?
3      A.   10/6/05.
4      Q.   There is a description under
5  coverage A.  Do you see that?
6      A.   I do see a description under
7  coverage A, yes.
8      Q.   Could you read that for me?
9      A.   Description:  "XacTotal valuation
10 equals $147,604.  Valuation exceeds policy
11 limits.  Deductible would be absorbed.
12 Dollar deductible will be absorbed."
13     Q.   What is XacTotal?
14     A.   XacTotal is a part of the
15 Xactimate program that streamlines the --
16 that we use in establishing a value for the
17 property that we're evaluating.
18     Q.   What kind of value?
19     A.   Just a value.
20     Q.   How is XacTotal different than
21 Xactimate?
22     A.   The estimate that you receive from
23 XacTotal is a rather generic estimate based
24 on generic assumptions:  Three bedrooms, two
25 garages, percentages of vinyl, percentages

Page 211

1  of brick, percentages of carpet.  It's just
2  a -- I'm looking for the right word.  It's
3  an educated estimate as to the value of the
4  house, but it's not something that provides
5  the details that you could say you could
6  rebuild the house for that amount.
7      Q.   Does it tell me the value of the
8  house or the value of the damage to the
9  house?
10     A.   It's telling me the value of the
11 house.
12     Q.   Okay.
13     A.   And it's not a -- I wouldn't hold
14 myself to that value.
15     Q.   So that $147,604 is XacTotal's
16 printout as to what that house is worth?
17 It's not what the value of the claim is?
18     A.   That's not what the value of the
19 claim is, no, sir.
20     Q.   Underneath it, it reads:
21 "Valuation exceeds policy limits"?
22     A.   That is correct.
23     Q.   Is that valuation of the damage or
24 is that valuation of the house?
25     A.   Valuation of the damage.

Page 212

53  (Pages 209 to 212)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    Q.  How do you know valuation of the
2 damage exceeds policy limits if there's no
3 valuation of the damage, if the $147,000
4 number just refers to the value of the
5 house?
6    A.  We have a house that we've insured
7 under the homeowners policy for a specific
8 amount.  We know that there's floodwaters at
9 a depth of seven feet to this house and we
10 have a coverage A limit, coverage A being
11 building of $8,200.  It's not much of a
12 stretch, it's not much of a jump to assume
13 that $8,200 will not cover the total damage
14 created by the floodwaters.
15    Q.  You can max out the flood policy
16 without doing a damage estimate?
17    A.  As previously discussed, we were
18 given latitude by the NFIP to establish or
19 to evaluate damage to the home over the
20 phone.  That's exactly how this one was
21 done.
22    Q.  Is there any estimate that details
23 the property damage to the Browns' home
24 caused by flood?
25    A.  There is not an estimate for the

Page 213

1 property damage caused by flood, no.
2    Q.  And it's State Farm's position
3 that the NFIP is okay with the State Farm
4 maxing out its flood policies, without
5 coming up with any estimate as to the flood
6 damage to the property?
7    MR. ZAUNBRECHER:
8      I just object to the form.  If
9 you're limiting it to this claim, fine.  If
10 not, it's beyond the scope of the court's
11 discovery order and I will -- I will ask him
12 not to answer.  If it's with regard to this
13 claim, answer away.
14 EXAMINATION BY MR. GISLESON:
15    Q.  You can answer as to this claim.
16    A.  I'm looking to see if I have
17 anything else that I may have overlooked.
18 Yes, I did.  There was a flood loss
19 questionnaire that was filled out over the
20 phone.
21    Q.  Okay.
22    A.  I'm looking at Brown 221.  I'm
23 assuming that is a document that we will
24 look at later.  Do you want to bring it
25 forward now?

Page 214

1    Q.  No.  We will look at it later.
2    A.  So we didn't just throw the money
3 out.  We went through this document.  This
4 document was accepted by the NFIP.
5    Q.  And is this statement of loss in
6 front of you something that would have been
7 submitted to the NFIP?
8    A.  The statement and loss itself may
9 not have been submitted to the NFIP as that
10 information was contained in the flood
11 coding strip plus the request for
12 reimbursement based on the payments made.
13    MR. GISLESON:
14      We will attach that statement of
15 loss as Exhibit 14.
16      (Exhibit No. 14 marked for
17 identification.)
18 EXAMINATION BY MR. GISLESON:
19    Q.  Let me direct your attention to
20 Brown 220.  Stated at the top, flood claim
21 worksheet.  Do you see that?
22    A.  Yes, do I.
23    Q.  What is this document?
24    A.  This document is a worksheet that
25 is used to establish whether the policy will

Page 215

1 be covered based on an ACV or RC value.
2    Q.  Let me direct your attention to
3 the age of the building.  It's on the top
4 left-hand side.
5    A.  Yes, sir.
6    Q.  It identifies the building as 20
7 years?
8    A.  Yes, sir.
9    Q.  The age?
10    A.  Yes, sir.
11    Q.  And it identifies a depreciation
12 per year of a half of a percent.  Do you see
13 that?
14    A.  Yes, sir.
15    Q.  How is that calculated?
16    A.  I do not recall how we established
17 the depreciation paid per year or applied
18 per year.
19    Q.  Well, isn't this a standard
20 formula for depreciation?
21    MR. ZAUNBRECHER:
22      I object to the form.
23      Answer it if you can.  I'm not
24 sure what you mean.
25    THE WITNESS:

Page 216

54 (Pages 213 to 216)

1    I do not recall how that
2 depreciation was established.
3 EXAMINATION BY MR. GISLESON:
4    Q.   Isn't there a depreciation
5 standard within the industry of age of the
6 property divided by the lifespan of the
7 property?
8    MR. ZAUNBRECHER:
9       I object to the form.  Beyond the
10 scope.  I direct him not to answer, but the
11 standard of the industry is.
12 EXAMINATION BY MR. GISLESON:
13    Q.   Would you agree that the -- that
14 formula was not used for this flood claim
15 worksheet?
16    MR. ZAUNBRECHER:
17       What formula are you referring to?
18 MR. GISLESON:
19       The one I just said, Alan.
20 EXAMINATION BY MR. GISLESON:
21    Q.   Do you agree?
22    A.   I don't agree with a standardized
23 formula.  I don't agree with that statement
24 in total.  I also don't -- based on the
25 flood limits that we have applicable to

Page 217

1 EXAMINATION BY MR. GISLESON:
2    Q.   Isn't it true that State Farm
3 habitually used lower depreciation rates on
4 adjusting flood claims than it used on the
5 homeowners claims after Hurricane Katrina?
6    MR. ZAUNBRECHER:
7       I object to the form.  Beyond the
8 scope of the discovery order.
9       Do not answer.
10 EXAMINATION BY MR. GISLESON:
11    Q.   Isn't it true that State Farm
12 would submit those deflated depreciation
13 rates on the flood claim to the federal
14 government in order to increase the amount
15 that it would pay out on flood coverage?
16    MR. ZAUNBRECHER:
17       Same objection.
18       Same instruction.
19 EXAMINATION BY MR. GISLESON:
20    Q.   Isn't it true that that would be a
21 fraudulent claim to the United States
22 Government?
23    MR. ZAUNBRECHER:
24       Same objection.
25       Same instruction.

Page 219

1 this, the application of depreciation as
2 applied here has no effect on the outcome of
3 this flood claim.
4    Q.   Does State Farm have any internal
5 documents concerning how to calculate
6 depreciation -- let me ask you this way.
7 Does State Farm calculate depreciation for a
8 flood claim the same way it calculates
9 depreciation for homeowners claim?
10    MR. ZAUNBRECHER:
11       I object to the form.  Beyond the
12 scope.
13       If you're limiting it to this
14 claim, answer it.  If there's no limitation,
15 don't.
16    MR. GISLESON:
17       I will limit it to this claim.
18    MR. ZAUNBRECHER:
19       Thank you.
20       Go ahead.
21    THE WITNESS:
22       The application of depreciation in
23 the handling of this claim has no bearing on
24 the depreciation that you have me
25 referencing to right now.

Page 218

1 EXAMINATION BY MR. GISLESON:
2    Q.   Was the flood claim worksheet
3 identified in front of you submitted to the
4 federal government for payment?
5    A.   I believe the information
6 contained within the flood claim worksheet
7 was used to support the payment that was
8 made.
9    Q.   So is your answer, yes, it was
10 submitted to the federal government for
11 payment?
12    A.   I do not know that this specific
13 document was sent to the NFIP.
14    Q.   If you wanted to the find out who
15 sent it to the NFIP, who would you ask?
16    MR. ZAUNBRECHER:
17       I object to the form.  He said he
18 didn't know if it was sent to the NFIP.
19       You can ask him who would you ask
20 to find out if it was sent.  I think that's
21 what you wanted to ask probably.
22 EXAMINATION BY MR. GISLESON:
23    Q.   If you wanted to find out whether
24 this document was submitted to the NFIP, who
25 would you ask?

Page 220

55 (Pages 217 to 220)

1  MR. ZAUNBRECHER:
2      Thank you.
3  THE WITNESS:
4      I do not have the name of an
5  individual that I would be able to ask.
6  MR. GISLESON:
7      We will attach the flood claim
8  worksheet as Exhibit 15.
9      (Exhibit No. 15 marked for
10  identification.)
11  EXAMINATION BY MR. GISLESON:
12      Q.   I direct your attention to Brown
13  221, titled "Flood Loss Questionnaire."  Do
14  you see that?
15      A.   Yes, sir.
16      Q.   What is this document?
17      A.   Flood loss questionnaire was a
18  questionnaire that was completed while
19  talking about the loss with the insureds
20  over the phone.
21      Q.   Okay.  And how do you know this
22  was completed while -- well, who filled this
23  out, though?
24      A.   On 10/6/05, Brown 0146, Dan
25  Sullivan phone scoped the flood damage to

Page 221

the dwelling coverage A, eighty-two hundred,
2  coverage B, twenty-eight hundred, log note
3  10.  By that, that would imply that Dan
4  Sullivan completed this form while phone
5  scoping with Vincent Brown.
6      Q.   Could you really figure out who
7  filled out the flood questionnaire or to
8  confirm one way or the other, we would
9  probably have to ask Dan Sullivan; right?
10      A.   There are no other identifiers on
11  here to state that this is in Dan Sullivan's
12  hand.
13      Q.   Do you know Dan Sullivan's hand?
14      A.   No, sir.
15      Q.   Well, you said this was in Dan
16  Sullivan's hand.
17      A.   I said there are no identifiers in
18  here to support that this is in Dan
19  Sullivan's hand; in other words, he hadn't
20  put his name on this thing.
21      Q.   I've got you.  Is this particular
22  document dated, though?
23      A.   There's a date on this document of
24  9/27/2005.
25      Q.   You're looking at the top

Page 222

1  left-hand corner?
2      A.   That's correct.
3      Q.   Do you know how it was that the
4  entire document is handwritten out, but the
5  date is computer generated?
6      A.   I do not know.
7      Q.   Could I direct your attention to
8  the question -- I don't know if this is a
9  misprint, or whatever, it appears to read:
10  "Here you received any flood advance
11  payments."
12      A.   That is indeed what it reads.
13      Q.   Should it be have you received any
14  flood advance payments?
15      A.   That's what I would say, yes, sir.
16      Q.   Can you read the handwriting
17  underneath it?
18      A.   Homeowners-ALE, advance applied to
19  homeowners 18R359672.
20      Q.   It's asking about a flood advance
21  payment.  Why would there be information
22  concerning a homeowners ALE advance; do you
23  know?
24      A.   At the time of Hurricane Katrina,
25  we were issuing an advance to policyholders.

Page 223

1  If for some reason we could not find that
2  there was a flood policy, that advance may
3  be coded to the homeowners claim.  At the
4  time that we found a flood policy and we
5  knew that there was flood damage to that,
6  that advance would be recoded toward the
7  flood policy.
8      Q.   Is that what happened in this
9  case?
10      A.   At the time the draft was created,
11  9/6/05, Draft No. 108545767, Bates stamped
12  Brown 0216, it was coded to the flood
13  policy.
14      Q.   Did Mr. Brown receive any advance
15  on some of the policy?
16      A.   There is a log note on Brown 0146
17  which indicates a draft 108904231F was
18  issued on September 6th, 2005, in the amount
19  of $2,500.
20          In my review of the claim file, I
21  did not see that that draft was ever coded
22  to this flood -- to this homeowners policy
23  and I have requested that we look to find
24  that draft to see if that indeed did occur.
25      Q.   I'm trying to figure out if what I

Page 224

56  (Pages 221 to 224)

```
 1   gave you, that 221, is a one-page document
 2   or a multipage document?
 3       A.   The document that you gave me is
 4   right here.
 5       Q.   But what I mean --
 6       A.   I understand.  The document is a
 7   three-page document.
 8       Q.   So the other two pages would be
 9   Brown 222 and Brown 223?
10       A.   That is correct.
11       Q.   Just confirm that by looking at
12   these.
13       A.   Oh, I'm sorry.
14       Q.   That's all right.  What about
15   Brown 224, is that not part of it?
16       A.   I do not believe Brown 224 is part
17   of this questionnaire.
18       Q.   Okay.
19       MR. GISLESON:
20           I will attach Brown 221 through
21   223 as Exhibit 16.
22           (Exhibit No. 16 marked for
23   identification.).
24   EXAMINATION BY MR. GISLESON:
25       Q.   And we do come to Brown 224
                                   Page 225
```

```
 1   (handing).  Can you tell from looking at the
 2   document who filled this out?
 3       A.   No, I can not.
 4       Q.   Do you know whether this was a
 5   document saved electronically in the file or
 6   not?
 7       A.   This would not be an electronic
 8   document.  It may have been imaged into the
 9   file, but, no, this would not be something
10   that's in CSR.
11       Q.   How can you tell?
12       A.   Because I'm familiar with the
13   format of CSR.  I'm familiar with handling
14   flood claims in CSR.  And this is not a CSR
15   document.
16       Q.   Do you see the depreciation
17   percentages in the middle?
18       A.   Yes, I do.
19       Q.   Do you know how those were
20   calculated?
21       A.   The depreciation figures were
22   calculated on bulk.
23       Q.   Do you know how they came up with,
24   say, clothing 20 percent depreciation?
25       A.   No, I do not.
                                   Page 226
```

```
 1       Q.   Is this something that was filled
 2   out by the insureds?
 3       A.   This would be a document that was
 4   filled out on or around the same time as the
 5   phone scope that was occurring, so, no, it
 6   would not be something that would be filled
 7   out by the insured.
 8       Q.   Do you know how they got any of
 9   this -- whoever filled out this document
10   came to any of the figures on this page?
11       A.   Any response I gave to you on that
12   would be speculative.
13       Q.   Okay.  Do you know what that other
14   category is?
15       A.   It appears the creator of this
16   document broke the contents down to four
17   identifiable items:  Clothing, electronics
18   appliances, furnishing.  The other would be
19   a catchall for all other items that may not
20   fall under the first four categories.
21       Q.   Would this be an acceptable
22   contents list for the Browns to submit to
23   you on their homeowners claim, broken down
24   by five categories?
25       MR. ZAUNBRECHER:
                                   Page 227
```

```
 1           I object to the form of the
 2   question.  I'm not sure what you mean by
 3   acceptable contents list.
 4   EXAMINATION BY MR. GISLESON:
 5       Q.   Do you understand the question,
 6   Mr. Lapinskie?
 7       A.   Would I make payment based on this
 8   under the homeowners claim?
 9       Q.   Yes.
10       A.   Maybe yes, maybe no.  It depends
11   on the situation.
12       Q.   What about in the Browns'
13   situations?
14       A.   I did make payment.
15       Q.   On the homeowners claim pursuant
16   to a contents list like that?
17       MR. ZAUNBRECHER:
18           Do you understand the question?
19   EXAMINATION BY MR. GISLESON:
20       Q.   If the Browns submitted to you a
21   contents list in just about this same format
22   where it wasn't broken down and it just said
23   here is everything that we think was damaged
24   by wind and rain, would you make payment
25   based on that?
                                   Page 228
```

57 (Pages 225 to 228)

1  MR. ZAUNBRECHER:
2      I object to the form.
3      If you can answer it, answer it.
4      I think he already has answered
5  it, frankly.
6  THE WITNESS:
7      Well, look, we're overcomplicating
8  the issue here.  We have $2,800 in contents
9  coverage.  The fact that you, Counsel, would
10  delay my insured's receiving money to the
11  tune of $2,800 when we know that their
12  contents was under seven feet of water may
13  be acceptable to you.  It's not acceptable
14  to State Farm, nor was it acceptable to the
15  NFIP.
16      We've documented what we needed to
17  document in order to issue the payment that
18  they had the right to because they suffered
19  a covered loss to the amount of $2,800.
20      So is this acceptable for
21  homeowners's claim?  I would need to know
22  the cause of loss especially under Hurricane
23  Katrina, especially under the Brown claim.
24  But is this acceptable and sufficient enough
25  documentation to support a $2,800 payment

Page 229

1  for the flood loss that the Browns suffered?
2  Absolutely.
3      Q.   This document was submitted to
4  FEMA for payment?
5      A.   This document -- I'm sorry.
6  MR. ZAUNBRECHER:
7      I think you misspoke.  You didn't
8  mean FEMA.
9  MR. GISLESON:
10      NFIP is FEMA, there's no building
11  out there that is NFIP or anything.  It's
12  just a program.  It's all actually run by
13  FEMA.
14  EXAMINATION BY MR. GISLESON:
15      Q.   Is this something that was
16  submitted to the NFIP or FEMA for payment?
17      A.   I do not know that this particular
18  document was submitted to support payment.
19  This document is contained within the claims
20  file that the NFIP or FEMA has access to.
21  MR. GISLESON:
22      I'm going to attach the contents
23  list as Exhibit 17.
24      (Exhibit No. 17 marked for
25  identification.).

Page 230

1  EXAMINATION BY MR. GISLESON:
2      Q.   You I show you Brown 225 through
3  228.  Can you identify that document?
4      A.   The document submitted to, this is
5  an XacTotal estimate that was created by Dan
6  Sullivan.
7      Q.   And what is the date where it says
8  date inspected?
9      A.   October 6th, 2005.
10      Q.   This property was never inspected
11  by Dan Sullivan; right?
12      A.   This property was inspected over
13  the phone by Dan Sullivan on 10/6/2005.
14      Q.   So when you put a date down as
15  date inspected, that could be date inspected
16  by phone or date inspected in person?
17      A.   Yes, it can.
18      Q.   So this is the XacTotal estimate
19  you referenced earlier in your deposition?
20      A.   This would be an XacTotal, yes.
21      Q.   And where would Mr. Sullivan have
22  received all of this information on the
23  left-hand side of Pages 1 and 2.
24      A.   Through the phone interview with
25  Mr. or Mrs. Brown.

Page 231

1      Q.   So when it comes to square foot,
2  do you understand that Dan Sullivan would
3  have gotten that information from Mr. Brown?
4      A.   That information is also the same
5  information that's contained in Brown 0222,
6  the document that we previously reviewed,
7  flood loss questionnaire.  The interview was
8  with Vincent Brown.
9      My assumption is that information
10  came through that interview with Mr. Brown.
11      Q.   What about the roof type,
12  100 percent gable.  Is it your understanding
13  that Dan Sullivan got that information from
14  Mr. Brown?
15      A.   In an effort to complete the
16  XacTotal estimate that was done during the
17  interview with Mr. Brown, I would say that
18  that's where that information came from.
19      Q.   What about the room information on
20  the bottom of 225, is it your understanding
21  that Mr. Sullivan got all that information
22  from the insureds?
23      A.   As previously stated, the XacTotal
24  estimate has its limitations.  One of those
25  limitations is sometimes it will stipulate

Page 232

58  (Pages 229 to 232)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

| | |
|---|---|
| 1 rooms that may not necessarily have been | 1 EXAMINATION BY MR. GISLESON: |
| 2 contained within the house, but we move on | 2    Q.  Can you identify that document? |
| 3 on those because we're just trying to | 3    A.  The document marked Brown 0229 is |
| 4 establish a value for the house to proceed | 4 titled "Louisiana Exposures." |
| 5 with the payment that we could make under | 5    Q.  Have you ever seen it before? |
| 6 the flood policy. | 6    A.  I saw it contained within the |
| 7       That information that we received | 7 claims file, but I'm not familiar with it, |
| 8 is information as a result of the interview | 8 no. |
| 9 that was conducted with the Browns over the | 9    Q.  Do you know what its purpose is? |
| 10 phone. | 10    A.  I do not know. |
| 11    Q.   Is that true of all the | 11    Q.  Do you know who created it? |
| 12 information on this document, you believe | 12    A.  No, I do not. |
| 13 that the Browns gave Mr. Sullivan all the | 13    Q.  Do you know how it's saved? |
| 14 information on these three pages? | 14    A.  No, I do not. |
| 15    A.   That would be a question that you | 15    Q.  Do you know if it's part of the |
| 16 would have to ask Mr. Sullivan. | 16 flood file or the homeowners file? |
| 17    MR. ZAUNBRECHER: | 17    A.  It is part of the flood file. |
| 18       Did you say on all three pages or | 18    Q.  How do you know that? |
| 19 just the first two? | 19    A.  Because it's contained within the |
| 20 EXAMINATION BY MR. GISLESON: | 20 flood file. |
| 21    Q.  Can I direct your attention to | 21    Q.  But there's flood information and |
| 22 Brown 227.  Do you know the percentage of | 22 homeowners information on this file, on this |
| 23 overhead and profit that's applied to this | 23 document? |
| 24 XacTotal? | 24    MR. ZAUNBRECHER: |
| 25    MR. ZAUNBRECHER: | 25       I object to the form. |
| Page 233 | Page 235 |

| | |
|---|---|
| 1       On a value? | 1       If you can answer, go ahead. |
| 2       I object to the form.  I don't | 2    THE WITNESS: |
| 3 think it's been established that any | 3       I don't understand a the question. |
| 4 overhead and profit was applied or | 4 EXAMINATION BY MR. GISLESON: |
| 5 necessary, but you answer his question if | 5    Q.   Sure.  If I could show -- direct |
| 6 you can answer. | 6 your attention on the top on the right-hand |
| 7    THE WITNESS: | 7 corner where it says PRI risk amount, eleven |
| 8       I don't know what the percentage | 8 thousand.  Do you see that? |
| 9 was.  The overhead and profit that's noted | 9    A.  Yes, sir. |
| 10 on the XacTotal estimate is $24,606.82. | 10    Q.  What does PRI stand for? |
| 11    MR. GISLESON: | 11    A.  I do not know. |
| 12       I will attach Brown 225 through | 12    Q.  Okay.  If I direct your attention |
| 13 228 -- I'm sorry. | 13 a couple of lines down, it says policy code, |
| 14 EXAMINATION BY MR. GISLESON: | 14 PRS flood.  Do you see that? |
| 15    Q.  Was this document submitted to the | 15    A.  Yes, sir. |
| 16 federal government for payment? | 16    Q.  Does that indicate to you that |
| 17    A.  This document is contained within | 17 this is information concerning the flood |
| 18 the claims file and is available to the | 18 policy? |
| 19 federal government.  As to whether it was | 19    A.  My answer would be speculative. |
| 20 submitted to support payment, I do not know. | 20    Q.  Does the policy number above the |
| 21    MR. GISLESON: | 21 policy code identify the flood policy |
| 22       I will attach Brown 225 through | 22 number? |
| 23 Brown 228 as Exhibit 18. | 23    A.  Yes, it does. |
| 24       (Exhibit No. 18 marked for | 24    Q.  Okay.  I direct your attention |
| 25 identification.) | 25 below that, sort of below the two double |
| Page 234 | Page 236 |

59  (Pages 233 to 236)

1  lines, there is another PRI risk amount, one
2  hundred ninety-eight six twenty-five.  Do
3  you see that?
4      A.   Yes, sir.
5      Q.   And two lines underneath that, it
6  says policy code, HO-W.  Do you see that?
7      A.   Yes, sir.
8      Q.   Is the $198,625 number the
9  homeowners policy limits?
10     MR. ZAUNBRECHER:
11         You mean the combined or single
12  coverage?  I don't --
13  EXAMINATION BY MR. GISLESON:
14     Q.   Do you understand the question,
15  Mr. Lapinskie?
16     MR. ZAUNBRECHER:
17         I don't.  Are you asking if that's
18  any particular coverage or the total amount
19  of coverage?
20  EXAMINATION BY MR. GISLESON:
21     Q.   Mr. Lapinskie, do you understand
22  the question?
23     A.   I'm seeing if I can understand the
24  question.  I do not know what that number
25  represents.

Page 237

1      Q.   Do you know what the policy number
2  underneath that represents?
3      A.   That policy No. 18CZ0736 is the
4  homeowners policy number.
5      Q.   Okay.  Do you know why State Farm
6  would create a document that's got both the
7  insured's homeowner and flood policy
8  information on it?
9      MR. ZAUNBRECHER:
10         I object to the form.
11         Go ahead and answer it if you can.
12     THE WITNESS:
13         I do not know that State Farm
14  created this form.  This is a document
15  that's contained within the flood file.  I
16  note in the bottom, the date on this
17  document is Thursday, October 6th, 2005.
18  And it's entitled FEMA policy, Page 1 of 1.
19  EXAMINATION BY MR. GISLESON:
20     Q.   So is it possible this is a FEMA
21  document?
22     A.   Any response I give to you, as I'm
23  not familiar with this document, would be
24  speculation.
25     Q.   Excuse me.  I'm sorry, did you say

Page 238

1  earlier, you didn't know where this was
2  saved or where it originated?
3      A.   I do not know where it originated.
4  It is contained within the flood file.
5      Q.   Who would you ask if you wanted to
6  find out who created the document, what its
7  purpose is, why it's called Louisiana
8  exposures?
9      A.   The first place I would go to find
10  out about this is I suspect this has
11  something to do with the computerized
12  handling of the flood claims in the blue
13  zone, would be people who had worked or in
14  the office.  Dan Sullivan might be a good
15  source.
16     Q.   What's the blue zone?
17     A.   The blue zone is an area that we
18  refer to based on -- because it showed up in
19  blue on our computer screens, of claims that
20  could be handled with approval or we
21  received approval from FEMA to handle those
22  claims over the phone.
23     Q.   How much did State Farm get paid
24  by FEMA for adjusting the Browns' flood
25  claim?

Page 239

1      A.   I do not know what the
2  reimbursement was for the handling of the
3  Browns' flood claim.
4      Q.   If you wanted to find out how much
5  State Farm got paid for adjusting the
6  Browns' flood claim, who would you ask?
7      A.   I do not know.
8      Q.   Who is your superior?
9      A.   I report to Mary Lou Piel.
10     Q.   What's the last name?
11     A.   Piel, P-I-E-L.
12     Q.   What's her title?
13     A.   The Lou Piel is a section manager.
14     Q.   She's the manager of what section?
15     A.   The section that I'm in.
16     Q.   Does the section -- is it called
17  anything?
18     A.   Lou Piel section.
19     Q.   That's it?
20     A.   There's no official title, sir.
21     Q.   But it's within the catastrophe
22  division?
23     A.   It's within catastrophe services.
24     Q.   Who is Mary Lou Piel's supervisor?
25     A.   Lou Piel's supervisor -- Lou Piel

Page 240

60  (Pages 237 to 240)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

```
 1   reports to Guerry, G-U-E-R-R-Y, Wooten,
 2   W-O-O-T-E-N.
 3       Q.   What is his title?
 4       A.   Claims manager.
 5       Q.   He's a claims manager within the
 6   catastrophe services?
 7       A.   Yes, he is.
 8       Q.   Where is he physically located?
 9       A.   Gary Wooten resides in
10   Bloomington, Illinois.
11       Q.   I direct your attention to the top
12   right-hand corner of Brown 229.  It reads:
13   "Two policies exposed."  There's a $209,625
14   number.  Do you see that?
15       A.   Yes, I do.
16       Q.   What does that number represent?
17       A.   I do not know.
18       Q.   Does that number represent the
19   combined limits of the flood and the
20   homeowners?
21       A.   Based on the quick math that I did
22   in my head, no.
23       Q.   Let me ask it a different way, I
24   guess.  Is it the combined risk amount for
25   the building coverage or limits under the
                                      Page 241
```

```
 1   flood of the homeowners?
 2       A.   No.
 3       Q.   Okay.  Why not?  What would be the
 4   combined limit as identified on
 5   Document 229?
 6       A.   Are you asking me to assume that
 7   PRI risk amount, eleven thousand and PRI
 8   risk amount, one ninety-eight six
 9   twenty-five, are those combined limits?  Is
10   that what you're asking me to assume?
11       Q.   I'm asking you not to maybe assume
12   it, but I'm asking if the two-oh-nine six
13   twenty-five number on the top right-hand
14   corner represents the addition of those two
15   numbers you just stated?
16       A.   It does.  It does.
17       MR. GISLESON:
18          I will attach Brown 229 as
19   Exhibit 19.
20          (Exhibit No. 19 marked for
21   identification.).
22       MR. ZAUNBRECHER:
23          Could we take a brief break?
24       MR. GISLESON:
25          Sure.
                                      Page 242
```

```
 1       MR. ZAUNBRECHER:
 2          Two, three minutes?
 3       MR. GISLESON:
 4          Sure.
 5       MR. ZAUNBRECHER:
 6          Thank you.
 7       THE VIDEOGRAPHER:
 8          We're off the record.  It's 3:18.
 9          (Whereupon, a brief recess was
10   taken.)
11       THE VIDEOGRAPHER:
12          We're back on the record.  It's
13   3:25.
14   EXAMINATION BY MR. GISLESON:
15       Q.   Mr. Lapinskie, I would like to
16   direct your attention to a four-page
17   document, Bates stamped Brown 8 through
18   Brown 11.
19          Can you identify this document?
20       A.   The documents that I received
21   marked Brown 8, 9, 10, and 11 is a CCF print
22   of the homeowners policy.
23       Q.   Is that what we talked about
24   earlier in the deposition, the CCF print?
25       A.   No.  I used a wrong acronym
                                      Page 243
```

```
 1   previously when I was referring to the fire
 2   claim service record full report.  This is a
 3   CCF print.
 4       Q.   And if I could direct your
 5   attention to the top right-hand corner where
 6   it says rep?
 7       A.   Yes, sir.
 8       Q.   You see Johnathan Dekievit's name?
 9       A.   Yes, sir.
10       Q.   And there seems to be a four
11   letter -- four letters preceding his name,
12   QNEJ?
13       A.   Yes, sir.
14       Q.   Does that lead you to believe that
15   that is his State Farm identify, number,
16   designation, whatever your call it?
17       A.   That is his four digit, yes.
18       Q.   Does that tell you that
19   Mr. Dekievit is, in fact, a State Farm
20   employee?
21       A.   That does not tell me that, no,
22   sir.
23       Q.   So even when State Farm hires an
24   independent contractor, an independent
25   agent, it designates it with a -- what did
                                      Page 244
```

61 (Pages 241 to 244)

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 63 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al · · · · · · · · · · 1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1 you call it?
2 · · A. Four digit.
3 · · Q. Four digit State Farm
4 identifying -- what did you called it
5 earlier?
6 · · A. Four-digit ID.
7 · · Q. So they get a four-digit ID, they
8 being independent adjusters?
9 · · A. Yes, they do.
10 · · Q. When his name is identified as the
11 rep, what does that mean?
12 · · A. His being Johnathan Dekievit.
13 · · Q. Yes, sir.
14 · · A. He's the rep assigned this claim.
15 · · Q. If I could direct your attention
16 to the lower right-hand corner, there seems
17 to be forms and titles and it lists a bunch
18 of forms and titles. Do you see that?
19 · · A. Yes, sir.
20 · · Q. We spoke earlier about the
21 endorsement which basically provided for
22 replacement coverage for the Browns' policy;
23 remember that?
24 · · A. Yes, sir.
25 · · Q. Which one of these forms and

Page 245

1 titles, what's it?
2 · · A. If I can see a copy of the policy.
3 · · Q. You can't tell from what's in
4 front of you? I think you still have a
5 policy to the left of you?
6 · · A. (Reading) The form is FE5273.
7 · · Q. What's the name of it?
8 · · A. Coverage A, loss settlements
9 endorsement.
10 · · Q. And, again, we're sort of back to
11 an activity log where the subsequent pages
12 are numbered 2, 3, 4, but no Page 1
13 identified.
14 · · · Is it fair to say that Brown 08 is
15 the first page of this four-page document?
16 · · A. That is a fair assessment, yes,
17 sir.
18 · · MR. GISLESON:
19 · · · I will identify as Brown 8 through
20 Brown 11 as Exhibit 20.
21 · · · (Exhibit No. 20 marked for
22 identification.).
23 EXAMINATION BY MR. GISLESON:
24 · · Q. You can you identify this for me?
25 I have no idea what it is.

Page 246

1 · · A. Brown 12 is a faxed confirmation
2 of the document that is Brown 15. It's
3 confirmation that the fax went through.
4 · · Q. I've got you. What is Brown 15?
5 Do you need a copy of it?
6 · · A. Brown 15 is a faxed cover sheet.
7 · · Q. Oh, I see. What was being faxed?
8 · · A. Seven pages.
9 · · Q. Do you know what seven pages?
10 · · A. I believe the pages that were
11 faxed were Brown 87, Brown 88, Brown 89,
12 Brown 90, Brown 91, and Brown 92 and
13 Brown 86.
14 · · Q. Who is it faxed from and who is it
15 faxed to?
16 · · A. This is from our centralized
17 office. I recall an activity log. I'm
18 looking for that activity log. You will
19 have to give me some latitude on that,
20 please.
21 · · Q. That's fine.
22 · · A. At this time, I can't find what I
23 was referencing. It is from our centralized
24 office to the field office.
25 · · Q. Where is the centralized office

Page 247

1 located?
2 · · A. Dallas.
3 · · Q. And the field office?
4 · · A. Luling catastrophe office. I'm
5 sorry, I have that reversed. It is to our
6 centralized office from the Luling
7 catastrophe office.
8 · · Q. I'm not going to attach that
9 document.
10 · · · I show you a four-page document,
11 Brown 17 through 20.
12 · · A. You want this?
13 · · Q. I'm not going for attach that.
14 Can you identify this document?
15 · · A. It's a document marked Brown 17,
16 18 --
17 · · Q. Yes. I had it backwards.
18 · · A. -- 19, and 20 is a -- is the
19 estimate printed on 11/21/2005.
20 · · Q. This is the document we discussed
21 earlier; correct?
22 · · A. I believe this is the document
23 that we discussed earlier, yes.
24 · · Q. I direct your attention to Brown
25 18. You spoke earlier about the unit cost

Page 248

62 (Pages 245 to 248)

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 64 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al        1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    of certain items and how State Farm's
2    lowered the unit price that came from
3    Xactware. Do you remember that testimony?
4        A.   Yes, I do.
5        Q.   And there were -- you were very
6    specific though as to which unit items,
7    which unit costs State Farm lowered from
8    Xactware. I just direct your attention to
9    Brown 18. Can you identify for me and for
10   the record, which items those were?
11       A.   The first item was remove, tear
12   off, haul and dispose of comp shingles, 20
13   to 25 years. The unit cost on the State
14   Farm price list is $40.
15       Q.   And it's your understanding that
16   that unit price is lower than the Xactware
17   unit cost?
18       A.   It's my understanding that the
19   combined unit cost for removal and the
20   replacement of one ninety is lower than what
21   the Xactware price list would indicate at
22   that same time.
23       Q.   And what about the -- one
24   underneath, that's three tab, 20-year
25   composition shingle roofing including the

Page 249

1        MR. ZAUNBRECHER:
2            You said with Mr. Lapinskie.
3    EXAMINATION BY MR. GISLESON:
4        Q.   I'm sorry, Mr. Lapinskie, did you
5    have that conversation with Mr. Richter?
6        A.   About whether those prices had
7    been revised?
8        Q.   Yes.
9        A.   I did ask whether if there were
10   any other prices contained within this
11   estimate that had been revised, yes.
12       Q.   And what did he tell you about the
13   third one, R and R gutter?
14       A.   That price was an acceptance of an
15   Xactimate price, or Xactware price.
16       Q.   What about the one on the bottom,
17   repair and replace the exterior door, eight
18   foot --
19       A.   That price was an acceptance of
20   the Xactware price.
21       Q.   When you say accepted, you mean
22   not to change the Xactware price?
23       A.   There was no change to that unit
24   cost made by State Farm.
25       Q.   If I could direct your attention

Page 251

1    felt?
2        MR. ZAUNBRECHER:
3            That's what he just said.
4    EXAMINATION BY MR. GISLESON:
5        Q.   Is that one also lower?
6        A.   Your use of the term also would
7    imply that I was only referring to the first
8    unit cost. My response referred to both the
9    remove and the replacement which would be
10   the first two lines.
11       Q.   Okay.
12       A.   The first one being 40, the second
13   one being one 50, the two combined adds up
14   to one-ninety. That combined price of
15   one-ninety would be lower than the combined
16   price contained within the Xactware price
17   list on the same date.
18       Q.   Did you have a conversation with
19   Mr. Lapinskie about the unit cost for the
20   repair, replace the gutter downspout --
21   aluminum?
22       MR. ZAUNBRECHER:
23           I'm sure you meant Mr. Richter.
24       MR. GISLESON:
25           What did I say?

Page 250

1    to Brown 19. There is a bolded line item
2    that reads: "Adjustments for base service
3    charges. And then at the end of that line
4    it says, "Adjustment." Do you see?
5        A.   Yes, sir.
6        Q.   What does that mean, adjustment
7    for Bates service charges?
8        A.   As we previously discussed on
9    Brown 17, underneath price list it says
10   restoration service remodel with service
11   charges broken out because service charges
12   are broken out. The estimate is generated
13   with the base service charges broken out at
14   the end of the estimate. Those base service
15   charges were carpenter refer and siding
16   installer.
17       Q.   Have you ever heard anyone say
18   that what base service charges broken out
19   really means is that they're not included in
20   the estimate at all?
21       MR. ZAUNBRECHER:
22           I object to the form. I'm not
23   sure what you mean.
24       THE WITNESS:
25           I'm sorry.

Page 252

63  (Pages 249 to 252)

1    MR. ZAUNBRECHER:
2        Go ahead, you can answer if you
3    understand it.
4    THE WITNESS:
5        With regard to this claim the base
6    service charges are included in the final
7    settlement that was issued.
8    EXAMINATION BY MR. GISLESON:
9        Q.   I direct your attention to Brown
10   20.
11       A.   (Complying).
12       Q.   What is this document?
13       A.   Included with our estimate is a
14   copy of the structural damage claim policy
15   which outlines our -- it gives an outline of
16   the estimate reconciliation process or
17   provides further instruction for the
18   policyholder.
19       Q.   Was this something that was
20   done -- well, let me ask you this way:  Was
21   this something that was attached to the
22   Browns' estimate and then sent to the
23   Browns?
24       A.   This is Page 4 of the Browns'
25   estimate.

Page 253

1        Q.   So then this is something that
2    would have been sent to the Browns?
3        A.   This is Page 4 of the estimate,
4    yes.
5        Q.   And so the estimate would have
6    been sent to the Browns; right?
7        A.   The estimate should have been sent
8    to the Browns with a copy of the drafts,
9    yes.
10   MR. GISLESON:
11       I'm going to attach Brown 17
12   through Brown 20 as Exhibit 21.
13       (Exhibit No. 21 marked for
14   identification.)
15   EXAMINATION BY MR. GISLESON:
16       Q.   Can you identify this document?
17       A.   Hold on one second.
18       Q.   Sure.  It's Brown 21?
19       A.   The document that was put before
20   me marked Brown 21 is a personal property
21   inventory form for a food loss.
22       Q.   Do you know how that $600 amount
23   was calculated?
24       A.   On Brown 0027 the document that
25   notes inspected 11/15/05, it states:  "Food

Page 254

1    in freezer $600," on the right-hand side of
2    the page right under gas expense.
3        Q.   Do you know who filled out this
4    document?
5        A.   Who filled out which document are
6    you referring to?
7        Q.   Brown 21.
8        A.   The document itself does not
9    identify who the completer of that document
10   was.
11       Q.   If I can direct your attention to
12   the lower right-hand corner.  It says by
13   MJB.  Do you see that?
14       A.   Yes, I do.
15       Q.   Do you know who MJB is?
16       A.   No, I do not.
17       Q.   I imagine that this document would
18   have been saved and made part of the
19   electronic claims file; right?
20       A.   This is not a CSR document.  This
21   is a document that would be contained within
22   the paper file.  Whether it was scanned in
23   images on the electronic file, I do not
24   know.
25       Q.   But it appears as though it was

Page 255

1    filled out on the computer; right?
2        A.   Yes, it is a computer-generated
3    form.
4        Q.   So it's your testimony that they
5    would have filled it out on the computer,
6    printed out the document and scanned it into
7    to the computer?
8        A.   That could have been what
9    happened, but I don't know whether it was
10   scanned in or not.
11   MR. GISLESON:
12       I will attach Brown 21 as
13   Exhibit 22.
14       (Exhibit No. 22 marked for
15   identification.)
16   EXAMINATION BY MR. GISLESON:
17       Q.   I will show you Brown 22.  Can you
18   identify this document?
19       A.   The document Brown 0022 is a
20   prohibited use worksheet.
21       Q.   Do you know who filled this out?
22       A.   This document was filled out by
23   QNEJ.  That would be Johnathan Dekievit.
24       Q.   And does this document appear to
25   be a computer-generated document?

Page 256

64  (Pages 253 to 256)

1    A.  This is a computer-generated
2  document, yes, sir.
3    Q.  Would it have been saved to the
4  electronic claims file?
5    A.  I do not know whether this was
6  scanned in to CSR.  This is not a CSR
7  document.
8    MR. GISLESON:
9      I will attach Brown 22 as
10 Exhibit 23.
11     (Exhibit No. 23 marked for
12 identification.)
13 EXAMINATION BY MR. GISLESON:
14   Q.  We spoke earlier about the
15 handwritten notes made by the adjuster,
16 identified on Brown 27.  I don't think my
17 copies are as legible as you were looking at
18 because you were reading some things I
19 couldn't see.
20   MR. ZAUNBRECHER:
21     They call them field notes instead
22 of adjuster's notes.
23   MR. GISLESON:
24     What's that?
25   MR. ZAUNBRECHER:

Page 257

1    MR. GISLESON:
2      I'm just going to put an exhibit
3  sticker on it now.
4    THE VIDEOGRAPHER:
5      And we will replace it with a
6  better copy.
7    MR. ZAUNBRECHER:
8      Do you want to look at the
9  original?
10   MR. GISLESON:
11     At a break.
12   MR. ZAUNBRECHER:
13     I was hoping we wouldn't have any
14 more breaks.
15   MR. GISLESON:
16     I'm actually winding down.
17   MR. ZAUNBRECHER:
18     And I will tell you because there
19 was a misread earlier on the document.  It
20 was minor, but I will point it out to you if
21 you will allow me to even if it's off the
22 record.
23   MR. GISLESON:
24     You tell me now.
25   MR. ZAUNBRECHER:

Page 259

1      I think he called them field
2  notes.  I have the original.
3  EXAMINATION BY MR. GISLESON:
4    Q.  Is that a better description of
5  this document?
6    A.  This is his scope notes.
7    MR. ZAUNBRECHER:
8      Scope notes.
9  EXAMINATION BY MR. GISLESON:
10   Q.  And is this, in fact, the document
11 that you were reading from earlier in the
12 deposition?
13   A.  Yes, this was.
14   MR. GISLESON:
15     Brown 27, as Exhibit 24.
16     (Exhibit No. 24 marked for
17 identification.)
18   MR. ZAUNBRECHER:
19     May I provide a better copy?
20   MR. GISLESON:
21     Yes, please.
22   MR. ZAUNBRECHER:
23     If the court reporter will note,
24 I'm going to make a better copy of Brown 27
25 for the exhibit.

Page 258

1      Earlier, Mr. Lapinskie read food
2  in freezer, $600, and the document actually
3  says food in fridge, freezer, fridge and
4  freezer.  Fridge and freezer and it's
5  impossible to see -- well, actually it's not
6  too bad on some of the copies, but the
7  pencil writing on your copy is -- didn't
8  copy well.  I will get a better copy.
9  EXAMINATION BY MR. GISLESON:
10   Q.  Could I direct your attention to
11 Brown 55.  You spoke earlier about printing
12 sort of screen shots from the claims file.
13 Do you remember that?
14   A.  Yes, sir.
15   Q.  Is that what Brown 55 is?
16   A.  Brown 55 is a screen -- sorry.
17 Brown 55 is a screen shot of the CSR, yes.
18   Q.  And we've got, it sort of -- looks
19 like it's in a format where the various
20 files for the Brown file.  Do you see that?
21   A.  I don't understand your question.
22   Q.  Sir, at the bottom, it's got the
23 identifying information, the CSR
24 information, the prints, activities.  What
25 is PILR theft?

Page 260

65  (Pages 257 to 260)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1     A.   PILR theft does not relate to this
2    specific claim.  It's if we had a theft
3    claim, there would be additional information
4    that we would fill out.
5         Q.   What is PILR fire?
6         A.   The same as if it was fire.
7         Q.   Where do you save it for -- as a
8    wind claim, where is that information found?
9         A.   Within CSR.  There is no save
10   function in CSR.  The minute I type
11   something in, it's in.
12        Q.   Can you delete it once you type it
13   in?
14        A.   No, sir.
15        Q.   Well, somebody can delete it,
16   somebody with authority can go in there and
17   delete it; right?
18        A.   Let me clarify.  If it was insured
19   information, I can change it.  I can change
20   addresses.  I can change parties to the
21   loss.  I can delete or add parties to the
22   loss.  But if your question is with regard
23   to activity logs, no, I can not.
24        Q.   When you say, no, you can't change
25   it, is it the computer program doesn't allow

Page 261

1    a change or is it -- it's just the policy of
2    State Farm that once it's in there, you
3    don't touch it?
4         A.   It doesn't allow a change.
5         Q.   How does the computer program
6    distinguish between the two entries?
7         A.   If I'm in activity logs, I'm in
8    activity logs.  If I'm in parties to the
9    loss, I'm in parties to the loss.
10        Q.   What's the send and close?
11        A.   It's a button on the bottom.
12   Icon.
13        Q.   Do you see the send and close?
14        A.   I do.
15        Q.   What does that do?
16        A.   This is a screen just to send CSR
17   instructions to print the file.  This has
18   nothing to do with the claim file.  This is
19   in compliance with your request.
20        Q.   So this isn't a snapshot of the
21   claims file?
22        A.   A snapshot of the instructions
23   saying that we're generating the paper copy
24   in compliance with your request.
25        Q.   What is that number on the bottom,

Page 262

1    the R1-SHU-514922?
2         A.   That would be the tool bar
3    contained within windows that's part of this
4    screen shot.  It has nothing to do with CSR.
5         Q.   SHU stands form special handling
6    unit?
7         A.   I believe that does stand for
8    special handling unit.
9         Q.   Why would the special handling
10   unit be involved in the Vincent Brown claim?
11        A.   On 9709, on Brown 0032, log note
12   57, the file was moved -- moving file to the
13   field for fire SHU handling, per request
14   from Peggy Bordelon.
15        Q.   I'm going to also show you Brown
16   56.  Are brown 56 and Brown 55 related in
17   some way?
18        A.   These are event logs that aren't
19   really a part of the claim file.  It's just
20   showing that we did what was asked.  These
21   are not screen prints that the adjuster
22   would see in the handling of the claim.
23        MR. GISLESON:
24            I will attach Brown 55 and Brown
25   56 of as Exhibit 25.

Page 263

1            (Exhibit No. 25 marked for
2    identification.).
3    EXAMINATION BY MR. GISLESON:
4         Q.   Does the claims file have the
5    photographs in electronic format?
6         A.   The electronic claims file --
7    during the handling of claims during
8    Hurricane Katrina, photos were uploaded to
9    the CSR, yes.
10        Q.   And would those photographs be in
11   color?
12        A.   The photographs that we would be
13   able to view in CSR would be in color, yes.
14        Q.   Can you identify --
15        A.   If I may, if you will allow me
16   some latitude.
17        Q.   Sure.
18        A.   Previously you had asked me what
19   items were scanned into CSR on the images,
20   on Brown 0054 is a description of those
21   items that are scanned into images.  I did
22   not recall that at the time.
23        MR. ZAUNBRECHER:
24            54.
25        THE WITNESS:

Page 264

66 (Pages 261 to 264)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1    54. The documents that you have
2    before you are the CSA instructions. CSAs
3    do not handle the claim. That's just the
4    instruction sheet saying this is what you
5    need to do.
6    EXAMINATION BY MR. GISLESON:
7    Q.   We might want to look under 54?
8    A.   Yes, sir.
9    Q.   Do you have a better copy than
10   what I have? I've got the description, part
11   of the description copied off of it.
12   MR. ZAUNBRECHER:
13        You're welcome to use mine. I'm
14   sorry, but the copy was bad.
15   EXAMINATION BY MR. GISLESON:
16   Q.   So Brown 54 is a list of documents
17   that were scanned and then uploaded into the
18   electronic claims filing system?
19   A.   This is an image list detailed
20   report for this claim, yes.
21   MR. GISLESON:
22        I will attach this one.
23   MR. ZAUNBRECHER:
24        Let me make you a better one of 27
25   and 54 and I will give it to you before we

Page 265

1    EXAMINATION BY MR. GISLESON:
2    Q.   Does this Exhibit 26, Brown 54,
3    also identify when documents are uploaded to
4    the system, not simply scanned and placed in
5    the system?
6    A.   The assigned date, just a second
7    here, let me get this right, the assigned
8    date is the date and the time that it is put
9    into CSR. The reviewed date is the date and
10   time that it is accessed in CSR and labeled.
11   Some of them are labeled automatically based
12   on the way that they're scanned in.
13        For example, the photos, you will
14   note that the assigned date and the reviewed
15   date and time will be exactly the same
16   because when we upload photos, we've already
17   labeled them so that we don't have to review
18   them when they get into CSR, but the
19   assigned date for the document marked
20   returned mail will show that it says 2006,
21   7/29 at 11:34, but it wasn't reviewed until
22   15:12 of the same date, so someone went into
23   CSR and reviewed that image and labeled it.
24   That's a long-winded answer to say, yes.
25   Q.   Can you identify that document?

Page 267

1    leave today. Mark your bad one -- your not
2    as clear one of Brown 54 as Exhibit 26, and
3    I will replace it with the court reporter
4    before we leave.
5        Can we take a brief break?
6    MR. GISLESON:
7        Yeah, that's fine.
8    MR. ZAUNBRECHER:
9        And I will get 54 and 27, better
10   copies made.
11   THE VIDEOGRAPHER:
12        Off the record. It's 4:01.
13        (Whereupon, a brief recess was
14   taken.).
15   THE VIDEOGRAPHER:
16        We're back on the record. It's
17   4:12.
18   THE WITNESS:
19        In further reflection after
20   recognizing that I did have this image list
21   details report, prior responses I may have
22   gave were I could not verify whether this
23   was imaged into the file or not. This
24   report will tell you whether it was imaged
25   into that file.

Page 266

1    A.   The document placed before me is
2    not Bates stamped. It appears to be a copy
3    of the declarations page for Vincent and
4    Jeannie Brown.
5    Q.   And would this declarations page
6    have been for the policy in effect at the
7    time of Katrina?
8    A.   No, I'm sorry, I got my dates
9    wrong. The effect date, May 23rd, 2005 to
10   May 23rd, 2006, yes.
11   MR. GISLESON:
12        I attach that as Exhibit 27.
13        (Exhibit No. 26 marked for
14   identification.).
15   MR. ZAUNBRECHER:
16        So I'm clear -- oh, Exhibit 26 was
17   Brown 54.
18   MR. GISLESON:
19        Yes, in case that wasn't put on
20   the record.
21   MR. ZAUNBRECHER:
22        Okay.
23   THE WITNESS:
24        The declarations page shows some
25   amendments that were made post-Katrina,

Page 268

67 (Pages 265 to 268)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

1  January 5th, 2006. You will note about a
2  third of the way down on the right-hand
3  side, it's a location of premises added or
4  insured's address and/or name change, but I
5  don't believe there's any change. I will go
6  back to the homeowners' claim which is
7  truly the question is the policy forms in
8  effect at the time. Is that correct?
9      Q.   Yes.
10     A.   Okay.
11     MR. GISLESON:
12         Okay. I will attach that as
13  Exhibit 27.
14         (Exhibit No. 27 marked for
15  identification.)
16  EXAMINATION BY MR. GISLESON:
17     Q.   Isn't it true, Mr. Lapinskie, that
18  you do not have any experience as an
19  insurance agent?
20     A.   That would be a correct statement.
21  I have not worked as an insurance agent.
22     Q.   At any point in time has, based
23  upon your review of the claims file, has
24  State Farm employed the anticoncurrent
25  clause cause to deny coverage to the Browns?

Page 269

1  East area during Hurricane Katrina?
2      MR. ZAUNBRECHER:
3         I object to the form. Beyond the
4  scope.
5         Don't answer.
6  EXAMINATION BY MR. GISLESON:
7      Q.   Isn't it true that State Farm put
8  together weather reports concerning the
9  impact Hurricane Katrina had in the
10  New Orleans Metropolitan area?
11     MR. ZAUNBRECHER:
12         Same objection.
13         Same instruction.
14  EXAMINATION BY MR. GISLESON:
15     Q.   Isn't it true that State Farm
16  mapped out the wind speeds of the -- from
17  Katrina in the New Orleans Metropolitan area
18  at the time Hurricane Katrina came through
19  the city?
20     MR. ZAUNBRECHER:
21         Same objection.
22         Same instruction.
23  EXAMINATION BY MR. GISLESON:
24     Q.   Isn't it true that State Farm also
25  created a graph and a chart to demonstrate

Page 271

1      MR. ZAUNBRECHER:
2         I object to the form. I'm not
3  sure what you're asking. At any time in the
4  claims file?
5  EXAMINATION BY MR. GISLESON:
6      Q.   Based upon your review of the
7  claims file, has State Farm invoked the
8  anticoncurrent cause clause to deny
9  coverage?
10     MR. ZAUNBRECHER:
11         I object to the form.
12         You can answer it if in the claims
13  file you saw any evidence of any concurrent
14  causation.
15  THE WITNESS:
16         If your reference to the
17  anticoncurrent causation is a reference to
18  losses not insured to, I see no
19  correspondence that was sent out from State
20  Farm to the Browns during the claim handling
21  that quotes that policy wording.
22  EXAMINATION BY MR. GISLESON:
23     Q.   Do you know whether State Farm put
24  together any kind of report that concerned
25  the weather conditions in the New

Page 270

1  the amount of rainfall in the New Orleans
2  Metropolitan area at the time of Hurricane
3  Katrina landfall?
4      MR. ZAUNBRECHER:
5         Same objection.
6         Same instruction.
7  EXAMINATION BY MR. GISLESON:
8      Q.   Isn't it true that State Farm
9  developed protocols on how to adjust claims
10  in the New Orleans East area?
11     MR. ZAUNBRECHER:
12         Same objection.
13         Same instruction.
14  EXAMINATION BY MR. GISLESON:
15     Q.   Isn't it true that the Browns'
16  property is located in the New Orleans East
17  area of the city?
18     A.   I believe the Browns are in the
19  east area. How that may be defined, it's
20  east of here. Is that right? I believe
21  it's east of here.
22     Q.   Isn't it true that State Farm
23  distributed e-mails concerning adjustment
24  issues related to Hurricane Katrina
25  specifically concerning the New Orleans East

Page 272

68  (Pages 269 to 272)

1  area?
2      MR. ZAUNBRECHER:
3          Same objection.
4          Same instruction.
5  EXAMINATION BY MR. GISLESON:
6      Q.   Isn't it true you had no
7  involvement in the adjustment of the Browns'
8  claim?
9      A.   I was not involved in the
10 adjustment of the Browns' claim.
11     Q.   What is the State Farm's office at
12 the time of Hurricane Katrina or the
13 adjustment office that would have sort of
14 encompassed the Browns' house?
15     MR. ZAUNBRECHER:
16         You're talking about the claims,
17 cat claims or agents?
18 EXAMINATION BY MR. GISLESON:
19     Q.   Do you know what I mean?
20     A.   If your question is where was the
21 location that we officed during the
22 adjustment of the Browns' claim?
23     Q.   Yes.
24     A.   The Browns' claim was handled out
25 of the Luling office.

                                    Page 273

1      Q.   Does that office still exist?
2      A.   The Luling office does not exist.
3  It was a temporary location.
4      Q.   Who was the team manager for the
5  Brown claim?
6      A.   The team manager that Dekievit
7  reported to was Carrie Demane, D-E-M-A-N-E.
8      Q.   Where is she located?
9      A.   I believe Carrie is based out of
10 either New York or New Jersey.
11     Q.   Have you ever spoken with her
12 about the Browns' claim?
13     A.   I've not spoken with Carrie with
14 regard to the Browns' claim, no.
15     Q.   Do you know what document that is
16 (handing)?
17     A.   The document that was handed to me
18 is not Bates stamped.  It looks very similar
19 to other documents that I previously was
20 unable to identify.
21     Q.   Can you authenticate that document
22 at all?
23     A.   I cannot.  I'm not familiar with a
24 document of this type at all.
25     MR. GISLESON:

                                    Page 274

1      I will attach it as Exhibit 28.
2      (Exhibit No. 28 marked for
3  identification.).
4  EXAMINATION BY MR. GISLESON:
5      Q.   Specifically what I'm attaching is
6  a one-page document which reads at the top,
7  view contact details dash Vincent O. Brown
8  and with comments dated December 2005.
9          Have you ever bought construction
10 materials or paid for labor in the
11 New Orleans Metropolitan area after
12 Hurricane Katrina?
13     MR. ZAUNBRECHER:
14         Objection to the form.  Beyond the
15 scope.  I'll grant some latitude if you're
16 laying a foundation for something.
17         I can see where you may say it
18 goes to his qualifications, so go ahead and
19 answer it, subject to my objection.
20     THE WITNESS:
21         I may have purchased a tape
22 measure, a scraper, a level.  I don't think
23 that I would qualify that as answering your
24 question.  I do not believe I have.
25 EXAMINATION BY MR. GISLESON:

                                    Page 275

1      Q.   Are you familiar with the
2  principle of demand surge?
3      MR. ZAUNBRECHER:
4          Same objection.
5          Same instruction.
6      THE WITNESS:
7          Any response I gave to defining
8  demand surge would be speculative.
9  EXAMINATION BY MR. GISLESON:
10     Q.   Who is Mike Tucker?
11     A.   Mike Tucker is a claims consultant
12 housed in Bloomington, Illinois.
13     Q.   Was he involved in the preparation
14 of the three-page wind/water protocol that I
15 showed you earlier?
16     MR. ZAUNBRECHER:
17         It's been asked and answered.
18 EXAMINATION BY MR. GISLESON:
19     Q.   You can answer the question if you
20 understand it.
21     A.   As previously stated, Mike Tucker
22 was one of the individuals in the committee
23 that put together the wind and water
24 protocols.
25     Q.   Who is Susan Hood?

                                    Page 276

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

```
 1        A.   Susan Hood is our vice president,
 2   claims, State Farm.
 3        Q.   At the time of Hurricane Katrinas?
 4        A.   At the time of Hurricane Katrina,
 5   she was in that position, yes.
 6        Q.   Who is Reed Richards?
 7        A.   The name Reed Richards rings a
 8   bell, but I cannot identify it at this time.
 9        Q.   Who is Mike Entwistle,
10   E-N-T-W-I-S-T-L-E?
11        A.   Mike Entwistle is the section
12   manager in catastrophe services.  He had
13   oversight over all the offices in the
14   New Orleans area.
15        Q.   At the time of Hurricane Katrina?
16        A.   Thank you for that clarification.
17   At the time of Hurricane Katrina, yes.
18        Q.   Who is Jim Damm, D-A-M-M?
19        A.   Jim Damm is our -- I always get
20   his title wrong.  I haven't got his title,
21   I'm sorry.
22        Q.   Is he a director?
23        A.   I do not believe that's a correct
24   title.
25        Q.   Who is John Fouert, F-O-U-E-R-T?
```
Page 277

```
 1   I know of no involvement that he had with
 2   regards to the handling of the Brown claim.
 3   EXAMINATION BY MR. GISLESON:
 4        Q.   Does the estimate in the Brown
 5   claim constitute an acknowledgment by State
 6   Farm of an amount due to the policyholder?
 7        A.   Yes.  Contained within the Brown
 8   claim is the estimate that we paid on to the
 9   Browns.
10        Q.   So would you agree with the
11   statement that the estimate does constitute
12   an acknowledgment by State Farm that that is
13   the amount due to the policyholder?
14        A.   I would agree that that was an
15   estimate that was generated and payment was
16   made, yes.
17        Q.   If we can take a very quick break,
18   the sun is going down and you're becoming
19   silhouetted.
20            (Whereupon, an off-the-record
21   discussion was held.)
22   EXAMINATION BY MR. GISLESON:
23        Q.   Are you familiar with the term
24   "all risk policy"?
25        A.   I've heard the -- sorry.
```
Page 279

```
 1        A.   John Fouert is who Jim Damm
 2   reports to.  He is vice president, claims.
 3        Q.   Was he the VP of claims at the
 4   time of Katrina?
 5        A.   Yes, sir.
 6        Q.   Who is Rick Rasmussen,
 7   R-A-S-M-U-S-S-E-N?
 8        A.   Rick Rasmussen is a team manager
 9   in catastrophe services.
10        Q.   What were his duties and
11   responsibilities after Katrina?
12   MR. ZAUNBRECHER:
13            Same objection.
14            Same instruction.
15            If it's a foundation for
16   something -- my instruction is to allow him
17   to answer, but I've allowed you to go on and
18   on about foundation for something I hoped
19   was relevant.  I've let you go on for quite
20   a while and I think he's already talked
21   about Mr. Rasmussen, but answer it again if
22   you know.
23   THE WITNESS:
24            Rick Rasmussen is a peer.  He
25   worked alongside me in the Hammond office.
```
Page 278

```
 1   MR. ZAUNBRECHER:
 2            Note my objection to the form of
 3   the question and beyond the scope.
 4            Again, I will allow some latitude
 5   even though it's beyond the scope.
 6   THE WITNESS:
 7            I've heard the use of the word or
 8   the terminology "all risk policy," yes.
 9   EXAMINATION BY MR. GISLESON:
10        Q.   What is your understanding of the
11   term?
12        A.   I've heard it used in many
13   contexts.
14        Q.   Do you have an understanding of
15   what all risk policy means?
16        A.   I'm familiar with all risk policy,
17   yes.
18        Q.   What is your understanding of the
19   term "all risk policy"?
20        A.   What I'm familiar with with
21   regards to all risk policy is that it was a
22   term that was sometimes used to reference a
23   homeowners policy with broad coverage.
24            I also am familiar that it has
25   been knocked around in the legal system to
```
Page 280

70  (Pages 277 to 280)

1  the point where I would not define the
2  Browns' policy as an all risk policy if
3  that's the question you're going to.
4      Q.   So is it my understanding you're
5  relying on your understanding of Louisiana
6  law to define whether or not the Browns'
7  policy is an all risk policy or not?
8      MR. ZAUNBRECHER:
9        I object to the form.
10     THE WITNESS:
11       My definition of the Browns'
12  policy is a homeowners, State Farm
13  homeowners FP7955, with the endorsements
14  attached.
15  EXAMINATION BY MR. GISLESON:
16     Q.   Do you still have the policy next
17  to you?
18     A.   Yes, sir.
19     Q.   First off, can you identify that
20  document?
21     A.   This is a certified copy of the
22  Browns' policy in effect on the date of
23  loss.
24     Q.   Is the word "damaged" defined in
25  that policy?

Page 281

1  definition section of the policy or was your
2  earlier testimony that the word "damage" is
3  not defined anywhere in the insurance
4  policy?
5      MR. ZAUNBRECHER:
6        I'm not sure there's a difference,
7  but if you can answer the question, go
8  ahead.
9      THE WITNESS:
10       The term "damage" is not under the
11  definitions in the insurance policy;
12  therefore, I would say it is not defined in
13  this policy, 7955.
14  EXAMINATION BY MR. GISLESON:
15     Q.   Was there an instruction to any of
16  the adjusters who handled the Browns' claim
17  instructing them not to use the phrase
18  hurricane damage or the phrase damage from
19  Hurricane Katrina in the course of adjusting
20  the claim?
21     MR. ZAUNBRECHER:
22       I object to the form.
23       You can answer.
24     THE WITNESS:
25       I have not spoke to the adjusters

Page 283

1      MR. ZAUNBRECHER:
2        Objection.  The document speaks
3  for itself.  If you're asking him to define
4  something -- I object to the form of the
5  question.
6      THE WITNESS:
7        Contained within the homeowners
8  policy is a series of definitions.  I note
9  that damages is not one of those
10  definitions.
11  EXAMINATION BY MR. GISLESON:
12     Q.   Have you reviewed that document
13  before today, that policy?
14     A.   I have reviewed the FP7955 before
15  today, yes, sir.
16     Q.   So based on your review of the
17  policy, is the word "damage" defined in the
18  policy?
19     MR. ZAUNBRECHER:
20       Asked and answered.  I object to
21  the form of the question.
22       Don't answer it again.
23  EXAMINATION BY MR. GISLESON:
24     Q.   Well, was your earlier statement
25  that the word "damage" is not found in the

Page 282

1  working this claim.  That would be a
2  question that I would defer to them for
3  response.
4  EXAMINATION BY MR. GISLESON:
5      Q.   In the course of your Hurricane
6  Katrina work, did you ever receive a
7  directive from anyone within State Farm that
8  said we do not want you telling the State
9  Farm insureds in Louisiana not to refer to
10  damage as Hurricane Katrina damage, but
11  refer to all damage as either flood damage
12  or wind damage?
13     MR. ZAUNBRECHER:
14       I object to the form.  Beyond the
15  scope of the discovery order.
16       Don't answer.
17  EXAMINATION BY MR. GISLESON:
18     Q.   Is it your position that the
19  Browns violated any terms of the insurance
20  policy in front of you?
21     MR. ZAUNBRECHER:
22       I object to the form.
23       Go ahead and answer.
24     THE WITNESS:
25       In my review of the pre-litigation

Page 284

71 (Pages 281 to 284)

1  file, I saw nothing that I would say would
2  be a violation of that policy.
3  EXAMINATION BY MR. GISLESON:
4      Q.  Is the term "uninhabitable"
5  defined in the policy before you?
6      MR. ZAUNBRECHER:
7          Objection.  The policy speaks for
8  itself.
9          You can answer it if you're able.
10     THE WITNESS:
11         The use of the word
12  "uninhabitable" is -- "uninhabitable" is
13  used within the 7955 homeowners policy.  It
14  is not in bold in that policy, therefore, I
15  would say it is not defined within the
16  policy.
17  EXAMINATION BY MR. GISLESON:
18     Q.  What is the difference between ALE
19  and prohibited use in that policy before
20  you?
21     A.  In your reference to ALE, I assume
22  you're referring to additional living
23  expense, which is under coverage C, loss of
24  use, No. 1, prohibited use is found under
25  that same coverage, but it is defined under

Page 285

1  living expense, or prohibited use, he's not
2  going to do it.
3      MR. GISLESON:
4          So you're directing him not to
5  answer based on privilege?
6      MR. ZAUNBRECHER:
7          No.  I'm directing him not to
8  answer because the form of the question is
9  improper.  It's beyond the scope of the
10  discovery order and I'm instructing him not
11  to answer.  It's an improper question to ask
12  him to interpret a defined term in an
13  insurance policy.  Interpretation of defined
14  terms are for the courts.
15     MR. GISLESON:
16         You know, I'm going to move to
17  compel and get sanctions and have
18  Mr. Lapinskie brought down here to explain
19  the insurance policy.
20     MR. ZAUNBRECHER:
21         Then do what you need to do
22  because I'm telling you that's an
23  inappropriate question.  He's pointed out to
24  you where those terms are defined in the
25  policy.  I've given you great leeway away

Page 287

1  No. 3.
2      Q.  So what is your understanding of
3  the difference?
4      MR. ZAUNBRECHER:
5          The document speaks for itself.
6  He's not going to interpret the policy for
7  you.  I object to the form.
8          Instruct him not to answer.
9  EXAMINATION BY MR. GISLESON:
10     Q.  Is it State Farm's position that
11  the Browns can interpret the policy the way
12  that the Browns read the policy?
13     MR. ZAUNBRECHER:
14         I object to the form.
15     MR. GISLESON:
16         Are you honestly seriously
17  instructing the State Farm representative
18  not to discuss or explain any of the terms
19  in the State Farm Insurance policy?
20     MR. ZAUNBRECHER:
21         He's provided you, he cited you in
22  the policy where the terms you asked him to
23  define are defined.  He's not going to
24  provide an interpretation of those.  A legal
25  analysis of what constitutes an additional

Page 286

1  from the -- beyond the discovery order.
2          If you have an appropriate
3  question, I will continue to allow him to
4  answer.
5  EXAMINATION BY MR. GISLESON:
6      Q.  Isn't it true that in other
7  depositions you've given on behalf of State
8  Farm as a corporate representative, you've
9  described the difference between ALE and
10  prohibited use?
11     MR. ZAUNBRECHER:
12         I object to the form.  Whether
13  he's giving testimony in other depositions,
14  not subject to discovery orders, is not at
15  issue in this case.
16         I'm instructing him not to answer
17  that question.
18  EXAMINATION BY MR. GISLESON:
19     Q.  Isn't it true that you've given
20  other depositions has a corporate
21  representative concerning issues like the
22  anticoncurrent cause clause?
23     MR. ZAUNBRECHER:
24         Same objection.
25         Same instruction.

Page 288

72 (Pages 285 to 288)

EXAMINATION BY MR. GISLESON:

Q. Does State Farm have a policy, practice, or procedure of making sure the insureds get paid within 30 days of receiving an adjuster's report?

MR. ZAUNBRECHER:

Same objection.

Same instruction.

EXAMINATION BY MR. GISLESON:

Q. Are there any time limits in the guidelines maintained by State Farm as to when to issue payment after it receives a copy of its own adjuster's report?

MR. ZAUNBRECHER:

Same objection.

Same instruction.

MR. GISLESON:

Let me look at my notes. I will attach the insurance policy as Exhibit 29.

(Exhibit No. 29 marked for identification.).

MR. ZAUNBRECHER:

Let's go off the record for a second while you look at your notes.

MR. GISLESON:

Page 289

Okay.

THE VIDEOGRAPHER:

Off the record. It's 4:43.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:

We're back on the record. It's 4:45.

EXAMINATION BY MR. GISLESON:

Q. Why didn't State Farm employ the services of an engineer on the Brown claim?

A. We were able to go out to the Brown claim, we were able to evaluate the coverages available, the damage that was incurred, and we made our claims decision. The use of an engineer did not seem to be needed on this loss.

Q. What guidelines did State Farm look to to make that determination that no engineer was needed on the Brown claim?

MR. ZAUNBRECHER:

I object to the form.

You can answer it if you can.

THE WITNESS:

The adjuster handling the claim

Page 290

evaluated that claim and paid based on that evaluation. The adjuster did not feel that they needed the assistance of any outside experts in order to perform that duty.

EXAMINATION BY MR. GISLESON:

Q. And you feel comfortable discussing and testifying as to what the adjuster felt like having never spoken with him?

A. I've reviewed the claim file. I believe the claim file speaks for itself as to coverages and damage.

MR. GISLESON:

That's all the questions I have for today.

MR. ZAUNBRECHER:

Thank you. I have no questions.

THE VIDEOGRAPHER:

That concludes our deposition. It is 4:47.

(Whereupon the deposition was concluded.)

* * *

Page 291

WITNESS' CERTIFICATE

I have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony with the exception of any attached corrections or changes.

_____

CHRISTOPHER JOHN LAPINSKIE

PLEASE INDICATE
( ) NO CORRECTIONS
( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Page 292

73  (Pages 289 to 292)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

```
1          REPORTER'S CERTIFICATE
2
3          I, Diane Tewis Clark, RPR, RMR,
4   CRR, Certified Court Reporter, State of
5   Louisiana, do hereby certify that
6   above-named witness, after having been duly
7   sworn by me to testify to the truth, did
8   testify as hereinabove set forth;
9          That this testimony was reported
10  by me in the stenotype reporting method and
11  transcribed thereafter by me on computer,
12  and that same is a true and correct
13  transcript to the best of my ability and
14  understanding;
15         That I am not of counsel, nor
16  related to counsel or the parties hereto,
17  and in no way interested in the outcome of
18  this matter.
19
20
21
22  _____
23      Diane Tewis Clark, RPR, RMR, CRR
24         Certified Court Reporter
25
                           Page 293
```

74 (Page 293)

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

**A**

**abbreviation**
208:2,5
**abbreviations**
194:10
**abide** 112:5
**abided** 111:23
**ability** 30:20
31:6 70:10
71:5 79:14
143:14 177:8
186:17 203:17
293:13
**able** 66:6 69:21
69:24,25 70:5
76:19 77:1
84:17,21 86:19
86:21,23 87:16
135:23 142:8
155:24 159:13
160:12 183:13
186:22 189:1
192:21 221:5
264:13 285:9
290:12,13
**above-mentio...**
9:1
**above-named**
293:6
**absolutely** 39:16
89:22 100:12
107:18 115:8
230:2
**absorbed** 211:11
211:12
**acceptable**
227:21 228:3
229:13,13,14
229:20,24
**acceptance**
251:14,19
**accepted** 35:2
215:4 251:21
**accepting** 32:9
**access** 60:16
70:7,23,25
71:6 79:24

80:5,6 83:22
90:6 125:17
135:24 142:9
142:10 167:21
230:20
**accessed** 83:2
267:10
**acknowledgm...**
279:5,12
**acronym** 50:15
91:6 151:11
243:25
**action** 16:4
**activities** 176:1
260:24
**activity** 4:15,16
64:20,24,25
65:2,3,9,14
75:6,7,13 76:9
76:12,13 79:25
80:2,5,7 156:8
161:17 189:12
246:11 247:17
247:18 261:23
262:7,8
**actual** 21:16
61:23 67:12
75:16 76:21
151:19 161:17
204:25
**ACV** 216:1
**adaptations**
26:23
**add** 36:25 37:25
38:2 136:14
261:21
**added** 86:6,7,22
168:15 173:6
269:3
**addition** 18:21
19:6,13 24:23
87:20,20 92:25
168:19 242:14
**additional** 19:14
75:22 76:22
90:19 94:18
116:24,25

140:12 171:19
172:24 173:5,6
181:15 261:3
285:22 286:25
**address** 11:22
12:2,8 61:25
62:2 63:15
82:10 157:16
269:4
**addresses**
261:20
**adds** 250:13
**adjust** 108:8
121:14,25
122:5,18 123:6
123:22 124:11
134:13 137:14
141:16,24
143:4 155:4
159:14 160:7
161:12 272:9
**adjusted** 103:14
108:24 109:1
114:6 125:11
154:10 157:1,4
157:11 179:8
**adjuster** 65:4
77:21 78:11
79:13,16,23,24
80:3,3,17,20
81:9,25 94:20
102:22 103:14
114:14 130:13
131:1,15,21
135:3,13,22
143:3,6,18
146:2,9 154:3
154:9,13,19,21
155:4,6,19,21
156:15 164:4,7
165:6 173:25
176:6,23 190:5
198:5,12,14,22
199:3,3 200:11
200:12,23,25
201:9 204:13
257:15 263:21

290:25 291:2,8
**adjusters** 58:6
62:12 78:19
111:22 112:5
117:8,10
133:20 134:5
134:13 177:3
245:8 283:16
283:25
**adjuster's**
257:22 289:5
289:13
**adjusting** 108:3
114:15 125:22
179:7,11,14
219:4 239:24
240:5 283:19
**adjustment**
111:16 113:22
115:18 116:15
133:3,21
135:23 154:8
158:22,25
159:2,3,5
160:13 162:8
172:1 252:4,6
272:23 273:7
273:10,13,22
**adjustments**
175:25 252:2
**administering**
7:24
**administrative**
105:3
**admit** 13:11
**admittance**
60:17
**advance** 202:13
202:14,16,18
203:12 223:10
223:14,18,20
223:22,25
224:2,6,14
**advances** 203:1
203:3
**affidavits** 140:14
**affirmatively**

85:3 113:4
**aforementioned**
7:4
**age** 140:7 216:3
216:9 217:5
**agency** 188:2
**agent** 101:22
145:21 183:8
183:12 188:8
244:25 269:19
269:21
**agents** 183:19,24
273:17
**agent's** 184:3
**ago** 14:18 19:18
87:22 115:17
197:11
**agree** 34:17 35:4
42:7 52:16
54:7 122:16
123:18 156:17
188:4,11
191:14 198:8
199:19 217:13
217:21,22,23
279:10,14
**agreed** 7:2
**agreement** 30:15
123:13
**ahead** 12:19,24
23:19 25:22
40:4 41:22
57:14 58:1
85:5 89:7
112:2 116:1
122:20 125:14
127:25 152:12
176:14 178:19
179:12 218:20
236:1 238:11
253:2 275:18
283:8 284:23
**al** 8:11
**Alabama** 18:14
**Alan** 2:9 8:18
17:19 18:21
19:6,13 20:13

217:19
**ALE** 223:22
285:18,21
288:9
**allow** 23:19
29:23 51:12,14
53:12 63:9
78:20 259:21
261:25 262:4
264:15 278:16
280:4 288:3
**allowances**
171:19
**allowed** 174:18
278:17
**allowing** 152:10
**alludes** 16:9 17:6
**alongside** 278:25
**altered** 112:23
**aluminum**
167:18 250:21
**amendments**
268:25
**America** 106:20
**amount** 4:20
104:6 105:11
136:19 140:8
140:18 168:23
173:2 175:10
175:12 177:13
200:14 202:11
210:5 212:6
213:8 219:14
224:18 229:19
236:7 237:1,18
241:24 242:7,8
254:22 272:1
279:6,13
**amounts** 175:9
**analysis** 286:25
**and/or** 269:4
**announce** 48:3
**answer** 7:15
14:10 23:12,19
23:23,24 24:5
24:7 25:15
26:14 27:25

28:14,25 29:23
33:22 35:13
36:5 38:6 39:2
42:2,13,22
43:19 45:25
46:18 47:14
50:22 51:15,24
53:12 54:3,3
56:24 57:14
58:1 59:24
71:11 78:17
79:3 80:13
85:5,18,24
91:25 92:10
95:17 97:9
99:18 106:12
112:17 115:6
120:9 121:18
122:11 123:10
124:3 126:2
127:14,25
128:1 129:9
130:7,18
131:10,13
132:2,20 133:8
134:1 135:17
136:8,16 137:4
137:19 138:14
138:22 141:7
141:13 142:4
142:21,24
145:17 146:16
152:3,13
155:10,12
157:25 160:3
161:2 162:14
176:14 179:12
186:18 214:12
214:13,15
216:23 217:10
218:14 219:9
220:9 229:3,3
234:5,6 236:1
236:19 238:11
253:2 267:24
270:12 271:5
275:19 276:19

278:17,21
282:22 283:7
283:23 284:16
284:23 285:9
286:8 287:5,8
287:11 288:4
288:16 290:23
**answered** 36:24
38:1,14 114:17
122:20 229:4
276:17 282:20
**answering** 14:13
275:23
**answers** 9:18,18
14:15 20:22
29:13 186:17
**anticoncurrent**
269:24 270:8
270:17 288:22
**anybody** 97:14
152:4
**anymore** 185:21
185:22
**anyway** 39:3
**apologize** 66:10
**appear** 166:18
168:3 190:7
256:24
**appearance** 9:22
**APPEARANC...**
2:1
**appears** 12:15
117:16 189:25
206:7 223:9
227:15 255:25
268:2
**appliances**
227:18
**applicable**
140:21 142:13
217:25
**application**
218:1,22
**applied** 111:15
112:14 114:13
114:14 173:2
202:18,21

203:3,24
216:17 218:2
223:18 233:23
234:4
**apply** 115:18
116:14 142:17
150:14,20
151:2 203:6
**approach** 82:24
113:11
**appropriate**
120:20 288:2
**approval** 41:18
105:12 176:17
177:21 239:20
239:21
**approved**
175:13,18
176:18
**approximately**
8:3
**area** 21:14 22:5
24:15 32:8,22
33:16 34:8,9
34:19 35:3
41:6,13 53:8
61:19,20,21,21
72:24 121:5
142:9 147:18
167:24 239:17
271:1,10,17
272:2,10,17,19
273:1 275:11
277:14
**areas** 12:21 14:8
37:9 63:8
106:10 160:7
208:13
**arising** 53:7
**arrived** 172:3
**art** 90:25 92:15
**Article** 7:6
**Ashante** 168:14
**asked** 25:25
31:17 38:1
43:23 44:2
59:3 69:17

74:24 122:20
162:18 263:20
264:18 276:17
282:20 286:22
**asking** 60:25
75:2 80:23,24
86:2 99:1
127:2 141:6
184:18 208:16
223:20 237:17
242:6,10,11,12
270:3 282:3
**assessment**
246:16
**assigned** 107:11
107:16,17,22
111:22 164:3,7
165:5 166:11
174:3 198:22
245:14 267:6,7
267:14,19
**assignments**
108:13
**assist** 61:13
62:19 112:6
133:19 185:20
**assistance** 291:3
**associated** 44:9
61:23 76:10
116:6 128:13
153:13 168:25
189:11
**Associates** 4:2
157:13,15
179:24,25
**assume** 19:21
46:13 77:22
186:16 213:12
242:6,10,11
285:21
**assuming** 55:13
119:4 174:4
207:9 210:9
214:23
**assumption**
174:5 185:25
206:21 232:9

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 78 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 296

**assumptions**
29:15 211:24
**assure** 199:9,20
**attach** 12:19
13:9,23 158:3
188:15 201:17
207:12 210:13
215:14 221:7
225:20 230:22
234:12,22
242:18 248:8
248:13 254:11
256:12 257:9
263:24 265:22
268:12 269:12
275:1 289:19
**attached** 120:18
140:9 174:17
253:21 281:14
292:8
**attaching** 275:5
**attachment**
77:25
**attempt** 157:18
157:20 163:5
**attempted**
161:15 162:17
163:20
**attempting**
163:5 190:11
**attention** 14:5
117:15 149:18
169:15 173:16
182:23 204:20
207:20,25
208:18 210:19
215:19 216:2
221:12 223:7
233:21 236:6
236:12,24
241:11 243:16
244:5 245:15
248:24 249:8
251:25 253:9
255:11 260:10
**attorney** 18:22
136:12 185:12

**attorneys** 2:6,11
2:17 19:5
47:17,22,23,23
48:18
**August** 164:13
164:18,19,24
165:2
**authenticate**
188:21,22
189:1,3 274:21
**author** 151:23
196:21
**authority** 41:22
105:6,7,9,10
105:13,15
146:3 159:19
176:7,19,24
177:4,11,11,24
177:25 178:3,4
178:7,11
200:13 261:16
**authorization**
4:24 207:23
208:15 209:24
**authorized**
196:19,23,25
200:3,5,7,21
**authorizing**
210:2
**automatically**
267:11
**available** 61:15
114:10 151:1
181:25 203:5
208:25 234:18
290:14
**AVENUE** 2:4
**aware** 29:16
92:23 112:10
112:19 113:13
113:20,24
132:16 137:13
142:16 143:5
157:22
**A-actual** 204:22

_____
**B**

**B** 4:8,10 82:7
222:2
**BA** 101:5,6
**back** 11:19 33:3
66:20 67:1
82:23 94:2
109:23 119:14
144:18 158:19
180:13 197:21
206:3 208:15
243:12 246:10
266:16 269:6
290:7
**background**
27:9 100:19
179:19,22
**backwards**
248:17
**bad** 260:6
265:14 266:1
**bank** 140:16
**bar** 263:2
**base** 171:18
172:1,6,19,21
172:25 173:4
173:11,13,13
252:2,13,14,18
253:5
**based** 26:24 27:6
30:12 32:5,25
33:6 37:9
40:20 46:8,10
53:17 70:5
71:6 83:12
103:15 111:19
124:3,21 134:5
135:25 137:10
159:8 160:8
161:10 166:7
171:24 175:24
204:13,25
211:23 215:12
216:1 217:24
228:7,25
239:18 241:21
267:11 269:22
270:6 274:9

282:16 287:5
291:1
**basically** 245:21
**basing** 45:20
**Bates** 73:1 81:22
110:10 117:24
150:1 169:7
182:10 184:17
185:3 189:8
190:21 191:11
224:11 243:17
252:7 268:2
274:18
**BBBB** 194:12
**bearing** 218:23
**becoming**
279:18
**bedrooms**
211:24
**began** 102:7
**beginning**
109:24 206:4
**behalf** 8:15,18
9:19 14:23
15:1 17:1,4
97:15 102:18
136:25 288:7
**belabor** 23:24
**belief** 139:19
**believe** 9:4 16:5
19:11,16 22:13
29:2 34:22
42:24 45:14
46:20 47:6,22
48:6 54:18
55:20 59:16
62:1,20 63:12
65:13 71:10
75:13 77:19
85:25 93:5
94:25 95:5
105:16 107:7
108:17 111:17
111:19 118:3
125:2 130:23
132:25 133:11
135:8,8 137:21

145:24 151:4
152:16,24
164:6,9 166:14
167:14 170:7,9
171:6,9,10
184:4,19
187:24 191:23
192:23 197:4
197:14,18
208:11 220:5
225:16 233:12
244:14 247:10
248:22 263:7
269:5 272:18
272:20 274:9
275:24 277:23
291:11
**believes** 161:19
163:22
**bell** 277:8
**belonged** 195:24
**benefits** 174:18
**Bennett** 18:25
19:1,2,6,13
20:13
**Berry** 1:15 11:24
**best** 15:18 34:17
35:6 139:18
174:6 293:13
**better** 106:14
188:24 258:4
258:19,24
259:6 260:8
265:9,24 266:9
**beyond** 23:9
24:3 27:22,23
29:21 35:10,11
41:24 51:13
52:24 53:13
54:1 56:21
91:21 96:17
120:1,17 122:9
127:12 132:18
133:23,24
149:2 152:8
162:12 214:10
217:9 218:11

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 79 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 297

219:7 271:3
275:14 280:3,5
284:14 287:9
288:1
**bills** 140:9
**bind** 14:15 125:6
**binding** 14:17
**Birmingham**
18:17,19
**bit** 29:18 95:18
162:23
**blocked** 71:1,3,8
**Bloomington**
19:2 151:17,18
153:3 241:10
276:12
**blue** 2:14 239:12
239:16,17,19
**BNYN** 207:6,8
**Bob** 1:8 183:15
183:16
**bold** 285:14
**bolded** 252:1
**boom** 62:22
**Bordelon** 263:14
**bottom** 65:11
67:20,23 75:11
183:6 207:5
232:20 238:16
251:16 260:22
262:11,25
**bought** 28:19
101:16 275:9
**Boulevard** 1:17
2:9,15 8:8
**bound** 115:4
**box** 110:17
157:17 209:13
**break** 58:14,15
66:15,19
109:12 242:23
259:11 266:5
279:17
**breaking** 58:10
**breaks** 259:14
**BRIAN** 2:21
**brick** 212:1

**brief** 66:23
109:20 180:10
242:23 243:9
266:5,13 290:4
**bring** 70:16
214:24
**broad** 31:5
32:16 145:20
181:13,13
280:23
**broke** 227:16
**broken** 171:16
172:2,9,10,19
172:22 227:23
228:22 252:11
252:12,13,18
**broker** 101:16
101:21
**brought** 87:15
87:16 287:18
**brown** 1:5,5
4:12,19 5:2
6:14 8:10
19:21 21:2
22:22,25 25:20
26:1,3,19 31:3
31:8,9 34:20
35:25 36:8,21
37:23 38:11,24
41:7 42:17
43:7,10,25
53:16,17 55:16
56:9,11 57:16
57:19,20,23
58:5 68:16
69:20,22 70:1
72:2,4,18,20
72:21 73:3,21
74:8,12,20
75:1,12,20
76:6,7,16,20
77:2,24 79:1
79:23,24 80:3
80:4,21 81:1,8
81:9,24 82:13
82:21 83:5,14
83:16,20 84:4

84:7,14,22
85:12 86:15
87:2,14,23
88:4,7,12,14
89:10,11,15
90:23,24,24
91:3 93:3,8,23
93:25 94:2,4
95:8,25 97:15
98:14,19,24
99:13 100:15
108:24 109:1
112:14 113:1,9
113:23 114:15
115:5,7 117:12
117:14 120:3
126:14,16,19
126:23 135:2
140:25 142:9
143:18,20
145:13,22
146:19 147:3
148:24 150:20
154:14 158:23
158:25 160:14
161:14 163:10
163:17 165:17
166:3,5,6
168:13,13
169:9 171:22
171:23 172:18
172:22 173:8
173:17 174:12
175:23 179:15
189:8,24 190:1
190:13,13
193:6,10,20
194:1 195:20
200:4,6 201:18
201:18 202:8
202:10 204:3,9
206:6 207:12
207:23 210:22
210:23 214:22
215:20 221:12
221:24 222:5
224:12,14,16

225:9,9,15,16
225:20,25
229:23 231:2
231:25 232:3,5
232:8,10,14,17
233:22 234:12
234:22,23
235:3 241:12
242:18 243:17
243:18,21
246:14,19,20
247:1,2,4,6,11
247:11,11,12
247:12,12,13
248:11,15,24
249:9 252:1,9
253:9 254:11
254:12,18,20
254:24 255:7
256:12,17,19
257:9,16
258:15,24
260:11,15,16
260:17,20
263:10,11,15
263:16,16,24
263:24 264:20
265:16 266:2
267:2 268:4,17
274:5 275:7
279:2,4,7
290:11,13,20
**Browns** 35:20
40:21 54:21,24
55:1,1,18,20
55:25 56:3,7
58:22 59:5,5,8
59:19 60:2,11
61:5,14,24
62:8,9,19,21
62:22,24 63:4
63:9 64:18
65:6,16 67:6
69:6,6,13,18
70:23 71:1,7
71:24 73:17,20
77:18 80:10

88:20 89:2,18
89:21,24 90:4
92:7,9,3 93:16
93:17 94:23
96:8 108:16,18
111:16,22
114:5 115:18
116:16,17
120:25 121:18
121:24 122:18
122:23 123:5
123:19,21
124:6,11,19,20
125:17,23
130:14 131:16
132:23 133:1
134:25 136:19
136:20 137:14
138:19,25
140:22 141:2,9
141:16 142:8
142:12,17
143:3,4,7,22
145:7,7,13
148:8 150:14
152:9 154:3,10
155:19 157:2
157:11 159:14
160:18,18
162:16 163:4
164:4,20 165:1
165:3,6 173:3
173:10 174:16
175:5 179:8
180:22 181:9
181:22 182:3,4
188:4 196:20
196:24 201:12
213:23 227:22
228:12,20
230:1 233:9,13
239:24 240:3,6
245:22 253:22
253:23,24
254:2,6,8
269:25 270:20
272:15,18

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

273:7,10,14,22
273:24 274:12
274:14 279:9
281:2,6,11,22
283:16 284:19
286:11,12
**BROWNV000...**
3:21
**BROWNV000...**
3:22
**BROWNV000...**
3:18
**BROWNV000...**
3:19
**BROWNV000...**
4:5
**BROWNV000...**
4:5
**BROWN0008**
5:18
**BROWN0011**
5:18
**BROWN0017**
5:21
**BROWN0020**
5:21
**BROWN0021**
5:24
**BROWN0027**
6:4
**BROWN0054**
6:9
**BROWN0055**
6:6
**BROWN0056**
6:6
**BROWN0211**
4:16
**BROWN0214**
4:17
**BROWN0217**
4:22
**BROWN0218**
4:25
**BROWN0219**
5:2
**BROWN0220**

5:5
**BROWN0221**
5:7
**BROWN0223**
5:7
**BROWN0224**
5:10
**BROWN0225**
5:12
**BROWN0228**
5:13
**BROWN0229**
5:15
**Bruce** 207:6
**Bruce's** 207:10
**building** 52:11
140:1 159:11
203:7,9,20
209:6 213:11
216:3,6 230:10
241:25
**built** 12:3
**bulk** 226:22
**bunch** 245:17
**Burlington**
18:14
**business** 71:6
202:22,25
**button** 262:11
**buy** 28:21

——————
**C**
**C** 2:15 82:7
151:10,16
285:23
**calculate** 218:5,7
**calculated**
216:15 226:20
226:22 254:23
**calculates** 218:8
**calculation**
94:18
**Calgary** 100:24
101:8,13,19
102:11
**California**
157:17

**call** 20:13,15,20
47:2,3,19,20
47:21,25 48:5
48:12,14,19,21
48:24 49:3,7
64:23 156:5
163:17 164:15
244:16 245:1
257:21
**called** 90:18
239:7 240:16
245:4 258:1
**calling** 123:9,24
141:20
**calls** 19:7 132:19
146:14
**Canada** 100:24
104:3 106:18
106:22 108:7
**capacity** 15:2,5
15:6 16:3
17:13 19:20
20:25 21:2,20
21:23
**car** 4:8,10
182:25
**card** 140:15,16
**carpenter**
252:15
**carpet** 212:1
**Carrie** 81:14
82:11 175:22
176:4,17,18
177:20 274:7,9
274:13
**carved** 106:8
**case** 8:9 14:20
16:8,11 20:20
50:10 95:23
98:2,20 99:15
108:16 110:4,6
112:14 113:9
120:14 124:2
127:20 131:6
131:15 144:9
149:13 158:23
199:14,18

224:9 268:19
288:15
**cases** 159:1
**cash** 204:25
**cast** 204:22
**casual** 150:17
**casualty** 1:7,13
2:12,18 4:3 8:5
8:10 151:7,12
153:15
**cat** 4:2 273:17
**catastrophe** 5:21
59:22 63:16
103:9,18,24
104:1,11,22
107:23 108:5
240:21,23
241:6 248:4,7
277:12 278:9
**catastrophic**
104:3
**catchall** 227:19
**categories**
227:20,24
**category** 52:17
52:18 227:14
**causation**
270:14,17
**cause** 139:19
140:18 208:23
209:4,5 210:8
229:22 269:25
270:8 288:22
**caused** 150:21
151:1 213:24
214:1
**Causeway** 1:17
2:9,15 8:8
**cause/line**
208:19
**CCF** 4:15 5:18
90:18,20,22,23
90:25 91:4
243:21,24
244:3
**center** 106:5
164:14,15

169:13
**central** 4:3 107:8
107:11,13
**centralized**
247:16,23,25
248:6
**certain** 52:18
61:10 63:10
86:8 131:6
160:7,9 192:14
249:1
**certainly** 52:11
52:13 131:13
**CERTIFICATE**
292:3 293:1
**certification**
14:21 16:20
**certified** 2:24
7:23 178:22
281:21 293:4
293:24
**certify** 292:6
293:5
**cetera** 115:1
116:4
**change** 31:6
32:19 33:6
36:9 41:19
77:7,7 112:7
113:6 139:23
251:22,23
261:19,19,20
261:24 262:1,4
269:4,5
**changed** 26:7
43:13 87:8
105:20 112:11
112:23
**changes** 30:21
30:22 46:5
77:2,4,12
84:22 85:8,12
85:15,20 86:20
87:14,18
113:14,20,24
292:9
**changing** 24:25

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 299

| | | | | |
|---|---|---|---|---|
| **charges** 171:16 | 57:9 58:22 | 134:19 135:3,7 | 224:3,20 | 108:9 110:4 |
| 171:17,18 | 59:19 60:1,4 | 135:10,22 | 227:23 228:8 | 111:4,5,7,12 |
| 172:2,6,19,21 | 60:11 61:1,5 | 137:8,15 | 228:15 229:21 | 111:14 114:8 |
| 172:25 173:4 | 61:15,19,19 | 140:15 141:24 | 229:23 239:25 | 117:3,6 123:14 |
| 173:11,13,14 | 62:15,19,24 | 142:7,11,11 | 240:3,6 244:2 | 141:16 144:19 |
| 252:3,7,11,11 | 64:18 65:16 | 143:4,7,20,22 | 245:14 253:5 | 144:22,24,25 |
| 252:13,15,18 | 67:8,8 68:2 | 145:7,13,14,23 | 253:14 261:2,3 | 145:4,8 146:11 |
| 253:6 | 69:6 70:23 | 145:25 146:3 | 261:8 262:18 | 146:12 147:3 |
| **chart** 271:25 | 72:18 73:22,24 | 146:10,19 | 263:10,19,22 | 151:10,14,14 |
| **check** 64:16 65:8 | 74:1,12 75:1 | 148:9,24 | 265:3,20 269:6 | 151:16 152:18 |
| 68:15 176:11 | 75:12,21,23 | 150:14,20 | 270:20 273:8 | 152:22 153:15 |
| 203:16 | 77:11,18,24 | 151:7,12 152:9 | 273:10,22,24 | 154:8 155:5 |
| **checking** 44:25 | 78:10 79:19,22 | 154:4,10,14 | 274:5,12,14 | 159:17,18,20 |
| **checks** 82:8 | 80:4 81:14,16 | 157:2,4,11 | 279:2,5,8 | 164:14 167:6 |
| **Chicago** 19:9,12 | 81:17,18 82:9 | 159:4,14 | 283:16,20 | 177:4,6 181:12 |
| **choose** 87:16 | 82:11,15 83:9 | 160:18,23 | 284:1 290:11 | 185:10 192:13 |
| **chose** 176:16 | 84:7,12 87:21 | 161:4,7,9,12 | 290:13,20,25 | 192:15,17,24 |
| 177:6,25 | 87:21,24 88:5 | 161:13 162:17 | 291:1,10,11 | 198:14 199:3 |
| **Chris** 8:5 29:15 | 88:8,12,13,13 | 163:1,18,24 | **claims** 21:13 | 200:21 219:4,5 |
| 58:13 | 88:14,16 89:2 | 164:11,20 | 27:14 50:1,3,4 | 226:14 230:19 |
| **CHRISTOPH...** | 89:10,15,16 | 165:1,3 174:3 | 50:6 51:5,8 | 234:18 235:7 |
| 1:14 8:24 | 91:7,11,12 | 176:7 177:7,15 | 52:5,19 53:22 | 239:12,19,22 |
| 292:15 | 93:3,8,13 | 177:20 179:8 | 54:9,10,14,21 | 241:4,5 255:19 |
| **circle** 208:10 | 94:10,11,23 | 179:15 180:23 | 54:25 55:4,9 | 257:4 260:12 |
| 209:8 | 95:8,14 96:13 | 180:24,25 | 55:14,25 56:6 | 262:21 264:4,6 |
| **circled** 204:23 | 96:14,15,18 | 181:1,1,2,3,6 | 56:7 57:18 | 264:7 265:18 |
| 209:14,17 | 98:14,17 | 181:10,15,21 | 58:23 59:4,6,7 | 269:23 270:4,7 |
| **circulated** | 100:15 102:1 | 181:24 182:3,4 | 59:8,13,14,15 | 270:12 272:9 |
| 153:23 | 102:14 105:2 | 182:9,11 | 59:18,24 60:3 | 273:16,17 |
| **circumstances** | 105:23,24 | 184:14 186:20 | 60:11,13,24 | 276:11 277:2 |
| 123:1 126:7 | 106:2,3 108:24 | 190:12,13 | 62:9,13,16 | 278:2,3 290:15 |
| **cited** 286:21 | 109:1 110:15 | 194:6,7 195:16 | 63:4,9 64:16 | **claim-handling** |
| **city** 18:12 | 111:22 113:1 | 195:20 196:20 | 64:17 65:6 | 150:5 |
| 271:19 272:17 | 113:23 114:3,5 | 196:24 197:7 | 68:23 69:8,10 | **clarification** |
| **Civil** 1:1 7:6 | 114:15 115:5,8 | 198:22 200:13 | 69:13,14,18,22 | 81:4 98:23 |
| **claim** 3:18,21 | 115:19 116:16 | 201:12 202:17 | 70:8 71:1,8,25 | 277:16 |
| 4:2,3,24 5:2,5 | 116:17 117:1 | 202:19,20 | 73:12,14 77:21 | **clarify** 31:4 99:5 |
| 6:9 25:7,8 | 120:4,25 | 203:4 204:14 | 78:2,25 79:11 | 110:25 147:20 |
| 26:10 28:18 | 121:14,25 | 206:21 207:24 | 79:15,17 80:9 | 209:5,22 |
| 29:10 31:8,10 | 122:1,5,18,23 | 210:23 212:17 | 81:1,2 88:20 | 261:18 |
| 32:23 33:5 | 123:7,22 124:7 | 212:19 214:9 | 90:5 91:2,3,17 | **Clark** 2:24 7:22 |
| 39:7,14,25 | 124:12,19,20 | 214:13,15 | 92:17,20 93:9 | 293:3,23 |
| 40:2,7,18,19 | 125:8,10,17,22 | 215:20 217:14 | 93:9,10,16,17 | **class** 14:21 16:4 |
| 51:9,19,20,24 | 126:6,8,15,19 | 218:3,8,9,14 | 96:19,20 | 16:20 |
| 52:2,8,10,12 | 128:16,17 | 218:17,23 | 102:17,19,20 | **classified** 204:10 |
| 53:6,7,23 54:4 | 131:19 132:9 | 219:13,21 | 103:2,4 104:6 | **clause** 269:25 |
| 54:23 56:12 | 133:10 134:13 | 220:2,6 221:7 | 107:12 108:3,6 | 270:8 288:22 |

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 300

clear 24:17
188:24 266:2
268:16
clearly 51:13
53:13 119:2
120:16
click 68:16
close 82:8
262:10,13
closed 77:8
clothing 226:24
227:17
code 7:6 60:16
63:16 194:25
205:7,9,9
209:16 210:4
210:10,10
236:13,21
237:6
coded 224:3,12
224:21
coding 4:22
204:10,11
205:17 207:1,3
215:11
cold 29:16
college 100:19
colon 192:16
color 264:11,13
combined
237:11 241:19
241:24 242:4,9
249:19 250:13
250:14,15
come 11:19
34:12 37:15,22
38:9 66:19
104:8 133:3
173:7 185:9
225:25
comes 63:11
232:1
comfortable
291:6
coming 33:14
214:5
comment 46:10

69:21 127:4
129:19
comments 275:8
committee
151:23,25
152:2,5 153:5
153:10,13
276:22
commodities
101:16
commonsense
42:15
communicate
184:2
communicatio...
144:8
comp 249:12
companies 73:25
101:17,18
companion
163:18
company 1:8,13
2:12,18 8:5,11
27:11 91:16,17
102:2,3 134:20
157:12
company's
203:15
comparing 44:3
comparison
45:21 69:11,15
100:8 118:9
119:19
compatible
184:1
compel 287:17
complete 161:15
163:20 193:13
232:15
completed 81:12
131:21 135:13
204:13 208:17
210:25 211:2
221:18,22
222:4
completely
191:4 203:16

completeness
13:8,21
completer 255:9
completion
198:21
complexity 52:2
compliance
128:12 137:11
184:20 262:19
262:24
complies 123:13
comply 199:18
Complying
202:6 253:11
composition
249:25
comprise 51:8
52:5
comprised
105:24
comprises 56:12
57:8
compromise
53:6,22 54:8
compromised
92:21
computer 27:20
30:1 58:25
63:1,5 69:5
70:8 73:6,18
98:12 100:13
189:20 223:5
239:19 256:1,5
256:7 261:25
262:5 291:11
computerized
239:11
computer-gen...
256:2,25 257:1
concern 132:14
concerned
270:24
concerning 62:8
68:18 74:20
75:22 93:8
133:20 154:8
155:4 183:15

218:5 223:22
236:17 271:8
272:23,25
288:21
concluded
291:22
concludes
291:19
conclusion 44:19
117:3,5 123:10
123:25 132:19
183:14,20
concurrent
270:13
conditions 125:4
270:25
conducted 35:5
233:9
conducting
148:23
conference 19:7
20:12,14,20
47:1,3,19,20
47:21,24 48:5
48:12,14,19,21
48:24 49:3,7
confirm 34:25
45:11 72:17
192:21,22
222:8 225:11
confirmation
247:1,3
confirmed 26:2
26:17 45:6
72:14 73:5
confirming
65:21
conflict 132:10
140:24 141:2
141:10
confused 85:15
connectivity
87:10
consider 101:22
considered
130:14 131:2
133:4 191:12

considers 140:21
Consila 19:8,9
20:13
consistent 156:4
constitute 279:5
279:11
constitutes
286:25
construction
275:9
consult 51:1
consultant
152:18,18,22
153:7 276:11
consulting 4:4
151:7,12
153:16
consults 151:13
contact 4:12
6:14 23:2 77:9
102:3 157:19
157:21,24
199:10,22
275:7
contain 51:24,25
contained 26:1
26:18 35:19
36:7 51:18
53:15 54:10
55:4 56:8
57:18 58:4
62:14 64:11,12
66:7 68:4
76:20 77:2
81:19 82:17
83:8 93:22
100:6 126:14
126:15 137:23
146:19 150:15
171:19 215:10
220:6 230:19
232:5 233:2
234:17 235:6
235:19 238:15
239:4 250:16
251:10 255:21
263:3 279:7

282:7
**contains** 36:8
**contents** 5:10
  94:17 159:12
  203:4,5,7,20
  203:24 204:1
  209:5 227:16
  227:22 228:3
  228:16,21
  229:8,12
  230:22
**contested** 144:8
**context** 128:22
  129:15 131:6
  138:19
**contexts** 280:13
**continuation**
  191:6,7
**continue** 152:11
  288:3
**continued** 137:8
**continues**
  105:20
**continuing**
  52:22 118:24
  124:14 131:19
  135:7 152:8
**contracting**
  179:1
**contractor** 39:11
  178:22 244:24
**contractors** 33:3
  34:12,16 35:2
  35:6 37:21
  38:9 39:9
  94:16
**contractors's**
  37:14
**contractor's**
  38:22
**contribute**
  153:21
**contributed**
  25:19 151:20
**contributor**
  153:17
**control** 103:15

**conversation**
  20:10 25:17,24
  41:8 46:24
  47:1 75:6
  250:18 251:5
**conversations**
  20:18 48:11,23
**copied** 265:11
**copies** 15:8,12
  15:13,16 60:1
  68:11,24,25
  94:1 95:25
  257:17 260:6
  266:10
**copy** 4:19 13:23
  33:18 54:11
  55:3,13,21
  59:20 66:7
  69:1 81:6
  82:16 88:18
  90:2,10 94:9
  94:12,14
  138:24 158:7
  181:8 202:9
  207:17 246:2
  247:5 253:14
  254:8 258:19
  258:24 259:6
  260:7,8,8
  262:23 265:9
  265:14 268:2
  281:21 289:13
**corner** 73:21
  74:9,17 110:17
  117:18 166:4
  167:1 169:16
  182:24 183:7
  191:9,16 192:3
  194:8 223:1
  236:7 241:12
  242:14 244:5
  245:16 255:12
**corporate** 9:10
  9:15,20,25
  14:24 15:2,7
  15:19 16:3
  107:13,24

120:12 199:7
  288:8,20
**correct** 9:12,13
  18:16 19:22,23
  27:4 30:10,18
  45:7 63:2
  67:22 70:24
  72:15 74:5
  103:19 104:23
  106:24 107:5
  114:6 115:22
  117:8,12
  120:16 148:10
  160:16 164:21
  165:1 174:8,11
  174:13 181:23
  192:18 201:14
  207:2 209:19
  212:22 223:2
  225:10 248:21
  269:8,20
  277:23 292:7
  293:12
**corrections**
  292:9,21,22
**correctly** 71:15
**correspondence**
  22:16 68:12,13
  95:10 270:19
**COS** 80:18
**cost** 148:20
  168:21,22,24
  171:24 174:18
  204:22 248:25
  249:13,17,19
  250:8,19
  251:24
**costs** 249:7
**COTLAR** 2:3
**counsel** 7:3 8:12
  16:11,17,25
  17:1,3,11,15
  17:18,23 18:9
  18:10,24 19:15
  19:16 48:25
  51:24 64:13
  88:9 95:1

97:18,18 98:1
  98:5,7,24,25
  99:21,22
  113:17 143:23
  144:8 148:6
  149:5 154:25
  184:17,20,24
  192:10 198:8
  229:9 293:15
  293:16
**counsel's** 129:20
**count** 15:22
**counterfeit**
  140:17
**country** 104:2
  106:1,16,17
  147:18 203:2
**county** 194:25
**couple** 118:20
  191:17 236:13
**course** 30:4
  47:19 49:9,14
  49:17 50:9
  86:13 133:24
  283:19 284:5
**court** 1:1 2:24
  7:23 9:1,6
  12:11 13:24
  14:21 15:25
  23:10 28:7
  36:12,15 54:5
  57:4,7 99:9,11
  129:12,22
  156:16 258:23
  266:3 293:4,24
**courtroom** 16:1
**courts** 287:14
**court's** 24:4
  35:12 52:25
  120:17 149:3
  214:10
**cover** 94:5
  139:23 213:13
  247:6
**coverage** 4:15
  140:17 189:11
  202:23 203:14

208:24 211:5,7
  213:10,10
  219:15 222:1,2
  229:9 237:12
  237:18,19
  241:25 245:22
  246:8 269:25
  270:9 280:23
  285:23,25
**coverages**
  290:14 291:12
**covered** 82:7
  216:1 229:19
**covers** 77:19
**co-adjusted**
  108:12,12
**co-counsel** 8:21
**CR** 161:15
  163:19
**create** 153:21
  238:6
**created** 5:12
  84:20 213:14
  224:10 231:5
  235:11 238:14
  239:6 271:25
**creation** 22:25
  52:7 95:13
  110:22 111:1
  152:17 153:18
  190:25
**creator** 28:16
  227:15
**credibility**
  127:17,22
**credit** 140:15
**crime** 115:1
  116:4
**Crochet** 192:4
  193:6
**CRR** 2:24 7:22
  293:4,23
**CSA** 265:2
**CSAs** 265:2
**CSR** 6:6 60:14
  67:10 70:10
  89:14,16,17,20

89:23 90:4
92:25 93:1,3
181:7,11,17
189:22 195:15
208:25 226:10
226:13,14,14
255:20 257:6,6
260:17,23
261:9,10
262:16 263:4
264:9,13,19
267:9,10,18,23
**current** 193:20
**currently** 105:22
105:25 106:4
157:6 164:15
201:6
**curved** 106:14
**C-A-R-R-I-E**
176:5
**C-N-T-Y** 194:23
**C-R-O-C-H-E...**
192:4 193:6

**D**

**D** 4:19 171:2,4
195:17,25
197:11 202:10
209:14,16,17
210:4
**Dallas** 95:6 97:2
97:4,4,16,19
97:22 98:1,8
98:19 99:14
100:1,7 168:10
169:2 248:2
**damage** 27:14
82:4,5 140:1,2
150:21,22
151:1 212:8,23
212:25 213:2,3
213:13,16,19
213:23 214:1,6
221:25 224:5
253:14 282:17
282:25 283:2
283:10,18,18

284:10,10,11
284:11,12
290:14 291:12
**damaged** 101:18
101:19 140:3,6
167:21 228:23
281:24
**damages** 161:16
163:19,21
282:9
**Damm** 277:18
277:19 278:1
**Dan** 5:12 189:25
190:2,3,4,9,10
191:1,17
196:25 197:2,4
197:6,12,15,22
200:2,5,7,10
200:20 201:5,7
201:15 206:20
206:21 210:25
221:24 222:3,9
222:11,13,15
222:18 231:5
231:11,13
232:2,13
239:14
**dash** 275:7
**data** 63:16
**database** 58:25
67:7 73:12
181:11 187:2
**date** 10:5 79:7
110:16,19,20
110:22,23
111:1 117:17
135:3,5 164:11
165:20,21,22
169:3,10 170:7
173:17,18,19
173:22,23,25
173:25 174:2
175:4 184:10
184:11,11
190:20,24
192:14,14
193:1,20 211:2

222:23 223:5
231:7,8,14,15
231:15,16
238:16 250:17
267:6,8,8,9,9
267:14,15,19
267:22 268:9
281:22
**dated** 4:4 10:17
10:21 13:24
158:4 165:17
222:22 275:8
**dates** 77:9,9
268:8
**David** 17:3
157:13,14
179:23,25
**day** 1:19 8:2
33:2,3 168:10
168:12
**days** 134:20
137:15 139:16
168:11 289:4
**deal** 112:12
**dealing** 201:12
**dealt** 24:16
**December** 1:20
8:2 104:17,18
104:19 175:8
275:8
**decent** 109:8
**decide** 32:12
133:16
**decision** 33:17
34:13 35:24
36:19 37:15,22
38:10,22 39:12
39:19,23 40:12
40:13 41:11
46:8 56:10,15
57:11 58:7
133:13 202:25
290:15
**declarations**
6:12 268:3,5
268:24
**decrease** 30:23

31:1,12,18,18
**decreased** 32:1
**deductible** 65:22
72:21,23 73:5
211:11,12
**deductibles**
72:14,18
**deduction**
174:13,14
**deemed** 145:23
**defense** 16:10,12
16:25 184:24
**defer** 284:2
**deficiencies**
103:16
**define** 131:11
132:14 281:1,6
282:3 286:23
**defined** 128:10
128:21 129:2
129:13,25
139:1 272:19
281:24 282:17
283:3,12 285:5
285:15,25
286:23 287:12
287:13,24
**defining** 276:7
**definitely** 127:21
**definition** 87:4
125:6,7 127:3
127:5 128:19
130:11,22
132:4 133:14
133:15 137:22
138:7 172:16
281:11 283:1
**definitions** 282:8
282:10 283:11
**deflated** 219:12
**degree** 101:4
**Dekievit** 81:12
81:16 131:18
135:6 155:23
156:5,14,20
157:1,10,19,21
157:24 166:11

174:4,7 176:16
176:23 177:10
177:20 178:2
178:16,21,25
179:3,6 244:19
245:12 256:23
274:6
**Dekievit's** 166:6
166:10,14,16
167:11 179:21
244:8
**delay** 203:16
229:10
**delete** 261:12,15
261:17,21
**delivered** 69:9
78:22
**delve** 34:3
**demand** 276:2,8
**Demane** 81:14
81:19 82:1
175:22 176:17
274:7
**demonstrate**
271:25
**deny** 269:25
270:8
**department**
104:11 151:13
**depending** 52:1
87:9 148:16
**depends** 125:9
147:11 228:10
**deponent** 121:6
**deposed** 9:5
**deposition** 1:12
1:21 3:12,14
7:4,16 8:4 9:21
9:23 12:19,23
13:15,25 14:19
16:6,20 17:2,9
17:11,17 18:23
19:5,15 23:21
24:2,4 27:24
31:17 32:4
35:11,18 41:25
43:3,5,5,23

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 85 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al     1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page  303

49:5,21 52:25
56:3 64:6
70:18,21 120:2
120:21,22
127:17 133:24
144:15 198:12
231:19 243:24
258:12 291:19
291:21
**depositions**
14:23 15:1,4,5
15:9,12,14,16
15:20 16:22
128:4,8 288:7
288:13,20
**depreciation**
174:10,13,15
216:11,17,20
217:2,4 218:1
218:6,7,9,22
218:24 219:3
219:12 226:16
226:21,24
**depth** 205:2,11
205:12,14,16
206:24 213:9
**described** 140:4
288:9
**description**
140:7 211:4,6
211:9 258:4
264:20 265:10
265:11
**designate** 13:14
**designated** 1:13
9:15 13:3
**designates**
244:25
**designation**
244:16
**detailed** 140:1,7
265:19
**details** 4:12 6:9
6:14 212:5
213:22 266:21
275:7
**determination**

290:19
**determine** 93:7
102:5 119:20
132:8 154:18
**determined**
124:1
**developed** 272:9
**devise** 103:15
**Diane** 2:24 7:22
293:3,23
**dictate** 42:15
57:17
**dictates** 57:22
**difference** 43:23
44:2,4 46:14
118:4,15 283:6
285:18 286:3
288:9
**differences**
118:10,14
119:21,22
**different** 10:24
11:1 42:20
74:13 76:8
91:5 106:9,17
172:13 181:17
182:8 191:5
192:16 211:20
241:23
**difficult** 145:3
**digit** 191:25
244:17 245:2,3
**digits** 205:14
**direct** 14:5 23:11
54:2 117:15
120:8 131:7,9
132:20 136:8
149:17 169:7
169:15 173:16
182:23 204:20
207:20,25
208:18 210:18
215:19 216:2
217:10 221:12
223:7 233:21
236:5,12,24
241:11 243:16

244:4 245:15
248:24 249:8
251:25 253:9
255:11 260:10
**directing** 56:23
91:24 120:11
287:4,7
**directive** 284:7
**director** 277:22
**discovered**
136:25
**discovery** 23:9
24:4 27:23
35:12 42:1
50:9 52:25
120:17 121:8
127:13 133:25
149:3 162:13
185:15 214:11
219:8 284:15
287:10 288:1
288:14
**discuss** 25:18
177:7 286:18
**discussed** 48:13
48:18 87:22
88:6,22 89:19
89:22,25 93:4
154:17 163:19
181:5 197:10
213:17 248:20
248:23 252:8
**discussing** 67:5
291:7
**discussion** 17:11
20:7,11 88:22
119:12 156:24
169:18 206:1
279:21
**displaced** 203:2
**dispose** 249:12
**disrupt** 23:21
**distinguish**
262:6
**distinguishable**
150:23
**distributed**

272:23
**District** 1:1 16:2
**divided** 106:13
106:16,23
217:6
**division** 1:6
103:20 240:22
**document** 4:12
5:15 6:14 52:4
52:6 68:22
72:8,22,25
73:4,7 81:23
82:12 87:18
92:19,24 110:8
110:12,14,23
111:2,24
112:10,19,22
112:24 113:8
114:9,10 115:4
115:6 117:23
118:1,5,25
120:13 128:11
137:22 138:1
149:18,21
150:3,7,10,11
150:14,16,17
151:5,6,22,24
152:17 153:18
153:21,23,25
165:25 166:19
167:5 182:14
182:16,17,20
182:24 183:18
184:9,15,19,22
184:23 185:22
186:18,23
187:7 189:5,6
189:7 190:8
191:4,5,6,8,13
198:18 202:8
204:8,9,17,19
207:21,22
210:19,20,21
210:24,25
214:23 215:3,4
215:23,24
220:13,24

221:16 222:22
222:23 223:4
225:1,2,3,6,7
226:2,5,8,15
227:3,9,16
229:17 230:3,5
230:18,19
231:3,4 232:6
233:12 234:15
234:17 235:2,3
235:23 238:6
238:14,17,21
238:23 239:6
242:5 243:17
243:19 246:15
247:2 248:9,10
248:14,15,20
248:22 253:12
254:16,19,24
255:4,5,8,9,17
255:20,21
256:6,18,19,22
256:24,25
257:2,7 258:5
258:10 259:19
260:2 267:19
267:25 268:1
274:15,17,21
274:24 275:6
281:20 282:2
282:12 286:5
**documentation**
229:25
**documented**
77:2,4,12
229:16
**documents** 4:15
32:25 33:1,4,5
33:6 34:4 43:2
49:1,5,20 50:8
51:18,19,22
52:17,19 53:5
53:15,16,21
59:12 66:11
77:8 83:5,8,12
92:22 109:10
110:3 113:6

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

121:7 140:10
154:24 180:17
180:22 181:2
183:14 187:12
187:14,18
188:5,8,21,23
189:2,4 200:10
200:15,16,17
218:5 243:20
265:1,16 267:3
274:19
**doing** 33:8 49:9
197:20 213:16
**dollar** 105:10
211:12
**door** 82:6 167:20
251:17
**doors** 161:21
163:24
**double** 236:25
**double-check**
159:3
**downspout**
250:20
**draft** 4:19 65:18
67:25 68:6,20
153:11,14
175:7,10,11
202:9 210:1,2
210:3 224:10
224:11,17,21
224:24
**drafted** 153:5
**drafts** 68:1,4,14
68:16,17,18,24
68:25 69:2
175:8 254:8
**drew** 117:2,5
**due** 279:6,13
**duly** 8:25 293:6
**duties** 22:20,24
25:2 41:1,3,10
102:16,25
104:24 278:10
**duty** 23:1 121:13
121:13,24
122:4,17 123:5

123:19,21
124:1,10,18
125:1,7,9
134:11 137:14
291:4
**Duval's** 16:1
**dwelling** 222:1
**D-A-M-M**
277:18
**D-E-K-I-E-V-...**
156:9
**D-E-K-I-E-W-...**
156:6
**D-E-M-A-N-E**
81:21 176:4
274:7

------

**E**

**E** 2:4 192:1
**earlier** 15:25
20:22 40:24
48:19 49:19
74:24 88:10
114:2 181:5
231:19 239:1
243:24 245:5
245:20 248:21
248:23,25
257:14 258:11
259:19 260:1
260:11 276:15
282:24 283:2
**early** 109:12
**ease** 23:20
**east** 271:1
272:10,16,19
272:20,21,25
**Eastern** 16:1
**Echo** 183:8,10
183:11,18,21
183:23 184:1,6
187:1,2,24
**economics** 101:5
**edit** 63:12
**educated** 212:3
**education**
100:20,21

**Edward** 192:1
**effect** 111:8
218:2 268:6,9
269:8 281:22
**effective** 184:10
**effort** 157:23
159:20 232:15
**eight** 251:17
**Eighteen** 209:4
**eighty-two** 210:5
222:1
**either** 23:23 61:1
77:8 148:2
274:10 284:11
**Eldridge** 168:13
**electronic** 59:23
59:25 60:2,4
60:24 69:10,12
69:18,22 71:8
75:21 76:13
80:5,7,9 82:15
82:16 87:21
88:4,13,13,17
88:20,23,25
89:1,9 93:2,9
95:16 145:8
146:11 167:6
181:7,8,11
226:7 255:19
255:23 257:4
264:5,6 265:18
**electronically**
59:20 87:24
90:16 226:5
**electronics**
227:17
**eleven** 236:7
242:7
**eliminating**
125:4
**employ** 101:10
102:10 103:4
147:15 290:10
**employed** 19:20
146:23 269:24
**employee** 146:24
147:12,22,24

148:8,20 157:3
157:5,7,8,23
197:3 198:2,3
201:6 244:20
**employees** 148:4
**employer** 179:22
179:23 180:1
199:24
**employment**
49:17
**empty** 73:17,19
**ENCLOSED**
292:22
**encompassed**
273:14
**encumbrances**
139:22
**endorsed** 174:16
**endorsement**
174:17,21
175:2 245:21
246:9
**endorsements**
55:20 71:23
281:13
**engineer** 290:11
290:16,20
**English** 196:3
**enter** 23:8 75:24
118:24 119:24
152:7
**entertain** 178:13
**entire** 52:23 59:5
74:16 160:13
161:19 163:22
181:24 185:1
209:24 223:4
**entitled** 5:15 8:9
114:8 150:4
238:18
**entity** 107:24
**entries** 262:6
**entry** 164:14
187:19
**Entwistle** 277:9
277:11
**envelope** 94:2,3

**equals** 168:12
211:10
**equipment**
102:1,4
**ERRATA**
292:22
**error** 52:13,15
**especially**
229:22,23
**ESQUIRE** 2:4,9
2:15
**establish** 37:4
113:11 128:19
133:13 213:18
215:25 233:4
**established** 40:8
216:16 217:2
234:3
**establishes**
114:12,22
**establishing**
211:16
**estimate** 5:12,21
15:18 19:21
21:2 22:22
23:1 25:20
26:1,3,16,19
27:13 34:20
35:19,25 36:8
36:21 37:23
38:11,22,24
39:11 40:18,18
40:19 41:7
42:18 43:10,25
49:9,15 52:12
77:23 78:9,12
78:21,21 79:1
79:2,10,14,16
79:17,18 80:9
80:21 81:1,9
81:10,13,15,19
82:3,14,17,18
82:22,25 83:1
83:6,14,17,20
84:4,10,13,15
84:18,19,23
85:8,12,22

Case 2:06-cv-08262-LMA-ALC   Document 260-2   Filed 01/15/2010   Page 87 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al   1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 305

86:5,6,7,8,12
86:20,21 87:3
87:7,11,14
93:12,13 94:6
94:9,14,15
109:4,6 131:22
131:22 135:24
136:1 161:15
163:20 171:20
171:22,23
172:19,22
173:12 174:10
174:12 176:17
211:22,23
212:3 213:16
213:22,25
214:5 231:5,18
232:16,24
234:10 248:19
251:11 252:12
252:14,20
253:13,16,22
253:25 254:3,5
254:7 279:4,8
279:11,15
**estimated** 137:9
171:25
**estimates** 33:2
33:15,18 37:10
37:14,21 38:9
39:15 140:1
**estimating** 27:12
27:17
**et** 7:6 8:11 115:1
116:4
**evaluate** 124:20
213:19 290:13
**evaluated** 137:9
142:10 291:1
**evaluating**
135:10 211:17
**evaluation** 93:12
124:22 137:10
291:2
**event** 104:4,8
155:14 205:10
263:18

**eventually** 61:14
**evidence** 7:18
140:14 270:13
**exact** 127:19
**exactly** 213:20
267:15
**EXAMINATI...**
3:2,4 9:3 11:21
14:3 16:18
18:4,20 23:13
24:9 25:16
26:5 27:1 28:4
28:20 29:4,24
35:14 37:12,19
38:7,20 39:17
40:10,23 42:6
42:14 43:1
44:6 45:15
46:6,23 51:2
51:21 53:2,18
54:6,20 57:21
58:18 64:1,22
67:3 78:5,23
80:19 81:7
85:9 86:3,25
89:12 92:5,14
96:6,11,22
97:3,12 99:23
106:19 109:25
111:13 112:9
112:21 113:12
115:14 116:8
117:25 119:16
121:3,11,19
122:15 123:3
123:17 124:8
124:23 125:19
126:9 127:6
128:5 129:8
130:12,24
131:14 132:6
132:21 133:17
134:2,9,17,24
136:2,9,17
137:12,25
138:15 140:19
141:8,14,22

142:15 143:1
144:1,10 146:6
146:21 149:8
149:24 152:20
155:1,17
156:13,25
158:6,20
160:11 161:6
162:22 163:25
167:4 169:19
170:5 176:2,21
177:22 178:20
179:16 180:15
185:19 186:15
187:10 188:19
191:3 193:8,16
194:22 200:1
202:3 204:7
206:5 207:16
210:17 214:14
215:18 217:3
217:12,20
219:1,10,19
220:1,22
221:11 225:24
228:4,19
230:14 231:1
233:20 234:14
235:1 236:4
237:13,20
238:19 243:14
246:23 250:4
251:3 253:8
254:15 256:16
257:13 258:3,9
260:9 264:3
265:6,15 267:1
269:16 270:5
270:22 271:6
271:14,23
272:7,14 273:5
273:18 275:4
275:25 276:9
276:18 279:3
279:22 280:9
281:15 282:11
282:23 283:14

284:4,17 285:3
285:17 286:9
288:5,18 289:1
289:9 290:9
291:5
**example** 76:14
93:23 267:13
**exceeds** 211:10
212:21 213:2
**exception** 7:10
292:8
**excluded** 150:23
**excuse** 39:21
102:7 238:25
**exhibit** 3:11,13
3:15,17,20 4:1
4:7,9,11,14,18
4:21,23 5:1,4,6
5:9,11,14,17
5:20,23 6:1,3,5
6:8,11,13,16
13:4,5,15,18
13:25 14:1,6,9
14:11,14
115:11,12
118:7 120:18
139:4,5,11,12
149:22 150:1
158:5 186:3,8
186:19 187:7,8
188:16,17,25
201:19,20
204:3,5 207:13
207:14 210:14
210:15 215:15
215:16 221:8,9
225:21,22
230:23,24
234:23,24
242:19,20
246:20,21
254:12,13
256:13,14
257:10,11
258:15,16,25
259:2 263:25
264:1 266:2

267:2 268:12
268:13,16
269:13,14
275:1,2 289:19
289:20
**EXHIBITS** 3:8
**exist** 144:13
274:1,2
**expect** 52:14
53:17
**expected** 56:19
56:19
**expeditiously**
122:2,25
123:15 126:6
**expense** 94:18
168:14 255:2
285:23 287:1
**expenses** 140:12
168:25
**experience**
179:1,4,7,11
179:18 269:18
**experts** 291:4
**explain** 39:2
95:18 170:20
286:18 287:18
**exposed** 241:13
**exposures** 5:15
235:4 239:8
**exterior** 163:23
167:20 251:17
**exteriors** 161:20
**external** 147:11
147:11,24
**extracted** 181:20
**e-mail** 22:15,18
78:14 80:8
143:3,5,15
144:12,16,21
144:24,25
145:6,12,21
146:9,20
148:23 149:16
154:1,2,19
**e-mailed** 77:24
78:2,6 79:11

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 88 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page  306

80:23
**e-mails** 77:20
  143:19 144:6,9
  144:13,18
  155:3 272:23
**E-N-T-W-I-S-...**
  277:10

**F**

**F** 170:8
**fact** 34:24 72:6
  74:10 97:20
  98:7 100:6
  119:21 122:17
  123:19,20
  144:17 172:4
  178:9 229:9
  244:19 258:10
**factored** 171:21
  172:10,11
  173:1
**facts** 4:16 65:23
  65:25 66:1
  74:4,11,17
  159:7,8,10
  189:13
**factually** 45:7
**fair** 35:21 36:16
  45:5,19 48:1
  59:10 117:2
  140:13 149:12
  164:1 186:16
  188:20 246:14
  246:16
**fairly** 121:14,24
  122:5,18 123:6
  123:22 124:11
**faith** 141:24
**fall** 227:20
**false** 177:1
**familiar** 22:8
  100:17 182:21
  183:17,18
  187:3,13,17,21
  188:1 226:12
  226:13 235:7
  238:23 274:23

276:1 279:23
280:16,20,24
**familiarity**
  188:9
**family** 168:11
**far** 28:17 54:1
  88:19
**Farm** 1:7,12,15
  2:11,17 4:2 8:5
  8:10,19,22
  9:11,16,19
  10:1 11:24
  14:15,17,23
  15:1,13,15,21
  17:1,4 18:9,11
  19:20 21:18
  23:4,15 24:18
  26:3,6,8,19
  27:3,12 28:18
  30:9,11,14
  31:10,14 33:15
  37:5 40:8,15
  40:20 41:12
  43:15 46:21
  49:18 50:17,25
  53:4 58:24
  59:19,22 60:5
  60:6,9,10,15
  67:7,8 70:7,12
  73:24 74:2
  77:24 78:14,22
  82:15,22 83:1
  83:2,6,15,20
  87:25 88:5
  89:3 91:1,16
  91:18 92:6,16
  92:20 93:19
  95:11 96:24
  97:15 98:25
  100:13 101:9
  101:11,14
  102:8,11,18,20
  103:3,21,22,25
  104:12 105:18
  106:8 108:4
  120:11,13
  121:12,23

122:7,17 123:4
123:18,21
124:1,10
126:10 131:23
132:7,22,23
133:2,18 134:3
134:11 135:1
135:11,14
136:18 137:1
137:13 140:21
141:15,23
143:2,7 145:12
146:7,12,23,25
147:22 148:22
149:9 151:13
155:18 156:14
157:2,5,6,8,23
159:13 160:12
162:2,8,25
164:2,12,20,25
165:5,8 176:23
183:15,21,24
183:25 184:2
187:1 188:7
189:15,20
190:5 191:21
196:1,23 197:2
198:22 199:22
201:6,8,10
202:25 214:3
218:4,7 219:2
219:11 229:14
238:5,13
239:23 240:5
244:15,19,23
245:3 249:7,14
251:24 262:2
269:24 270:7
270:20,23
271:7,15,24
272:8,22 277:2
279:6,12
281:12 284:7,9
286:17,19
288:8 289:2,11
290:10,18
**Farm's** 27:6

44:3 51:6
56:15 57:11
125:20 126:5
128:15 136:3
136:10,22
182:18 214:2
249:1 273:11
286:10
**Farm-issued**
  70:14
**fashion** 182:2
**favor** 81:8
**fax** 94:12 247:3
**faxed** 94:5 247:1
  247:6,7,11,14
  247:15
**FCSR** 91:6,8,9
  92:15,17
**fed** 82:23
**federal** 219:13
  220:4,10
  234:16,19
**fee** 168:18
**feel** 127:3 149:4
  188:11 291:2,6
**feet** 167:18
  205:20 213:9
  229:12
**felt** 56:8 58:6
  59:16 133:12
  250:1 291:8
**FEMA** 230:4,8
  230:10,13,16
  230:20 238:18
  238:20 239:21
  239:24
**FE5273** 175:3
  246:6
**FICO-654** 205:3
**field** 32:7,23
  60:21 102:22
  161:18,21,23
  162:2,18,21
  163:21,24
  164:3,4,7
  165:5,10,10,13
  177:5,6 247:24

248:3 257:21
258:1 263:13
**fields** 63:8
**fifty** 105:16
  168:18,19,20
  168:21
**figure** 33:10
  136:11 222:6
  224:25
**figured** 59:13
**figures** 140:11
  226:21 227:10
**file** 43:7 50:1,3,5
  50:7 51:4,5,8
  51:19,20,24
  52:2,5,8,20
  53:6,16,22
  54:5,9,10,14
  54:21,23,25
  55:5,9,14,25
  56:4,6,7,9,11
  56:13,14 57:9
  57:10,16,18,19
  57:20,23 58:5
  58:23,23 59:4
  59:6,7,9,13,14
  59:15,18,19,24
  60:1,3,4,24
  61:15 62:9,13
  62:15,16,25
  63:4 64:13
  65:5,7 66:11
  68:16,23 69:6
  69:9,10,13,14
  69:19,23 70:1
  71:1,8,25 72:2
  74:20 75:21
  78:10,25 79:1
  79:12,15,17,19
  79:22 80:10,16
  81:1,2,15,16
  81:18 82:17
  83:9 88:13,21
  89:11 90:23
  93:9,10,10,13
  93:16,17,23
  94:24 95:1,4

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

95:14,16,16,25
96:8,14,19,20
96:24 97:16,17
97:21,24 98:1
98:5,7,8,9,14
98:17,19,24
99:13,21,25
100:3,5,7,10
108:13 110:4
117:4,6 144:19
144:22,24
145:1,4,8,14
145:23 146:1
146:11,12,19
147:3 161:21
165:9 166:11
167:6,7,9
177:4 180:23
180:24 181:12
182:11 183:15
185:2,10,14
186:21 189:9
189:10,12
190:11,25
192:14,17
194:3,5 195:24
197:7 224:20
226:5,9 230:20
234:18 235:7
235:16,16,17
235:20,22
238:15 239:4
255:19,22,23
257:4 260:12
260:20 262:17
262:18,21
263:12,12,19
264:4,6 266:23
266:25 269:23
270:4,7,13
285:1 291:10
291:11
**filed** 62:10 96:14
102:1 144:2
147:4 148:25
165:3
**files** 70:23 71:6

185:4 192:15
194:4 260:20
**FileZilla** 100:11
100:14,16
**filing** 122:6
265:18
**fill** 261:4
**filled** 204:15,16
204:18 206:22
208:14 210:24
214:19 221:22
222:7 226:2
227:1,4,6,9
255:3,5 256:1
256:5,21,22
**final** 172:5
210:11 253:6
**find** 38:19 44:11
61:3 83:19
84:1,5,6,21
98:18 99:12,20
119:22 143:16
144:12 155:3
178:12 179:17
179:18,20
197:15,19,23
206:17,19
220:14,20,23
224:1,23 239:6
239:9 240:4
247:22
**finding** 198:1
**fine** 186:2 214:9
247:21 266:7
**finished** 81:17
189:16 194:6
**finishes** 81:9
**fire** 1:7,12 2:11
2:17 8:5,10
91:2,7,10,14
91:16,19 92:7
92:17,20 94:10
94:11 101:25
244:1 261:5,6
263:13
**fires** 101:19
**firm** 17:5 18:5

19:12 148:19
197:8 198:5
**first** 3:18,21
8:25 20:16
35:16 61:7,21
67:24 110:15
111:4,6,14
114:3,8 150:9
150:11 165:5
165:11,12
166:16 170:6
176:4 227:20
233:19 239:9
246:15 249:11
250:7,10,12
281:19
**firsthand** 97:14
**first-party**
114:24
**Fitz** 16:14
**five** 167:13
168:10 170:2,6
202:11 227:24
**fives** 170:4
**five-inch** 167:18
**fix** 203:22
**flood** 4:22,24 5:2
5:5,7 43:7 50:4
50:6 82:7
128:13,24
129:17 151:2
158:22,25
159:4,6,14
160:13,17,18
160:23 161:4
161:13 163:18
180:22,23,25
181:2,10,15,18
181:21,24
182:9 184:13
185:2,9 186:20
189:9,10,12,18
190:13 194:3,4
195:20 196:20
196:24 198:12
198:15 199:3
200:13 201:12

202:17,19
204:10,11,24
207:24 208:23
209:4,6 210:23
213:15,24
214:1,4,5,18
215:10,20
217:14,25
218:3,8 219:4
219:13,15
220:2,6 221:7
221:13,17,25
222:7 223:10
223:14,20
224:2,4,5,7,12
224:22 226:14
230:1 232:7
233:6 235:16
235:17,20,21
236:14,17,21
238:7,15 239:4
239:12,24
240:3,6 241:19
242:1 284:11
**flooding** 104:4
**floodwaters**
151:1 213:8,14
**Florida** 1:15
11:25 106:6,7
106:25 107:2,3
107:4,16,17,25
108:2
**flow** 23:22,25
**focus** 21:1
**focusing** 88:24
**following** 92:22
198:21
**follows** 9:2 76:11
**food** 5:24 168:11
168:16,18
254:21,25
260:1,3
**foot** 167:25,25
206:25 232:1
251:18
**force** 113:9
**forced** 177:5

**foregoing** 292:5
**forever** 67:16
**forgery** 140:16
**forget** 43:8
100:18 115:10
139:3 146:22
**forgot** 28:5
**form** 5:24 7:14
33:11 35:9
36:2 37:17
42:10,21 43:18
45:23 50:21
51:11 53:25
56:20 57:25
78:16 79:18
80:12 85:14
89:5 91:21
92:9,13 94:11
96:5 97:6
99:17 106:12
111:11 112:1
112:16 121:16
122:9 125:13
125:25 130:17
131:4,9 132:1
132:18 135:16
136:15 137:3
137:18 138:12
138:21 142:20
145:16 146:14
149:2 154:23
155:8 160:2
161:1 162:12
176:9 178:18
179:10 206:22
214:8 216:22
217:9 218:11
219:7 220:17
222:4 228:1
229:2 234:2
235:25 238:10
238:14 246:6
252:22 254:21
256:3 263:5
270:2,11 271:3
275:14 280:2
281:9 282:4,21

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 90 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page  308

283:22 284:14
284:22 286:7
286:14 287:8
288:12 290:22
**formalities** 7:9
**format** 93:20
154:1,1 172:13
181:9,11
187:15 226:13
228:21 260:19
264:5
**formatted**
181:10
**formatting**
181:14
**forms** 245:17,18
245:25 269:7
**formula** 216:20
217:14,17,23
**forth** 111:24
139:18 141:25
142:18 144:18
293:8
**forward** 198:9
214:25
**Fouert** 277:25
278:1
**found** 68:9 82:5
103:16 180:20
181:8 224:4
261:8 282:25
285:24
**foundation**
29:12 120:7,8
120:23 131:8
131:11 152:10
205:16 275:16
278:15,18
**foundational**
29:22
**four** 155:14
167:12,19
168:12 191:25
201:17 205:20
206:25 227:16
227:20 244:10
244:11,17

245:2,3
**fourth** 170:1
171:4
**four-digit**
191:21,22
207:10 245:6,7
**four-page** 189:5
243:16 246:15
248:10
**FP7955** 55:17
92:13 281:13
282:14
**FP79552E**
139:15
**frame** 33:17
34:20 41:6
42:17 167:20
**frankly** 229:5
**fraudulent**
219:21
**free** 149:4
**freezer** 168:16
255:1 260:2,3
260:4,4
**Friday** 1:19 20:8
20:21 47:7
48:22
**fridge** 260:3,3,4
**front** 39:11,15
44:24 63:20
64:7,15,18
65:7 72:22
82:6 111:24
114:9 156:21
158:7 167:20
174:19 182:7
190:19 215:6
220:3 246:4
284:20
**full** 70:2 90:18
90:20,22,23,25
91:2,3,7 167:2
171:7 244:2
**function** 61:1
65:12,15,17
67:6,18,22,25
68:17 72:1,13

72:17 73:12
74:3,20,25
75:3,16,16
76:22,22 77:13
77:15,17 80:17
90:8,13 261:10
**functions** 61:9
75:4,11,19,20
76:17,24
103:12
**fund** 140:16
**furnishing**
227:18
**further** 10:7,10
39:3 54:3
105:12 131:8
177:7 179:21
253:17 266:19
**future** 23:20
24:1
**F-O-U-E-R-T**
277:25
**F5** 65:13 75:15
170:10,21,22
**F6** 75:13

---

**G**
**gable** 232:12
**gain** 60:17 84:9
142:8
**gained** 90:7
142:10
**garages** 211:25
**Garrett** 22:7,8
22:10,11,14,16
22:18
**Gary** 241:9
**gas** 168:14 255:2
**gather** 41:16
**gathered** 204:14
**Gaubert** 22:7,9
22:12,16
**general** 43:14
119:1 124:14
**generally** 69:19
69:24
**generated** 4:16

37:10 68:6
79:18 86:22
120:4 169:4
175:7 190:25
223:5 252:12
279:15
**generating** 33:1
65:18 82:25
90:10 262:23
**generation**
85:22 86:4
153:14
**generic** 211:23
211:24
**geographical**
106:9
**getting** 38:6 49:6
62:19 65:19
**Giseleson-2** 3:4
8:14,15 9:3
10:12,16,20,25
11:8,17,21
13:2,13 14:3
16:18 17:24
18:4,20 23:13
24:9 25:9,16
26:5,11 27:1
28:4,6,11,20
29:4,11,24
35:14 36:11
37:12,19 38:4
38:7,17,20
39:17 40:1,10
40:23 42:6,14
43:1 44:6
45:15 46:6,15
46:23 51:2,21
53:2,18 54:6
54:20 56:22
57:3,21 58:12
58:18 64:1,22
66:13,18 67:3
78:3,5,23
80:19 81:7
85:2,9 86:3,14
86:25 89:12
91:23 92:3,5

92:14 96:6,11
96:22 97:3,12
99:2,7,23
106:19 109:7
109:25 111:13
112:9,21 113:3
113:12 114:18
115:9,14 116:8
117:21,25
118:18 119:16
120:10 121:3
121:11,19
122:15 123:3
123:17 124:8
124:23 125:19
126:9,24 127:6
127:15 128:5
129:3,8 130:1
130:12,24
131:14 132:6
132:21 133:17
134:2,9,17,24
136:2,9,17
137:12,25
138:15 139:2,9
140:19 141:8
141:14,22
142:15 143:1
144:1,10 146:6
146:21 149:8
149:24 152:20
151:1,17 156:1
156:7,13,19,25
158:2,6,20
160:11 161:6
162:22 163:25
166:22 167:4
169:19 170:5
175:17 176:2
176:21 177:14
177:22 178:20
179:16 180:6
180:15 185:6
185:11,17,19
186:1,10,15
187:5,10
188:14,19

Case 2:06-cv-08262-LMA-ALC     Document 260-2     Filed 01/15/2010     Page 91 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page  309

191:3 192:25
193:8,16
194:18,22
198:10,17,24
199:6,12 200:1
201:16,24
202:3 204:2,7
205:21 206:5
207:11,16
210:12,17
214:14 215:13
215:18 217:3
217:12,18,20
218:16 219:1
219:10,19
220:1,22 221:6
221:11 225:19
225:24 228:4
228:19 230:9
230:14,21
231:1 233:20
234:11,14,21
235:1 236:4
237:13,20
238:19 242:17
242:24 243:3
243:14 246:18
246:23 250:4
250:24 251:3
253:8 254:10
254:15 256:11
256:16 257:8
257:13,23
258:3,9,14,20
259:1,10,15,23
260:9 263:23
264:3 265:6,15
265:21 266:6
267:1 268:11
268:18 269:11
269:16 270:5
270:22 271:6
271:14,23
272:7,14 273:5
273:18 274:25
275:4,25 276:9
276:18 279:3

279:22 280:9
281:15 282:11
282:23 283:14
284:4,17 285:3
285:17 286:9
286:15 287:3
287:15 288:5
288:18 289:1,9
289:17,25
290:9 291:5,13
**give** 9:18 15:18
61:17 70:2
80:17 81:25
120:6 147:8,12
171:9 199:10
199:20 238:22
247:19 265:25
**given** 15:20
16:21 127:7
150:16 177:3
191:21 213:18
287:25 288:7
288:19
**gives** 147:5
253:15
**giving** 142:4
190:20,20
288:13
**Glendale** 157:17
**go** 11:15 12:9,19
12:24 23:18
25:22 40:4
41:22 45:10
57:14 58:1
64:16 78:11,12
79:25 85:5
89:7 98:20
99:15 100:18
103:13 109:9
109:16 112:1
116:1 118:19
119:7 122:20
125:14,21
127:25 143:20
148:22 152:12
154:24 158:12
176:13 178:19

179:12,20
180:16 197:20
197:21 208:25
218:20 236:1
238:11 239:9
253:2 261:16
269:5 275:18
278:17,19
283:7 284:23
289:23 290:12
**goes** 10:7,10
11:6 127:16,21
275:18
**going** 12:18,21
13:3,11,23
14:14 23:18,22
29:17 32:7
37:9 40:22
54:2 59:1
98:13 102:23
113:10 115:10
119:18 120:8
124:15 125:6
141:7 144:18
149:25 152:7
156:17 158:3
170:9 172:12
174:23,25
180:18 182:6
187:6 201:1
209:17 230:22
248:8,13
254:11 258:24
259:2 263:15
279:18 281:3
286:6,23 287:2
287:16
**good** 58:9
127:24 141:24
155:15 239:14
**gotten** 174:24
232:3
**government**
219:14,22
220:4,10
234:16,19
**graduated** 101:1

101:8
**graduation**
101:13
**grant** 275:15
**graph** 271:25
**great** 287:25
**greater** 21:13
22:5 33:16
34:9
**ground** 33:7
39:8
**group** 105:1
**Guerry** 241:1
**guess** 180:21
188:24 192:4
196:1 241:24
**guidance** 116:24
116:25 143:3
**guide** 50:16 52:7
52:8 110:15
112:12 114:7
114:22
**guideline** 52:3
113:21 116:15
**guidelines** 50:18
110:6 113:15
114:4,13,23
289:11 290:18
**guides** 51:1
112:4,5,6,7
**gutter** 167:19
250:20 251:13
**gutters** 161:20
163:23
**G-U-E-R-R-Y**
241:1

---

**H**
**H** 191:25
**habitually** 219:3
**hail** 104:4
**half** 216:12
**Hammond** 34:9
278:25
**hand** 81:11
186:5 189:5
222:12,13,16

222:19
**handed** 150:1
201:18 207:17
274:17
**handing** 158:9
186:7 207:19
226:1 274:16
**handle** 104:9
108:6 115:5
122:2 123:14
124:6 126:5
162:17 177:4,5
239:21 265:3
**handled** 88:17
102:20 122:24
154:14 161:23
162:5 206:21
239:20 273:24
283:16
**handlers** 77:11
**handles** 91:17
**handling** 4:2
23:20 58:6
81:18 104:3
114:23 116:19
117:1 120:3,24
131:20 133:10
135:7,21 137:9
151:14 152:9
159:18,20
161:22 163:24
194:6 204:14
218:23 226:13
239:12 240:2
263:5,8,9,13
263:22 264:7
270:20 279:2
290:25
**hands** 159:21
**handwrite**
190:16
**handwriting**
71:14 167:12
223:16
**handwritten** 6:4
189:23 190:1
208:9 223:4

257:15
**happen** 70:9
108:1 145:3
**happened** 103:7
104:18 224:8
256:9
**happy** 119:5
192:11
**hard** 59:20
70:11
**Hardin** 19:10
**Harry** 191:25
**haul** 249:12
**head** 241:22
**hear** 48:3 164:22
175:15
**heard** 252:17
279:25 280:7
280:12
**hearing** 14:21
16:4,21 190:23
**height** 205:18
**held** 119:12
156:24 169:18
206:1 279:21
**help** 52:9 72:3
194:16
**helped** 153:11
153:21
**Henry** 2:15 8:20
8:21
**hereinabove**
293:8
**hereto** 7:3
293:16
**HERMAN** 2:3,3
**hierarchy**
147:23,25
195:15,16
**hires** 244:23
**hiring** 136:12
**history** 65:23
73:11,13,20,22
73:24 74:2
101:6
**hit** 77:15
**hold** 212:13

254:17
**home** 164:16,17
213:19,23
**homeowner**
238:7
**homeowners**
5:18 43:7
49:25 50:2
51:4 55:17
71:22 91:15,17
91:19 92:7,13
102:21 128:23
129:16 161:7,9
161:12 162:8
163:1 180:24
181:3,12,19
182:11 185:2
190:12 213:7
218:9 219:5
223:19,22
224:3,22
227:23 228:8
228:15 235:16
235:22 237:9
238:4 241:20
242:1 243:22
280:23 281:12
281:13 282:7
285:13
**homeowners's**
51:9 229:21
269:6
**Homeowners-...**
223:18
**honestly** 286:16
**Hood** 276:25
277:1
**hoped** 278:18
**hoping** 259:13
**hotel** 70:20
168:9,17,18
169:1
**hours** 109:11
**house** 12:3
108:20,22
135:24 148:17
212:4,6,8,9,11

212:16,24
213:5,6,9
233:2,4 273:14
**housed** 106:4
276:12
**Houston** 96:24
**HO-W** 237:6
**hundred** 105:16
168:8,12,15,16
168:17,17
202:11 210:5
222:1,2 237:2
**hurricane** 17:14
21:8 22:4,21
25:3,12 53:6
59:21 60:18
78:8 79:15
88:11 104:5
108:9,10 111:9
112:13 114:11
123:1,6 125:5
125:8,16 145:2
153:8 159:16
190:6 202:24
219:5 223:24
229:22 264:8
271:1,9,18
272:2,24
273:12 275:12
277:3,4,15,17
283:18,19
284:5,10
**hybrid** 59:23

————————
**I**
————————
**ice** 104:5
**Icon** 262:12
**ID** 147:13 245:6
245:7
**idea** 100:12
173:24 183:3
246:25
**identifiable**
227:17
**identification**
13:6,19 14:2
115:13 139:13

149:23 186:9
187:9 188:18
201:21 204:6
207:15 210:16
215:17 221:10
225:23 230:25
234:25 242:21
246:22 254:14
256:15 257:12
258:17 264:2
268:14 269:15
275:3 289:21
**identified** 25:20
31:9 61:13
67:20,23 72:14
72:22 74:3
116:10,11
118:6 220:3
242:4 245:10
246:13 257:16
**identifier** 191:22
191:22
**identifiers**
222:10,17
**identifies** 172:25
216:6,11
**identify** 8:12
73:1 74:25
110:8,10,12
117:23 139:3
149:19,25
180:19 182:13
184:18 186:3
186:17,22
187:6 189:6
202:7 204:8
207:21 210:20
231:3 235:2
236:21 243:19
244:15 246:19
246:24 248:14
249:9 254:16
255:9 256:18
264:14 267:3
267:25 274:20
277:8 281:19
**identifying**

185:21 191:11
191:24 245:4
260:23
**II** 1:18 2:10
**Illinois** 19:3
151:18 153:3
241:10 276:12
**IM** 209:7
**image** 6:9
265:19 266:20
267:23
**imaged** 70:3
79:17 226:8
266:23,24
**imagery** 160:8
**images** 65:19
68:8,9,10 69:4
69:17,20 71:13
71:16 82:19
94:22 167:10
255:23 264:19
264:21
**imagine** 255:17
**impact** 271:9
**implied** 161:17
**implies** 22:1
203:20
**imply** 222:3
250:7
**impossible** 51:23
260:5
**improper** 287:9
287:11
**inappropriate**
287:23
**inches** 205:20
206:25
**include** 29:7
55:1 61:18
87:12 94:4,6,8
178:9
**included** 102:25
148:1 172:4,7
173:12,14
198:15 252:19
253:6,13
**includes** 39:8

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 311

including 44:8
104:3 147:16
147:17,18
249:25
inclusion 150:24
inclusive 22:23
61:18 63:17
115:4
incoming 68:13
increase 30:23
31:1,11,18
219:14
increasing 30:16
incurred 140:13
290:15
independent
34:15 35:5
45:17 126:20
155:22 177:3
190:4 197:5
198:4 200:11
200:23,25
201:3,9 244:24
244:24 245:8
index 3:2,8 4:8
4:10 182:25
indicate 236:16
249:21 292:20
indicated 110:2
indicates 76:14
224:17
indicating 72:5
79:7 85:3
113:4
indication 79:9
193:22
indicators
194:10
individual
147:15 191:20
221:5
individually
199:23
individuals
77:10 276:22
industry 217:5
217:11

inform 197:12
information
26:25 31:22,23
32:6,11,20,21
32:25 33:7,10
33:11,12,14
34:7,23 35:23
36:18 37:3,7
38:18 39:5,6,8
39:13 41:16
43:19 44:13,14
44:15,21 45:6
51:25 52:1
55:23 56:8,9
56:14 57:10,18
57:19 58:20,22
60:22 61:12
62:8,11,18
63:20 64:15
68:3,5,8,11
72:16 73:10
74:7 75:12,22
84:6,8,10,11
84:12,14 87:13
87:23 88:4,7
88:14,15 89:1
89:9 90:2,4,7
90:19 93:2,7
111:19 133:12
144:15 147:9
147:12,14
154:16 159:9
160:9 171:10
179:21 181:21
182:22 186:25
187:4 189:11
189:19 198:9
199:10,21,22
204:14 215:10
220:5 223:21
231:22 232:3,4
232:5,9,13,18
232:19,21
233:7,8,12,14
235:21,22
236:17 238:8
260:23,24

261:3,8,19
initial 62:18
63:11 66:2
155:22 189:13
192:24
initially 153:24
163:9
inquiry 12:21
14:8 24:15
121:5
INS 208:1,2
insisted 161:18
163:21 165:13
inspect 124:18
160:15 162:9
164:3,4 165:6
inspected 108:19
108:21 131:16
131:18 135:3,6
155:19 166:4
166:13 173:18
173:19,23
174:1 231:8,10
231:12,15,15
231:16 254:25
inspection 77:9
130:13,18,20
130:20 131:1
155:22 160:20
161:5,8,10,11
161:19,24
162:2,19,21
163:22 165:10
165:13,16,21
166:2,7 175:6
inspections
103:1
inspector 164:3
installer 252:16
instruct 23:23
35:13 133:25
136:16 138:14
286:8
instructing
283:17 286:17
287:10 288:16
instruction

121:2 133:20
134:8,12,16,23
141:13 219:18
219:25 253:17
265:4 271:13
271:22 272:6
272:13 273:4
276:5 278:14
278:16 283:15
288:25 289:8
289:16
instructions
134:4 262:17
262:22 265:2
insurance 6:17
49:22,24 54:8
54:11 55:2,3
73:25 101:17
101:17,22
102:2,2 127:9
134:20 139:23
140:22 204:25
269:19,21
283:3,11
284:19 286:19
287:13,19
289:19
insured 16:8
60:23 121:13
125:1 139:20
150:25 161:18
161:19 162:1
163:21,22
164:15 165:13
208:3 209:9,12
210:6 213:6
227:7 261:18
270:18
insureds 68:2
123:14 134:11
136:25 203:1,1
221:19 227:2
232:22 284:9
289:4
insured's 61:2
125:22 161:24
165:9 203:17

229:10 238:7
269:4
interaction 39:9
interest 204:1
interested
293:17
interests 139:20
internal 67:11
67:15 77:21
148:3,8,20
218:4
interpret 286:6
286:11 287:12
interpretation
171:8 181:14
286:24 287:13
interpretations
142:13
interpreted
148:2
interrogatory
121:4
interview 231:24
232:7,10,17
233:8
inventory 5:24
94:17 140:2,5
140:9,11
254:21
invite 120:25
invited 48:22
invoked 270:7
involved 139:21
152:2,5,17
263:10 273:9
276:13
involvement
199:14,17
273:7 279:1
in-house 18:9,10
18:24
issuance 159:11
issue 68:1
105:11 194:3
229:8,17
288:15 289:12
issued 4:19

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 312

23:10 193:25
194:2 202:9,15
203:13 210:6
224:18 253:7
**issues** 23:2
112:13 170:13
272:24 288:21
**issuing** 210:1,3
223:25
**item** 70:3,5,5
172:24 173:5,8
249:11 252:1
**items** 31:9 32:14
32:15,17,19
43:10 58:4,5
61:6 64:9
101:18,18,19
173:6,7 181:15
206:8 227:17
227:19 249:1,6
249:10 264:19
264:21
**iteration** 111:1
111:18

**J**

**Jacksonville**
106:5,6,7,25
107:2,16
**January** 269:1
**Jay** 17:19 18:21
19:6,13
**JEANNE** 1:5
**Jeannie** 4:19
202:10 268:4
**Jennifer** 168:13
**Jersey** 274:10
**Jim** 277:18,19
278:1
**job** 39:20 102:12
102:14 103:12
105:20 148:19
148:21
**Joe** 19:8,9,14
20:13
**John** 1:14,15
2:15 8:21,24

11:25 167:1
277:25 278:1
292:15
**Johnathan**
166:17 244:8
245:12 256:23
**joining** 101:14
**judge** 16:1
198:11
**judgment** 3:16
13:23 198:19
**July** 101:11,12
102:8 103:5
**jump** 213:12
**June** 13:24
198:25

**K**

**Katrina** 17:14
21:9,16 22:4
22:21 25:3,12
53:6,23 59:21
60:18 78:9
79:15 88:12
108:9,11 111:9
111:18 112:11
112:13 113:21
114:11 123:1,7
125:5,8,16
145:2 153:9
154:8 155:5
159:16,25
190:6 202:24
219:5 223:24
229:23 264:8
268:7 271:1,9
271:17,18
272:3,24
273:12 275:12
277:4,15,17
278:4,11
283:19 284:6
284:10
**Katrinas** 277:3
**KATZ** 2:3
**keep** 30:24 31:1
31:10 33:9

124:15
**keeping** 30:17
**keeps** 38:18
**kept** 15:22
**key** 65:12,17
67:25 72:17
75:17,24 76:2
77:13,15 196:2
**keys** 65:15 67:6
67:18,22 74:20
74:25 75:3
77:17
**kicked** 82:6
**kind** 22:1 68:8
104:8 114:19
114:19 183:13
203:11 211:18
270:24
**Kinko's** 78:13
**knew** 45:20 46:4
46:4 171:10
224:5
**knocked** 280:25
**know** 12:18
15:11,15 16:7
17:5 18:5,8,12
21:15 22:6
23:14 24:16
27:25 28:14,25
35:22 36:17
37:13,20 38:8
39:13 42:2,8
42:12,16,22,25
43:15 45:8
46:3,4,7,8,9
47:4,15 48:2
48:10,15,17,23
49:1 58:14
60:7,8 61:17
66:14 67:14
70:1 71:7,17
74:22 75:15
79:4 82:21
83:9,11,16
85:25 88:1
95:22 96:2,23
97:13 101:20

109:11 113:16
116:18,24
118:4 122:13
143:15 149:4,7
149:9,10,11,13
152:1,4,12
153:1,13 154:6
154:11,15,18
155:15,20
157:14,25
162:20 165:19
165:20,20
166:9 167:10
168:2 171:2,7
172:15 176:18
177:10,19
178:2,4,7,15
178:21,24,25
179:2,3,5,6,12
179:14 183:10
184:21 186:4
187:11,15,19
190:3,17 192:4
192:6,7 194:12
194:24 195:2,5
195:8,11 196:6
196:17 197:7
198:15 201:2,5
201:7,8,14
204:16,18,23
205:8 206:11
206:14 207:4,8
208:12 213:1,8
220:12,18
221:21 222:13
223:3,6,8,23
226:4,19,23
227:8,13
229:11,21
230:17 233:22
234:8,20 235:9
235:10,11,13
235:15,18
236:11 237:24
238:1,5,13
239:1,3 240:1
240:7 241:17

247:9 254:22
255:3,15,24
256:9,21 257:5
270:23 273:19
274:15 278:22
279:1 287:16
**knowledge**
95:22 97:14
139:19 206:11
**knowledgeable**
14:7
**known** 100:14
**knows** 29:22

**L**

**L** 7:1
**labeled** 267:10
267:11,17,23
**labor** 275:10
**Lake** 1:18
**LAKEWAY**
2:10
**landfall** 272:3
**Lane** 1:15 11:24
**LANO5F5D3**
169:22
**Lapinskie** 1:14
8:6,24 9:4
11:23 67:4
110:1,13
119:17 158:21
180:16 206:6
228:6 237:15
237:21 243:15
250:19 251:2,4
260:1 269:17
287:18 292:15
**laptop** 70:13,14
70:16,19,22
80:1
**large** 104:6
**latitude** 213:18
247:19 264:16
275:15 280:4
**law** 7:8 133:19
134:6 138:10
140:24,25

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 313

141:3,10,18
142:18 281:6
**lawsuit** 122:6
**lawyer** 141:6
**lay** 29:12,18
120:6,23
123:25 131:11
141:21
**laying** 275:16
**layperson** 142:4
142:22
**lead** 244:14
**leads** 48:6
**leave** 266:1,4
**leeway** 51:12,14
152:10 287:25
**left** 117:17
174:22 195:1
246:5
**left-hand** 110:17
182:24 183:6
192:2 216:4
223:1 231:23
**legal** 2:21 123:9
123:25 127:2,4
132:11,11,13
132:19 133:15
135:20 136:4
137:8 141:6,21
142:4 280:25
286:24
**legible** 257:17
**letter** 93:24 94:3
244:11
**letters** 94:1
170:25 196:8
196:10 197:10
244:11
**let's** 11:18 13:14
55:24 64:15
68:15 77:22
109:16 126:11
196:19 205:22
289:23
**level** 275:22
**levels** 176:20
178:5,8

**license** 28:22
**licensed** 29:2,5
**lienholder**
203:10,25
**lifespan** 217:6
**likelihood**
196:13
**Lillie** 18:25 19:1
20:13
**limit** 71:5
142:16 213:10
218:17 242:4
**limitation**
218:14
**limitations**
232:24,25
**limited** 25:7
26:10 113:1
188:10
**limiting** 39:25
86:12,15 214:9
218:13
**limits** 211:11
212:21 213:2
217:25 237:9
241:19,25
242:9 289:10
**Lincoln** 12:10,11
**line** 52:23
119:25 144:5
172:24 173:5,6
173:7,8 174:25
208:24 210:7
252:1,3
**lines** 4:15 173:17
191:17 209:2
236:13 237:1,5
250:10
**list** 5:10 6:9
22:23 26:4
27:5,6,7 29:7
30:11,12,13,19
30:21,25 31:4
37:5 40:7,9,20
45:3 46:21
61:18 68:20
94:17 169:16

169:20 171:8
171:14 227:22
228:3,16,21
230:23 249:14
249:21 250:17
252:9 265:16
265:19 266:20
**listed** 161:17
171:14
**lists** 30:2,6,8
55:19 71:22
245:17
**litigation** 95:8
95:14 96:1,21
119:2 120:5
**little** 20:1 29:18
95:18 162:23
**live** 12:5 47:9
**lived** 47:10
**lives** 47:13
**living** 94:18
140:12 285:22
287:1
**LLC** 1:17 2:8
8:7
**LLP** 2:14
**loaded** 83:10,20
84:19,19 85:23
**local** 34:12
**located** 8:7
18:12 19:1
47:5 61:12
108:1 147:6
148:14,16
151:15,16,17
153:1 157:15
169:11 241:8
248:1 272:16
274:8
**location** 269:3
273:21 274:3
**log** 4:15,16,16
52:14 60:16
61:3 64:16,17
64:18,20,24
65:1,2,3,9,14
75:7,7,13 76:3

76:4,5,6,8,9,11
76:12,14 79:25
80:2,5,7 144:7
156:8 161:14
161:18 163:10
163:11 166:12
175:23 176:1
190:12,14
193:4,12 222:2
224:16 246:11
247:17,18
263:11
**logged** 60:19
**logs** 189:13,13
193:5,15
261:23 262:7,8
263:18
**long** 12:1 87:1
103:2 104:10
105:17 156:4,5
**longer** 20:23
23:5
**long-winded**
267:24
**look** 11:16 12:24
49:23 50:2,6
50:10 68:19
69:8,10 71:21
72:3 73:9,15
74:12 83:23
95:24 110:7
118:20 119:5
143:8 181:17
182:17 184:8
197:18 202:4
214:24 215:1
224:23 229:7
259:8 265:7
289:18,24
290:19
**looked** 33:15
43:5 49:2,6
50:4 69:5 83:5
97:23 100:3
133:18
**looking** 10:8,13
12:14 44:18,21

45:2,4 46:7,9
46:20,21,22
82:13,18 132:4
192:20 193:5,9
212:2 214:16
214:22 222:25
225:11 226:1
247:18 257:17
**looks** 132:8
168:9,14 194:9
205:19 260:18
274:18
**loss** 5:2,7,24
53:17 63:16
65:23,23,25
66:1 73:11,13
73:20 74:4,12
74:18 75:25
82:3,5 94:8,13
102:24 103:13
126:13,17,19
126:21 127:3,5
127:8 128:7,11
128:15,19,22
129:14 130:11
130:14,22
131:2,17,24
132:5,8,15,16
132:24 133:1,5
133:15 134:21
135:2,9,12,19
136:4,12,24
137:7,16,23
138:3,4,9,18
139:1,17,18,20
139:23 140:8
140:14,18,20
159:7,9 165:17
175:2,25
208:23 209:4,6
210:23 214:18
215:5,8,15
221:13,17,19
229:19,22
230:1 232:7
246:8 254:21
261:21,22

Case 2:06-cv-08262-LMA-ALC     Document 260-2     Filed 01/15/2010     Page 96 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 314

262:9,9 281:23
285:23 290:17
losses 114:25,25
116:3 128:4,10
150:24 270:18
lost 52:10 101:25
lot 50:17 52:1
82:4 184:16
192:15
Lou 240:9,13,18
240:24,25,25
Louisiana 1:3,18
2:5,10,16 5:15
7:5,24 8:9 21:6
21:10 23:6,16
24:12,19,21
97:18 107:6,7
132:14 133:19
134:6,14,18
138:10 140:24
140:25 141:3
141:10,17,25
142:18 153:8
154:9 169:1,24
178:23 235:4
239:7 281:5
284:9 293:5
lower 32:12
34:13 35:24
36:19 37:22
38:10,23 39:19
39:22 40:13,14
40:15,22 43:15
74:8,17 219:3
245:16 249:16
249:20 250:5
250:15 255:12
lowered 34:19
249:2,7
lowering 30:16
Luling 5:21
248:4,6 273:25
274:2
lunch 109:12,14
158:17
L199 76:15
L825 193:19

**M**

M 1:6
Madam 28:7
36:12 57:4
99:9
mail 82:8 267:20
mailing 82:10
157:16
maintain 15:8
15:12,16 58:24
98:13
maintained
59:19 60:3,5
89:3 93:19
94:24 95:3,20
180:23 187:1
188:7 194:4
289:11
maintaining
100:14
maintains 15:13
196:2
major 63:17,21
making 289:3
management
90:6
manager 104:20
104:21,25
105:1,6,8,14
105:18,19,21
107:9 108:11
153:25 240:13
240:14 241:4,5
274:4,6 277:12
278:8
manually 76:15
mapped 271:16
March 103:5,7,8
117:18 139:4
139:10 207:22
mark 20:3,4,5,7
20:10,11,17,18
20:23 21:4,7,9
21:11,15,22
22:20 24:24
25:2,11,17,24
26:17 31:20,24

31:25 32:6
34:14,21,23
35:15,18 36:10
39:10,13,18
40:12,13,17,24
40:25 41:3,4
41:15,20 42:4
42:7,16,24
43:13 44:16,17
44:23 45:1,7
45:12,19 46:2
48:4,8,10
115:10 146:22
146:24 174:23
204:3 266:1
marked 13:5,18
14:1 115:12
139:12 149:22
175:1 186:8
187:8 188:17
201:20 202:8
204:5,9 207:14
207:22 210:15
210:21 215:16
221:9 225:22
230:24 234:24
235:3 242:20
243:21 246:21
248:15 254:13
254:20 256:14
257:11 258:16
264:1 267:19
268:13 269:14
275:2 289:20
marking 13:1
Mary 240:9,24
master 194:5
match 196:10
matches 196:13
material 44:9
154:12
materials 37:6
154:7 275:10
math 241:21
matter 48:13
145:5 172:11
293:18

max 213:15
maxing 214:4
McInery 18:2,5
mean 26:6 33:4
46:13 50:14
56:20 64:20
71:3 80:25
84:25 85:16
90:9 95:19
98:23 99:24
120:20 127:9
155:11 159:5
170:12 176:10
176:11,12
177:13 179:11
183:10 196:8
205:6 208:4,22
209:3,7,11,15
216:24 225:5
228:2 230:8
237:11 245:11
251:21 252:6
252:23 273:19
meaning 170:16
171:7
means 124:25
126:21 138:10
138:18 170:21
171:3 172:23
187:20 192:7
194:13 195:3,9
195:12 205:15
209:17,19,21
210:10 252:19
280:15
meant 250:23
measure 275:22
meet 125:7
137:22 138:6
meets 133:14
135:8
member 104:1
memo 153:6,11
Memorandum
4:2
memory 170:9
201:2

mentioned 19:18
67:19,24 68:7
message 94:10
94:11
Metairie 1:18
2:10,16 8:8
method 197:25
293:10
Metropolitan
34:19 41:6
53:8 271:10,17
272:2 275:11
Mexico 106:21
middle 55:16
226:17
midway 150:25
Mike 152:18,21
153:2,4,7,17
276:10,11,21
277:9,11
mine 265:13
minor 259:20
minute 14:18
19:18 87:10,22
115:17 197:11
261:10
minutes 58:10
58:11 109:14
118:20 180:5
243:2
mirrors 193:19
misprint 223:9
misread 259:19
missing 12:16,17
56:5 59:12,17
missing/dama...
167:17
misspoke 230:7
MJB 255:13,15
money 136:19
140:17 159:21
215:2 229:10
month 199:1,2
months 12:9
Morse 157:13,14
179:23,25
mortgage

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al

1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

203:15
mortgagee 208:6
209:9 210:7
move 233:2
287:16
moved 12:3
161:21 163:24
165:9 263:12
moving 110:3
263:12
MTG 208:4
multipage 225:2
multiple-part
129:7 130:5
multitask 11:20
mystery 192:10
M-C-I-N-E-R-Y
18:3

## N

N 1:17 2:9 7:1
name 16:7,9
17:6,20 19:11
19:24 20:3
22:8 27:15,16
60:6,8,10 61:2
61:20,21 63:15
67:11,12,15,15
67:16 143:15
147:4,13 148:7
151:19 152:4
155:18,23
166:16,18
167:3 174:20
176:3,4 189:23
190:7,16 192:2
192:8 195:21
203:15 221:4
222:20 240:10
244:8,11
245:10 246:7
269:4 277:7
names 17:15
20:2 62:15
152:1 153:20
narrow 53:3
nature 93:19

navigate 64:3
near 172:17
nearest 78:13
Nebraska 12:11
12:12
necessarily
147:7 233:1
necessary 234:5
Necho 187:19,21
187:23,24
188:6,9
need 13:9 30:5
52:19 58:13
70:25 71:6
143:17 147:20
148:5 159:24
160:6 163:2
180:19,22
205:17 229:21
247:5 265:5
287:21
needed 56:10
58:6 133:12
208:14,16
229:16 290:17
290:20 291:3
needs 125:21
161:20 163:23
210:2
neither 93:8
178:1
network 70:8
never 99:25
117:11 136:24
146:10 155:24
231:10 291:8
new 2:5 21:13
22:5 32:22
33:16 34:19
41:5 53:7
70:17 169:24
170:13,14,14
270:25 271:10
271:17 272:1
272:10,16,25
274:10,10
275:11 277:14

NFIP 159:16,19
159:24 181:16
181:23,25
182:3,5 196:21
205:8,13
206:24 213:18
214:3 215:4,7
215:9 220:13
220:15,18,24
229:15 230:10
230:11,16,20
nineteen 168:17
168:20
ninety 249:20
ninety-eight
237:2 242:8
NN 195:17,24
197:11
North 2:15 8:8
106:20
Nos 43:6
notation 167:24
notations 168:3
note 13:11 23:22
24:2 52:14,22
57:13 86:10
124:14 152:13
161:14 163:10
163:12 171:24
174:9 175:23
182:9 190:12
190:14 222:2
224:16 238:16
258:23 263:11
267:14 269:1
280:2 282:8
noted 26:16
81:13 82:2,9
82:10 234:9
notes 4:16 6:4
65:4 76:20,21
80:1 94:19
166:7,7,10,12
166:15 189:14
254:25 257:15
257:21,22
258:2,6,8

289:18,24
notice 3:12,14
9:21,24 10:15
12:19 13:15
27:24 35:11
52:24 142:7
164:25 184:10
noticed 56:6
164:20
notices 12:14
November 10:19
10:23 169:6
Nowlin 1:8
183:16
Nowlin's 183:15
number 15:19
45:11 61:2,2
61:19,20,22,23
62:22 63:16
73:2 81:22
110:10 149:20
159:17 169:8
172:5,12 181:1
190:21 191:24
206:7 213:4
236:20,22
237:8,24 238:1
238:4 241:14
241:16,18
242:13 244:15
262:25
numbered
246:12
numbering
167:13
numbers 68:20
206:8,12,14,18
207:4 242:15

## O

O 6:14 7:1 275:7
oath 7:25 42:11
object 35:9 36:2
37:17 42:10
43:18 45:23
50:21 51:11
53:25 56:20

78:16 80:12
85:14 89:5
91:21 92:9
96:5,17 97:6
99:17 106:12
111:11 112:1
112:16 119:2
121:4,10,16
122:9 123:9
125:13,25
127:12 129:6
130:4,17 131:4
131:9 132:1,18
133:23 135:16
137:3,18
138:12,21
142:20 144:5
145:16 146:14
149:2 154:23
155:8 160:2
161:1 162:12
176:9 178:18
179:10 214:8
216:22 217:9
218:11 219:7
220:17 228:1
229:2 234:2
235:25 238:10
252:22 270:2
270:11 271:3
281:9 282:4,20
283:22 284:14
284:22 286:7
286:14 288:12
290:22
objection 23:8
23:18,22 24:3
25:6,14 27:22
28:24 33:21
36:23 38:13
39:1 41:24
42:20 51:12
52:23 53:10
54:16 56:17
57:13,25 86:10
86:11 118:24
119:24 121:1

123:24 124:15
133:7 134:8,16
134:23 136:7
136:14,14
138:13 141:5
141:20 142:2
144:4 152:8,13
219:17,24
271:12,21
272:5,12 273:3
275:14,19
276:4 278:13
280:2 282:2
285:7 288:24
289:7,15
**objections** 7:13
37:25 119:5
141:12
**Obviously**
183:25
**occupancy**
139:24
**occur** 224:24
**occurred** 48:24
**occurring** 227:5
**October** 12:4
164:2 165:4,8
193:23 231:9
238:17
**office** 5:21 8:6
33:19 77:6,7
78:22 197:22
239:14 247:17
247:24,24,25
248:3,4,6,7
273:11,13,25
274:1,2 278:25
**officed** 273:21
**offices** 1:16
32:22 37:8
104:7 151:17
277:13
**official** 67:15
240:20
**officiated** 7:24
**off-the-record**
119:11 156:23

169:17 205:25
279:20
**OG** 3:18,21
50:13,13,15
110:14 111:4
111:15 112:12
115:2 116:5,7
116:9,11,13,18
139:4
**OGs** 50:10,11,12
115:15,17
116:14,22
118:14
**OG7501** 114:3
115:11 117:17
119:20 120:1
**oh** 162:25
190:19 194:21
199:5,5,5
201:4 209:19
225:13 247:7
268:16
**okay** 23:23
28:12 32:11
41:20 44:17
51:3 59:10
62:17 63:1,19
64:5,14 66:9
72:6 73:4
74:19 75:5,14
75:18 81:15
87:19 88:3,10
88:24 89:1,23
91:14 105:22
114:2 118:17
118:21 150:9
151:5 153:19
169:15 175:20
175:24 177:2
177:17 185:7
185:18 186:22
187:11 188:13
193:17 196:15
202:2 212:12
214:3,21
221:21 225:18
227:13 236:12

236:24 238:5
242:3 250:11
268:22 269:10
269:12 290:1
**once** 9:5 30:19
30:25 41:18
82:24 87:15,15
142:8 194:3,5
261:12 262:2
**ones** 74:21
200:17
**one-ninety**
250:14,15
**one-page** 225:1
275:6
**onset** 95:20
**open** 9:6 15:25
44:24 77:8
120:22
**opened** 52:13,15
**operating** 52:3
113:14,21
**operation** 50:16
50:18,25 52:6
110:14 112:4,4
114:7,22
**operational**
105:3 110:5
**operations** 106:5
**opinion** 138:2
141:7,21 142:5
150:19
**opportunity**
120:6
**opposed** 79:10
**option** 30:15
**options** 55:19
61:15 71:23
**orange** 55:22
**order** 23:10 24:4
27:23 35:12
42:1 43:5 53:1
60:23 77:14
120:18 133:25
149:3 162:13
182:8 184:2
198:25 206:17

209:25 214:11
219:8,14
229:17 284:15
287:10 288:1
291:4
**ordered** 54:5
198:11
**orders** 288:14
**original** 96:19
96:20 97:23
99:25 100:3,6
100:10 258:2
259:9
**originate** 30:8
**originated** 94:21
95:11 98:10
239:2,3
**origins** 98:17
**Orleans** 1:2 2:5
21:13 22:5
32:22 33:16
34:19 41:5
53:7 70:17
169:24 270:25
271:10,17
272:1,10,16,25
275:11 277:14
**outcome** 57:20
218:2 293:17
**outgoing** 68:12
**outline** 138:25
253:15
**outlined** 14:11
132:12 138:5,5
**outlines** 76:12
139:16 253:15
**outlining** 154:12
166:12
**outlook** 147:1,5
148:9 197:25
**outside** 127:9
128:22 129:14
198:2,3 200:11
291:3
**overcomplicat...**
229:7
**overhead** 233:23

234:4,9
**overlooked**
214:17
**oversee** 105:5
**oversight** 277:13
**owe** 125:1
**owes** 121:13,23
123:5,18,21
124:10 134:11
**ownership** 27:19
28:17
**O'KEEFE** 2:4

———————
**P**
**P** 7:1 151:10,16
191:25
**page** 3:3,9 6:12
11:5 12:16,17
12:22 74:14,16
139:15 150:22
150:25 168:5
169:14 171:24
172:1 190:16
191:10,11,11
191:12 207:5
227:10 238:18
246:12,15
253:24 254:3
255:2 268:3,5
268:24
**pages** 13:11
187:12 188:15
201:17 225:8
231:23 233:14
233:18 246:11
247:8,9,10
**paid** 134:19
136:18 173:2
173:10 174:19
175:5 200:21
216:17 239:23
240:5 275:10
279:8 289:4
291:1
**panel** 167:20
**paper** 59:23 60:1
64:12 66:12

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

68:11 69:14
79:18 81:6
82:16,17 88:14
88:18,23 93:10
93:15,20,22,22
94:4,5,7,11,21
94:23,25 95:4
95:16,20,21,24
96:8,15,24
97:16,17,21,24
97:25 98:5,6,7
98:9,19 99:13
99:21,25 100:3
100:6,10
146:12 153:25
167:7,8 169:12
181:7 190:25
194:4,5 204:12
255:22 262:23
PARISH 1:2
part 7:17 17:10
41:10 54:25
68:14 73:6
81:16,17 82:24
93:17 96:14
102:25 103:22
106:1 150:19
163:11 167:6,8
185:25 186:20
187:25 189:9
189:10 211:14
225:15,16
235:15,17
255:18 263:3
263:19 265:10
participated
16:5
particular 60:22
86:5,6 107:22
108:4 126:8
147:14 155:5
196:4 222:21
230:17 237:18
parties 7:3 75:24
261:20,21
262:8,9 293:16
parts 63:18,22

party 3:18,21
8:13 110:15
111:4,6,15
114:4,8
Paul 192:1
pausing 113:18
pay 137:14
146:3 175:24
176:7 177:21
219:15
payee 208:1
payment 4:24,24
68:2 124:21
131:23 133:11
133:13 135:14
135:25 136:20
136:23 137:10
137:24 142:11
160:17,21
175:13 193:25
194:2,4 196:20
196:22,24
197:1 200:3,6
200:8 203:18
207:23,24
208:14,25
209:16,18,20
209:21,24,25
210:1,10,10,11
220:4,7,11
223:21 228:7
228:14,24
229:17,25
230:4,16,18
233:5 234:16
234:20 279:15
289:12
payments 68:21
175:18 215:12
223:11,14
peer 278:24
Peggy 263:14
pencil 260:7
people 33:7 34:6
62:15 152:2,16
239:13
percent 216:12

226:24 232:12
percentage
233:22 234:8
percentages
211:25,25
212:1 226:17
perform 160:13
291:4
performed
32:10 135:22
155:21 166:8
period 104:7
periodically
30:5
persists 122:5
person 14:7
34:18 42:11,12
77:22 90:6
108:20 147:2
147:10 151:20
191:1 192:12
192:12,16,23
195:19 206:20
210:1,2,3
231:16
personal 5:24
11:22 114:24
140:3,6 202:19
202:21 254:20
personally 108:8
157:20
Persons 17:3
person's 176:3
pertain 113:8
pertaining 13:24
188:7
pertinent 93:13
phone 20:12,14
46:25 48:8
159:4,6,8,15
160:10,19,23
161:13,16
162:5,9,18,20
163:1,6,8
213:20 214:20
221:20,25
222:4 227:5

231:13,16,24
233:10 239:22
photographs
165:21 166:1
264:5,10,12
photos 165:17
165:23 264:8
267:13,16
phrase 283:17
283:18
physical 55:3
physically 47:5
143:9 241:8
pick 104:8
piece 51:25
169:12 204:12
Piel 240:9,11,13
240:18,25
Piel's 240:24,25
PILR 260:25
261:1,5
PL 4:2
place 35:16
46:24 114:5
132:7 165:16
166:2 196:14
239:9
placed 52:19
144:19 150:3
267:4 268:1
places 156:11
179:20
plain 196:3
plaintiffs 2:6
8:16 16:16
108:16
plans 103:15
please 8:12 24:7
26:14 28:3,14
36:4 37:1 38:3
39:3 40:4 42:2
42:13,22 45:24
46:18 49:12
51:15 57:5
73:2 82:8
85:17 97:8
99:5 112:17

121:18,22
124:4 129:19
130:7 133:8
142:4 162:14
167:15 169:8
192:17 247:20
258:21 292:20
plus 15:23 159:9
205:15 215:11
point 58:10
60:20 101:7
109:9 127:24
133:3 136:18
181:20 188:10
196:9 259:20
269:22 281:1
pointed 72:24
287:23
pointless 203:11
points 86:8
policies 91:19,19
112:6 113:14
113:23 128:13
214:4 241:13
policy 4:16 5:18
6:17 49:22,24
51:7 53:4 54:8
54:11,13 55:2
55:4,10,11,12
55:18,18 61:2
61:22,23 62:21
63:15,15 65:20
65:20 71:15,19
71:22 72:1,7,9
72:10 74:2
76:19,21 91:15
92:7,7,12,13
95:9 112:8
113:9,10
115:21 116:20
116:23 126:11
126:16,23,25
127:9 128:10
128:23,24
129:16,17
130:15,22
132:5,9,10,12

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 100 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 318

132:16 134:10
137:11,24
138:5,6,19,25
139:1,25
140:22,24,25
141:2,10
142:12 145:5
145:12,22
146:8 150:24
151:2 160:9,17
174:16,21,23
181:18,19
189:14 204:24
211:10 212:21
213:2,7,15
215:25 224:2,4
224:7,13,15,22
233:6 236:13
236:18,20,21
236:21 237:6,9
238:1,3,4,7,18
243:22 245:22
246:2,5 253:14
262:1 268:6
269:7 270:21
279:24 280:8
280:15,16,19
280:21,23
281:2,2,7,7,12
281:16,22,25
282:8,13,17,18
283:1,4,11,13
284:20 285:2,5
285:7,13,14,16
285:19 286:6
286:11,12,19
286:22 287:13
287:19,25
289:2,19
policyholder
82:8 159:10
253:18 279:6
279:13
policyholders
223:25
policyholders's
159:21

pop 72:16
pops 68:17
portion 60:24
88:20 93:15
95:24 203:4,7
203:8,9
portions 60:3
150:15,22
posed 35:7
position 104:13
104:16,20
105:19,21
108:10 125:20
126:5 132:22
136:3,10,22
214:2 277:5
284:18 286:10
possession 97:17
possibility 162:4
possible 120:24
143:11 154:5
199:25 238:20
possibly 120:3
post 119:2
125:16
post-Katrina
268:25
practice 51:7
53:4 95:9
126:11 145:5
146:8 185:3
289:3
practices 113:23
154:12
preceding 118:6
244:11
predicate 29:19
preempt 132:15
preliminary
11:18
premiere 90:2
premises 155:19
165:6 269:3
preparation
9:22 17:10
24:14 31:16
32:3 35:17

43:4,22 49:4
49:20 56:2
69:7 93:18
98:3,15 144:14
149:14 276:13
prepare 17:8,16
18:22 19:5,15
43:3 140:5
prepared 14:10
22:22 109:3
preparer 109:5
present 2:20
20:9 47:17
107:10
presented 100:5
president 277:1
278:2
press 65:12
pretty 109:8
180:18
prevail 132:12
141:1
previously 97:19
100:2 140:23
153:12 154:17
213:17 232:6
232:23 244:1
252:8 264:18
274:19 276:21
pre-Hurricane
111:18
pre-litigation
59:8,12 95:2,4
284:25
PRI 236:7,10
237:1 242:7,7
price 25:8 26:4
27:6,7 29:7
30:2,6,8,11,12
30:12,16,17,17
30:19,21,23,24
30:25 31:7,19
32:1,5,9 34:13
34:18 37:5,22
38:10,23 39:12
39:19,22 40:6
40:7,8,9,20,22

41:17 44:7
45:3,20 46:3
46:21 102:6
169:16,20
171:8,14 172:3
249:2,14,16,21
250:14,16,16
251:14,15,15
251:19,20,22
252:9
prices 24:25
25:20,25 26:2
26:7,18,20,21
27:4 31:5,10
31:12,12,13
32:12 35:1,19
35:24,25 36:7
36:9,9,20,20
38:11,23 39:20
41:12 43:9,12
43:12,16 44:10
251:6,10
pricing 17:12
19:19,24 20:24
21:3,5,7,9,11
21:17,19,24,25
22:3 23:2,3,5
23:15 24:12,18
24:21 27:5
31:24 34:2,8
37:4 41:5,15
102:24
principle 276:2
print 4:15 5:18
61:7,11 63:7
64:2 75:4
78:13,20 90:8
90:13,16,17
190:15,24
193:19,23
243:21,24
244:3 262:17
printed 76:15
78:9 79:2,4,6,7
79:10,16 81:10
98:12 169:5
190:19 192:23

193:2 194:7
248:19 256:6
printer 76:15
78:20 193:19
printing 195:23
260:11
printout 63:4
64:7 69:1 72:7
72:11 73:18
189:22 212:16
prints 192:13,17
260:24 263:21
prior 12:10
47:24 48:24
49:6 73:14
101:14 128:4,8
164:7 179:15
266:21
privilege 144:7
287:5
probably 63:6
182:7 186:12
220:21 222:9
procedure 7:6
51:7 52:18
53:5 95:9
96:13 111:4,7
111:14 112:24
126:11 145:6
146:8 289:3
procedures 3:18
3:21 110:15
111:5,23
112:12 113:7,7
114:3,8,23
154:13 159:23
proceed 51:20
233:4
proceeded
133:10 158:25
process 27:3
160:13 172:7
253:16
produce 95:25
produced 50:9
69:13 110:6
118:25 120:13

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 101 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 319

120:19 121:7
144:6,9 185:15
**PROFESSIO...**
2:21
**proffered** 9:10
**profit** 233:23
234:4,9
**program** 25:4
27:12,15,16,18
28:17,17,19,21
28:22 30:2,3,4
30:7 44:24
45:4 49:9,14
49:16 84:2,4,6
84:9,16 85:1,7
85:11,21 93:6
93:11,14
100:14 147:1
211:15 230:12
261:25 262:5
**programs** 27:20
**progress** 190:11
**prohibited** 6:2
256:20 285:19
285:24 287:1
288:10
**promoted** 103:8
104:20
**promptly** 199:24
**pronounce**
155:24
**proof** 126:13,16
126:19,21
127:3,5,8
128:3,7,9,11
128:14,19,22
129:14 130:11
130:14,21
131:2,17,23
132:5,8,15,15
132:24 133:1,5
133:14 134:21
135:2,9,12,19
136:4,11,24
137:6,16,23
138:3,4,9,18
139:1,17

140:20
**proofing** 36:9
**properly** 183:1
**property** 4:3
5:24 27:13
114:24 131:16
131:19 135:4,6
139:21,22,24
140:3,6 143:18
151:7,11
153:15 160:14
162:10 164:5
202:19,22
203:14,19
211:17 213:23
214:1,6 217:6
217:7 231:10
231:12 254:20
272:16
**protect** 203:10
**protocol** 150:5
158:4 276:14
**protocols** 272:9
276:24
**provide** 17:22
75:21 116:23
130:21 134:12
143:2 147:9
182:21 199:24
203:1 258:19
286:24
**provided** 14:22
14:25 15:24
16:2 26:7
70:12 78:19
128:6 132:23
135:1 138:24
142:12 182:9
245:21 286:21
**provides** 27:12
134:4 212:4
253:17
**providing** 14:20
130:10 133:19
**PRS** 236:14
**pull** 62:7,10,13
71:20 73:16

74:10 87:10
**pulled** 65:8
**pulling** 61:14
**purchased**
275:21
**purely** 47:15
**purpose** 235:9
239:7
**purposes** 7:7
**pursuant** 30:14
82:12 119:1
133:2 141:17
175:5 181:22
228:15
**push** 109:13
**put** 61:19,20,21
61:21 80:25
135:24 139:5
143:23 164:25
173:25 184:9
203:15 210:21
222:20 231:14
254:19 259:2
267:8 268:19
270:23 271:7
276:23
**P-I-E-L** 240:11
**p.m** 165:18
**P.O** 157:16

_____
**Q**
**QK50** 191:18,23
**QNEJ** 244:12
256:23
**qualifications**
275:18
**qualified** 127:4
135:20 188:11
**qualify** 138:2
275:23
**quality** 103:14
**quantities**
171:25
**quantity** 140:7
**quarter** 169:25
170:1 171:4
**question** 7:14

24:10,11,15,17
28:2,9 32:4
33:22 35:6,10
36:3,13 38:19
40:11 45:9
46:2 48:16
49:11 51:15,23
54:19 55:5
56:21 57:2,5
58:19 59:2,25
70:4 71:12
74:23 78:17
79:2 85:10,15
85:24 86:1
88:2,8 89:6
96:3 97:7,11
99:6,8 113:17
114:1 115:3
116:23 121:17
121:18,20,21
122:14 123:4
124:4 125:3
126:1 128:1
129:7,9,10
130:5 131:10
136:15 137:7
146:5 147:21
148:5 152:3
155:9 156:16
158:1 162:23
162:24 164:23
175:16 176:10
176:13 180:18
196:7 210:9
223:8 228:2,5
228:18 233:15
234:5 236:3
237:14,22,24
260:21 261:22
269:7 273:20
275:24 276:19
280:3 281:3
282:5,21 283:7
284:2 287:8,11
287:23 288:3
288:17
**questioned** 9:5

128:3
**questioning**
52:23 119:25
144:5 174:25
**questionnaire**
5:7 214:19
221:13,17,18
222:7 225:17
232:7
**questions** 14:11
14:13 29:13,22
54:3,4 64:8
208:16 291:14
291:17
**quick** 68:15
203:17 205:22
241:21 279:17
**quickly** 122:2,24
123:15 125:18
125:21 126:6
159:22
**quite** 278:19
**quotations**
131:12
**quote** 131:7,12
**quotes** 33:3
270:21

_____
**R**
**R** 251:13,13
**Rachel** 192:3
193:6,7
**rain** 228:24
**rainfall** 272:1
**Rasmussen**
278:6,8,21,24
**rate** 32:8 37:9
**rated** 205:15
**rates** 219:3,13
**rating** 205:13
**RC** 216:1
**reach** 58:9
**read** 36:12,15
57:7 99:11
129:12,19,22
163:11,14,15
167:11,15

168:7 169:20
171:13 182:25
211:8 223:9,16
260:1 286:12
292:5,6
**reading** 7:10
29:16 246:6
257:18 258:11
**reads** 183:7
207:6 212:20
223:12 241:12
252:2 275:6
**real** 205:22
**really** 29:6 86:1
113:25 125:7
222:6 252:19
263:19
**reason** 71:10
166:13 171:6
182:12 206:23
207:3 224:1
**reasonable** 32:9
**reassignment**
77:6
**reassignments**
77:10
**rebuild** 212:6
**recall** 16:23
22:17 24:10,11
41:2,8 42:4
118:9 128:18
130:10 170:25
171:11 182:15
216:16 217:1
247:17 264:22
**receipts** 140:10
140:12
**receive** 27:7
30:13,19 104:6
122:1,23
129:10 184:11
205:7 211:22
224:14 284:6
**received** 10:24
11:3 22:15
26:25 31:23
32:13 34:23

39:6 44:14,16
64:13 66:8
68:12 90:11,18
93:24 94:15
99:21 100:9,9
128:12 132:25
133:11 135:1
135:12 137:21
142:7 143:19
146:9 153:24
154:19 155:4
159:17,18
163:17 164:12
165:2 207:22
223:10,13
231:22 233:7
239:21 243:20
**receives** 27:3
289:12
**receiving** 22:17
32:6,21 33:2,5
37:8 41:18
134:21 137:15
203:11 229:10
289:5
**recess** 66:23
109:20 158:16
180:10 243:9
266:13 290:4
**recoded** 224:6
**recognize**
206:24
**recognizing**
266:20
**recollection** 22:9
**recommendati...**
39:21 41:14,17
41:21
**recommended**
135:25
**reconciliation**
253:16
**record** 11:15
13:9,22 29:17
60:14 66:22
67:1,5,17 91:2
91:3,7,13

92:18,21 96:19
109:16,19,23
110:2,9 117:22
118:19 119:8
119:10,14,18
148:1 152:14
158:12,15,19
180:9,13
185:21 192:11
197:21 205:24
206:3 243:8,12
244:2 249:10
259:22 266:12
266:16 268:20
289:23 290:3,7
**records** 89:16
140:13
**recounted** 44:15
**Redman** 16:12
**reduced** 102:6
**Reed** 277:6,7
**reevaluate**
103:13
**refer** 60:13
64:25 67:10
91:18 92:6,12
115:1 116:4,18
239:18 252:15
284:9,11
**reference** 55:10
55:12 115:7
116:7 126:16
126:18 131:6
148:15,21
154:18 166:25
168:1 200:15
205:17 270:16
270:17 280:22
285:21
**referenced**
47:24 128:11
128:24 129:16
138:4 200:18
200:19 231:19
**references** 52:7
55:9 170:10
205:9

**referencing**
218:25 247:23
**referred** 250:8
**referring** 32:17
169:11 200:16
217:17 244:1
250:7 255:6
285:22
**refers** 183:4
191:23 195:6
213:4
**reflect** 72:9
148:9,12,13,18
**reflection**
266:19
**regard** 46:13
70:4 143:22
199:23 214:12
253:5 261:22
274:14
**regarding**
119:25
**regardless**
172:12
**regards** 34:2
125:3 145:22
279:2 280:21
**regular** 209:13
**reimbursement**
215:12 240:2
**reinspector**
103:9,11,12
104:10,13
**relate** 120:3
170:25 261:1
**related** 25:3
58:22 61:5
74:25 87:23
89:18,21,24
93:3 95:23
140:10 145:6
145:12,20,23
148:23 263:16
272:24 293:16
**relation** 31:3
120:24
**relationship**

150:17
**relative** 14:14
79:21 88:4,7
89:1,10 143:19
**relayed** 31:23
34:1,22,24
**relaying** 34:6
**release** 118:16
**relevance** 119:3
**relevant** 60:22
127:19 278:19
**relied** 33:13
34:11 35:23
36:18 37:14,21
38:15 39:6
**rely** 32:12 38:21
**relying** 281:5
**remember** 9:7
12:8,12 16:10
17:19 41:1,7
64:10 66:5
71:16 118:13
153:20 245:23
249:3 260:13
**remodel** 252:10
**remotely** 70:8
**removal** 26:22
31:15 43:25
249:19
**remove** 32:18
37:6 249:11
250:9
**removed** 86:24
**Renaissance**
168:10
**rental** 140:14
**rep** 40:18,19
78:2 103:2,4
191:18 199:7
244:6 245:11
245:14
**repair** 140:2
250:20 251:17
**repeat** 57:1,5
**replace** 32:18
37:7 250:20
251:17 259:5

266:3
**replaced** 102:5
**replacement**
26:23 31:15
44:1 101:15,21
140:8 161:20
163:23 174:18
245:22 249:20
250:9
**report** 6:9 87:2,5
87:6 135:13
147:23 169:4,5
174:1 181:16
182:2 240:9
244:2 265:20
266:21,24
270:24 289:5
289:13
**reported** 1:19,22
2:23 22:10
42:5,8,25
105:2 182:4
197:8 274:7
293:9
**reporter** 2:24
7:23 9:1 28:7
36:12,15 57:4
57:7 99:9,11
129:12,22
156:17 258:23
266:3 293:4,24
**REPORTERS**
2:21
**REPORTER'S**
293:1
**reporting** 66:3
181:23 195:4
198:6 293:10
**reports** 87:17
241:1 271:8
278:2
**represent** 8:13
110:20 241:16
241:18
**representative**
1:14 9:11,16
9:21 10:1

14:24 15:3,7
15:20 16:3
90:5 102:15,17
102:19 107:14
120:12 286:17
288:8,21
**representatives**
39:7 105:2,23
105:25 106:2,3
**represents**
237:25 238:2
242:14
**reps** 32:7,23
33:5 39:14
**request** 4:24
90:16,17 119:1
143:23 144:15
154:24 161:24
165:9 185:16
192:13 207:24
215:11 262:19
262:24 263:13
**requested** 36:14
57:6 96:24
97:15 99:10
129:11,21
131:23 144:6
162:2,21
192:15 193:18
194:2 224:23
**required** 19:19
57:17 116:25
134:12 144:19
145:25 181:16
182:1
**requirement**
134:19
**requirements**
112:24 128:13
141:17 142:17
181:23
**research** 45:18
**reserved** 7:16
**reserving** 119:4
**reset** 167:19
**reside** 11:24
**resided** 12:1

**residence** 12:7
12:10 142:9
**resides** 47:16
153:2 241:9
**residing** 169:2
**respond** 135:21
**response** 70:2
129:20 164:14
164:15 172:17
178:13 185:15
227:11 238:22
250:8 276:7
284:3
**responses** 14:16
266:21
**responsibilities**
22:20,24 41:11
102:17 104:25
278:11
**responsibility**
105:4
**responsible**
24:24 195:20
**responsive** 43:20
**responsiveness**
7:15
**restart** 113:19
**restoration**
252:10
**Restoration/se...**
171:15
**restricted** 108:3
**result** 151:22
233:8
**resulted** 159:10
**resulting** 163:19
**return** 93:15
94:2
**returned** 267:20
**returning** 68:14
206:6
**reversed** 248:5
**review** 26:16
43:2 50:12
59:15 65:20
71:15,18,24
72:1,2,7,10

115:7 116:17
117:3,6 149:15
159:7,9 181:25
224:20 267:17
269:23 270:6
282:16 284:25
**reviewed** 9:23
43:6 49:20
51:3 55:24,25
56:3 58:20
59:5,7 82:11
93:18 232:6
267:9,14,21,23
282:12,14
291:10
**reviewing** 68:23
143:14
**revise** 32:20
**revised** 31:14
32:5 251:7,11
**revisions** 120:1
**reword** 43:24
59:1
**Richards** 277:6
277:7
**Richter** 20:3,4,6
20:7,10,11,17
20:19,23 21:4
21:7,9,12,22
24:24 25:18,25
26:18,24 31:21
31:24,25 32:6
33:23 34:1,7
34:10,11,14,21
34:23 35:5,7
35:15,18,23
36:10,18 37:3
37:13,18,20
38:14 39:5,10
39:13,18 40:12
40:13,17,25
41:4,16,20
42:4,7,16,24
43:8,13 44:16
44:17,23 45:2
45:7,12,19
46:3 47:4,4,7

48:4,8,10,17
48:22,25 49:2
146:22,24
171:7,9 250:23
251:5
**Richter's** 21:15
22:20 25:2,11
40:25 41:3
**Rick** 278:6,8,24
**Ridge** 12:11
**right** 12:13
16:19 19:10
30:24 35:22
36:17 45:21
49:22 50:19
52:20 53:19
54:22 56:1
60:23 61:6
63:5,9,23 67:9
67:21 68:15
69:23 72:4
73:24 79:25
80:2 81:2
87:14 88:15,21
88:25 92:4
96:8,10 100:1
103:18 106:10
107:17 109:9
114:15 118:13
123:7 136:19
145:1,8 146:23
147:6 154:21
158:10 160:24
165:7 172:20
173:3,18,21,21
173:23 176:25
179:24 184:3
186:11 196:5,9
201:4 202:17
205:2 207:2
208:7 212:2
218:25 222:9
225:4,14
229:18 231:11
254:6 255:2,19
256:1 261:17
267:7 272:20

**rights** 27:19
**right-hand**
55:17 72:20
73:21 74:9,17
166:4 167:1
168:4,4 169:16
191:9,16 194:8
236:6 241:12
242:13 244:5
245:16 255:1
255:12 269:2
**ring** 52:10
**rings** 277:7
**risk** 236:7 237:1
241:24 242:7,8
279:24 280:8
280:15,16,19
280:21 281:2,7
**RMR** 2:24 7:22
293:3,23
**Rob** 207:6
**Robert** 207:9
**role** 25:11,19
107:9
**roof** 82:5 161:20
163:23 232:11
**roofers** 32:8
34:12
**roofing** 26:22,23
31:15,16 32:5
32:13,15,16,19
37:5 39:15
44:1,2 179:4
249:25
**room** 47:21,23
70:20 232:19
**rooms** 233:1
**rough** 166:7
**route** 192:3,8,16
**routed** 208:15
**routinely** 134:4
**RPR** 2:24 7:22
293:3,23
**RQ-20352** 4:8
4:10
**ruin** 23:25
**run** 87:1,6 93:7

230:12
278:7
**R-A-S-M-U-S-...**
**R-P-T** 195:2
**R-replacement**
204:21
**R1-SHU-514922**
263:1

—————
**S**
—————

**S** 7:1
**sake** 110:9
**sanctions** 287:17
**satellite** 160:8
**satisfactory**
132:24 133:1,5
134:21 135:2,9
135:12,19
136:4,11,24
137:16 138:3
138:18
**satisfy** 138:2
**save** 261:7,9
**saved** 87:24 89:2
189:21 226:5
235:13 239:2
255:18 257:3
**saw** 56:19 58:24
59:16 68:24
150:10,11
235:6 270:13
285:1
**saying** 38:18
52:15 127:20
203:13 262:23
265:4
**says** 55:17 73:22
92:20 127:10
173:17 176:1
182:24 191:10
195:2 198:23
200:4,6 204:21
205:11 208:19
209:13,25
231:7 236:7,13
237:6 244:6
252:4,9 255:12

260:3 267:20
**SBA** 93:24
**scan** 68:11
**scanned** 69:18
80:16 82:19
94:22 167:5,9
255:22 256:6
256:10 257:6
264:19,21
265:17 267:4
267:12
**scanning** 80:15
81:5
**Schiff** 19:10
**scope** 23:9 24:3
27:23 35:11,12
41:25 51:13
52:24 53:13
54:2 56:21
82:2,3 91:22
94:19 96:17
120:2,17
122:10 127:12
132:19 133:23
147:15 149:3
152:8 162:13
166:6 214:10
217:10 218:12
219:8 227:5
258:6,8 271:4
275:15 280:3,5
284:15 287:9
**scoped** 221:25
**scoping** 102:24
222:5
**scraper** 275:22
**scratched** 206:9
206:12,15,18
207:2,4
**scratching**
206:23
**screen** 6:6 60:21
61:6,8,10,11
61:13 62:4,5,6
62:11,14,18
63:1,5,6,9,11
63:13,14,20,22

63:25 64:2,4,7
64:9,12,17
65:7,10,11
67:6,20 68:18
69:2,5 71:20
72:3,7,11 73:6
73:19 75:10
260:12,16,17
262:16 263:4
263:21
**screens** 239:19
**se** 194:5
**search** 60:25
61:1,8 62:1,5
143:9,11,13,17
144:12 148:23
**searches** 144:16
**second** 10:2
109:17 158:13
175:11 194:16
250:12 254:17
267:6 289:24
**section** 153:25
195:10,13,14
195:16,24
196:4 197:11
240:13,14,15
240:16,18
277:11 283:1
**see** 11:9,9 52:14
53:17 56:19
61:4 63:21
68:22 69:12
72:19 73:18
74:8 76:2,5,19
77:1,14 84:18
85:11,21,22
86:5,19,21,23
90:2,15,18
110:17 117:18
119:6 143:17
147:22,24
163:18 167:2
168:5 172:1
173:22 183:7
189:24 192:20
193:20 205:2,3

205:17,17
206:9 208:7
211:5,6 214:16
215:21 216:12
221:14 224:21
224:24 226:16
236:8,14 237:3
237:6 241:14
244:8 245:18
246:2 247:7
252:4 255:13
257:19 260:5
260:20 262:13
263:22 270:18
275:17
**seeing** 86:4
118:9 179:15
182:15 237:23
**seemless** 167:18
**seen** 9:20 69:22
71:25 83:13
97:21 99:25
108:19,21
118:1 150:6,7
173:8 235:5
**sell** 102:6
**send** 80:20,22
163:3 262:10
262:13,16
**sending** 160:14
162:9
**sense** 29:14,18
154:20 155:2
155:12
**sent** 11:14 13:10
30:9 82:22
95:11 98:1,19
98:24 99:13
131:22 143:19
146:9 148:24
154:2,9,13
177:20 220:13
220:15,18,20
253:22 254:2,6
254:7 270:19
**separate** 30:3
77:13,15

150:22 180:25
181:1,2
**separately**
180:23
**September** 4:4
150:12 158:5
224:18
**seq** 7:7
**sequence** 76:10
76:11
**series** 87:17
282:8
**seriously** 286:16
**served** 11:4,14
**server** 60:5,7,9
60:16,19 61:5
82:22 83:1,2,7
83:10,15,17,21
83:22,24
**serves** 71:14
**service** 60:14
89:16 91:2,3,7
91:13 92:18,21
95:5 171:16,17
171:18 172:2,6
172:19,21,25
173:4,11,13,13
244:2 252:2,7
252:10,10,11
252:13,14,18
253:6
**serviced** 101:17
**services** 4:4
59:22 103:9,18
103:24 104:2
104:11,22
107:23 108:6
151:8,12
240:23 241:6
277:12 278:9
290:11
**set** 111:23
141:25 142:18
171:20 293:8
**sets** 139:18
**settle** 163:6,8
200:13

**settled** 142:14
161:9 162:19
**settlement** 105:5
105:7,9,10,12
105:13,15
161:4 172:7
173:14 175:2
176:24 177:10
177:11 178:3
178:10 253:7
**settlements**
246:8
**seven** 75:19
168:18,20
213:9 229:12
247:8,9
**sheet** 94:5,12
247:6 265:4
**SHEET(S)**
292:22
**shingle** 249:25
**shingles** 32:18
37:6 167:17
249:12
**short** 104:6
**SHORTHAND**
2:21
**shot** 6:6 63:22
64:7 67:6
73:19 260:17
263:4
**shots** 260:12
**show** 72:24 73:5
131:5 148:1
166:1 172:3
198:4 231:2
236:5 248:10
256:17 263:15
267:20
**showed** 239:18
276:15
**showing** 72:8
140:7 263:20
**shown** 173:4
**shows** 75:10
87:7 173:19
268:24

**Shreveport** 47:8
47:9,13,18
**SHU** 263:5,13
**side** 55:17 72:20
102:21 168:4,5
188:2 216:4
231:23 255:1
269:3
**side-by-side**
118:8
**siding** 252:15
**sign** 207:10
**signed** 139:17
**signify** 198:5
**signing** 7:10
**sign-on** 147:13
**silhouetted**
279:19
**similar** 72:4
191:11 274:18
**Simmons** 191:23
**Simms** 168:14
168:14
**simply** 41:13
80:8 172:24
267:4
**single** 38:21 62:5
64:8 147:2,10
237:11
**sir** 14:12,17
15:10,17 16:6
16:24 17:6
22:18 30:21
41:3,9 44:22
46:22 47:2,11
48:25 50:12
54:12 55:15
60:9,19 61:11
63:7,12 64:3
65:1 66:8
69:16 70:6,11
70:15,20,21
72:12 74:16
77:16 83:18
88:18 89:16
90:21 93:5
97:24 98:10

100:3,10,22
101:24,24
103:1,23 105:8
108:18,22
109:1,6 111:6
112:20 114:11
116:12 118:3
122:3 123:2,16
124:7 128:20
136:21 143:10
143:12 144:16
145:10 146:25
148:21 151:4
152:25 157:5
160:20 161:10
162:6 164:10
165:14 172:8
176:14 179:15
180:1 184:5
186:24 187:17
188:23 189:4
190:2 191:15
194:14 195:4,7
202:15 208:8
208:11,20
209:20 212:19
216:5,8,10,14
221:15 222:14
223:15 236:9
236:15 237:4,7
240:20 244:7,9
244:13,22
245:13,19,24
246:17 252:5
257:2 260:14
260:22 261:14
265:8 278:5
281:18 282:15
**sister's** 164:16
164:17
**sit** 23:14 35:21
36:16 53:19
99:24 118:12
124:24 138:8
138:16 153:19
170:24 177:9
177:19 196:18

201:4
**site** 103:1 160:19
161:5,8,10,11
**situated** 106:2
**situation** 125:10
146:18 162:16
163:2 228:11
**situations** 162:7
162:25 163:4
228:13
**six** 75:2 167:20
168:16 237:2
242:8,12
**snapshot** 262:20
262:22
**snow** 104:5
**soffit** 167:19
**software** 28:10
29:5,6 60:11
67:13
**SOILEAU** 2:21
**SOL** 176:1
**sold** 101:16
**somebody** 15:11
39:22 80:25
163:3 173:24
196:11,11
205:19 261:15
261:16
**someplace**
196:11
**somewhat** 53:3
**Soren** 2:4 8:15
20:2 58:9 81:4
180:4
**sorry** 12:12
16:16 17:20
18:7,19 20:2
44:12 48:16
49:10 65:24
72:23 73:3
90:20 91:8
99:5 101:1
104:15 114:1
115:24 121:5
126:15 156:20
164:16,22

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 106 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al          1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 324

170:1 175:15
189:16,17
190:10,23
200:24 210:22
225:13 230:5
234:13 238:25
248:5 251:4
252:25 260:16
265:14 268:8
277:21 279:25
**sort** 30:3 77:21
88:12 110:2
126:10 158:21
197:25 202:13
236:25 246:10
260:12,18
273:13
**sought** 7:17
**sound** 24:20
**sounded** 24:21
**sounds** 137:7
**source** 83:13
155:15 183:7
184:22,23
239:15
**Southern** 4:3
**speak** 17:8 18:22
19:4,14 20:5
108:25 109:2,5
117:7,9,13
**speaking** 19:19
45:1
**speaks** 282:2
285:7 286:5
291:11
**special** 263:5,8,9
**specialist** 2:21
17:12 19:19,25
20:24 21:3,5,8
21:17,19,24
22:1,3 23:3
24:19,22 31:24
41:5,15
**specialists** 21:10
21:11 23:5,16
24:13
**specific** 20:20

35:22 36:18
38:19 39:10,14
40:21 70:4
114:25 116:3
143:7 144:22
208:13 213:7
220:12 249:6
261:2
**specifically**
69:20 199:2
205:10 272:25
275:5
**specifications**
139:25
**speculate** 82:20
196:17
**speculation**
142:25 146:15
238:24
**speculative**
47:15 227:12
236:19 276:8
**speeds** 271:16
**spell** 81:20
155:25 176:3
**spoke** 13:22
17:12,16 18:24
19:8,17 21:12
22:13 40:24
41:4 47:6
49:19,21 74:21
117:11 245:20
248:25 257:14
260:11 283:25
**spoken** 20:17
22:11 108:14
108:15,17,23
274:11,13
291:8
**spot** 176:12
**square** 43:25
44:1 232:1
**St** 1:15 11:25
**staff** 200:23
201:3
**staffed** 104:7
**stamp** 84:18

110:10 169:8
185:4 190:21
191:12
**stamped** 117:24
150:2 182:10
184:18 189:8
224:11 243:17
268:2 274:18
**stand** 91:4
169:23 170:2,6
170:8 191:18
208:1 236:10
263:7
**standard** 180:18
216:19 217:5
217:11
**standardized**
217:22
**stands** 92:17
263:5
**start** 14:5 101:8
110:3 158:22
**started** 75:6
85:23 101:10
102:10 120:5
**starting** 76:6
**state** 1:3,7,12
2:11,17 4:2
7:23 8:4,10,19
8:21 9:11,16
9:19 10:1
14:15,17,23
15:1,13,15,21
17:1,4 18:9,11
19:20 21:5,10
21:17 23:4,5
23:15,16 24:12
24:18,19 26:3
26:6,8,19 27:3
27:6,12 28:18
30:9,11,14
31:10,14 33:15
37:5 40:8,15
40:20 41:12
43:15 44:3
46:21 49:18
50:17,25 51:6

53:4 56:14
57:11 58:24
59:19,22 60:5
60:6,8,10,15
67:7,8 70:7,12
70:14 73:24
74:2 77:24
78:14,22 82:15
82:22 83:1,2,6
83:14,20 87:25
88:5 89:3 91:1
91:16,18 92:6
92:15,20 93:19
95:11 96:23
97:15 98:25
100:13 101:9
101:10,14
102:8,10,18,20
103:3,20,22,25
104:11 105:18
106:8 108:4
120:11,13
121:12,23
122:6,17 123:4
123:18,20
124:1,10
125:20 126:5
126:10 128:15
131:22 132:7
132:14,22,23
133:2,18 134:3
134:11 135:1
135:11,14
136:3,10,18,22
137:1,13
140:21 141:15
141:23 143:2,6
145:11 146:7
146:12,23,25
147:22 148:22
149:9 151:13
155:18 156:14
157:2,5,6,8,23
159:13 160:12
162:2,7,25
164:2,12,19,25
165:4,8 176:23

178:22 182:18
183:15,21,23
183:25 184:2
187:1 188:7
189:15,20
190:5 191:21
195:4 196:1,23
197:2 198:22
199:22 201:6,8
201:10 202:25
214:2,3 218:4
218:7 219:2,11
222:11 229:14
238:5,13
239:23 240:5
244:15,19,23
245:3 249:1,7
249:13 251:24
262:2 269:24
270:7,19,23
271:7,15,24
272:8,22
273:11 277:2
279:5,12
281:12 284:7,8
286:10,17,19
288:7 289:2,11
290:10,18
293:4
**stated** 121:6
140:23 153:12
175:22,24
215:20 232:23
242:15 276:21
**statement** 5:2
32:16 94:8,13
175:25 177:1
188:12 191:14
203:22 210:22
215:5,8,14
217:23 269:20
279:11 282:24
**states** 101:23
106:9 108:7
140:5 167:1,2
219:21 254:25
**stating** 140:17

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

**status** 77:7
**statutes** 141:25
**staying** 93:1
  164:16
**stenographica...**
  1:22
**stenotype**
  293:10
**stereo** 102:1,4
**stick** 116:19
**sticker** 139:6
  259:3
**stipulate** 192:11
  232:25
**stipulated** 7:2
**stolen** 101:18
  140:3,6
**stopping** 109:8
**stops** 11:3,4
**stored** 60:12
  87:24 88:5
  89:2,10,13,15
  95:6 97:19
  98:8
**straight** 127:16
**streamline**
  159:19
**streamlines**
  211:15
**stretch** 213:12
**strictly** 201:1
**strip** 4:22 204:10
  204:11 215:11
**structural**
  114:24 253:14
**struggle** 125:2
  195:21
**struggling** 88:8
  184:12,16
**stuff** 11:18
**subject** 48:13
  111:3,5 120:20
  120:21 275:19
  288:14
**submit** 139:16
  176:16 219:12
  227:22

**submitted** 79:5
  135:13 181:22
  184:16,19
  215:7,9 220:3
  220:10,24
  228:20 230:3
  230:16,18
  231:4 234:15
  234:20
**subpoena** 3:12
  3:14 11:4
  12:20
**subsequent**
  117:16 246:11
**substantiate**
  140:11
**successful** 62:2
**suffered** 229:18
  230:1
**sufficient** 229:24
**suggestion** 40:14
**suit** 62:10 96:13
  144:2 147:3
  148:24
**Suite** 1:18 2:16
**Sullivan** 5:12
  189:25 190:2,3
  190:4,9,10
  191:1,17
  196:25 197:2,4
  197:6,12,16
  200:2,5,7,10
  200:21 201:5,7
  201:15 206:20
  206:22 211:1
  221:25 222:4,9
  231:6,11,13,21
  232:2,13,21
  233:13,16
  239:14
**Sullivan's**
  222:11,13,16
  222:19
**summarized**
  144:23
**summary** 182:2
**sun** 279:18

**superior** 240:8
**supervise** 105:23
  106:4
**supervisor** 42:16
  147:16,17
  148:10,12
  240:24,25
**supervisory**
  21:20,23
**support** 56:10
  58:7 220:7
  222:18 229:25
  230:18 234:20
**supporting**
  140:13,15
**supports** 56:14
  57:11,20
**supposed** 51:5,8
  52:5 53:5
  141:16,24
**sure** 10:3 11:12
  12:13 17:25
  42:11 45:10
  49:13 59:4
  74:24 85:16
  97:13 113:2
  155:11 164:24
  176:10,12
  179:11 180:7
  184:23 216:24
  228:2 236:5
  242:25 243:4
  250:23 252:23
  254:18 264:17
  270:3 283:6
  289:3
**surge** 276:2,8
**surrounding**
  123:1 126:7
**survey** 34:15
  35:6
**surveyed** 33:4
**Susan** 276:25
  277:1
**suspect** 239:10
**sweep** 31:6
**switch** 205:22

**sworn** 8:25
  139:17 293:7
**system** 4:16
  60:17 67:7,8
  76:2,4,5,6,8,11
  76:14 78:25
  80:1 82:15
  87:21,21 95:12
  98:13 147:5
  148:9 180:20
  181:4 182:19
  183:11,19,22
  183:23 184:1,7
  187:2,22,23,25
  188:1,6,7,10
  189:15,20,21
  197:19 205:13
  207:1,3 265:18
  267:4,5 280:25
**systems** 184:3,4
**system-genera...**
  189:13 193:5
  193:15
**S-C-C** 195:8
**S-T-A-T** 195:2
**S-U-L-L-I-V-...**
  190:10

———————
T
———————
**T** 7:1,1
**tab** 249:24
**table** 196:2
**tail** 175:15
**take** 58:14 62:23
  66:14,19 81:8
  87:1,9 109:10
  109:12 110:7
  118:20 165:16
  180:4 198:12
  202:4 242:23
  266:5 279:17
**taken** 1:16 7:5
  8:6 14:19
  66:24 86:7
  94:19 109:21
  113:11 158:16
  174:10 180:11

  243:10 266:14
  290:5
**takes** 62:22,24
**talk** 35:15
  109:17 184:4
**talked** 14:18
  35:18 48:17
  75:18 243:23
  278:20
**talking** 25:6,10
  29:9 41:2 64:5
  67:18 81:5
  91:15 121:17
  146:2 148:3
  158:22 166:21
  186:4 199:1
  221:19 273:16
**talks** 52:4
**tape** 109:24
  206:4 275:21
**tapes** 205:22
**tax** 44:9
**team** 104:20,21
  104:25 105:1,6
  105:8,14,17,19
  105:21,24
  107:9 108:11
  195:17,19,25
  196:4 197:11
  274:4,6 278:8
**tear** 249:11
**tell** 24:5,23
  32:24 34:10
  43:9 44:17
  51:4 69:19,24
  69:25 70:6
  71:18 82:13
  83:4,11 87:17
  93:16 98:11
  100:5 102:3
  149:4 156:12
  163:7 170:23
  177:23,24
  195:18,19
  200:9,20,22
  210:2 212:7
  226:1,11

244:18,21
246:3 251:12
259:18,24
266:24
**telling** 212:10
284:8 287:22
**tells** 178:1
195:22,23
196:2
**temporary** 12:7
274:3
**ten** 105:24
**term** 90:25
92:15 101:15
128:22 129:1
129:14,25
132:15 135:20
136:5 137:8
139:25 203:19
250:6 279:23
280:11,19,22
283:10 285:4
287:12
**termed** 130:21
**terminology**
91:6 93:21
100:16 124:18
137:6 145:10
145:19 280:8
**terms** 31:8 43:14
52:16 64:6
132:11,11,13
284:19 286:18
286:22 287:14
287:24
**testified** 71:13
81:10 88:10,19
114:2 115:16
127:18 128:14
130:25 131:12
172:18
**testify** 9:1 14:7
42:11 120:12
121:6 293:7,8
**testifying** 291:7
**testimony** 14:20
15:25 16:2

36:15 57:7
69:8 98:4,16
99:11 111:21
127:7,19 128:6
129:12,22
131:5 149:14
249:3 256:4
283:2 288:13
292:6,8 293:9
**Tewis** 2:24 7:22
293:3,23
**thank** 13:17 20:4
24:7 49:23
58:17 66:17
86:17 152:14
194:21 218:19
221:2 243:6
277:16 291:17
**theft** 260:25
261:1,2
**thereof** 7:17
**thing** 222:20
**things** 63:10
199:19 257:18
**think** 13:9 18:2
29:15,21 32:15
36:23 49:21
53:25 58:2
67:19 71:14
75:1,5 76:18
76:24 106:13
116:14 139:10
144:23 145:9
146:18 147:20
148:1 153:4
156:5 174:21
185:1 186:11
198:11 200:2
220:20 228:23
229:4 230:7
234:3 246:4
257:16 258:1
275:22 278:20
**third** 11:5 12:22
169:25 170:1
171:5 251:13
269:2

**thirteen** 106:24
168:16
**thought** 44:3
115:16,16,21
**thousand** 105:16
202:11 236:8
242:7
**three** 12:9 58:11
167:12,19
168:8,12,15
171:3,4 205:20
206:25 211:24
233:14,18
243:2 249:24
**three-page**
225:7 276:14
**throw** 215:2
**Thursday**
238:17
**thwart** 203:17
**Tiffany** 191:23
**time** 7:16 8:3
15:24 16:9,23
17:7 19:21
20:16,19 21:1
21:2,8,16,21
21:23 22:21,25
24:13 33:17
34:5,20,25
35:1 37:11
41:6 42:17
47:6 59:21
78:8 87:8
88:16 94:25
95:7,7,13,14
102:13 104:7
114:5,10
139:19 142:16
150:9,11 153:8
157:1,4,11
165:5,11,12
166:12 171:11
171:12,20
180:1 184:12
195:23 197:3
197:13,16,24
198:6 201:11

202:24 223:24
224:4,10 227:4
247:22 249:22
264:22 267:8
267:10,15
268:7 269:8,22
270:3 271:18
272:2 273:12
277:3,4,8,15
277:17 278:4
289:10
**timeliness**
133:21
**timely** 121:14,24
122:5,18 123:6
123:21 124:11
137:14
**times** 9:7 38:1
38:16 86:11
**time-stamped**
165:25
**title** 4:12 21:16
21:19 102:12
102:14 105:20
115:2 116:5
139:24 148:18
148:19,21
152:23,24
240:12,20
241:3 277:20
277:20,24
**titled** 4:15 6:14
221:13 235:4
**titles** 245:17,18
246:1
**today** 8:2 9:10
9:23 20:2
23:14 88:6
93:18 96:21
99:24 124:24
138:8,16
148:11,12
153:19 170:24
177:9,19
196:18 199:19
266:1 282:13
282:15 291:15

**today's** 17:9,16
18:23 19:5,15
32:3 35:17
43:3,4,22 49:4
49:21 56:2
69:7 98:4,16
**told** 31:21 33:23
34:2 37:17,18
38:14,15,15
56:18 97:25
144:11
**tool** 263:2
**top** 73:21 75:12
117:17 166:3
167:1 169:13
182:23 189:24
190:17 191:9
192:2 194:8
215:20 216:3
222:25 236:6
241:11 242:13
244:5 275:6
**tornado** 104:4
**total** 44:4,7,8
81:15 168:11
168:17 173:8
193:12 213:13
217:24 237:18
**touch** 262:3
**touched** 147:3
**traffic** 149:16
154:19
**trainer** 103:10
103:11,13
104:14
**training** 103:15
**transaction**
209:14 210:4
**transcribed**
293:11
**transcript** 7:11
293:13
**transcription**
292:7
**transfer** 140:16
**transitioning**
95:15

**traveled** 104:2
**traveling** 168:25
**Treadaway** 1:17
 2:8 8:7
**trip** 70:17 168:9
 168:9,21,22,24
 171:20
**trouble** 20:1
**true** 21:4 23:4
 30:1 121:12,23
 122:4 134:3,10
 134:18,25
 135:11 141:9
 141:15,23
 176:22 188:25
 201:11 219:2
 219:11,20
 233:11 269:17
 271:7,15,24
 272:8,15,22
 273:6 288:6,19
 292:7 293:12
**truly** 184:15
 269:7
**truth** 293:7
**try** 11:19 43:24
 122:1 123:14
 163:5
**trying** 29:12
 33:10 38:19
 114:20 163:8
 224:25 233:3
**Tucker** 152:19
 152:21 153:2,5
 153:7,17
 276:10,11,21
**tune** 229:11
**twenty-eight**
 222:2
**twenty-five**
 237:2 242:9,13
**twenty-nine**
 168:21
**twenty-six**
 168:19
**two** 9:7 12:14
 26:21 31:13

32:16 35:10
43:12 58:11
69:16 109:15
118:14 119:19
167:12,18
170:4 173:16
175:8 180:4
184:4 202:11
205:13 209:2
211:24 225:8
233:19 236:25
237:5 241:13
242:14 243:2
250:10,13
262:6
**two-oh-nine**
 242:12
**Tyler** 164:17
**type** 60:21 61:8
 62:21 63:15
 65:21 71:15,19
 116:15 138:1
 147:4 148:7
 210:3 232:11
 261:10,12
 274:24
**typed** 72:17
**types** 75:19
 114:25 116:3
**typical** 53:22
**T-R-A-N** 194:11

U

**U** 7:1
**Uh-huh** 85:3
 113:4
**ultimate** 173:2
**ultimately**
 195:19,22
 196:21
**unable** 274:20
**underneath**
 171:14 191:17
 194:11,12
 195:1,6,11
 204:21 205:11
 208:19,21

209:2,10
212:20 223:17
237:5 238:2
249:24 252:9
**understand**
 14:16 36:4
 45:8,24 48:15
 50:23 51:15
 53:11 54:18
 59:2 74:22
 85:17 87:4
 88:1 90:14
 96:2 97:8
 113:16,25
 121:20 122:13
 123:11 124:17
 126:3 142:3
 176:13 196:6
 225:6 228:5,18
 232:2 236:3
 237:14,21,23
 253:3 260:21
 276:20
**understanding**
 9:9,14,17 14:4
 14:6 22:19
 25:2,11 27:2
 47:12 53:20
 124:4,9,25
 126:12,20
 128:7,9,15
 134:5 138:9,17
 153:16 158:24
 188:3,6 199:13
 232:12,20
 249:15,18
 280:10,14,18
 281:4,5 286:2
 293:14
**understood**
 40:25 127:8
**underwriters**
 145:21
**underwriting**
 90:1,3,7,19
 185:2,4,14
 186:12,14,25

187:4 189:18
**uninhabitable**
 285:4,12,12
**unit** 24:25 25:19
 25:25 26:2,7
 26:18,20,21
 27:4 30:16,17
 30:17,23,24
 31:5,7,9,10,12
 31:12,13 32:1
 32:5,12 34:13
 34:18 35:24,25
 36:7,9,20,20
 37:22 38:10,11
 38:23,23 39:12
 39:19,20 40:22
 41:12 43:9,12
 43:16 44:7,9
 45:20 95:5
 171:24 195:2,4
 195:17,24
 196:4 197:11
 248:25 249:2,6
 249:7,13,16,17
 249:19 250:8
 250:19 251:23
 263:6,8,10
**United** 106:9
 108:7 219:21
**university**
 100:21,24
**unusual** 178:12
**update** 170:16
**updated** 30:5,7
 170:17
**updates** 170:14
**upload** 78:24
 79:14 80:8
 82:25 267:16
**uploaded** 78:7
 79:11 83:6,14
 83:17 95:12
 264:8 265:17
 267:3
**upper** 191:16
**use** 6:2 27:13,17
 28:19 32:15

40:6 70:22
84:5 85:10
93:21 100:13
124:17 137:6
145:9,19
147:25 151:11
177:25 182:6
183:19,21
184:1 203:19
211:16 250:6
256:20 265:13
280:7 283:17
285:11,19,24
285:24 287:1
288:10 290:16
**uses** 23:5,15
 24:12,18,21
 30:2,12
**usually** 192:12
**usurped** 112:20
**U.S** 106:22

V

**V** 192:1
**valuation** 211:9
 211:10 212:21
 212:23,24,25
 213:1,3
**value** 128:16
 140:14 204:22
 204:25 205:1
 211:16,18,19
 212:3,7,8,10
 212:14,17,18
 213:4 216:1
 233:4 234:1
**various** 37:8
 64:9 67:5
 75:11 260:19
**vent** 167:19
**verification**
 160:9
**verify** 34:4
 266:22
**version** 59:24
 115:11 117:16
 118:5 169:24

170:1,10,12,15
170:17,22,22
170:23 171:1,5
**versions** 119:19
170:13
**versus** 1:6 8:10
181:18
**vice** 277:1 278:2
**Victor** 192:1
**VIDEO** 2:21
**VIDEOGRAP...**
8:1 66:21,25
109:18,22
119:9,13
158:14,18
180:8,12
205:23 206:2
243:7,11 259:4
266:11,15
290:2,6 291:18
**videotaped** 1:21
8:4
**view** 4:12 6:14
53:13 264:13
275:7
**Vincent** 1:5 4:13
4:19 5:2 6:14
8:9 163:17
168:13 202:10
210:23 222:5
232:8 263:10
268:3 275:7
**vinyl** 211:25
**violate** 146:7
**violated** 284:19
**violation** 145:11
285:2
**voicing** 144:4
**VP** 278:3

**W**

**W** 4:19 156:11
202:10
**wait** 174:25
**waived** 7:12
**want** 11:15
17:22 23:24

37:25 52:11
61:3,4 64:16
65:8 66:14
74:11 109:12
109:13 116:6
117:15 124:6
131:5 149:20
155:3 158:21
180:4,16
193:23 200:12
201:17 214:24
248:12 259:8
265:7 284:8
**wanted** 44:11
62:7 63:3,21
68:15 70:24
83:19 98:18
99:12,20 110:2
110:5 125:18
143:16 154:15
179:17 197:15
220:14,21,23
239:5 240:4
**war** 161:22
**wasn't** 40:21
46:21 58:23
69:13 174:9
182:10 189:16
228:22 267:21
268:19
**water** 101:19
115:1 116:4,5
116:7,9,11,13
150:4,23 205:2
205:11,12,14
206:23 229:12
276:23
**way** 11:1 24:20
25:1,19 27:3
29:25 51:6
55:24 58:21
59:3 67:9
77:23 83:25
84:5 96:12
113:22 146:11
148:2 182:12
218:6,8 222:8

241:23 253:20
263:17 267:12
269:2 286:11
293:17
**weather** 270:25
271:8
**weight** 104:5
**welcome** 265:13
**went** 67:4,17
95:24 109:3
110:1 119:17
179:7 215:3
247:3 267:22
**weren't** 59:14
190:20
**we'll** 12:9
**we're** 29:14
66:22 67:1
91:15 98:13
109:19 115:22
119:4,10,14
125:4 155:14
156:17 180:9
180:13 181:16
186:4 191:21
205:24 206:3
211:17 229:7
233:3 243:8,12
246:10 262:23
266:16 290:7
**we've** 56:17 65:8
213:6 229:16
260:18 267:16
**whatsoever**
178:3 179:1,4
**WILLIAMS**
2:14
**willing** 118:23
**wind** 77:23 82:4
150:4,23
161:16 163:19
163:20 228:24
261:8 271:16
276:23 284:12
**winding** 12:11
259:16
**windows** 170:18

170:18 263:3
**windstorm**
150:21
**wind/water**
276:14
**wind/water-ha...**
158:4
**wired** 70:11
**withdraw** 121:1
**witness** 7:4,11
7:25 10:6
16:15 18:18
23:11,19,23
24:5 25:23
26:15 28:1,15
29:1 33:25
35:13 36:6
37:2 39:4 40:5
42:3,23 43:21
46:1,19 50:24
51:17 53:14
54:17 57:15
58:3,16 78:18
80:14 85:6,19
86:18 89:8
92:11 97:10
99:19 106:15
112:3,18 113:5
114:21 115:23
116:2 120:9
122:12,22
123:12,25
124:5,16
125:15 126:4
127:1 128:2
130:9,19 131:9
132:3 133:9,25
135:18 137:5
137:20 138:23
139:7,14
141:21 142:6
142:23 145:18
146:17 149:6
152:15 155:13
160:4 161:3
162:15 163:16
166:24 175:21

176:15 177:18
179:13 186:6
190:22 192:19
193:3,14
216:25 218:21
221:3 229:6
234:7 236:2
238:12 252:24
253:4 264:25
266:18 268:23
270:15 275:20
276:6 278:23
280:6 281:10
282:6 283:9,24
284:24 285:10
290:24 292:3
293:6
**Wooten** 241:1,9
**word** 33:9 71:17
91:14 147:25
192:3 212:2
280:7 281:24
282:17,25
283:2 285:11
**wording** 150:24
198:23 270:21
**words** 102:23
128:18 222:19
**wore** 65:21
**work** 32:9 33:8
78:7 101:8
102:7,9 147:19
148:16 151:23
155:22 157:10
197:6 198:1
284:6
**worked** 17:18
22:4,6,10 62:9
62:16 80:4
101:15 103:17
107:12,24
148:8 157:12
190:5 197:9,12
197:16,19,23
239:13 269:21
278:25
**working** 11:13

Case 2:06-cv-08262-LMA-ALC     Document 260-2     Filed 01/15/2010     Page 111 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al     1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 329

13:10 17:13
21:1,13 29:14
34:8,9 59:22
125:5 154:3
191:2 201:9
284:1
**workings** 65:5
**works** 18:6 27:3
191:20 201:8
**worksheet** 5:5
6:2 215:21,24
217:15 220:2,6
221:8 256:20
**worry** 159:24
160:6
**worth** 212:16
**wouldn't** 52:11
52:13,16 67:14
69:21,25 72:23
78:24 79:23
118:16 162:1,3
196:11 198:1
203:20 212:13
259:13
**write** 176:11
**writing** 49:14
95:11 151:21
260:7
**written** 19:22
128:23 129:15
132:9 154:7,12
156:21 167:22
184:11 206:8
**wrong** 115:22
173:25 192:18
243:25 268:9
277:20
**wrote** 151:5,20
205:19 206:17
**W-O-O-T-E-N**
241:2

**X**

**X** 208:7,9
**Xact** 92:25
**XactAnalysis**
84:1,3,6,9,15

84:25 85:7,11
85:21 87:2,7
87:11,20 93:6
93:11,14
**Xactimate** 25:4
27:17,20 30:1
30:7 36:8 45:2
49:8,14,16
78:12 79:14
80:8 82:14
83:3 109:3,6
169:3,5,25
170:10,13
172:14 211:15
211:21 251:15
**XacTotal** 5:12
211:9,13,14,20
211:23 231:5
231:18,20
232:16,23
233:24 234:10
**XacTotal's**
212:15
**Xactware** 26:8
27:4,7,10,11
28:9,16,22
29:3,6 30:9,13
30:15,20 31:11
32:2,13 43:9
43:11 44:12,24
45:4,20 46:3
82:23 249:3,8
249:16,21
250:16 251:15
251:20,22
**Xactware's**
27:18 44:4

**Y**

**Yeah** 69:25 78:6
174:24 266:7
**year** 12:4 15:25
100:25 216:12
216:17,18
**years** 155:14
216:7 249:13
**York** 274:10

**Z**

**Zaunbrecher**
1:16 2:8,9 8:7
8:17,18 10:4,9
10:14,18,22
11:2,11 12:25
13:7,16,20
16:13 17:21
18:1,15 23:7
23:17 25:5,13
25:21 26:9,13
27:21 28:8,13
28:23 29:8,20
33:20 35:8
36:1,22 37:16
37:24 38:12,25
39:24 40:3
41:23 42:9,19
43:17 45:13,22
46:12,17 50:20
51:10 52:21
53:9,24 54:15
56:16,25 57:12
57:24 58:8
63:24 64:19
66:16 78:1,15
80:11 81:3
84:24 85:4,13
86:9,16 89:4
91:20 92:1,8
96:4,9,16 97:1
97:5 98:22
99:4,16 106:11
109:15 111:10
111:25 112:15
112:25 114:16
115:20,25
118:22 119:23
120:15 121:9
121:15 122:8
122:19 123:8
123:23 124:13
125:12,24
126:22 127:11
127:23 128:25
129:5,18,23
130:3,6,16

131:3,25
132:17 133:6
133:22 134:7
134:15,22
135:15 136:6
136:13 137:2
137:17 138:11
138:20 141:4
141:11,19
142:1,19
143:24 144:3
145:15 146:4
146:13 149:1
152:6 154:22
155:7 156:3,10
158:11 160:1
160:25 162:11
163:13 166:20
170:3 175:14
175:19 176:8
177:12,16
178:17 179:9
180:3 184:25
185:8,13,23
186:13 190:18
192:9 193:11
194:15,20
198:7,13,20
199:4,8,16
201:22 202:1
214:7 216:21
217:8,16
218:10,18
219:6,16,23
220:16 221:1
227:25 228:17
229:1 230:6
233:17,25
235:24 237:10
237:16 238:9
242:22 243:1,5
250:2,22 251:1
252:21 253:1
257:20,25
258:7,18,22
259:7,12,17,25
264:23 265:12

265:23 266:8
268:15,21
270:1,10 271:2
271:11,20
272:4,11 273:2
273:15 275:13
276:3,16
278:12 280:1
281:8 282:1,19
283:5,21
284:13,21
285:6 286:4,13
286:20 287:6
287:20 288:11
288:23 289:6
289:14,22
290:21 291:16
**zip** 12:12
**zone** 106:25
107:3,4,6,8,11
107:13,17,22
107:25 108:4
239:13,16,17
**zones** 4:3 106:17
106:23,24

**$**

**$1,868.16** 175:11
**$147,000** 213:3
**$147,604** 211:10
212:15
**$150** 168:10
**$198,625** 237:8
**$2,370.12** 175:12
**$2,500** 4:20
224:19
**$2,800** 159:12
229:8,11,19,25
**$20** 44:5,7,7,8
45:11,14,16
46:14
**$209,625** 241:13
**$24,606.82**
234:10
**$300** 168:8,20,22
**$40** 249:14
**$400** 168:8,9

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 112 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 330

**$500** 72:25
**$60** 168:12
**$600** 254:22
255:1 260:2
**$750** 168:11
**$8,200** 159:11
213:11,13

**0**

**00** 207:1
**00017226578**
173:9
**0008** 55:16
**001** 208:24 210:7
**0012** 94:5
**0013** 94:10
**0015** 94:5
**0017** 94:14 169:9
**0018** 94:14
**0019** 94:15
**0020** 94:15
**0021** 94:17
**0022** 94:19
256:19
**0023** 94:11
**0025** 94:12
**0026** 94:12
166:21
**0027** 94:20 166:3
166:5,6 254:24
**0028** 90:24 91:3
**0032** 263:11
**0038** 81:24
175:23
**0039** 161:14
163:10 190:13
**0040** 76:6
**0041** 76:7,16
**0043** 76:20
**0047** 77:3
**0053** 90:24
**0054** 264:20
**0057** 93:25
**0058** 93:25
**0059** 93:25
**0060** 93:25
**0061** 93:25

**0077** 94:2
**0078** 94:2
**0079** 94:3
**008** 73:3,21 74:8
**0080** 94:4
**0082** 94:9
**0083** 94:9
**0084** 94:10
**0085** 94:10
**0086** 94:8
**0087** 94:6
**0088** 94:7
**0089** 94:7
**0090** 94:7
**0091** 94:8
**0092** 94:8
**0093** 94:13
**0094** 94:13
**0095** 94:16
**0096** 94:16
**0098** 94:16
**01** 207:1
**0100** 94:16
**0102** 94:16
**0104** 94:17
**0106** 94:17
**0109** 94:13
**0110** 94:13
**0146** 221:24
224:16
**0147** 193:6,10
**02** 207:1
**0209** 200:4
**0210** 200:6
**0211** 193:21
**0216** 202:8
224:12
**0217** 204:9
**0218** 207:23
**0222** 232:5
**0229** 235:3
**04** 205:15
**06-7269** 1:5
**08** 246:14

**1**

**1** 3:11 13:4,5

43:6 167:15
191:11,12
210:10,10
231:23 238:18
238:18 246:12
285:24
**1:11P** 184:12
**1:13** 158:19
**1:43** 180:9
**1:49** 180:14
**10** 4:14 58:10
167:24 190:14
193:23 201:19
201:20,23
222:3 243:21
**10th** 164:2 165:4
165:8
**10/10/05** 161:14
161:25 164:7
193:18,21
**10/10/2005**
173:20 174:2
**10/6/05** 190:9,12
193:25 211:3
221:24
**10/6/2005**
231:13
**10:13** 66:22
**10:22** 67:2
**100** 232:12
**1045** 1:18
**108545767**
224:11
**108904231F**
224:17
**11** 4:18 204:3,5
243:18,21
246:20
**11/15/05** 166:4,8
175:5 254:25
**11/15/2005**
165:18
**11/17/04** 110:19
**11/21/2005** 79:8
169:14 248:19
**11/27** 82:9
**11/27/05** 81:13

82:2
**11/28** 82:10
**11/14** 109:19
**11/23** 109:23
**11/33** 119:10
**11/34** 267:21
**11/37** 119:15
**115** 3:17
**12** 4:21 15:23,23
207:13,14
247:1
**12th** 175:8
**12/9** 82:11
**12/9/05** 175:22
**12:21** 158:15
**13** 3:11,13 4:4,23
106:17,23
139:15 210:14
210:15
**13th** 150:12
158:5
**139** 3:20
**14** 3:15 5:1
121:5,5 175:24
215:15,16
**1421** 7:6
**1442** 1:12 3:12
3:14 8:4 9:18
9:20 13:14,25
16:5 120:22
**146** 194:1
**149** 4:1
**15** 5:4 58:10
109:13 193:5
221:8,9 247:2
247:4,6
**15:12** 267:22
**16** 5:6 76:14
225:21,22
**17** 5:9 11:5 43:6
167:17 173:17
208:23 209:5
210:8 230:23
230:24 248:11
248:15 252:9
254:11
**17th** 10:19,23

**17-001** 208:21
**18** 5:11 11:7
234:23,24
248:16,25
249:9
**18CZ0736** 238:3
**18R359672**
223:19
**18th** 1:19 8:2
**18-R** 163:18
**18/000** 209:3
**186** 4:7
**187** 4:9
**188** 4:11
**19** 5:14 242:19
242:20 248:18
252:1
**1988** 101:2
**1993** 101:11
103:5
**1996** 103:8
104:17,19
105:15 107:10
**1998** 101:1

**2**

**2** 3:13 13:12,15
13:18 14:6,9
14:11,14
109:24 167:25
167:25 171:24
191:10 231:23
246:12
**2C** 140:4,5
**2:00** 165:18
**2:24** 205:24
**2:28** 206:4
**20** 5:17 32:17
37:6 167:25
210:22 216:6
226:24 246:20
246:21 248:11
248:18 249:12
253:10 254:12
**20-year** 249:24
**2000** 139:4
**2005** 4:4 139:8

Case 2:06-cv-08262-LMA-ALC    Document 260-2    Filed 01/15/2010    Page 113 of 113

Vincent Brown, et al v. State Farm Fire & Casualty Company, et al                    1442 State Farm Fire & Casualty Company through Christopher John Lapinskie

Page 331

150:12 158:5
164:2,18,19,25
165:2,4,8
169:6 170:7
175:8 193:24
224:18 231:9
238:17 268:9
275:8
**2006** 267:20
268:10 269:1
**2007** 117:18
119:25 139:10
**2009** 1:20 8:3
10:19,23 13:24
**201** 4:14
**204** 4:18
**207** 4:21
**21** 5:20 254:12
254:13,18,20
255:7 256:12
**21st** 169:6
**210** 4:23
**211** 189:8,24
190:1,16 191:4
191:12 194:8
194:19 201:18
**212** 1:15 11:24
189:8 190:13
191:5,10
**213** 189:8
**214** 189:8 201:18
**215** 5:1 117:24
**216** 204:4
**217** 206:7 207:12
**219** 210:22
**22** 4:8,10 5:23
256:13,14,17
257:9
**22nd** 12:4
**22RQ-20352V...**
182:25
**220** 215:20
**221** 5:4 214:22
221:13 225:1
225:20
**222** 225:9
**223** 225:9,21

**224** 225:15,16,25
**225** 5:6 231:2
232:20 234:12
234:22
**227** 233:22
**228** 231:3 234:13
234:23
**229** 241:12 242:5
242:18
**23** 6:1 11:7
257:10,11
**23rd** 268:9,10
**230** 5:9
**234** 5:11 117:24
**235** 110:11
**24** 6:3 258:15,16
**242** 5:14
**246** 5:17
**25** 6:5 249:13
263:25 264:1
**25-year** 32:18
37:6
**254** 5:20
**255** 110:11
**256** 5:23
**257** 6:1
**258** 6:3
**26** 6:8 187:12
188:15 266:2
267:2 268:13
268:16
**26-page** 4:12
**26004** 157:17
**264** 6:5
**268** 6:8
**269** 6:11
**27** 6:11 257:16
258:15,24
265:24 266:9
268:12 269:13
269:14
**275** 6:13
**28** 6:13 275:1,2
**28th** 117:18
**289** 6:16
**29** 6:16 289:19
289:20

**3**

**3** 3:15 12:16,17
13:25 14:1
120:18 172:1
206:4 246:12
286:1
**3:18** 243:8
**3:25** 243:13
**30** 134:20 289:4
**30-day** 134:19
**31** 165:2
**31st** 164:13,18
164:19,24
**32260** 1:16 11:25
**3421** 2:15
**355-619** 163:18
**3850** 1:17 2:9
8:8

**4**

**4** 3:17 13:12,24
115:11,12
118:7 246:12
253:24 254:3
**4th** 198:25
**4:01** 266:12
**4:12** 266:17
**4:43** 290:3
**4:45** 290:8
**4:47** 291:20
**40** 195:5 250:12
**42** 72:4,20

**5**

**5** 3:20 139:4,11
139:12 167:15
167:23,24
**5F** 170:9,20
**5th** 269:1
**5/22/07** 184:12
**5/23/07** 184:10
184:11
**50** 33:15,18
250:13
**54** 264:24 265:1
265:7,16,25
266:2,9 267:2

268:17
**55** 260:11,15,16
260:17 263:16
263:24
**56** 263:16,16,25
**57** 263:12
**576** 150:2
**577** 150:22
**578** 150:2

**6**

**6** 4:1 149:22
150:1 158:5
**6th** 224:18 231:9
238:17
**60** 137:15 139:16
**6501** 12:11

**7**

**7** 4:7 186:3,8,19
188:25
**7/29** 267:21
**70002** 1:19 2:10
**70002-3760** 2:16
**70113** 2:5
**75** 120:1
**75-01** 3:21
**7501** 3:18 110:15
114:7
**7955** 61:22
283:13 285:13

**8**

**8** 4:9 161:14
163:10,12
187:7,8 188:25
243:17,21
246:19
**8:53** 193:18
**82** 167:18
**820** 2:4
**86** 247:13
**87** 247:11
**88** 247:11
**89** 247:11

**9**

**9** 3:4 4:11
188:16,17
243:21
**9/27/2005**
222:24
**9/6/05** 4:20
202:12 224:11
**9:14** 8:3
**90** 247:12
**900** 2:16
**91** 247:12
**91222-6004**
157:17
**92** 247:12
**93** 101:13 102:8
103:5
**95** 170:18
**96** 49:17 103:6,7
104:18 105:14
**97** 170:19
**9709** 263:11
**98** 4:8,10
**99** 207:1